Hearing Date:  January 26, 2011
Hearing Time:  10:30 a.m.
Place:       Albany, New York

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____x

In re:

HIGHGATE LTC MANAGEMENT, LLC, *et al.*,

                      Debtors.

Chapter 11
Case No. 07-11068 (REL)
(Jointly Administered)

_____x

EF CONSULTING LLC AND
OASIS HC LLC,

               Plaintiffs,

     v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

               Defendant.

Adversary Pro. No. 10-90175

_____x

## **NOTICE OF DEFENDANT'S MOTION TO DISMISS COMPLAINT**

PLEASE TAKE NOTICE THAT, upon the annexed Declaration of Richard

Arrowsmith In Support of Defendant General Electric Capital Corporation's ("GECC") Motion

Pursuant To Bankruptcy Rule 7012(b) To Dismiss Adversary Complaint, dated January 4, 2011,

and all the exhibits annexed thereto, the accompanying Memorandum of Law in Support of

Defendant GECC's Motion to Dismiss Adversary Complaint pursuant to Bankruptcy Rule

7012(b)(6), dated January 6, 2011, and all other papers and proceedings heretofore had herein,

GECC, by its undersigned attorneys, will move this Court on Wednesday, January 26, 2011 (the

"Hearing Date"), before the Honorable Robert E. Littlefield, United States Bankruptcy Court,

Northern District of New York (Albany), James T. Foley Courthouse, 445 Broadway, Suite 330,

Albany, New York 12207, for an Order, pursuant to Rules 12(b)(6) and of the Federal Rules of

Civil Procedure and Bankruptcy Rule 7012(b)(6), granting GECC's Motion to Dismiss (the "Motion") and dismissing the Complaint of Plaintiffs EF Consulting LLC and Oasis HC LLC in its entirety and with prejudice, and for such other and further relief as this Court may deem just and proper.

Responses to the Motion shall be filed and served, so as to be received, by no later than January 21, 2011 at 4:00 p.m.

Dated: Garden City, New York
January 6, 2011

MORITT HOCK & HAMROFF LLP

By:/s/_____

*Marc L. Hamroff*
Marc L. Hamroff
William P. Laino
Theresa A. Driscoll

400 Garden City Plaza
Garden City, New York 11530
(516) 873-2000

*Attorneys for Defendant General Electric Capital Corporation*

To:  Abraham J. Backenroth
Mark Frankel
Backenroth Frankel & Krinsky LLP
489 Fifth Avenue
New York, NY 10017

*Attorneys for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

In re:                                                    Chapter 11

HIGHGATE LTC MANAGEMENT, LLC                              Case No. 07-11068 (REL)

                    Debtor.

-------------------------------------------------------------------x

EF CONSULTING LLC and OASIS HC LLC,          Adversary Case No.

                  Plaintiffs,

       -against-

GENERAL ELECTRIC CAPITAL CORPORATION,

                  Defendant.

-------------------------------------------------------------------x

## DECLARATION IN SUPPORT OF DEFENDANT'S MOTION PURSUANT TO BANKRUPTCY RULE 7012(B) TO DISMISS ADVERSARY COMPLAINT

STATE OF MARYLAND    )
                        ss.:
COUNTY OF MONTGOMERY)

      RICHARD ARROWSMITH, pursuant to 28 U.S.C. §1746, declares as follows:

      1.     I am Senior Vice President of General Electric Capital Corporation

("GECC"), defendant in this adversary proceeding. I have been employed in my present

position since May, 2001. My duties include the management and workout of GECC

loans, including the loans to Highgate Manor Group, LLC and Highgate LTC

Management, LLC (collectively "Highgate" or the "Debtors"), which are the Debtors in

this jointly administered bankruptcy proceeding. I am personally familiar with the facts

set forth below, having been personally involved in the workout of the original Revolving

Credit Loan and Security Agreement (the "Revolver" or "LSA") between GECC, as Lender, and Highgate and another, as Borrowers; the commencement of the foreclosure action against Highgate and others in the Supreme Court of the State of New York, Rensselaer County; the negotiation with and appointment of Long Hill Alliance Company ("Long Hill") as original State Court Receiver; the negotiation and implementation of the Cash Collateral Order of this Court; the negotiation of the Purchase and Sale Agreement between Plaintiff Oasis HC LLC ("Oasis") as Purchaser and the Trustee of the Debtors' bankruptcy estate, as Seller; the negotiation and implementation of the Substitute Receivership Order appointing Plaintiff EF Consulting LLC ("EF" or "Substitute Receiver") (collectively with Oasis, the "Plaintiffs") as Substitute Receiver and the implementation of the Revolver during the Substitute Receivership. Based on my own knowledge and all the pleadings, court orders and documents in my file, I make this Declaration in support of GECC's motion pursuant to Bankruptcy Rule ("BR") 7012(b) and Federal Rule of Civil Procedure ("FRCP") 12(b)(6) for an order dismissing the Adversary Complaint filed in this proceeding for failure to state a claim on which relief can be granted. For the reasons set forth below and in the accompanying Memorandum of Law in Support of Defendant General Electric Capital Corporation's Motion Pursuant to Bankruptcy Rule 7012(b) to Dismiss The Adversary Complaint ("Defendant's Mem."), GECC's motion should be granted in its entirety.

## BACKGROUND

2.     I am confident that the Court is fully familiar with the events leading up to

the filing by the Debtors of this Chapter 11 proceeding and GECC's critical role in

funding and preserving the continued operations of the Debtors' four nursing home

facilities in upstate New York (the "Facilities") on which GECC held a first priority lien,

as well as GECC's role in carving out from the proceeds of sale of the Facilities millions

of dollars for payment of professional fees, administrative claims and distribution to

unsecured creditors. It is important, however, to highlight certain events both in this

Court as well as in the State Court which are referred to in the Adversary Complaint,

albeit with little analysis or understanding, and which, when fully analyzed, demonstrate

that Plaintiffs' Adversary Complaint should be dismissed. A true copy of the Adversary

Complaint is annexed hereto as Exhibit "1".

3.     The touchstone of each of Plaintiffs' claims in their Adversary Complaint

is the erroneous notion that under the Substitute Receivership Order ("SRO") entered by

the Supreme Court, Rensselaer County, appointing Plaintiff EF Substitute Receiver for

the Debtors' Facilities, GECC was obligated to make available to the Substitute Receiver

100% of the accounts receivable due the Debtors and the Facilities which were collected

on behalf of GECC, as secured lender, pursuant to the Revolver. Plaintiffs' notion is

erroneous because the SRO did not, as Plaintiffs suggest, modify the Revolver which,

consistent with several prior orders of this Court, as well as of the State Court, permitted

GECC to use the accounts receivable collected on its behalf to pay down fees, accrued

interest and principal on the Revolver so that new credit could be made available for

continued operation of the Facilities.

## OPERATION OF THE REVOLVER

4.     In order to properly analyze the legal sufficiency of Plaintiffs' Adversary

Complaint as it relates to the prior orders of this Court and the State Court, it is necessary

to understand how the Revolver worked. On May 26, 2005, GECC, as Lender, entered

into a Loan and Security Agreement ("LSA") with Highgate and Guilderland LTC

Management, LLC, as Borrowers, pursuant to which GECC made available to the

Borrowers a revolving loan in a maximum amount of $4,000,000 (Exhibit "2", ¶2.1(a)).

A true copy of the LSA is annexed hereto as Exhibit "2". The loan was unconditionally

guaranteed by certain principals of the Borrowers and secured by a first priority lien and

security interest in, among other things, "all of Borrower's Accounts, and all of

Borrower's money, ... deposit accounts" and "all of Borrower's now owned or hereafter

acquired deposit accounts into which Accounts or the proceeds of Accounts are

deposited, including the Lock Box Account." (Exhibit "2", ¶¶3.1(a)(c)). "Account" is

defined in the LSA as "any right to payment or a monetary obligation" and "any account

receivable, any health-care insurance receivable ... any payment intangible ... and all

other rights to payment of every kind and description..." (Exhibit "2", ¶1.1.)

5.     The loan was administered pursuant to ¶2.2 of the LSA "and on such other

basis as Lender may reasonably determine." (Exhibit "2", ¶2.1(a).) The actual loan

amount depended upon the availability in the "Borrowing Base" and loan requests made

by the Borrowers by means of Borrowing Certificates. (Id.) "Advances ... [were] made

against a borrowing base equal to eighty-five percent (85%) of Qualified Accounts..."

(Exhibit "2", ¶2.1(d).) A "Qualified Account" is an Account generated in the ordinary

course of Borrower's business for Medical Services "which lender, in its sole credit

judgment, deems to be a Qualified Account." (Exhibit "2", ¶1.51.) Among other things, Accounts over 150 days past due or not payable to Borrowers directly from Medicare/Medicaid or a commercial insurer are not "Qualified Accounts." (Id.)

6. According to the LSA, two days before the proposed borrowing, the Borrower was to give Lender notice of its intention to borrow, specifying the amount to be borrowed and the date of borrowing. Id. ¶2.2(a). The Lender would then make advances based on 85% of Qualified Accounts and other "liquidity factors" it deemed appropriate in its sole discretion, up to the $4,000,000 loan maximum. (Exhibit "2", ¶2.1(d)). Under ¶2.2(a) of the LSA, as interest or any other Obligation became due, the Borrower was deemed to have made a request for a Revolving advance and to have authorized Lender to disburse the proceeds of such revolving credit loan to payment of such interest or Obligation.

7. Section 2.3 of the LSA spells out how the Borrowers' accounts receivable were to be collected and applied. Borrowers were required to establish and maintain a lockbox with a specific bank (originally Manufacturer Travelers Trust Company and later Citizens Bank, Albany, New York). Borrowers were required to execute a Lockbox Agreement in the form annexed to the LSA. On October 24, 2005, the Borrowers, GECC and Citizens Bank entered into a Lockbox Account Agreement whose terms mirror the procedures set forth in Section 2.3 of the LSA. A true copy of the Lockbox Agreement is annexed hereto as Exhibit "3". (As discussed in ¶16 below, Plaintiff EF is a signatory to the Lockbox Agreement).

8. Under those agreements, Borrowers were to ensure that all collection of Accounts (not just Qualified Accounts) were paid directly from their Account Debtors

into the Lockbox (essentially a P.O. Box to which Citizens Bank had exclusive access). (Exhibit "2", ¶2.3(a); Exhibit "3",¶4). Citizens would then open all of the mail sent to the Lockbox and credit to the various Borrower accounts, designated as "Lockbox Accounts," all funds collected. (Exhibit "3",¶4 (a)(b)). All funds credited to the designated Borrower Lockbox Accounts were then "immediately transferred into a depository account maintained by Lender at Deutsche Bank" (the "Concentration Account"). (Exhibit "2", ¶2.3(c); Exhibit "3",¶(c)(d)). Under ¶2.3(c) of the LSA, on a daily basis GECC "shall apply ... all funds transferred into the Concentration Account pursuant to the section 2.3 to reduce the outstanding indebtedness under the loan (in accordance with section 2.2(d)) and all future revolving credit loan advances and other extensions of credit...." LSA ¶2.2(d) provides that all collections from the Concentration Account are to be applied first to fees, costs and expenses, then to interest due and then to principal on the Revolver. Section 2.4 of the LSA sets forth the monthly and audit fees due. The LSA further provides that Principal shall be paid upon receipt "by Borrower or Lender of any payment or proceeds from any Collateral." (Exhibit "2", ¶2.5). Contrary to Plaintiffs' allegations in paragraphs 30 and 33 of their Adversary Complaint that the Lockbox Agreement was simply "a mechanism for GE to ensure that all accounts receivable were properly collected" (emphasis in original) and that it did "not in any way permit GE to utilize any of Highgate's income to pay principal, interest or fees," the express language of the Lockbox Agreement and Revolver clearly and unambiguously demonstrate that the Lockbox was not just some bookkeeping convenience for the Borrower and that GECC was indeed permitted to use the collections it received to reduce the debt due it.

9.     If, as Plaintiffs allege, a lender was obligated to make available to the borrower 100% of collections, there would be no need for a lockbox. Moreover, the principal due the lender would never be reduced until payment at termination of the "revolver" and interest and fees would simply continue to grow unabated. In short, under Plaintiffs' view, the secured "revolving" loan would be turned into a term loan, the security for which would depend solely on the state of accounts receivable at termination.

10.     It should be apparent from the above that while the Revolver and Lockbox Agreements remained in effect, all accounts receivable due from the operations of the Facilities were to be transmitted via the lockbox to GECC, which would then be permitted to reduce the outstanding revolver debt due it, thereby making additional funds available up to a maximum of $4,000,000 to the Borrowers pursuant to a formula based on 85% of Qualified Accounts. It should also be apparent that while these agreements were in effect, neither the original Borrowers nor their successors had the right to collect or demand 100% of any monies due the Facilities.

### THE FORECLOSURE ACTION

11.     On October 17, 2006, GECC commenced an action in the Supreme Court of the State of New York, Rensselaer County, to foreclose its real property fee and leasehold mortgages on the four nursing home facilities owned and operated by Highgate. On November 29, 2006, the State Court issued an Order Appointing Receiver in which it appointed Long Hill as Receiver of the four premises (the "Mortgaged Premises") with authority to operate the Facilities. A true copy of the Order Appointing Receiver (the "Long Hill Order") is annexed hereto as Exhibit "4". It is referred to on this motion to

7

dismiss because it is referred to in and is the genesis of the SRO, which, in turn, is explicitly alleged as the basis for Plaintiffs' claims herein.

12.     Like the later SRO, the Long Hill Order provided that Long Hill was to pay receivership expenses out of collections, but that nothing in the Long Hill Order would modify or abrogate the lockbox arrangement whereby the Facilities' accounts receivable were collected for the benefit of GECC so that GECC could pay down old debt and continue to make new funds available to Long Hill to run the Facilities. (See Exhibit "4", pp. 17-18). Unlike the later SRO, however, Long Hill was not required to pay any expenses out of its own pocket, and in the event receivership expenses exceeded receivership income, GECC was required to make up any shortfall pursuant to a written Shortfall Agreement. (See Exhibit "4", pp. 7, 9, 16). A true copy of the Shortfall Agreement is annexed hereto as Exhibit "5". Like the later SRO, the Long Hill Order provided that any costs and expenses incurred by GECC, including payment under the Shortfall Agreement, were to be added to the lien of the mortgages held by GECC and were to be recovered "as provided in said Mortgages and the loan documents secured thereby or executed in connection therewith." (See Exhibit "4", p. 22) (emphasis added).

13.     Thus, as a result of the Shortfall Agreement, under the Long Hill Order, the Facilities' accounts receivable continued to be collected pursuant to the Revolver, but, in the event the Facilities' operating expenses exceeded GECC's resupply of funds to Long Hill, GECC was obligated to provide additional funds necessary to close the gap.

## THE CASH COLLATERAL ORDER

14.     On April 17, 2007, Highgate filed for protection under Chapter 11 of the Bankruptcy Code and a trustee (the "Trustee") was appointed to jointly administer the

estates of both Debtors. On May 14, 2007, this Court issued its Final Order Authorizing

the Debtors to (A) Borrow Money Pursuant to Sections 105, 301, 326(c)(1); 364(c)(2),

364(c)(3) and 364(e) of the Bankruptcy Code; and (B) use Cash Collateral on a

Consensual Basis and (C) Granting Adequate Protection and Related Relief Pursuant to

Section 105, 361 and 363 of the Bankruptcy Code (the "Cash Collateral Order"). A true

copy of the Cash Collateral Order is annexed hereto as Exhibit "6". On May 18, 2007,

this Court continued Long Hill as Receiver of the Facilities, which were property of the

Debtors' bankruptcy estate (the "Continuation Order"). A copy of the Court's

Continuation Order continuing Long Hill as Receiver is annexed hereto as Exhibit "7".

In its Cash Collateral Order, this Court specifically found that

> "The access of the Receiver to sufficient working capital
> and liquidity through the incurrence of new indebtedness
> for borrowed money and other financial accommodations is
> vital to the health and welfare of the patients and
> Receivership of the Facilities, the preservation and
> maintenance of the going concern values of the Debtors
> and to a successful reorganization of the Debtors."

(See Exhibit "6", p. 6, ¶F). The Cash Collateral Order further provided that "The

Receiver is hereby authorized to use Cash Collateral and borrow money in accordance

with the terms of the Order, the Loan Documents, the Receivership Order and the

Shortfall Agreement..." (Id. p. 7, ¶12) (emphasis added). Pursuant to the Continuation

Order, Long Hill was directed to "continue to keep in place all account and lock-box

arrangements and deposit all funds consistent with the credit facilities and loan

documents in existence between the Debtors and GECC." (See Exhibit "7", ¶6). In

recognition that Long Hill would continue to deposit accounts receivable in the Citizen's

Bank lockbox and GECC would continue to use those collections to pay down the existing revolving loan, the Cash Collateral Order also provided that

> "no post-petition obligation, <u>payment</u>, <u>transfer</u> or grant of security under the Loan Documents, the Shortfall Agreement, or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under an applicable law..."

(<u>Id</u>. p. 8) (Emphasis added).

## THE PURCHASE AGREEMENT

15.     On August 12, 2008, the Trustee entered into a Purchase Agreement for the sale of the Mortgaged Premises and the Facilities to Oasis following an auction sale. A true copy of the Purchase Agreement, which was approved by subsequent Order of this Court, is annexed as Exhibit "8". Pursuant to the Purchase Agreement, the Purchaser, Oasis, or its designee, was to apply in the State Court for appointment as Substitute Receiver to replace Long Hill. (<u>See</u> Exhibit "8", p 3, Fifth Whereas Clause). The Purchase Agreement further provided that the Purchaser or its Receivership Designee could use accounts receivable by establishing and/or continuing the revolving credit facility with GECC and that "Purchaser shall comply with all aspects of the existing Revolving Credit Facility with [GECC] including the establishment of lockbox accounts and executing such other documents as [GECC] may reasonably require." (<u>See</u> Exhibit "8", ¶1C and ¶5.1 (c)). Pursuant to the Order of the Court approving the Purchase Agreement, upon entry of the SRO, the Substitute Receiver "shall be deemed to have replaced The Long Hill Alliance Company and/or Debtors as signatory and responsible person on the Lockbox currently maintained by Citizens Bank...". <u>See</u> Exhibit "9" at ¶12.

## THE SUBSTITUTE RECEIVERSHIP ORDER

16.    On November 3, 2008, Oasis's designee, Plaintiff EF, was appointed Substitute Receiver to replace Long Hill. Although Plaintiffs refer often to the SRO in their Adversary Complaint (See, e.g., Adversary Complaint ¶¶6, 15-29, 46), they do not annex a copy. A true copy of the SRO is annexed hereto as Exhibit "10". The Ordering paragraph at p. 21 of the SRO specifically states that "the Substitute Receiver shall forthwith deposit all monies received by it at the time it receives same in a special account in its own name in RBC Citizens Bank, N.A. or such other bank as GECC shall require ..." The paragraph goes on to state that "Nothing herein is intended to annul, modify or abrogate the lockbox arrangement for the collection and deposits of accounts receivable by the Substitute Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC..." (Emphasis added.)

17.    One significant difference between the Long Hill Order (Exhibit "4") and the SRO (Exhibit "10") was the fact, made explicit in the SRO, that there was no Shortfall or similar Agreement (See Exhibit "10", p. 20). Under the SRO, Plaintiff EF had the obligation to pay all Facility payables out of its own funds (Exhibit "10", pp. 8-9, 11) and GECC had no obligation to fund those payables beyond its obligations under the Revolver. The Substitute Receiver's obligation to fund any shortfalls itself was simply a part of the cost it incurred for purchase of the Facilities.

18.    As can be seen from the above, Plaintiffs' notion that they were entitled to 100% of all accounts receivable owed to the Facilities is flatly incorrect because it ignores the operation of the Revolver and Lockbox Agreements, which limited Plaintiffs' access to Highgate's accounts receivable and which were specifically preserved by this

11

Court's Cash Collateral Order, its Continuation Order, the Purchase Agreement and the SRO.

## PLAINTIFFS' BORROWINGS UNDER THE REVOLVER

19.    Not only should it be clear that Plaintiffs' claim that they were entitled to 100% of the Facilities' accounts receivable is dead wrong, but it should also be clear that Plaintiffs <u>know</u> that it is wrong. During the 21 months Plaintiff EF operated as Substitute Receiver, it submitted to GECC, almost on a daily basis, 301 Borrowing Certificates pursuant to which it sought new loans in the aggregate amount of $72,195,736.40 under the Revolver with GECC. A true copy of an Excel spreadsheet, prepared in the ordinary course of GECC's business, showing all of the Substitute Receiver's borrowings is annexed hereto as Exhibit "11". Annexed hereto as Exhibit "12" are three Borrowing Certificates dated November 10, 2008 (first borrowing), August 3, 2009 (an intermediate borrowing) and August 26, 20010 (final borrowing) submitted by Plaintiff EF, which are identical (except for dates and amounts collected and requested) of all of the 301 Borrowing Certificates submitted to GECC by Plaintiff EF.

20.    At the same time as Plaintiff EF was submitting Borrowing Certificates, Citizens Bank was collecting the Facilities' accounts receivable and transmitting them daily to GECC's Concentration Account and GECC was applying the proceeds in the Concentration Account to repayment of the principal, interest and fees due it under the Revolver. A review of the Borrowing Certificates annexed hereto as Exhibit "12" demonstrates that Plaintiffs knew precisely the extent to which GECC was collecting and applying the Facilities' accounts receivable. For example, on the email from GECC to Brendon Tanner and Gerald Vilaire of EF, preceding the submission of the Borrowing

12

Certificate dated August 3, 2009, GECC indicated that the total availability would be reduced by accrued interest and fees in the amount of $15,666.44 (See also Borrowing Certificate dated August 3, 2009 at line 32). On page 2 of the Borrowing Certificate contained in Exhibit "12" and dated August 26, 2010, signed by Gerald Vilaire, EF's accountant, as of August 26, 2010, the Facilities' gross Medicaid accounts receivable amounted to $4,514,703.11 (line 1). The Borrowing Certificate also shows that gross Medicare receivables amounted to $271,420.19 (line 8) and commercial receivables amounted to $1,676,444.98 (line 15). The total gross billed receivables were thus over $6,461,000, of which less than $5,300,000 were "Eligible Accounts" (lines 5, 12 and 20).

21.  Section III of Borrowing Certificate of August 26, 2010 entitled "Computation of Loan" clearly shows the loan balance since the last Borrowing Base Certificate was $3,409,203.81 (line 30) and that since the last Borrowing Base Certificate, GECC had collected $794,116.52 in accounts receivable (line 31). More importantly, the Certificate shows that GECC applied all of these collections to the Revolver to reduce the loan to $2,616,087.29 (line 33).

22.  On page 3 of the August 3, 2009 Borrowing Certificate, instead of seeking 100% of the $4,655,085.25 of total Eligible Accounts (line 23) or even 100% of the $75,551.66 in accounts collected as of that date (line 31), EF only requested a loan of $59,885.42 (line 43). Similarly, page 2 of the August 26, 2010 Certificate shows that instead of seeking all $794,116.52 in receivables collected by Citizens Bank and applied by GECC (line 31), Plaintiff EF sought to borrow only $285,347.32 (line 34), which represented the total availability at 85% of Eligible Accounts less the current loan balance (line 29 less line 33). Finally, page 3 of the Borrowing Certificate of August 26,

2010, like each Borrowing Certificate before it, contains the acknowledgment by Plaintiff EF that the current loan balance (See Exhibit "12", page 2, line 29) is properly due and that by accepting the requested advance, "Borrower agrees to waive and release Lender from all claims, demands, causes of action (whether known or unknown) based in whole or in part on acts or omissions of Lender as relating to the Loan Agreement." (See Exhibit "12", p. 3, ¶(j)).

23. Plaintiffs submitted their Borrowing Certificates and made these same acknowledgements, not once, but 301 times, over the 21 months of the Substitute Receivership. It is against this background of prior Bankruptcy and State Court orders and Plaintiffs' continual written acknowledgments and releases that the sufficiency of Plaintiff's Adversary Complaint must be judged.

## GECC DID NOT DEFRAUD PLAINTIFFS

24. As the indisputable facts above demonstrate, contrary to Plaintiffs' allegations contained in paragraphs 30 and 33 of their Adversary Complaint, the Lockbox and Revolver were in place and effective throughout the Substitute Receivership and GECC did more, as permitted by the Loan Documents, than simply provide a collection and bookkeeping service for Plaintiff EF. In paragraph 34 of the Adversary Complaint, Plaintiffs admit that the Revolver continued to operate during the Substitute Receivership, but they allege that GECC some how "fraudulently misrepresented to the Substitute Receiver that [GECC] was merely operating the lockbox pursuant to court order and passing through each dollar collected through the lockbox to the Substitute Receiver." (See Adversary Complaint ¶35). Similarly, at paragraph 65 of their Adversary Complaint, Plaintiffs allege that GECC misrepresented "the procedures for

operation of the lockbox" including that "the Line of Credit was still in force and effect" and that GECC "would not retain any funds deposited in the lockbox." This, and similar allegations of fraudulent and/or negligent misrepresentation contained in the Adversary Complaint, are simply and demonstrably false. They are so outrageous that, I am advised, they violate FRCP 11 and BR 9011 and should subject Plaintiffs and/or their counsel to sanctions.

25. First, I wish to bring to the Court's attention that, in addition to being absolutely at odds with the prior orders of this Court and the State Court and Plaintiffs' own actions, Plaintiffs' allegations of fraud and negligent misrepresentation are wholly conclusory and lack any specificity. Nowhere in its 111 paragraph Adversary Complaint do Plaintiffs allege who at GECC made the alleged misrepresentations to the Substitute Receiver; what words were said; when the alleged misrepresentations were made; how and when they were made and who, if anyone, besides the Substitute Receiver, witnessed the alleged statements. I understand from my attorneys that such lack of specificity violates the rules of pleading set forth in FRCP 9(b) and BR 7009(b).

26. However, this complete lack of specificity is not simply a deficiency in pleading. It is symptomatic of the fact that Plaintiffs have avoided pleading with specificity because they cannot plead specifics because no one at GECC would have ever made such alleged misrepresentations. I was the principal contact at GECC who negotiated the Purchase Agreement and Substitute Receivership Order. I can state categorically that I never misrepresented orally or in writing the operation of the Lockbox, GECC's intention to continue the Revolver, or its intention in accordance with the Loan Documents to retain the account collections to pay down the Revolver debt. My

15

staff is highly trained and would never make a loan representation without clearing it with me and I am unaware of anyone at GECC who asked for authority to make, or discussed the possibility of making, the representations contained in Plaintiffs' Adversary Complaint.

27.     More importantly, as discussed above, there is simply no way Plaintiffs could have believed that GECC agreed to pass through, represented that it would pass through or was passing through to EF, dollar for dollar, 100% of the accounts receivable collected through the lockbox when Plaintiffs were submitting hundreds of Borrowing Certificates which clearly demonstrate the contrary. The Borrowing Certificates (Exhibit "12") were executed by Plaintiffs' accountant before submission to GECC. Plaintiffs knew precisely how the lockbox operated and that GECC did indeed retain all of the receivables collected and re-loaned only a portion as requested and acknowledged by Plaintiff.

## GECC NEVER MISAPPROPRIATED
## ANY MONEY FROM PLAINTIFFS

28.     At paragraph 40 of the Adversary Complaint, Plaintiffs allege that GECC "misappropriated" $625,000 from Plaintiffs and then, in an apparent admission of guilt, raised the "Line of Credit" by $500,000. This allegation is a complete distortion of the facts.

29.     GECC did indeed use $625,000 of receivables to pay down principal, interest and fees. Indeed, as Exhibits "11" and "12" above shows, over the course of the Substitute Receivership, GECC used much more in receivables to pay down the Revolver debt due.

30.     Due to the lack of specificity in the Adversary Complaint, it is difficult to know what Plaintiffs are referring to. I can say with certainty that at no time did GECC take Plaintiffs' funds and then give them back or increase the $4,000,000 maximum loan available under the Revolver. What Plaintiff may be alluding to is the fact that from time to time, Plaintiff EF, in violation of the SRO, did not pay all of the Facilities' expenses, such as trade payables and real estate taxes. As a result, due to the Substitute Receiver's serious delinquency, GECC would <u>withdraw</u> loan availability by taking a reserve until the deficiency was rectified.[1] In one such case, in or about June, 2010, GECC released $500,000 in funds it had held in reserve as a result of the Substitute Receiver's failure to pay the Facilities' payables. GECC restored this availability to the $4,000,000 maximum loan availability under the Revolver in consideration for a personal guaranty by one of Oasis's principals to pay the overdue trade debt and the vendors' release of the Highgate estate from liability for those payables. This was not in any sense an increase in the "Line of Credit", but, rather, a release of frozen availability. Under no circumstances was it an admission of wrongdoing by GECC but, rather, prudent husbandry by GECC of its collateral for its benefit and the benefit of Highgate's estate.

31.     At paragraphs 19 and 20 of their Adversary Complaint, Plaintiffs claim that because the SRO at page 25 required the Substitute Receiver to pay GECC interest on its Revolver after payment of certain necessary expenses relating to preservation of the Mortgaged Premises, the only debt due GECC that the Substitute Receiver was

---

[1] Under the terms of the Purchase Agreement, Oasis had the right to walk away from the deal in the event, for example, it did not receive the requisite approval from the New York State Department of Health (Exhibit "8", ¶12.3). In that event, the Substitute Receivership by EF could terminate (Exhibit "10", p. 8). By taking reserves against obligations that the Substitute Receiver was not meeting, GECC was prudently ensuring that in the event the Substitute Receivership terminated, the Facilities were not left with a mountain of unpaid trade debt.

authorized to pay GECC was accrued interest and then only after "all" Facilities' expenses had been paid (See Exhibit "1", ¶20). Plaintiffs' distortion of the SRO is apparent.

32.    First, the provision of the SRO cited by Plaintiffs at ¶19 of their Adversary Complaint on its face does not address "all" of the Facilities' expenses. It only addresses three types of expenses -- fire loss and liability insurance, taxes and utilities and municipal requirements. Clearly, the Facilities had many other expenses not included in this portion of the SRO, such as salaries, benefits, medical services and medicine costs, equipment costs, transportation costs, professional costs and the like. A fair reading of this portion of the SRO indicates that Plaintiffs were obligated to ensure payment of those expenses critical to the integrity of the real property which was GECC's principal security and against which GECC had, independent of the Revolver, loaned Highgate $23,500,000. Contrary to the Plaintiffs' assertions, there is nothing is the SRO that requires that "all" Facilities' expenses be paid before payment of Revolver debt due GECC.

33.    Second, nothing in that portion of the SRO cited by Plaintiffs at ¶19 of their Adversary Complaint purports to limit payment of other debts due GECC. It is my understanding that in a typical foreclosure case where a receiver is appointed, a foreclosure court does not provide for payment of past due principal, which is to be paid out of the proceeds of sale. Nor does a foreclosure court provide for additional loans by the mortgagee to the receiver and payment of principal and interest or new debt. Under the Substitute Receivership, however, the Substitute Receiver in this case agreed to and in fact made repeated requests for Revolver advances pursuant to the Purchase

Agreement and Court orders directing continuation of the Lockbox Agreement, which

agreements provided for repayment of principal, interest and fees.

34.     At paragraph 54 of their Adversary Complaint, Plaintiffs claim that GECC

wrongfully took a retroactive Medicaid rate adjustment of $610,218.18 due the Facilities.

At paragraph 59 of the Adversary Complaint, Plaintiffs acknowledge that the Medicaid

rate adjustment check was deposited in the lockbox. Thus, for the reasons set forth at

length above, the rate adjustment check, like all other receivables on which GECC had a

first priority lien, was properly used to pay the Revolver debt pursuant to the Orders of

this Court and the State Court.

35.     There is yet another reason Plaintiffs were never entitled to this, or any

other Medicaid retroactive adjustment receivable. Pursuant to the Purchase Agreement,

Plaintiff Oasis purchased, among other things, all of the Debtors' "ordinary course

accounts receivables" in existence "at the Closing". (See Exhibit "8", ¶1A(iv)). Oasis

did not purchase, and the Trustee did not sell, the Debtors' accounts receivable which

existed prior to Closing and which, when collected prior to Closing, became cash or cash

equivalents and were no longer accounts "receivable". Second, Section 1B (viii) of the

Purchase Agreement specifically excludes from the assets to be purchased at Closing,

> "All rights to refunds, settlement, retainages, holdbacks,
> and/or for retroactive adjustments, to the extent applicable
> to the period ending on or before the Closing, arising in
> connection with the Sellers' Medicare or Medicaid provider
> numbers and related participation or any other third party
> healthcare payer system..."

See Exhibit "8", ¶1B(vii) (emphasis added). This is simply another demonstration of the

false and frivolous nature of the allegations which permeate Plaintiffs' Adversary

Complaint.

36. Accompanying this Declaration is Defendants' Memorandum of Law which, based on the above facts and applicable law, demonstrates that Plaintiffs' claims are legally insufficient and wholly without merit.

37. I declare under penalty of perjury that the foregoing is true and correct.

WHEREFORE, GECC respectfully requests that the Adversary Complaint filed in this proceeding against GECC be dismissed in its entirety for failure to state a claim. Executed on January 4, 2011.

/s/_____
RICHARD ARROWSMITH

188236v1

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    ) ss:

COUNTY OF NASSAU    )

    Joyce DeSousa, being duly sworn, deposes and says:

    I am not a party to the action, am over 18 years of age and reside at Whitestone, New York.

    On the 6th day of January, 2011, I served a true copy of the Notice of Defendant's Motion to Dismiss Complaint and Declaration of Richard Arrowsmith in Support of Defendant's Motion Pursuant to Bankruptcy Rule 7012(b) to Dismiss Adversary Complaint with Exhibits "1" - "12" in a securely sealed postpaid wrapper addressed to the last known address of the addressee(s) as indicated below by in an official depository under the care and custody of the United States Postal Service within the State of New York as follows:

Abraham Backenroth, Esq.
Backenroth Frankel & Krinsky LLP
Attorneys for Plaintiffs
489 Fifth Ave., 28th Fl.
New York, NY 10017


/s/_____
JOYCE DESOUSA


Sworn to before me this
6th day of January, 2011


/s/_____
Dagmar E. Rowinsky
Notary Public, State of New York
No. 4789327
Qualified in Nassau County
Commission Expires 10-31-13


190077v1