EXHIBIT "1"

Abraham Backenroth (AB - 1989)
Backenroth Frankel & Krinsky LLP
489 Fifth Avenue
28th Floor
New York, NY 10017
(212) 593-1100
(212) 644-0544 (fax)
abackenroth@bfklaw.com
*Attorneys for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------x

In re:                                      Chapter 11

HIGHGATE LTC MANAGEMENT, LLC,               Case No: 07-11068 (REL)

                Debtor,
-------------------------------------------------x
EF CONSULTING LLC and OASIS HC LLC,         Adversary Case no.

             Plaintiffs,

            v.                        **COMPLAINT**

GENERAL ELECTRIC CAPITAL
CORPORATION,

            Defendant,
-------------------------------------------------x

## INTRODUCTION

1.      This is an action arising from a lender's manipulation, misappropriation and

misuse of its unlawfully held power over the assets of a bankrupt debtor. Defendant, a lender

and mortgage-holder, was the debtors' major creditor. Plaintiffs, the court-appointed receiver

and purchaser of the debtor's assets, were misled into working with defendant in order to

maintain the assets of the debtors while their property was in foreclosure and effect the orderly

{038665}               1

purchase of the debtors' estate from bankruptcy. Defendant, instead of working together with plaintiffs pursuant to court order, misused its position to defraud and misappropriate millions of dollars from the debtors' estate, leaving plaintiffs with millions of dollars of debt.

## PARTIES

2.     Plaintiff EF Consulting, LLC ("EF" or the "Substitute Receiver"), is a New York Limited Liability Company and the substitute receiver in this action. EF was appointed on November 3, 2008 as the substitute receiver over the assets of the debtors by the New York State Supreme Court in a state foreclosure action, entitled *General Electric Capital Corp. v. Highgate Manor Group, LLC et al*, Rennselaer County, Index No. 2193393-06 (the "foreclosure action").

3.     Plaintiff Oasis HC, LLC ("Oasis") is a New York Liability Company. As discussed in more detail below, Oasis purchased, pursuant to the order of this Court, the assets of the debtors in this action.

4.     Defendant General Electric Capital Corporation ("GE") is a Connecticut corporation headquartered in 3135 Easton Turnpike, Fairfield Connecticut, 06828, with offices at 2 Bethesda Metro Center, Suite 600, Bethesda, Maryland 20814.

## JURISDICTION AND VENUE

5.     This is a core proceeding arising from the Chapter 11 proceeding entitled *In re: Highgate LTC Management, LLC*. Case No. 07-11068 (REL). Jurisdiction is proper pursuant to 28 U.S.C. 157(2)(A), (C), (M), (N), and (O). Venue is proper based on 28 U.S.C. §§ 1391, 1408, and 1409 because this action arises from a bankruptcy petition filed in this Court and the activities alleged herein occurred substantially in this district.

{038665}

## BACKGROUND

6.     EF was appointed, pursuant to an order of the court on motion from GE in the foreclosure action, dated November 3, 2008 (the "Substitute Receiver Order"), to act as substitute receiver of Highgate LTC Management, LLC ("Highgate LTC") and Highgate Manor Group, LLC ("Highgate Manor," collectively with Highgate LTC, "Highgate"). As provided for in the Receiver Order, EF has the powers accorded to a receiver appointed in an action to foreclose a mortgage on real property and in equity, and the powers, duties, rights and obligations of a receiver appointed under Section 2810(2) of the New York State Public Health Law.

7.     Highgate LTC was the operator of three nursing homes in the Albany region and one in the City of Cortland with a total of over 500 beds (the "Facilities"). Highgate Manor owned the real property upon which the Facilities are located (the "Properties").

8.     On May 26, 2005, Highgate and GE entered into four agreements: (a) a Loan and Security Agreement pursuant to which GECC provided Highgate with a revolving line of credit (the "Line of Credit") of up to $4,000,000.00 for the operation of the Facilities; (b) a Lockbox Account Agreement, to facilitate the operation of the Line of Credit (the "lockbox agreement"); and (c) a Loan Agreement, pursuant to which GECC provided Highgate up to $23,500,00.00 for refinancing of the Properties, which loan is secured by the Mortgages (collectively the "Loan Documents").

9.     In April 2006, Highgate defaulted on it its obligations to GE by failing to make payments when due under the Loan Documents. On or about October 11, 2006, GE commenced the foreclosure action against Highgate, seeking, among other things, to foreclose on the

Mortgages and, in the interim, to have a receiver appointed to operate and manage Highgate's businesses.

10. By an order dated November 29, 2006, the New York State Supreme Court appointed The Long Hill Alliance Company ("Long Hill") as the receiver of the Properties and the Facilities.

11. On April 16, 2007, Highgate filed these joint petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. By order dated August 28, 2008, the Court-appointed bankruptcy trustee received the approval of this Court to sell most of Highgate's assets (the "Final Sale Order"). The Final Sale Order provides that Oasis will be the purchaser of the assets of Highgate and that EF replaces Long Hill as receiver.

12. On or about August 30, 2010, Oasis closed on its purchase of Highgate's assets.

13. Pursuant to the Final Sale Order, the Substitute Receiver (and the purchaser) was responsible for any accounts payable owed at the time of the sale.

14. At the closing the Facilities owed over $10 million to creditors. Pursuant to the Final Sale Order, plaintiffs were responsible for these shortfalls. As discussed below, the existence of much of the shortfall was due to GE's wrongful manipulation and perversion of this Court's instructions and its duties under New York law.

**The Substitute Receiver Order**

15. The state court order gave the Substitute Receiver the power to collect all income and account receivables of Highgate and to pay all trade creditors, accounts payable and expenses of the properties and facilities necessary for their continued operation.

{038665}

16.     The Substitute Receiver was given sole control over all bank accounts containing assets of Highgate. As stated in the Order:

> The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder, including, in Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes...

P. 15.

17.     All incoming payments were ordered to go directly towards expenses of the properties and facilities:

> The Substitute Receiver shall collect incoming payments from all sources *and apply them to the costs incurred in the performance of its functions and obligations hereunder.*

P. 16 (emphasis added).

18.     Under the Substitute Receiver Order, only after *all* expenses were paid could the remaining funds be applied to accrued interest under the Line of Credit.

19.     The Substitute Receiver Order provided:

> That the Substitute Receiver be, and hereby is, authorized and directed: (a) to keep the Mortgaged Premises insured against loss or damage by fire and in repair; (b) to pay the taxes, assessments, water charges, sewer rents, electric bills, and other charges on the Mortgaged Premises, in a manner consistent with the provisions of this Order; (c) to comply with all requirements of any municipal department or authority having jurisdiction over the Mortgaged Premises; (d) to procure, if necessary, such insurance and liability insurance against claims for losses or injuries to persons and property, which may be asserted by persons on, near or about the Mortgaged Premises, as may be necessary; and (e) to pay to Plaintiff monthly, *out of funds remaining in the custody of the Substitute Receiver,* all interest accrued on the Revolving Credit

{038665}

5

> Note, provided that any unpaid interest shall continue to accrue on the Real Estate Loan, Senior Promissory Note and Revolving Credit Documents secured by its Consolidated and Leasehold Mortgages.

P. 25 (emphasis added).

20.     This provision of the order clearly indicates that GE was: (i) only entitled to "funds remaining" after the Substitute Receiver first discharged its duty to pay all of Highgate's operating costs and expenses; and (ii) was to be paid by the Substitute Receiver with funds in its custody.

21.     Instead, GE by its fraud and unlawful actions took whatever funds it wanted without regard to whether the Substitute Receiver was able to pay Highgate's operating expense, which under the order (and New York law) had first priority on the funds collected by the Substitute Receiver.

22.     The order does not allow the payment of *any* money to GE aside from accrued interest under the Line of Credit. There is no provision allowing for the payment of any fees, expenses or principal to GE.

23.     This means that GE was not permitted to use the lockbox funds and any of Highgate's funds to pay down the line of credit.

24.     At the time of GE's transfers, Highgate still had millions of dollars in outstanding operating expenses.

25.     Further, under the Order, GE was not permitted to exert control over any of Highgate's assets. The Substitute Receiver Order provides:

> *The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder,* including, in

{038665}

6

> Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes...

P. 15 (emphasis added).

26.     The Substitute Receiver Order gives the Substitute Receiver the authority to utilize *all* of the facilities' accounts receivable to meet its obligations.

> That the Substitute Receiver *shall be entitled to utilize all accounts receivable* cash existing at the Facility as of the date of the commencement of its appointment as receiver to meet Substitute Receiver's obligations hereunder except that funds held in escrow by Long Hill for professional fees shall not be deemed to be cash existing at the Facility but shall be turned over by Long Hill to be held in escrow by counsel to the Trustee.

P. 9 (emphasis added).

27.     GE, by taking funds from the lockbox account, violated the Substitute Receiver Order and 11 U.S.C. 362.

### The Lockbox Agreement

28.     Under the terms of the Substitute Receiver Order, the Court ordered that:

> The Substitute Receiver shall forthwith deposit all monies received by it at the time it receives same in a special account in its own name as Substitute Receiver in RBS Citizens Bank, N.A.,...[n]othing herein is intended to amend, modify or abrogate the lock box arrangement for the collection and deposit of accounts receivable by the Substitute Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC.

P. 21-22.

{038665}

29.     The "lock box arrangement" referred to by the court is embodied by a Lockbox Account Agreement (the "Lockbox Agreement") between GE, Highgate and Manufacturers and Traders Trust Company.

30.     The Lockbox Agreement, like most such agreements, is simply a *mechanism* for GE to ensure that all accounts receivable are properly collected.

31.     The Lockbox Agreement provides that all accounts receivable collected by the lockbox are placed in a "Concentration Account" designated by GE.

32.     Under the Lockbox Agreement, Highgate has the explicit authority to modify this arrangement.

> Company may modify these directions by written notice to Bank and Lender, provided that such a modification shall not become effective until ten (10) business days after receipt by Bank and Lender of such notice by facsimile or overnight delivery service as the addresses or facsimile numbers shown in Section 12 below.

P. 3.

33.     The Lockbox Agreement does not in any way permit GE to utilize any of Highgate's income to pay principal, interest or fees.

## GE's Fraudulent Diversion and Conversion of Highgate's Assets

34.     When the Substitute Receiver was appointed, GE continued to operate the lockbox as if nothing had happened and Highgate was still a compliant borrower. GE continued to take the lockbox funds as if it was a dollar-for-dollar pay down of the outstanding money owed under the line of credit.

35.     GE took control of the lockbox funds by misrepresenting its intentions in controlling the lockbox. GE fraudulently misrepresented to the Substitute Receiver that it was

{038665}

8

merely operating the lockbox pursuant to court order and passing through each dollar collected through the lockbox to the Substitute Receiver.

36.    In furtherance of this scheme, after misappropriating the lockbox funds, GE on many occasions made available a similar amount of money under the Line of Credit which the Substitute Receiver could withdraw to pay out expenses.

37.    GE required that the Substitute Receiver formally request funds from GE as if the Substitute Receiver was somehow a borrower and the line of credit agreement was in full force and effect.

38.    GE's taking of funds from the lockbox and then providing other funds to the Substitute Receiver breached the Substitute Receiver Order, New York law and Federal Bankruptcy law.

39.    Once in control of the Substitute Receiver's funds, GE unlawfully manipulated the lockbox and converted the funds therein by taking money as its alleged expenses and interest on a regular basis—all the while misleading the Substitute Receiver as if it was maintaining the status quo and operating the lockbox pursuant to court order.

40.    As GE's scheme progressed, instead of just skimming some of the lockbox money as expenses and interest (although not entitled to anything), GE took $500,000 in principal and an additional $125,000. After initially refusing, GE eventually raised the line of credit to reflect the $500,000 it misappropriated, although it never returned all of the Principal that it took in and interest and "fees."

**GE Wrongfully Misappropriated Highgate's**
**Funds To Pay Down The Line of Credit**

41.    On April 16, 2007 (the "Petition Date"), Highgate filed joint petitions pursuant to Chapter 11 of the Bankruptcy Code.

42.    Upon information and belief, on the Petition Date, Highgate owed GE $3,492,795.41 for the Line of Credit.

43.    Since the Petition Date, GE has taken Highgate's income and paid down the Line of Credit in the amount of $785,561.04.

44.    Upon information and belief, GE never moved the Bankruptcy Court and the Bankruptcy never entered an Order to lift the automatic stay in order to permit the repayment of the Line of Credit in whole or in part to GE.

45.    Thus, GE, in violation of the automatic bankruptcy stay (11 U.S.C. § 362) and the Substitute Receiver Order, used funds belonging to the Substitute Receiver in order to pay down the line of credit even though: (i) GE was not entitled to any payments while a receiver was in place and there were still outstanding expenses on the facilities; (ii) GE was prohibited from collecting any payments from Highgate's funds during the pendency of its bankruptcy; and (iii) GE was prohibited from collecting or disbursing principal on the line of credit because the line of credit was frozen by virtue of Highgate's default under the terms of the Line of Credit Agreement and Highgate's bankruptcy.

**GE Wrongfully Misappropriated Highgate's**
**Funds To Pay Itself Purported Fees**

46.    The Substitute Receiver Order did not permit GE to take Highgate's funds and income to pay GE fees.

{038665}

47.    Upon information and belief since the entry of the Substitute Receiver Order, GE has taken Highgate's income and paid itself purported fees in the amount of $843,467.39.

48.    Also, GE never provided any detail or information concerning the purported fees.

49.    Thus, GE, in violation of the automatic bankruptcy stay (11 U.S.C. § 362) and the Substitute Receiver Order, used funds belonging to the Substitute Receiver in order to pay itself undefined "fees" under the line of credit even though: (i) GE was not entitled to any payments while a receiver was in place and there were still outstanding expenses on the facilities; (ii) GE was prohibited from collecting any payments from Highgate's funds during the pendency of its bankruptcy; and (iii) GE was prohibited from collecting payments on the line of credit because the line of credit was frozen by virtue of Highgate's default under the terms of the Line of Credit Agreement and Highgate's bankruptcy.

**GE Wrongfully Misappropriated Highgate's**
**Funds To Pay Itself Interest**

50.    The Substitute Receiver Order permitted GE to be paid interest on the Line of Credit only after *all* expenses were paid.

51.    The Substitute Receiver did not pay all expenses and owed significant payables.

52.    Upon information and belief, since the entry of the Substitute Receiver Order, GE has taken Highgate's income and paid itself purported interest in the amount of $845,709.90.

53.    GE was not permitted to receive any interest on the Line of Credit because the Receiver did not have any surplus funds beyond its expenses.

{038665}

11

**GE Wrongfully Misappropriated Highgate's**
**PRI Rate Adjustment**

54.     On or about April 7, 2010, Medicaid made a $610,218.18 rate-adjustment payment to the facilities. This was received because of Medicaid's regular practice of retroactively adjusting its per-patient reimbursement rate based on the patient's actual condition and treatment. Although it is unknown when such adjustments would be received in the ordinary course of business, these rate adjustments are part of a nursing facility's regular income.

55.     Medicaid, through the State of New York Department of Health ("DOH"), reimburses a skilled nursing facility such as Highgate for each patient under its care entitled to Medicaid. DOH bases its reimbursement rate on the submission of a bi-annual Patient Review Instrument ("PRI").

56.     The submission of PRIs is governed by 10 NYCRR § 86-2.10 *et seq.* Under those regulations a facility is required to submit a full assessment of every patient under its case. This assessment outlines the level of care provided to each patient and the value of such case. Three months after every full assessment the facility is required to submit an assessment regarding any new patients or discharges.

57.     DOH's Medicaid reimbursement to a facility is based on its last processed PRI submission. Often, because of delays in DOH's processing of PRI submissions, a facility receives an outdated reimbursement rate for its patient. Under 10 NYCRR § 86-2.10, when DOH finally processes the updated PRIs a facility is entitled to a retroactive reimbursement rate based on what it should have received for each patient if its PRI submission was processed by DOH timely. This arises solely from the fact that because of DOH's delay in processing a facility's PRI, DOH was reimbursing a facility based on an outdated and inaccurate rate.

{038665}

58.     This is what happened to the facilities, as DOH delayed processing the PRI submissions for so long that when they were finally processed, and the facilities' rate was property adjusted, the facilities received $610,218.18 as a retroactive reimbursement.

59.     As always, the check was deposited into the GE-controlled lockbox. The check cleared the lockbox on or about May 6, 2010. Instead of keeping with its fraudulent scheme and giving the Substitute Receiver its own money, GE decided to abandon all pretenses of complying with the Substitute Receiver Order and the Bankruptcy Code and retained the entire amount and refused to re-fund the Line of Credit. The Substitute Receiver immediately made a motion in the state foreclosure action, dated June 3, 2010, for the return of this money. The state court, in an order dated August 12, 2010, denied the Substitute Receiver's motion with leave to seek relief in the bankruptcy court, this adversary proceeding followed.

60.     GE's retention of the PRI reimbursement was a blatant violation of the Substitute Receiver Order because this money was part of the regular income of the facilities and thus belonged to the Substitute Receiver. Second, GE's retention of the PRI reimbursement was a willful violation of the automatic bankruptcy stay because GE was not entitled to keep any funds belonging to the debtor while the bankruptcy was pending. Third, GE was not entitled to use the funds to pay down the Line of Credit because, pursuant to the terms of the Line of Credit Agreement (and by operation of the Bankruptcy Code and Substitute Receiver Order), the Line of Credit was frozen.

61.     GE acted wrongfully and fraudulently thereby taking millions of dollars from the lockbox. The Receiver Order, New York law and the Bankruptcy Code, do not allow GE to retain control over the income of the facilities to pay down the Line of Credit. Under the

{038665}

Receiver Order, all income of the facilities belongs solely to the Substitute Receiver and under the Bankruptcy Code all collections, set-offs or payments from the debtor's funds are automatically stayed.

62.     GE's unlawful actions however, did not end with its wrongful manipulation of the lockbox. After diverting Highgate's account receivables, instead of making all the money available under the Line of Credit, GE kept some of the money for itself. Over the years, GE diverted approximately $3 million as interest and "fees."

63.     Much of the shortfall at closing was attributable to the fact that: (i) GE has diverted millions of dollars of interest and expenses over the years; (ii) kept the PRI adjustment; and (iii) used funds from the lockbox to pay down over $700,000 from the Line of Credit.

## FIRST CLAIM FOR RELIEF
### (FRAUD)

64.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-63 of the complaint, as if fully set forth herein.

65.     In order to retain control of Highgate's account receivables, GE misrepresented to plaintiffs its procedure for operation of the lockbox in order to induce them to continue to deposit money in the lockbox and retain Highgate's previous bank accounts. GE's misrepresentations included telling plaintiffs that: (i) the Line of Credit was still in force and effect; (ii) it would continue to provide plaintiffs with the money that was collected in the lockbox; and (iii) that it would not retain any of the funds deposited in the lockbox.

66.     In addition, GE acted fraudulently when it continued to maintain the farce that the Line of Credit was still in force and effect in order to lull plaintiffs into a false sense of security that GE was working together with them to maintain the debtors' assets for Oasis' ultimate

{038665}

14

purchase pursuant to the Court's Order and the ultimate discharge of the debtors' debt in bankruptcy. GE further fraudulently failed to disclose to plaintiffs that it was no longer authorized to retain any of the money deposited in the lockbox.

67.     In reliance on GE's misrepresentations, the Substitute Receiver continued to deposit all accounts receivable in the lockbox and continued to allow GE to maintain control of the collection accounts. Plaintiffs had no knowledge as to the falsity of GE's misrepresentations and omissions. Only GE knew it would unlawfully abuse its authority over the lockbox and collection account to misappropriate the funds.

68.     Plaintiffs' reliance was justifiable under the circumstances because: (i) GE was bound by court order to maintain the lockbox pursuant to that order; (ii) GE was bound by state and federal law not to convert or misuse the money deposited in the lockbox; (iii) GE had maintained the lockbox previously, with the earlier receiver and Highgate, without any known incident; and (iv) GE had an incentive to maintain the lockbox properly to ensure that the sale of the debtors' assets proceeded as planned (because GE received a substantial payment from the purchaser of the facilities at closing).

69.     Each dollar kept by GE was directly one dollar less that the Substitute Receiver had available to pay Highgate's trade creditors. Therefore, as a proximate cause of GE's fraudulent scheme, the Substitute Receiver did not have enough assets to pay all of Highgate's trade creditors. At closing plaintiffs had to pay certain of Highgate's creditors out of their own assets, approximately $2.9 million of the shortfall is directly attributable to GE's fraudulent scheme.

{038665}

70.     Pursuant to court order and its contractual obligations, GE was tasked with maintaining certain property which was both an asset of the bankruptcy estate and the property of a receiver—a court officer. GE's misuse and manipulation of this system and abuse of the trust reposed in it by the court, was willful, wanton, quasi-criminal and shocking to the conscience. Further, GE's actions amounted to a willful and knowing violation of the automatic bankruptcy stay. In order to discourage others from misusing the public trust in the same manner and in order to protect assets entrusted to the courts by virtue of either bankruptcy or the appointment of a receiver, the Court should impose punitive damages in the amount of $10 million or such other amount as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
## (NEGLIGENT MISREPRESENTATION)

71.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1-70 of the complaint, as if fully set forth herein.

72.     In connection with its operation of the lockbox, GE negligently or recklessly misrepresented to plaintiffs that (i) the Line of Credit was still in force and effect; (ii) it would continue to provide plaintiffs with the money that was collected in the lockbox; and (iii) that it would not retain any of the funds deposited in the lockbox. GE further negligently failed to disclose that the Line of Credit should no longer have been in operation.

73.     The above representations were material, were false and GE knew they were false when it made the misrepresentations or was negligent in not appreciating their falsity.

74.     Plaintiffs relied on the above-mentioned representation and on the absence of the above-mentioned material omissions, to their detriment.

{038665}

16

75. Such reliance was reasonable and justifiable under the circumstances. Plaintiffs relied on the fact that GE presented itself as a legitimate lending institution with control over the lockbox and collection account.

76. Each dollar kept by GE was directly one dollar less that the Substitute Receiver had available to pay Highgate's trade creditors. Therefore, as a proximate cause of GE's negligent misrepresentations, the Substitute Receiver did not have enough assets to pay all of Highgate's trade creditors. At closing plaintiffs had to pay certain of Highgate's creditors out of their own assets, approximately $2.9 million of the shortfall is directly attributable to GE's fraudulent scheme.

77. Pursuant to court order and its contractual obligations, GE was tasked with maintaining certain property which was both an asset of the bankruptcy estate and the property of a receiver—a court officer. GE's misuse and manipulation of this system and abuse of the trust reposed in it by the court, was willful, wanton, quasi-criminal and shocking to the conscience. Further, GE's actions amounted to willful and knowing violation of the automatic bankruptcy stay. In order to discourage others from misusing the public trust in the same manner and in order to protect assets entrusted to the courts by virtue of either bankruptcy or the appointment of a receiver, the Court should impose punitive damages in the amount of $10 million or such other amount as the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duties)

78. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1-77 of the complaint, as if fully set forth herein.

{038665}

79.     GE assumed the responsibility of operating and maintaining the lockbox and collection account. Included in that responsibility was the responsibility to ensure that the funds collected in the lockbox were only used for legitimate purposes pursuant to the Substitute Receiver Order and New York law. Notably, pursuant to the Substitute Receiver Order and the terms of the Lockbox Agreement, GE did not have to participate in the operation of the lockbox—it chose to.

80.     GE owed plaintiffs the fiduciary duty to perform its duties responsibly and with due regard to the rights of the plaintiffs.

81.     GE recklessly disregarded its duties in order to line its own pockets and ensure its collection of funds to which it would not normally be entitled because of the pending bankruptcy and foreclosure proceedings.

82.     GE acted deliberately or with gross recklessness by keeping for itself certain funds collected in the lockbox including money kept as fees and interest and the PRI rate adjustment. GE breached its fiduciary duty to plaintiffs by continuing to operate the Line of Credit as if Highgate was still a compliant borrower and thereby using income from the facilities to pay down the Line of Credit prior to plaintiffs' closing on its purchase.

83.     As a proximate result of GE's breach of its fiduciary duties, the Substitute Receiver did not have enough assets to pay all of Highgate's trade creditors. At closing, plaintiffs had to pay certain of Highgate's creditors out of their own assets, approximately $2.9 million of the shortfall is directly attributable to GE's fraudulent scheme.

84.     Pursuant to court order and its contractual obligations, GE was tasked with maintaining certain property which was both an asset of the bankruptcy estate and the property

{038665}

18

of a receiver—a court officer. GE's misuse and manipulation of this system and abuse of the trust reposed in it by the court, was willful, wanton, quasi-criminal and shocking to the conscience. Further, GE's actions amounted to willful and knowing violation of the automatic bankruptcy stay. In order to discourage others from misusing the public trust in the same manner and in order to protect assets entrusted to the courts by virtue of either bankruptcy or the appointment of a receiver, the Court should impose punitive damages in the amount of $10 million or such other amount as the Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
### (Negligence)

85.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1-84 of the complaint, as if fully set forth herein.

86.     GE assumed the responsibility of operating and maintaining the lockbox and collection account. Included in that responsibility was the responsibility to ensure the funds collected in the lockbox were only used for legitimate purposes pursuant to the Substitute Receiver Order and New York law.

87.     GE owed plaintiffs a duty to perform its duties responsibly, in good faith and with due regard to the rights of the plaintiffs, consistent with the standard of care exercised by like individuals or entities in similar circumstances and in the banking industry.

88.     GE was negligent in performing its duties and responsibilities, and such was contrary to that degree of care exercised by members of the banking industry as well as by persons tasked with maintaining or dealing with funds belonging to a debtor in bankruptcy.

89.     GE acted negligently in failing to immediately transmit all funds collected in the lockbox directly to the Substitute Receiver and keeping for itself certain funds collected in the

{038665}

lockbox including money kept as fees and interest and the PRI rate adjustment. GE negligently continued to operate the Line of Credit as if Highgate was still a compliant borrower.

90.     As a proximate result of GE's breach of its negligence, the Substitute Receiver did not have enough assets to pay all of Highgate's trade creditors. At closing, plaintiffs had to pay certain of Highgate's creditors out of their own assets, approximately $2.9 million of the shortfall is directly attributable to GE's fraudulent scheme.

91.     Pursuant to court order and its contractual obligations, GE was tasked with maintaining certain property which was both an asset of the bankruptcy estate and the property of a receiver—a court officer. GE's misuse and manipulation of this system and abuse of the trust reposed in it by the court, was willful, wanton, quasi-criminal and shocking to the conscience. Further, GE's actions amounted to willful and knowing violation of the automatic bankruptcy stay. In order to discourage others from misusing the public trust in the same manner and in order to protect assets entrusted to the courts by virtue of either bankruptcy or the appointment of a receiver, the Court should impose punitive damages in the amount of $10 million or such other amount as the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF
## (Conversion)

92.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1-91 of the complaint, as if fully set forth herein.

93.     Pursuant to the Substitute Receiver Order and New York law, Highgate's accounts receivable were to be kept in a specifically identifiable and segregated bank account.

94.     All monies collected by Highgate including all of Highgate's accounts receivable were in the possession, custody and control of plaintiffs. Further, under the Bankruptcy Code,

{038665}

those funds were within the exclusive possession and control of plaintiffs who were tasked with maintaining the facilities.

95.     GE unlawfully exercised dominion and control over plaintiff's property by: (i) keeping certain funds as expenses, fees and interest; (ii) failing to turn over the $610,218.18 received as a PRI rate adjustment; and (iii) crediting all receivables in the lockbox as a pay down for the line of credit and ultimately paying the Line of Credit down by over $700,000.00.

96.     GE's actions constitute an unlawful conversion of plaintiffs personal property, *e.g.* the specific funds collected in the lockbox.

97.     As a direct result of GE's unlawful conversion, plaintiffs were damaged in the amount of approximately $2.9 million, the precise amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### (Declaratory Judgment)

98.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1-97 of the complaint, as if fully set forth herein.

99.     As discussed above, pursuant to the Substitute Receiver Order, all funds collected by or through Highgate belonged to the Substitute Receiver.

100.     Pursuant to the terms of the Substitute Receiver Order, the Bankruptcy Code and New York statutory law, GE was not entitled to keep any of the money collected in the lockbox for itself for any purpose.

101.     Pursuant to the terms of the Substitute Receiver Order, Letter of Credit Agreement, the Bankruptcy Code and New York statutory law, GE was not allowed to credit the money collected in the lockbox as a pay down for the principal owed on Highgate's Line of Credit Agreement.

{038665}

102. As discussed above, GE fraudulently induced plaintiffs to allow the continued operation of the lockbox in order to keep certain monies collected for itself.

103. Unless the respective legal rights, relations and duties of the parties are determined and declared, the parties' rights are under a cloud in that they lack a definitive statement as to such rights.

104. As a result of the foregoing, plaintiffs are entitled to a declaratory judgment declaring their respective rights, including without limitation who is entitled to the funds collected in the lockbox and retained or used by GE.

105. Plaintiffs have no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF
### (Turnover Pursuant To 11 U.S.C. § 542)

106. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1-105 of the complaint, as if fully set forth herein.

107. Pursuant to the order of the Bankruptcy Court and the Substitute Receiver Order, plaintiffs stand in the shoes of the debtor with regard to the income and expenses collected by the facilities and are, therefore, entitled to a turnover of all funds unlawfully collected by GE pursuant to 11 U.S.C. §§ 542.

108. As discussed above, aside from the unlawful nature of GE's retention of funds, GE retention of income from the facilities was a willful and knowing violation of the automatic stay in bankruptcy (11 U.S.C. § 362).

109. GE retained and converted the funds with full knowledge of the bankruptcy. In fact, GE was an active participant in every aspect of Highgate's bankruptcy. Upon information and belief, GE's fraudulent and unlawful actions discussed above were designed specifically to

{038665}

willfully evade the automatic bankruptcy stay which prohibited it from retaining any of Highgate's funds collected in the lockbox.

110.    Further, upon information and belief, GE made no attempt to seek permission from the Bankruptcy Court for a set-off of the funds collected, pursuant to 11 U.S.C. § 553, to pay down the amounts owed to it under the Line of Credit.

111.    As a result of GE's willful and knowing violation of the automatic bankruptcy stay, plaintiffs are entitled to a turnover and return of all funds unlawfully retained by GE including those funds collected as "fees," interest or as principal under the Line of Credit.

WHEREFORE, plaintiffs request judgment:

A.     Awarding plaintiffs compensatory damages against defendant, in an amount in excess of $2.9 million, the precise amount to be determined at trial;

B.     Awarding plaintiffs punitive damages of $10 million against defendants;

C.     Adjudging and declaring that plaintiffs are the true owners of all funds collected in the lockbox;

C.     Ordering defendant to turn over all funds collected by it from the lockbox;

D.     Awarding plaintiffs their costs, disbursements and reasonable attorney's fees; and

E.     Granting such other and further relief as the Court deems just and proper.

Dated: Nanuet, New York
November 11, 2010

Backenroth Frankel & Krinsky LLP
*Attorney for Plaintiffs*

By: /s/ Abraham Backenroth
     Abraham Backenroth
489 Fifth Avenue, 28th Floor
New York, New York 10017
(212) 593-1100
(212) 644-0544 (fax)
abackenroth@bfklaw.com

{038665}