UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____x

In re:

                                           Chapter 11

HIGHGATE LTC MANAGEMENT, LLC, *et al.*,       Case No. 07-11068 (REL)
                                           (Jointly Administered)

                         Debtors.

_____x


EF CONSULTING LLC AND
OASIS HC LLC,

             Plaintiffs,                        Adversary Pro. No. 10-90175

             v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

             Defendant.

_____x




**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
GENERAL ELECTRIC CAPITAL CORPORATION'S MOTION
TO DISMISS THE ADVERSARY COMPLAINT
<u>PURSUANT TO BANKRUPTCY RULE 7012(b)(6)</u>**




                                   MORITT HOCK & HAMROFF LLP
                                   *Attorneys for Defendant General Electric*
                                   *Capital Corporation*
                                   400 Garden City Plaza
                                   Garden City, New York  11530
                                   (516) 873-2000

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

OVERVIEW OF ADVERSARY COMPLAINT ............................................................. 2

STATEMENT OF FACTS .............................................................................................. 3

   A.   Loan Documents ................................................................................. 3

   B.   Foreclosure Action and Appointment of Receiver ................................................. 6

   C.   Chapter 11 Filings ................................................................................. 7

   D.   Cash Collateral Order ........................................................................... 7

   E.   The Asset Sale ..................................................................................... 8

   F.   Appointment of Substitute Receiver ...................................................... 9

   G.   Effect of Loan Documents During Substitute Receivership Period ..................... 10

   H.   Borrowing Requests During Substitute Receiver Period ...................................... 11

   I.   The Medicaid Retroactive Adjustment ................................................. 12

STANDARD OF REVIEW ............................................................................................ 13

ARGUMENT ................................................................................................................. 15

POINT I    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST GECC FOR
FRAUD (COUNT I) ....................................................................................... 15

POINT II    PLAINTIFFS' CLAIMS AGAINST GECC FOR BREACH OF
FIDUCIARY DUTY, NEGLIGENT MISPRESENTATION, AND PUNITIVE
DAMAGES MUST BE DISMISSED (COUNTS II AND III) .................................... 19

   A.   The Fiduciary Duty Claim (Count III) ............................................... 19

   B.   The Negligent Misrepresentation Claim (Count II) ........................................ 22

   C.   Punitive Damages Claim (Count III) ................................................. 24

POINT III    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST GECC FOR
NEGLIGENCE (COUNT IV) ........................................................................ 25

POINT IV    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST GECC FOR
CONVERSION (COUNT V) ......................................................................... 28

POINT V        PLAINTIFFS LACK STANDING TO ASSERT A CLAIM FOR
TURNOVER UNDER 11 U.S.C. § 542 (COUNT VII) ................................................ 29

POINT VI        PLAINTIFFS LACK STANDING TO ASSERT VIOLATIONS OF
THE AUTOMATIC STAY NOR WERE THERE ANY VIOLATIONS UNDER 11
U.S.C. § 362 (COUNTS I, II, III, IV AND VII).......................................................... 30

POINT VII        PLAINTIFFS' CLAIM FOR DECLARATORY JUDGMENT
SHOULD BE DISMISSED (COUNT VI) .................................................................... 33

CONCLUSION.................................................................................................................. 34

# TABLE OF AUTHORITIES

## Cases

Advanced Marine Technologies, Inc. v. Burnham Sec. Inc., 16 F. Supp.2d 375, 384 (S.D.N.Y. 1998) .......................................................................................................... 26

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) ................................................................ 14

Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp., 580 N.Y.S.2d 299, 301 (1st Dep't 1992) ............................................................................................................................. 21

Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 158 (2d Cir. 1995) ........................................................................................................ 21

Banque Nationale de Paris v. 1567 Broadway Ownership Associates, 625 N.Y.S.2d 152, 154 (1st Dept. 1995) ..................................................................................................... 23

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ............................................. 14, 15

Bonnie & Company Fashions, Inc. v. Bankers Trust Co., 945 F. Supp. 693, 713 (S.D.N.Y. 1996) ........................................................................................................... 26

Chambers v. Time Warner, Inc., 282 F.3d 147, 152-155 (2d Cir. 2002) ........................ 13

Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) ................. 14

Cramer v. Devon Group, Inc., 774 F. Supp. 176, 184 (S.D.N.Y. 1991) .......................... 20

DDJ Capital Mont., LLC v. Rhone Group LLC, 862 N.Y.S.2d 814 (Sup Ct. N.Y. 2008) 22

EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 19 (2005) ......................................... 20

Eurycleia Partners, L.P. v. Seward & Kissel, LLP, 849 N.Y.S.2d 510, 512 (1st Dept. 2007) ............................................................................................................................. 23

Fisher v. Offerman & Co., Ltd., 1996 WL 563141, at *7 (S.D.N.Y. Oct. 2, 1996) ......... 19

Freestone v. New England Log Homes, Inc., 819 A.2d 550, 553-54 (Sup. Ct. Pa. 2003) 27

Givoldi, Inc. v. United Parcel Serv., 729 N.Y.S.2d 25, 27 (1st Dept. 2001) .................... 27

Hackeling v. Charter Financial, Inc. (In re Luis Electrical Contracting Corp.), 149 B.R. 751, 759-60 (Bankr. E.D.N.Y. 1992) ........................................................................... 27

Hale Trucks of Md. v. Volvo Trucks of N. Am., 224 F. Supp. 2d 1010, 1025 (D. Md. 2002) ............................................................................................................................. 27

Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC, 910 N.Y.S.2d 762 (Sup. Ct. May 10, 2010) ........................................................................ 16

Harris Trust & Sav. v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 29 (2d Cir. 2002) ................................................................................................................................................ 27

HF Mgmt. Serv. LLC v. Pistone, 818 N.Y.S.2d 40, 42 (1st Dept. 2006) ......................... 20

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) ................. 22

In re Chateaugay Corp., 920 F.2d 183, 187 (2d Cir. 1993) ............................................... 24

In re Clemmer, 178 B.R. 160, 167 (Bankr. E.D.Tenn. 1995) ........................................... 31

In re Commodore International Limited et al., 262 F.3d 96 (2d Cir. 2001) ..................... 30

In re Housecraft Industries USA, Inc., 310 F.3d 64 (2d Cir. 2002) .................................. 30

In re Marketxt Holdings Corp., 2006 WL 2864963 * 23-24 (Bankr. S.D.N.Y. 2006) ..... 25

In re Mid-City Parking, Inc., 332 B.R. 798, 816 (Bankr. N.D. Ill. 2005) ......................... 31

In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir. 2002) ....................................... 20

In re Minpeco, USA, Inc. v. Swiss Bank Corp., 237 B.R. 12, 26 (Bankr. S.D.N.Y. 1997) ................................................................................................................................................ 26

In re Prairie Trunk Railway, 112 B.R. 924 ............................................................... 31, 32

In re Quaker Distribs., Inc. 189 B.R. 63, 67 (Bankr. E.D. Pa. 1995) ............................... 30

In re Sharp International Corp. (Sharp International Corp. v. State Street Bank and Trust Company), 302 B.R. 760 (E.D.N.Y. 2003) ................................................................... 21

In re Siskin, 231 B.R. 514, 519 (Bankr. E.D.N.Y. 1999) .................................................. 31

In re STN Enterprises, 779 F.2d 901 (1985) ...................................................................... 30

Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007) ...................... 14

Kaye v. Grossman, 202 F.3d 611, 614 (2d Cir. 2000) ....................................................... 18

Korea First Bank of NY v. Noah Enters., 787 N.Y.S.2d 2, 4 (1st Dept. 2004) ............... 23

Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ..................................... 14

Kurtzman v. Bergstol, 835 N.Y.S.2d 644, 646 (2d Dept. 2007) ....................................... 20

Lehman Brothers Commercial Corp. v. Minmetals International, 179 F.Supp.2d 118, 154 (S.D.N.Y. 2000) ........................................................................................................... 22

Lopresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) ..................................................... 28

Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir.1993)................ 20

Matusovsky v. Merrill Lynch, 186 F.Supp.2d 397, 400 (S.D.N.Y. 2002) ........................ 15

Megaris Furs, Inc. v. Gimbel Brothers, Inc., 568 N.Y.S.2d 581, 583 (1st Dept. 1991) ... 26

Merino v. New York City Transit Auth., 639 N.Y.S.2d 784, 758 (1st Dep't.), aff'd, 89 N.Y.2d 824 (1996) ......................................................................................................... 25

Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 2005 WL 832050 *8 (S.D.N.Y. 2005) ............................................................................................................................... 23

Mills v. Polar Molecular Corporation, 12 F.3d 1170 (2d Cir. 1993)................................. 17

Morganthau v. Erlbaum, 59 N.Y.2d 143, 451 N.E.2d 150 (1983) .................................... 33

Moses v. Martin, 360 F.Supp.2d 533, 541 (S.D.N.Y. 2004) ............................................. 29

Nathan W. Drage, P.C. v. First Concord Sec., Ltd., 707 N.Y.S.2d 782, 787 (N.Y. Sup. Ct. 2000) ............................................................................................................................... 25

New York University v. Continental Ins. Co., 87 N.Y.2d 308, 315-316 (1995).............. 25

One-O-One Enters., Inc. v. Caruso, 848 F.2d 1283, 1287 (D.C. Cir 1988) ..................... 18

Pan Am. Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y. 1994)................. 20

Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1991) ......................... 14

Pennsylvania Chiropractic Ass'n v. Independence Blue Cross, 2001 WL 1807781, at *6 (Pa. Ct. Com. Pl. July 16, 2001) ................................................................................... 26

Ramos v. Madison Square Garden Corp., 257 A.D.2d 492, 684 N.Y.S.2d 212 (1st Dept. 1999) ............................................................................................................................... 34

Rocanova v. Equitable Life Assurance Soc'y of the U.S., 83 N.Y.2d 603, 613 (1994) ... 25

Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007)......................................................... 15

Rubin Squared, Inc. v. Cambrex Corp., 2007 WL 2428485 *4 (S.D.N.Y. 2007) ............ 18

S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996)..... 18

Scone Investments, L.P. v. American Third Market Corp., 1998 WL 205338 *10
(S.D.N.Y. 1998) ......................................................................................................... 26

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) ............................ 17

Sterbenz v. Attina, 205 F. Supp.2d 65, 70 (S.D.N.Y. 2002).............................................. 26

The Benjamin Shapiro Realty Company v. The Great American Insurance Companies,
2000 WL 35489676 (N.Y. Sup. July 5, 2000) ............................................................. 34

Unicredito Italiano SPA v. JP Morgan Chase Bank, 288 F. Supp.2d 485, 488 (S.D.N.Y.
2003) .......................................................................................................................... 16

Vigilant Ins. Co. of America v. Housing Auth. City of El Paso, Texas, 87 N.Y.2d 36, 44
(1995)......................................................................................................................... 28

Village on Canon v. Bankers Trust Co., 920 F. Supp. 520 *8 (S.D.N.Y. 1996) .............. 23

Vogel v. Sands Bros. & Co., 126 F.Supp. 2d 730, 739 (S.D.N.Y. 2001) ......................... 19

Weinberger v. Kendrich, 698 F.2d 61, 79 (2d Cir. 1982)................................................. 21

WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (2nd Dept. 2001).............................. 20

**Statutes**

11 U.S.C. § 1104....................................................................................................................... 7

11 U.S.C. § 542(a) ................................................................................................................. 29

**Other Authorities**

H.R.Rep. No. 95-595, at 341 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6297-98.... 31

## PRELIMINARY STATEMENT

Defendant General Electric Capital Corporation ("GECC") respectfully submits this Memorandum of Law in support of its motion (the "Motion")[1], pursuant to Rule 12(b)(6) and of the Federal Rules of Civil Procedure (the "Federal Rules"), as made applicable to this adversary proceeding by Rule 7012(b)(6) of the Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to dismiss the Adversary Complaint of EF Consulting LLC ("Plaintiff EF") and Oasis HC LLC ("Plaintiff Oasis", and together with Plaintiff EF, "Plaintiffs") against GECC in its entirety.[2]

The essence of Plaintiffs' Adversary Complaint is that Defendant GECC failed to make available to Plaintiff EF 100% of the accounts receivable collected by GECC during EF's receivership. Plaintiffs' understanding of, *inter alia*, how the Loan and Security Agreement and Lockbox functioned and what the parties' various rights and obligations were under prior orders of this Court and the State Court (defined below) is contradicted not only by the express language of such documents but by Plaintiffs' very own conduct during the relevant twenty-one (21) month period during which Plaintiff EF was Substitute Receiver, which ended on Plaintiff Oasis' closing of its purchase of the Debtors' assets). As more fully set forth below, Plaintiffs cannot transform their own misunderstanding of the relevant court orders and loan documents into various common law and statutory claims. As is demonstrated below, Plaintiffs have failed to plead any viable claim against GECC. Rather, GECC, at all relevant times, acted in accordance

---

[1]     Capitalized terms used but not defined herein shall have the meanings given to such terms in the Declaration of Richard Arrowsmith dated January 4, 2011 (the "Arrowsmith Dec.") filed in support of the Motion.

[2]     The Adversary Complaint is annexed as Exhibit 1 to the Arrowsmith Dec.

with the mandate of prior orders of this Court, the State Court and the underlying Loan Documents. The relevant provisions and mechanics of each of such documents are detailed in the Arrowsmith Dec., filed in support of this Motion. When this Court reviews the Adversary Complaint (including all documents relied upon therein as well as those of public record), GECC respectfully submits that it will be abundantly clear that the Adversary Complaint should be dismissed in its entirety and with prejudice.

## OVERVIEW OF ADVERSARY COMPLAINT

As this Court is intimately familiar, GECC has been, for all practical purposes, the backbone of the Debtors' bankruptcy case. It was only through GECC's cooperation and assistance that the Debtors were not forced to close their doors at the outset of this Chapter 11 case. But for GECC's concessions and consents with regard to, inter alia, cash collateral usage, continued borrowings under the revolving credit facility and active participation in the assumption of operational deficiencies under the Shortfall Agreement (as defined below), and an extensive marketing and sale process, the Debtors never would have been able to sell their assets in Chapter 11. Notably absent from the record of this bankruptcy case (and the Adversary Complaint) is any reference to a single motion filed or adversary proceeding commenced by the Trustee (as the court-appointed representative of the Debtors' estate) against GECC for any of the alleged wrongdoings set forth in the Adversary Complaint. The reason is simple. GECC's efforts and cooperation, which spared the Debtors from a fire-sale liquidation scenario which would have resulted in an immediate cessation of operations forcing thousands of nursing home residents to relocate to other health care facilities, are embodied in Court orders which

permitted GECC to do the very acts of which Plaintiffs, but no creditors or Trustee, now complain.

It is important for the Court to understand that even if Plaintiffs were successful (which they should not be), the Debtors' estate and Debtors' creditors would receive no benefit. This Adversary Proceeding is simply an attempt by Plaintiff Oasis to reduce the price for the Debtors' assets which it expressly agreed to pay and which this Court previously approved.

## STATEMENT OF FACTS[3]

### A.    Loan Documents

Prior to the commencement of the Debtors' Chapter 11 cases and prior to a State Court receivership discussed below, Highgate Manor Group LLC and Highgate LTC Management LLC (collectively, "Highgate" or the "Debtors") owned and operated four nursing home facilities in upstate New York. On May 26, 2005, Highgate and GECC entered into that certain Loan and Security Agreement dated as of May 26, 2005 (the "LSA") pursuant to which GECC provided to Highgate, as Borrowers, a revolving loan in a maximum amount of $4,000,000. See LSA, ¶2.1(a). A copy of the LSA is annexed to the Arrowsmith Dec. at Exhibit "1". The salient terms of the LSA are described in the Arrowsmith Dec. at paragraphs 4-9 and summarized below:

- The loan was unconditionally guaranteed by certain principals of the Borrower and secured by a first priority lien and security interest in, among other things, "all of Borrower's Accounts, and

---

[3]    The facts and supporting exhibits are set forth in detail in the accompanying Arrowsmith Dec. GECC has summarized the facts set forth in the Arrowsmith Dec. and "facts" alleged in the Adversary Complaint, but in doing so, it does not adopt any material allegations in the Adversary Complaint as true. Indeed, all of the vague and conclusory material allegations asserted by Plaintiffs in support of their so-called claims are false and are contradicted by unequivocal documentary evidence within Plaintiffs' possession including the prior orders of this Court and the Supreme Court of the State of New York, Rensselaer County (the "State Court").

all of Borrower's money, … deposit accounts" and "all of Borrower's now owned or hereafter acquired deposit accounts into which Accounts or the proceeds of Accounts are deposited, including the Lockbox Account." LSA ¶¶3.1(a)(c).

- "Account" is defined in the LSA as "any right to payment or a monetary obligation" and "any account receivable, any health-care insurance receivable … any payment intangible … and all other rights to payment of every kind and description…" LSA ¶1.1.

- The loan up to a maximum of $4,000,000 was administered pursuant to ¶2.2 "and on such other basis as Lender may reasonably determine." LSA ¶2.1(a). The loan amount depends upon the availability in the "Borrowing Base" and requests of the Borrower. <u>Id</u>. "<u>Advances … shall be made against a borrowing base equal to eighty-five percent (85%) of Qualified Accounts</u>…" LSA ¶2.1(d) (emphasis added). A "Qualified Account" is an Account generated in the ordinary course of Borrower's business for Medical Services "which lender, in its sole credit judgment, deems to be a Qualified Account." LSA ¶1.51. Among others, Accounts over 150 days or not payable to Borrower directly from Medicare/Medicaid or a commercial insurer are not "Qualified Accounts." <u>Id</u>.

- Under § 2.2(a) of the LSA, as interest or any other Obligation become due, the Borrower was deemed to have made a request for a Revolving advance and to have authorized Lender to disburse the proceeds of each revolving credit loan to payment of such interest or Obligation. According to the LSA, two days before the proposed borrowing, the Borrower was to give Lender notice of its intention to borrow, specifying the amount to be borrowed and the date of borrowing. <u>Id</u>. ¶2.2(a). The Lender would then make advances based on 85% of Qualified Accounts and other "liquidity factors" it deemed approximate in its sole discretion, up to the $4,000,000 maximum. LSA ¶2.1(d).

- Section 2.3 of the LSA outlines the procedure as to how the Borrower's accounts receivable are to be collected and applied. Borrower was required to establish and maintain a lockbox with a specific bank (originally Manufacturer Travelers Trust Company and later Citizens Bank, Albany, New York). Borrower was required to execute a Lockbox Agreement in the form annexed to the LSA. On October 24, 2005, the Borrower, GECC and Citizens Bank entered into a Lockbox Account Agreement (the "<u>Lockbox</u>

Agreement") whose terms mirror the procedures set forth in Section 2.3 of the LSA. The Lockbox Agreement facilitated the operation of the revolving credit line governed by the LSA. Complt. ¶ 8. A copy of the Lockbox Agreement is annexed to the Arrowsmith Dec. at Exhibit 3.

Under the LSA and Lockbox Agreement, Borrower was to ensure that all collection of Accounts (not just Qualified Accounts) were paid directly from its Account Debtors into the Lockbox (essentially a PO Box to which Citizens Bank had exclusive access). Citizens would then open all of the mail sent to the Lockbox and credit to the various Borrower accounts, designated as "Lockbox Accounts," all funds collected. All funds credited to the designated Borrower Lockbox Accounts were then "immediately transferred into a depository account maintained by Lender at Deutsche Bank" (the "Concentration Account"). Under ¶2.3(c) of the LSA, on a daily basis, GECC "shall apply … all funds transferred into the Concentration Account pursuant to the section 2.3 to reduce the outstanding indebtedness under the loan (in accordance with section 2.2(d)) and all future revolving credit loans advances and other extensions of credit…." LSA ¶2.2(d) provides that all collections from the Concentration Account are to be applied first to fees, cost and expenses, then to interest due and then to principal on the Revolver. Section 2.4 of the LSA sets forth the monthly and audit fees due. As to principal, See also LSA ¶2.5 (Principal shall be paid upon receipt "by Borrower or Lender of any payment or proceeds from any Collateral.").

Section 9.10 of the LSA provides:

Release of Lender. For and in consideration of the Loan and each advance or other financial accommodation hereunder, each Borrower . . . does hereby fully and completely release, acquit and forever discharge Lender . . . of and from any and all actions, causes of action, suits, debts, disputes, damages, claims, obligations, liabilities,

5

> costs, expenses and demands of any kind whatsoever, at
> law or in equity, whether matured or unmatured, liquidated
> or unliquidated, vested or contingent, choate or inchoate,
> known or unknown that [Borrower] . . .ha[s] or may have,
> against [Lender] . . ..  Borrower acknowledges that the
> foregoing release is a material inducement to Lender's
> decision to extend to Borrower the financial
> accommodations hereunder and has been relied upon by
> Lender in agreeing to make . . . each advance of Loan
> proceeds hereunder.

**B.** **Foreclosure Action and Appointment of Receiver**

On October 17, 2006, GECC commenced an action in the Supreme Court
of the State of New York, Rensselaer County, to foreclose its real property fee and
leasehold mortgages on the four nursing home facilities owned and operated by Highgate.
On November 29, 2006, the State Court issued an Order Appointing Receiver in which it
appointed Long Hill Alliance Company ("Long Hill" or "Receiver") as Receiver of the
four premises with authority to operate the Facilities.  A true copy of the Order
Appointing Receiver (the "Long Hill Order") is annexed to the Arrowsmith Dec. as
Exhibit "4".  It is referred to on this motion to dismiss because it is referred to in and is
the genesis of the Substitute Receiver Order (defined below as "SRO"), which, in turn, is
explicitly alleged as the basis for Plaintiffs' claims herein.

Pursuant to the Long Hill Order, GECC and Long Hill entered into a
Shortfall Agreement dated as of November 27, 2006 (the "Shortfall Agreement")
pursuant to which GECC agreed to "pay any Shortfall", i.e. the difference between
Receivership Income of the Facilities received by Receiver for any monthly period and
all Receivership Expenses, including, but not limited to, all "operating expenses, accounts
payable, including insurance and vendor expenses" plus "any costs and expenses incurred

in an emergency, that are extraordinary or that may be required by applicable law." Shortfall Agreement, ¶2(c).

## C.    **Chapter 11 Filings**

On April 16, 2007, (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under Chapter 11, Title 11, U.S.C. in the U.S. Bankruptcy Court for the Northern District of New York. ("<u>Bankruptcy Cases</u>").  *See* Adversary Complaint at ¶ 5; ECF Docket Case No. 07-11068 (REL).   On May 17, 2007, this Court ordered that a Chapter 11 Trustee be appointed.  *See* ECF Docket No. [85] Case No. 07-11068.   On May 21, 2007, Mark I. Fishman, Esq. ("<u>Trustee</u>") was appointed Chapter 11 Trustee pursuant to 11 U.S.C. § 1104 and, as of the date hereof, is still serving in such capacity. *See* ECF Docket No. [89] Case No. 07-11068.

## D.    **Cash Collateral Order**

On May 14, 2007, this Court issued its Final Order Authorizing the Debtors to (A) Borrow Money Pursuant to Sections 105, 301, 326(c)(1); 364(c)(2), 364(c)(3) and 364(e) of the Bankruptcy Code; and (B) use Cash Collateral on a Consensual Basis and (C) Granting Adequate Protection and Related Relief Pursuant to Section 105, 361 and 363 of the Bankruptcy Code (the "<u>Cash Collateral Order</u>").  A true copy of the Cash Collateral Order is annexed to the Arrowsmith Dec. as Exhibit "6".  On May 18, 2007, this Court continued Long Hill as Receiver of the Facilities, which were property of the Debtors' bankruptcy estate (the "<u>Continuation Order</u>").  A copy of the Court's Continuation Order continuing Long Hill as Receiver is annexed to the Arrowsmith Dec. as Exhibit "7".

In its Cash Collateral Order, this Court specifically found that:

> "The access of the Receiver to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the health and welfare of the patients and Receivership of the Facilities, the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors."

Cash Collateral Order, p. 6, ¶F). The Cash Collateral Order further provided that "The Receiver is hereby authorized to use Cash Collateral and borrow money in accordance with the terms of the Order, the Loan Documents, the Receivership Order and the Shortfall Agreement…" (Id. p. 7, ¶12) (emphasis added). Pursuant to the Continuation Order, Long Hill was directed to "continue to keep in place all account and lock-box arrangements and deposit all funds consistent with the credit facilities and loan documents in existence between the Debtors and GECC." (See Continuation Order, ¶6). In recognition that Long Hill would continue to deposit accounts receivable in the Citizen's Bank lockbox and GECC would continue to use those collections to pay down the existing revolving loan, the Cash Collateral Order also provided that

> "no post-petition obligation, payment, transfer or grant of security under the Loan Documents, the Shortfall Agreement, or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under an applicable law…"

(Id. p. 8) (Emphasis added).

**E.      The Asset Sale**

By Order entered in these cases on August 28, 2008 (the "Sale Order"), this Court approved the sale of substantially all of the Debtors' assets (the "Sale") to Oasis in accordance with that certain Asset Purchase Agreement dated as of August 12, 2008 (the "Purchase Agreement"). *See* Adversary Complaint at ¶ 11; ECF Docket No.

[603] Case No. 07-11068.   Copies of the Purchase Agreement and Sale Order are annexed to the Arrowsmith Dec. at Exhibits "8" and "9", respectively.

Pursuant to the Purchase Agreement, Plaintiff Oasis purchased all of the Debtors' ordinary accounts receivable "at Closing," but not prior thereto.   <u>See</u> Arrowsmith Dec. Exhibit "8", ¶1A(iv).   The Purchase Agreement further provides that "to the extent Purchaser [or the Substitute Receiver] during the period prior to Closing, seeks to use any accounts receivable," it must do so by establishing or continuing "the revolving credit facility of [GECC]."   <u>See</u> <u>id.</u>, ¶1C.   The closing of the Sale occurred on August 30, 2010 (the "<u>Closing Date</u>").   Paragraph 12 of the Sale Order (Arrowsmith Declaration Exhibit "9") specifically deemed the Purchaser or its Designee to be a signatory to the existing Lock Box Agreement which governed the collection and disbursement of the Facilities' receivables.

F.      **Appointment of Substitute Receiver**

In connection with the Sale, by Order of the Supreme Court of the State of New York (Rensselaer County) entered on November 3, 2008 (the "<u>SRO</u>"), EF was appointed Substitute Receiver of the Facilities in place of Long Hill.   *See* Adversary Complaint at ¶ 6.   The Substitute Receiver operated the Facilities between November 3, 2008, the date of the SRO, and August 30, 2010, the Closing Date (the "<u>Substitute Receivership Period</u>").   A copy of the SRO is attached to the Arrowsmith Dec. at Exhibit "10".   Pursuant to the terms of the Purchase Agreement and the SRO, the Substitute Receiver personally assumed all obligations at the Facilities existing at the commencement of the Substitute Receivership or arising thereafter.   SRO pp. 8, 9, 11.

The Shortfall Agreement and GECC's obligations thereunder were expressly terminated by the SRO and the Substitute Receiver obtained no rights thereunder.  <u>See</u> SRO, p. 20.  Thus, the SRO clearly provides that regardless of accounts receivable collections, the Substitute Receiver is obligated to pay out of its own funds all payables of the Facilities incurred both before as well as during the Substitute Receivership Period.

**G.**     **<u>Effect of Loan Documents During Substitute Receivership Period</u>.**

Section 5.1(c) of the Purchase Agreement provides that "Purchaser shall comply in all aspects of the existing Revolving Credit Facility with GE[CC] including the establishment of Lockbox accounts and executing such other documents a[s] GE[CC] may reasonably require."  <u>See</u> Purchase Agreement, § 5.1(c).  The Sale Order further provides that "[u]pon the entry of the Order Appointing Substitute Receiver, the Substitute Receiver shall be deemed to have replaced The Long Hill Alliance Company and/or the Debtors as signatory and responsible person on the Lockbox currently maintained by Citizens Bank for the Debtors' operating account, without the need for any further Order of this Court."  <u>See</u> Sale Order, ¶ 12.

Additionally, the SRO expressly provides that "the Substitute Receiver shall forthwith deposit all monies received by it at the time it receives same in a special account in its own name in RBC Citizens Bank, N.A. or such other bank as GECC shall require …" and "[n]othing contained herein is intended to amend, modify, or abrogate the lockbox arrangement for the collection and deposit of accounts receivable by the Substitute Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC."  <u>See</u> SRO, p. 21-22 (emphasis added).

Thus, based on the terms of the Purchase Agreement, Sale Order and SRO, the LSA and Lockbox Agreement were in full force and effect during the Substitute Receivership Period and the Substitute Receiver was deemed a signatory to the Lockbox Agreement requiring all of the accounts receivable to be deposited into the Lockbox and disbursed to GECC for payment of the Revolver.

**H.    Borrowing Requests During Substitute Receiver Period.**

During the Substitute Receiver Period, the Substitute Receiver made an aggregate of three hundred and one (301) requests to GECC for advances under the LSA. Such requests totaled $72,195,736.40 in the aggregate. See Arrowsmith Dec., ¶¶ 20-24. Each and every request for an advance was treated by GECC in accordance with the terms of the LSA. Id.

Further, each of the 301 total Borrowing Base Certificates submitted to GECC by the Substitute Receiver during the Substitute Receivership Period contains a release provision which provides as follows:

> Borrower acknowledges that . . . after this advance, [stated loan balance] plus costs and fees is justly due and owing to Lender without setoff, defenses or counterclaim. By accepting this advance from Lender, Borrower agrees to waive and release Lender from all claims, demands, causes of action (whether known or unknown) based in whole or in part on acts or omissions of Lender relating to the Loan Agreement.

See, e.g., Exhibit 11 to the Arrowsmith Dec. and examples of the Borrowing Base Certificates submitted to GECC by the Substitute Receiver on November 10, 2008, August 3, 2009 and August 26, 2010, copies of which are annexed to the Arrowsmith Dec. as Exhibit "12". The foregoing provisions of the LSA and Borrowing Base Certificates demonstrate that with each of the 301 advances requested by Plaintiff EF,

Plaintiff EF acknowledged that GECC was acting properly and in accordance with the LSA and the Orders of this Court and the State Court.

## I.    The Medicaid Retroactive Adjustment

According to the Adversary Complaint, Plaintiffs received from the New York State Department of Health ("DOH") a retroactive Medicaid reimbursement in the amount of $610,021.18 (the "Medicaid Retroactive Adjustment") as a result of the DOH's recalculation of the Facilities' Medicaid per diem reimbursement rate for the period commencing January 1, 2009.   In their Adversary Complaint Plaintiffs admit that "[a]s always, the check [for the Medicaid Retroactive Adjustment] was deposited into the GE-controlled lockbox." See Adversary Complaint, ¶ 59.

Contrary to Plaintiffs' allegations and misunderstandings, Plaintiffs had no right to the Medicaid Retroactive Adjustment or any other pre-Closing receivable collected by GECC.   See Purchase Agreement ¶1C.    Nor did Plaintiffs purchase or obtain any rights in other, non- "ordinary course" receivables specifically excluded from the Purchase Agreement.   Section 1.B(vii) of the Purchase Agreement specifically excludes from the assets being sold by the Trustee and purchased by Plaintiff Oasis (and thus available to EF as Oasis's "Receivership Designee"):

> "All rights to refunds, settlements, retainages, holdbacks, and/or retroactive adjustments, to the extent applicable to periods ending on or before the Closing, arising in connection with Sellers' Medicare and Medicaid provider numbers..." (emphasis added).

Based upon the foregoing, Plaintiff Oasis could not have had a legitimate expectation of acquiring the Medicaid Retroactive Adjustment even if it had remained a "receivable" on the Closing Date.

Because of the unambiguous provisions of the Cash Collateral Order, the

Purchase Agreement, Sale Order, the SRO, the Lockbox Agreement and the LSA,

Plaintiff EF should have understood the mechanics of the LSA borrowing based formulas

set forth in the LSA.  Based on Plaintiffs' actual 301 Borrowing Certificates, it is clear

that they in fact did understand those mechanics.  Plaintiffs' claim that they were

somehow mislead into believing that they were entitled to 100% of all accounts

receivable collected is false and frivolous.[4]

## STANDARD OF REVIEW

The Adversary Complaint is replete with partial, incomplete citations to

documents and court orders.  In the Adversary Complaint, Plaintiffs rely upon the LSA,

the Lockbox Agreement, the Order Appointing Long Hill as Receiver, the SRO, and the

Sale Order (together, the "Referenced Documents").  The Referenced Documents may be

considered by this Court in deciding this Motion as they are relied upon by Plaintiffs in

the Adversary Complaint and, while not attached to the Adversary Complaint, are

essential to the claims presented.  See, e.g., Chambers v. Time Warner, Inc., 282 F.3d

147, 152-155 (2d Cir. 2002); Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42,

---

[4] In their Adversary Complaint, Plaintiffs Oasis and EF essentially seek relief as joint, coextensive
Plaintiffs against Defendant GECC.  However, Plaintiffs' legal interests in the Facilities' accounts
receivable are quite different and distinct.  During the Substitute Receivership period prior to Closing of the
Purchase Agreement, Plaintiff EF only had an interest as a receiver for the Facilities, i.e. as a fiduciary, to
use the Facilities' accounts receivable under the Lock Box Agreement and Revolver for the benefit of the
Facilities.  Under the Purchase Agreement, however, Plaintiff Oasis had no cognizable right to pre-Closing
receivables not in existence at Closing. (Exhibit "8", ¶¶1A (iv), 5.1(a)).

In their Adversary Complaint, Plaintiffs do not make clear why both Oasis and EF are named as
Plaintiffs.  Perhaps the Plaintiffs are joined in order to bolster EF's limited right as Substitute Receiver
during the pre-Closing period to use pre-Closing receivables solely for the benefit of the Facilities and the
Highgate estate by confusing that limited right with Oasis's then future unlimited right as Purchaser to own
and use for itself all receivables that may exist at the later Closing.  Put another way, by joining their
distinct and differing rights, Plaintiffs are attempting to transform pre-closing collections which were not
sold to or purchased by Oasis into Oasis assets for which it never paid.

47 (2d Cir. 1991).  In addition to the Referenced Documents, there are other documents

which may be considered by the Court in deciding this Motion inasmuch as they are

attached to or referenced in the Referenced Documents or, alternatively, are otherwise

matters of public record.  These include (i) the Purchase Agreement (which is annexed to

the Sale Order as an exhibit); (ii) the Cash Collateral Order (which was entered by this

Court and is a matter of public record; (iii) the Borrowing Base Certificates (which are

incorporated by reference in the LSA and the Lockbox Agreement (upon which Plaintiffs

principally rely in the Adversary Complaint); and (iv) the Shortfall Agreement (which is

annexed to the Longhill Order and to the Cash Collateral Order and is otherwise part of

the record of this Chapter 11 case).  See Pani v. Empire Blue Cross Blue Shield, 152 F.3d

67, 71 (2d Cir. 1991) (documents that are attached to the complaint or incorporated by

reference are deemed part of the pleading and may be considered on a Rule 12(b)(6)

motion); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) (where there are

public records that are integral to the complaint and are not attached to it, the court is

permitted to take judicial notice of such records in deciding a Rule 12(b)(6) motion).

In deciding a motion to dismiss made pursuant to Federal Rule 12(b)(6),

and Bankruptcy Rule 7012(b)(6) a court generally "is to accept as true all facts alleged in

the Complaint" and "draw all reasonable inferences in favor of the plaintiff."  Kassner v.

2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  "[A] complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  However, "[a] pleading that offers 'labels

and conclusions' or 'a formulaic recitation of the elements of a cause of action will not

do.'"  Id. (citing Twombly, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders

'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (citing Twombly, 550

U.S. at 557). Where "plaintiffs . . . have not nudged their claims across the line from

conceivable to plausible, their complaint must be dismissed."  Twombly, 550 U.S. at 570.

 Here, however, Plaintiffs are not alleging "facts" but legal interpretations

of prior orders of this Court and the State Court as well as the various Loan Documents

upon which Plaintiffs principally rely.   This Court is permitted to look beyond the four

corners of the Adversary Complaint on a motion to dismiss pursuant to Federal Rule

12(b)(6) and Bankruptcy Rule 7012(b)(6) where, as here, Plaintiffs' understanding of the

terms of the documents which form the basis of the Adversary Complaint is misguided

and incorrect. See Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007); Matusovsky v.

Merrill Lynch, 186 F.Supp.2d 397, 400 (S.D.N.Y. 2002) ("if a plaintiff's allegations are

contradicted by a document considered in determining a Rule 12(b)(6) motion, those

allegations are insufficient to defeat the motion.").  Thus, this Court need not accept as

true all of Plaintiffs' claims to the extent that such claims are flatly contradicted by

documentary evidence relied upon in the Adversary Complaint or otherwise part of the

public record.  See id.

## ARGUMENT

### POINT I

### PLAINTIFFS FAIL TO STATE A CLAIM
### AGAINST GECC FOR FRAUD (COUNT I)

 In Count I of the Adversary Complaint, Plaintiffs allege that "[i]n order to

retain control of [Debtors]'s account receivables, [GECC] misrepresented to [P]laintiffs

its procedures for operation of the lockbox in order to induce them to continue to deposit

the money in the lockbox and retain [the Debtors'] previous bank accounts. [GECC]'s misrepresentations included telling [P]laintiffs that: (i) the Line of Credit was still in force and effect; (ii) it would continue to provide [P]laintiffs with the money that was collected in the lockbox; and (iii) that it would not retain any of the funds deposited in the lockbox." Complt. ¶ 65.

The elements of a Fraud claim under New York law[5] are as follows: (i) representation of a material fact; (ii) the falsity of such representation; (iii) intent to defraud plaintiff; (iv) reliance; and (v) damages. See Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC, 910 N.Y.S.2d 762 (Sup. Ct. May 10, 2010); Unicredito Italiano SPA v. JP Morgan Chase Bank, 288 F. Supp.2d 485, 488 (S.D.N.Y. 2003). Plaintiffs' fraud claim is deficient for multiple reasons.

First, even when viewed in a light most favorable to Plaintiffs and under the most liberal notice pleading requirement, let alone the stringent requirements of Federal Rule 9(b) and Bankruptcy Rule 7009(b), it is impossible to divine from the Fraud Claim *what* fraudulent act or acts GECC committed and *when*, *where* or *how* such alleged fraudulent statements or omissions were made. Nowhere in the Adversary Complaint do Plaintiffs state precisely what statements were made, when they were made, whether they were made orally or in writing, who at GECC allegedly made the statements and to whom. There simply is no specificity whatsoever. For that reason alone, the Adversary

---

[5]   The Lockbox Agreement is governed by New York law. Lockbox Agreement §15(e). The LSA is expressly governed by Maryland law "[e]xcept to the extent the UCC provides for the application of the law of the borrower's state of organization…" LSA ¶9.20. The elements of fraud are the same under New York and Maryland jurisprudence. See Nails v. S&R Inc., 639 A.2d 660, 668 (Md. 1994)(elements for fraud under Maryland law are (1) defendant made a false representation to plaintiff, (2) that its falsity was either known to the defendant or was made with reckless indifference as to its truth, (3) that the representation was made for purposes of defrauding plaintiff, (4) plaintiff relied on the representation and had the right to rely on it and (5) plaintiff suffered compensable injury resulting from the misrepresentation.).

Complaint should be should be dismissed.  See, e.g., Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (holding that where plaintiffs fail to plead facts sufficient to raise a strong inference of fraud, the complaint must be dismissed for failure to comply with the requirements of Rule 9(b)).  Mills v. Polar Molecular Corporation, 12 F.3d 1170 (2d Cir. 1993) (complaint which failed to specify statements plaintiff contended were fraudulent, identity of speaker, place where statements were made and why statements were fraudulent, dismissed for lack of particularity).

Second, even if GECC made the statements which Plaintiffs conclusorily allege were made (a fact which GECC vehemently denies), Plaintiffs' reliance thereon would not have been justified in light of (i) Plaintiff EF's history of requesting Advances under the LSA and (ii) the express terms of the LSA and Lockbox Agreement and (iii) the releases contained in EF's Borrowing Certificates.   Plaintiffs' allegations that they were entitled to 100% of accounts receivables runs counter to the terms of the LSA as well as the several hundred borrowing requests made by Plaintiff EF during the Substitute Receiver Period pursuant to which Plaintiff EF presented receivables and received less than a 100% advance based upon the receivables presented to GECC. Indeed, not only does Plaintiff EF's course of conduct demonstrate its knowledge of the mechanics of the LSA and Lockbox Agreement, it acknowledged that GECC acted properly in connection with each Advance made by signing the acknowledgement and release on the Borrowing Base Certificates.  See Borrowing Base Certificates, Arrowsmith Dec., Exhibit "12".

Additionally, course of conduct aside, Plaintiff EF's reliance on any representations made by GECC – assuming without conceding such representations were

made – would have been unreasonable inasmuch as the LSA provides that "[n]o amendment, supplement or modification of this Agreement nor any waiver of any provision thereof shall be made except in writing executed by the party against whom enforcement is sought." LSA ¶9.2. The Lockbox Agreement similarly provides that "[t]his Agreement may be amended only by a written instrument executed by Lender, Bank, and Company acting by their respective duly authorized representatives." Lockbox Agreement ¶15(a). GECC is unaware of (and denies the existence of) any written document signed by it which purports to modify the operative agreements in the way Plaintiffs suggest. Plaintiffs have not alleged or attached any such document to the Adversary Complaint. Accordingly, no modification and no reliance can exist. see also Rubin Squared, Inc. v. Cambrex Corp., 2007 WL 2428485 *4 (S.D.N.Y. 2007) (holding that plaintiffs' "[r]eliance on alleged oral representations not included in the highly detailed … [asset purchase agreement] was unreasonable."); see also One-O-One Enters., Inc. v. Caruso, 848 F.2d 1283, 1287 (D.C. Cir 1988) (same under Maryland law).

In addition, the requisite element of any fraud claim – the intent to defraud – is conspicuously absent. To prevail on a common law fraud claim, Plaintiffs must allege, with particularity, "facts that give rise to a strong inference of fraudulent intent." S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996). See also Kaye v. Grossman, 202 F.3d 611, 614 (2d Cir. 2000) (explaining that a fraud plaintiff must plead that the defendant both "knew of the falsity" of the misrepresentation and "possessed an intent to defraud").

The Adversary Complaint, however, lacks any particularized allegation that GECC possessed the requisite fraudulent intent. The only attempt to plead facts

showing either that GECC had a motive and opportunity to commit fraud or strong circumstantial evidence of such fraud is the Plaintiffs' repetitive assertions that GECC collected fees or paid itself from certain receivables collected (as to which under any reading of the LSA, the SRO or the Purchase Agreement GECC had the legal right to do). These allegations are insufficient. The allegation of an economic motive to earn transaction fees "is not alone sufficient to sustain a strong inference of fraudulent intent. If it were, every underwriter, law firm, accountant, and investment advisor whose compensation or commission depended upon the completion of an initial public offering would have a motive to commit fraud, which would make Rule 9(b) wholly meaningless." Fisher v. Offerman & Co., Ltd., 1996 WL 563141, at *7 (S.D.N.Y. Oct. 2, 1996); see also Vogel v. Sands Bros. & Co., 126 F.Supp. 2d 730, 739 (S.D.N.Y. 2001) (stating that the defendant's "alleged desire to realize greater transaction fees and its close relationship with [the plaintiff] are insufficient to show improper motive"). Accordingly, Plaintiffs' failure to plead specific facts giving rise to a "strong inference" that GECC had the requisite intent is an independent and sufficient basis for the dismissal of Plaintiffs Fraud Claim.

Accordingly, Plaintiffs' Fraud Claim should be dismissed.

## POINT II

## PLAINTIFFS' CLAIMS AGAINST GECC FOR BREACH OF FIDUCIARY DUTY, NEGLIGENT MISPRESENTATION, AND PUNITIVE DAMAGES MUST BE DISMISSED (COUNTS II AND III)

### A.     The Fiduciary Duty Claim (Count III)

Under New York law, "[i]n order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the

defendant, and damages that were directly caused by the defendant's misconduct."
Kurtzman v. Bergstol, 835 N.Y.S.2d 644, 646 (2d Dept. 2007); see also Cramer v. Devon
Group, Inc., 774 F. Supp. 176, 184 (S.D.N.Y. 1991) (two primary elements of breach of
fiduciary duty claim are (1) existence of a fiduciary relationship between the parties and
(2) a breach of the duty flowing from the relationship).

       A fiduciary relationship "is grounded in a higher level of trust than
normally present in the marketplace between those involved in arm's length business
transactions." EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 19 (2005) (citation).
Thus, "[a] fiduciary relationship 'exists between two persons when one of them is under a
duty to act for or to give advice for the benefit of another upon matters within the scope
of the relation.'" Id.; see also HF Mgmt. Serv. LLC v. Pistone, 818 N.Y.S.2d 40, 42 (1st
Dept. 2006).  An arms-length business relationship does not give rise to a fiduciary
obligation.  WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (2nd Dept. 2001).
Therefore, "[w]hen parties deal at arms length in a commercial transaction, no relation of
confidence or trust sufficient to find the existence of a fiduciary relationship will arise
absent extraordinary circumstances.'" In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d
Cir. 2002) (quoting Pan Am. Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y.
1994)).

       Here, the SRO makes clear that the Substitute Receiver was to step into
the shoes of Long Hill as a borrower under the LSA and Lockbox Agreement.  The law in
New York is well settled that the "usual relationship of bank and customer is that of
debtor and creditor," rather than that of fiduciaries.  Manufacturers Hanover Trust Co. v.
Yanakas, 7 F.3d 310, 318 (2d Cir.1993) ("[T]he mere fact that a corporation has

borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary.") (internal citation omitted)  <u>See also</u> <u>Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank</u>, 57 F.3d 146, 158 (2d Cir. 1995); <u>In re Sharp International Corp. (Sharp International Corp. v. State Street Bank and Trust Company)</u>, 302 B.R. 760 (E.D.N.Y. 2003); <u>Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp.</u>, 580 N.Y.S.2d 299, 301 (1st Dep't 1992) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower...."); <u>Weinberger v. Kendrich</u>, 698 F.2d 61, 79 (2d Cir. 1982) ("it would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table").  As a lender, GECC owed no fiduciary duty to Plaintiffs as borrowers.

      The Adversary Complaint fails to allege facts to support a fiduciary duty owed by GECC to Plaintiffs.  Instead, Plaintiffs make a conclusory statement that "GE owed plaintiffs the fiduciary duty to perform its duties responsibly and with due regard to the rights of the plaintiffs."  Complt. ¶80.  This conclusory statement, without more, fails to satisfy the pleading requirements of Federal Rule 9(b) and Bankruptcy Rule 7009(b).  Plaintiffs fail to allege any extraordinary circumstances elevating any obligation GECC may have had to Plaintiffs to those of a fiduciary.[6]  The Adversary Complaint is devoid of any allegation of such "extraordinary circumstances" that would suggest that GECC's relationship with Plaintiffs was one of fiduciary trustee.  On these bases, Plaintiffs' claim for breach of fiduciary duty must fail.

---

[6] This is another example of Plaintiffs improperly joining their disparate interests.  GECC was not a signatory to the Purchase Agreement between the Trustee and Oasis and never had any privity with or any obligations to Oasis, let alone a fiduciary one.

Accordingly, Plaintiffs' Breach of Fiduciary Duty Claim should be dismissed.

B.     The Negligent Misrepresentation Claim (Count II)

The Adversary Complaint alleges that "GE[CC] negligently or recklessly misrepresented to plaintiffs that: (i) the Line of Credit was still in force and effect; (ii) it would continue to provide [P]laintiffs with the money that was collected in the lockbox; and (iii) that it would not retain any of the funds deposited in the lockbox." Complt. ¶ 72. This claim is without merit.

First, these are the same "misrepresentations" alleged in Plaintiffs' "fraud" claim and, except for the element of scienter, for the same reasons set forth above (i.e. no particularity and no reasonable reliance), Plaintiffs' negligent misrepresentation claim should be dismissed.

Second, to plead a claim for negligent misrepresentation, a plaintiff must allege facts to support the conclusion that "the defendant had a duty, as a result of a special relationship, to give correct information." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000); Lehman Brothers Commercial Corp. v. Minmetals International, 179 F.Supp.2d 118, 154 (S.D.N.Y. 2000) ("the 'lynchpin' for [a negligent misrepresentation] claim is that a 'special relationship' exists between the parties.") (internal citations omitted).  A failure, as here, to plead facts that could establish a fiduciary relationship with the defendant is "generally fatal to the claim." DDJ Capital Mont., LLC v. Rhone Group LLC, 862 N.Y.S.2d 814 (Sup Ct. N.Y. 2008). Absent proper allegation of such a special relationship, Plaintiffs' claim must be dismissed.  See Eurycleia Partners, L.P. v. Seward & Kissel, LLP, 849 N.Y.S.2d 510, 512

(1st Dept. 2007); <u>Korea First Bank of NY v. Noah Enters.</u>, 787 N.Y.S.2d 2, 4 (1st Dept. 2004).

   As discussed above, there is no such duty in this case.  Under the clear and unambiguous terms of the SRO, Sale Order and Purchase Agreement, Plaintiffs were afforded the rights and privileges of a borrower under the LSA and Lockbox Agreement. <u>See</u> Sale Order, ¶12 ("Upon entry of the Order Appointing Substitute Receiver, the Substitute Receiver shall be deemed to have replaced The Long Hill Alliance Company and/or the Debtors as signatory and responsible person on the Lockbox currently maintained by Citizens Bank for the Debtors' operating account, without the need for any further Order of this Court."); Purchase Agreement, § 5.1 ("Purchaser shall comply with all aspects of the [LSA] with GE[CC] including the establishment of lockbox accounts and executing such other documents as GE[CC] may require."); SRO, p. 21. As noted above, there is no fiduciary duty arising out of the contractual arm's length debtor and creditor legal relationship between a borrower and a lender which would give rise to a cause of action for negligent misrepresentation.  <u>See</u>, <u>e.g.</u>, <u>Bank Leumi</u> 580 N.Y.S.2d at 301; <u>Banque Nationale de Paris v. 1567 Broadway Ownership Associates</u>, 625 N.Y.S.2d 152, 154 (1st Dept. 1995); <u>see</u> <u>also</u> <u>Village on Canon v. Bankers Trust Co.</u>, 920 F. Supp. 520 *8 (S.D.N.Y. 1996) (holding that where there is no special relationship between the parties, plaintiffs' negligent misrepresentation claim must fail); <u>Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.</u>, 2005 WL 832050 *8 (S.D.N.Y. 2005) (same).

   For all of the foregoing reasons, Plaintiffs' claim for negligent misrepresentation must be dismissed.

C.    Punitive Damages Claim (Count III)

The Adversary Complaint contains unsupported, conclusory allegations as a basis for punitive damages.  Specifically, the Adversary Complaint states that "GE[CC]'s misuse and manipulation of this system and abuse of the trust reposed in it by the court, was willful, wanton, quasi-criminal and shocking to the conscience… In order to discourage others from misusing the public trust in the same manner and in order to protect assets entrusted to the Courts by virtue of either bankruptcy or the appointment of a receiver, the Court should impose punitive damages in the amount of $10 million…" Complt., ¶84.

To the extent Plaintiffs seek punitive damages for GECC's alleged willful violation of the automatic stay, such claim should likewise be dismissed as Plaintiffs lack the standing requisite to assert stay violations under section 362(k) of the Bankruptcy Code because under such section only "individual debtors" may recover damages, including punitive damages, for stay violations.  See In re Chateaugay Corp., 920 F.2d 183, 187 (2d Cir. 1993) (holding that the remedy under Section 362(k) is not available to corporate debtors and, instead, is limited only to debtors who are natural persons); see Infra. at Point VI.  Further, Plaintiffs' demand for punitive damages pre-supposes their success on the claims asserted in the Adversary Complaint.  However, even under Plaintiffs' best case, punitive damages are not available.  "Punitive damages are available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'"  New York University v. Continental Ins. Co., 87 N.Y.2d 308, 315-316

(1995) (internal citations omitted.).  GECC's conduct, which was in good faith

compliance with the orders of this Court and the State Court, can hardly rise to the level

required for the imposition of punitive damages.

Moreover, punitive damages are appropriate only in cases where

repetitious conduct by the alleged wrongdoer threatens the public at large.  See Rocanova

v. Equitable Life Assurance Soc'y of the U.S., 83 N.Y.2d 603, 613 (1994) (a private party

seeking to recover punitive damages must not only demonstrate egregious tortious

conduct by which he or she was aggrieved, but also that such conduct was part of a

pattern of similar conduct directed at the public generally); see also In re Marketxt

Holdings Corp., 2006 WL 2864963 * 23-24 (Bankr. S.D.N.Y. 2006).   The case at bar,

however, is a private dispute.  There is no allegation that GECC generally violated court

orders or contractual agreements similar to the ones at issue here, and, if Plaintiffs are

successful (which GECC respectfully submits that should not be), the only person

affected by GECC's conduct would be Plaintiff EF.  Under these circumstances, punitive

damages are inappropriate.

## POINT III

### PLAINTIFFS FAIL TO STATE A CLAIM
### AGAINST GECC FOR NEGLIGENCE (COUNT IV)

A claim for negligence must allege that a duty of care was owed, that the

duty was breached, and that damages were substantially caused by the breach.  See

Merino v. New York City Transit Auth.,  639 N.Y.S.2d 784, 758 (1st Dep't.), aff'd, 89

N.Y.2d 824 (1996); Nathan W. Drage, P.C. v. First Concord Sec., Ltd., 707 N.Y.S.2d

782, 787 (N.Y. Sup. Ct. 2000).  Fatally absent from the Plaintiffs' Adversary Complaint

is any allegation that GECC owed Plaintiffs a legally cognizable duty.  Nor could there

be.  See Megaris Furs, Inc. v. Gimbel Brothers, Inc., 568 N.Y.S.2d 581, 583 (1st Dept.

1991) ("negligent performance of [a] contract [is] a cause of action which simply does

not exist").  There is no duty of care owed by a lender with respect to the lender's

administration of a borrower's loan. See Bank Leumi, 580 N.Y.S.2d at 301 (holding that

there is no "duty of care owed . . . with respect to the negligent administration of an

underlying loan"); Bonnie & Company Fashions, Inc. v. Bankers Trust Co., 945 F. Supp.

693, 713 (S.D.N.Y. 1996) ("[A] defendant who owes plaintiff no duty cannot be liable to

that plaintiff, even if defendant is negligent.").

Plaintiffs' failure and inability to plead a cognizable duty, alone,

constitutes sufficient ground to dismiss the negligence claim.   See Advanced Marine

Technologies, Inc. v. Burnham Sec. Inc., 16 F. Supp.2d 375, 384 (S.D.N.Y. 1998); Scone

Investments, L.P. v. American Third Market Corp., 1998 WL 205338 *10 (S.D.N.Y.

1998).

Moreover, it is well-established that where parties enter into a contract

such as the LSA or the Lockbox Agreement, their rights and obligations are defined by

the contract and courts will not look beyond the terms of the agreement to determine such

obligations. See Sterbenz v. Attina, 205 F. Supp.2d 65, 70 (S.D.N.Y. 2002); In re

Minpeco, USA, Inc. v. Swiss Bank Corp., 237 B.R. 12, 26 (Bankr. S.D.N.Y. 1997)

("[T]he contract as written governs the relationship of the parties and, . . . courts are not

at liberty to impose obligations . . . which are inconsistent with the terms of the contract

[.]"); Pennsylvania Chiropractic Ass'n v. Independence Blue Cross, 2001 WL 1807781, at

*6 (Pa. Ct. Com. Pl. July 16, 2001) ("[T]he law will not imply a contract different than

that which the parties have expressly adopted."(citation omitted).  Thus, courts

consistently dismiss tort claims arising out of contractual obligations.  Freestone v. New England Log Homes, Inc., 819 A.2d 550, 553-54 (Sup. Ct. Pa. 2003) (dismissing claim for negligent advice where negligence alleged was merely "an outgrowth of the contractual obligation of [defendant]"); Givoldi, Inc. v. United Parcel Serv., 729 N.Y.S.2d 25, 27 (1st Dept. 2001) (dismissing claim for negligence where alleged legal duty actually arose from contract).

Finally, even when a fiduciary duty exists between parties (which it does not in this case), compliance with the terms of a contract bars liability for alleged torts. See Harris Trust & Sav. v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 29 (2d Cir. 2002) (finding that an insurer-manager could not breach his fiduciary duty by complying with the terms of an ERISA plan); see also Hale Trucks of Md. v. Volvo Trucks of N. Am., 224 F. Supp. 2d 1010, 1025 (D. Md. 2002) (dismissing claim for breach of fiduciary duty notwithstanding defendant's intent to harm because the defendant's conduct conformed to the terms of the lending agreement between plaintiff and its lender); see also Hackeling v. Charter Financial, Inc. (In re Luis Electrical Contracting Corp.), 149 B.R. 751, 759-60 (Bankr. E.D.N.Y. 1992) (finding that lender's compliance with terms of a loan agreement did not support a fraudulent transfer claim, specifically stating "[t]he Defendants' performances pursuant to both the Loans and Leases gave rise to valid debts owed by the Debtor to the Defendants.").

The respective rights of GECC and Plaintiffs are defined in the LSA, Lockbox Agreement, Cash Collateral Order, Purchase Agreement, Sale Order and SRO. GECC's compliance with the terms of these documents, as more fully set forth in the Arrowsmith Dec., bars the claims that the Plaintiffs now seek to bring.  Plaintiffs cannot

ignore the contractual agreements and may not convert GECC's compliance with the obligations under the Loan Documents and relevant court orders into tort liability. Accordingly, Plaintiffs' claims for fraud, negligent misrepresentation, breach of fiduciary duty, negligence and conversion should be dismissed.

## POINT IV

### PLAINTIFFS FAIL TO STATE A CLAIM
### AGAINST GECC FOR CONVERSION (COUNT V)

In the Fifth Claim, Plaintiffs attempt to plead a claim for conversion against GECC premised solely upon the conclusory allegations that "GE unlawfully exercised dominion and control over plaintiff's property by: (i) keeping certain funds as expenses, fees and interest; (ii) failing to turnover [the Medicaid Retroactive Adjustment]; and (iii) crediting all receivables in the lockbox as a paydown for the line of credit and ultimately paying the Line of Credit down by over $700,000." Complt. ¶95. Plaintiffs' allegations of conversion are patently insufficient and they have not satisfied the standards for maintaining a conversion claim.

In New York, conversion is the exercise of "unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." Lopresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) (internal citations omitted); see Vigilant Ins. Co. of America v. Housing Auth. City of El Paso, Texas, 87 N.Y.2d 36, 44 (1995). To plead a cause of action for conversion, the plaintiff must show that "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession, or control over the property before its conversion, and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration

of its condition or to the exclusion of the plaintiff's rights."  Moses v. Martin, 360

F.Supp.2d 533, 541 (S.D.N.Y. 2004). (internal citations omitted).

Here, Plaintiffs had no legal right or expectation of a legal right to the

accounts receivable in question.  The Substitute Receiver EF's right to use receivables as

the receiver of the Debtor's property were <u>no</u> <u>greater</u> than the Debtor's rights.  Under the

express terms of the SRO, all receivables were required to be deposited into the Lockbox

and further, the Substitute Receiver's rights to use cash collateral were at all relevant

times expressly made subject to GECC's rights under the LSA and Lockbox Agreement.

Further, pursuant to the unambiguous terms of the Purchase Agreement, Plaintiffs could

not have had a reasonable expectation of owning any pre-Closing receivables that were

collected prior to Closing.  For these reasons, Plaintiffs' claim for conversion must be

dismissed.

## POINT V

### PLAINTIFFS LACK STANDING TO ASSERT A
### <u>CLAIM FOR TURNOVER UNDER 11 U.S.C. § 542 (COUNT VII)</u>

Section 542(a) of the Bankruptcy Code provides in relevant part as

follows:  "an entity, other than a custodian, in possession, custody, or control, during the

case, of property that the trustee may use, sell, or lease under section 363 of this title . . .

<u>shall deliver to the trustee,</u> and account for such property or the value of such property,

unless such property is of inconsequential value or benefit to the estate.  11 U.S.C. §

542(a) (emphasis added).  Section 542 by its express terms contemplates the return of

property of the estate to the estate (or the trustee on behalf of the estate).

Plaintiffs lack standing to assert a claim for turnover under Section 542 as they are neither the Debtors nor the Trustee nor has standing been conferred upon them by a prior order of this Court. See Sale Order, ¶ 9. ("Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the Transaction: (a) be a successor to the Debtors or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors."); see also In re STN Enterprises, 779 F.2d 901 (1985); In re Housecraft Industries USA, Inc., 310 F.3d 64 (2d Cir. 2002); In re Commodore International Limited et al., 262 F.3d 96 (2d Cir. 2001). Further, Plaintiffs claim for turnover fails as the Adversary Complaint demands turnover of purported property of the estate to Plaintiffs, as opposed to the Debtors' estate or the Trustee. See 5 COLLIER ON BANKRUPTCY ¶ 542.01 ("The turnover of property of the estate under section 542 must be made to the trustee."). See also In re Quaker Distribs., Inc. 189 B.R. 63, 67 (Bankr. E.D. Pa. 1995) (demand for turnover under 542 is appropriately made only by the debtor, as opposed to a demand for turnover by a non-debtor). Accordingly, in addition to the fact that GECC's retention and use of collections was permissible under all relevant agreements and orders, Plaintiffs' turnover claim fails for lack of standing and should be dismissed.

<h2 style="text-align:center">POINT VI</h2>

<h3 style="text-align:center">PLAINTIFFS LACK STANDING TO ASSERT<br>VIOLATIONS OF THE AUTOMATIC STAY NOR<br>WERE THERE ANY VIOLATIONS UNDER<br>11 U.S.C. § 362 (COUNTS I, II, III, IV AND VII)</h3>

Throughout the Adversary Complaint, Plaintiffs attempt to bootstrap to the rights of the Trustee or creditors of the Debtors' estate in asserting that GECC somehow

violated the automatic stay. First, standing aside, any claims for stay violations against GECC must fail based on the express authority provided for under the Cash Collateral Order. <u>See</u> Arrowsmith Dec. at Exhibit "6", p. 8 ("no post-petition obligation, <u>payment</u>, <u>transfer</u>, grant of security under the Loan Documents, the Shortfall Agreements or this Order shall be <u>stayed</u>, <u>restrained</u>, voidable or recoverable under the Bankruptcy Code or applicable law …") (emphasis added). Thus, under the Cash Collateral Order, this Court excepted from the reach of the automatic stay all payments or transfers authorized under the Revolver.

Second, Plaintiffs, as non-creditor third-parties, do not have standing to assert stay violations. Indeed, the legislative history of Section 362(a) indicates that the stay's purpose is to aid the trustee by allowing him more time to "inventory the debtor's position" and to familiarize himself with the various rights and interests involved." <u>See</u> <u>H.R.Rep. No.</u> 95-595, at 341 (1977), <u>reprinted</u> in 1978 U.S.C.C.A.N. 5963, 6297-98. <u>See</u> <u>In re Mid-City Parking, Inc.</u>, 332 B.R. 798, 816 (Bankr. N.D. Ill. 2005) ("Section 362(a) exists . . . so that a single voice may proceed to represent a diverse body of interests that have otherwise been enjoined from racing to pursue their own interests in scattered forums."); <u>In re Siskin</u>, 231 B.R. 514, 519 (Bankr. E.D.N.Y. 1999) ("The automatic stay typically does not apply to a non-debtor (or non-creditor) third party unless special circumstances exist."); <u>In re Clemmer</u>, 178 B.R. 160, 167 (Bankr. E.D.Tenn. 1995) (holding that third party, non-creditor did not have standing to challenge violations of automatic stay and recover damages.); <u>In re Prairie Trunk Railway</u>, 112 B.R. 924 (Bankr. N.D. Ill. 1990) (holding that a nondebtor-noncreditor third party was not entitled to recover damages under Section 362(h) of the Bankruptcy Code.).

The facts of Prairie Trunk are analogous to those presented here.  See 112 B.R. 924.  In that case, a purchaser of the debtor's assets filed a motion to hold the debtor's senior secured creditor in contempt for violating the automatic stay and sought sanctions.  See id.  The relevant facts of the Prairie Trunk case are as follows:

- A sale order was entered by the bankruptcy court authorizing the sale of certain of the debtor's real estate and tangible personal property to movant for $4.1M.

- The sale order provided that any and all liens asserted against the assets to be sold shall attach to the sale proceeds.

- Sometime after the sale order was entered, but prior to closing, the purchaser learned that the secured creditor sold certain of its collateral which was property of the estate to be sold to movant.

- The purchaser proceeded with the closing with the debtor notwithstanding this discovery and without seeking a credit against the sale price for the collateral sold by the secured creditor.

- At all relevant times, the purchaser was neither a creditor of the debtor nor its estate and had no claim or interest in any of the collateral which was subject to the secured creditor's security interest.

- Further, the secured creditor's actions were taken without court approval.

While the Bankruptcy Court in the Prairie Trunk case held that the secured creditor willfully violated the automatic stay (because, unlike here, the secured creditor's actions were taken without court approval), it held that the remedies afforded by Section 362(h) of the Bankruptcy Code are not available to a purchaser of the debtor's assets as it was neither a debtor nor a prepetition creditor for whose respective benefits the automatic stay is conferred.  See Prairie Trunk, 112 B.R. at 927.  Thus, even if a violation of the automatic stay had occurred (which it clearly did not), Plaintiffs would have no standing to complain.

Based upon the foregoing, Plaintiffs' claims based upon Section 362 of the Bankruptcy Code should be dismissed in their entirety.

## POINT VII

### PLAINTIFFS' CLAIM FOR DECLARATORY
### JUDGMENT SHOULD BE DISMISSED (COUNT VI)

Plaintiffs seek a judgment declaring the rights of the parties to "the funds collected in the lock box." (Adversary Complaint ¶104). Plaintiffs are not entitled to any declaratory relief for several reasons.

First, as demonstrated above, all of the operative Loan Documents and Court orders point unerringly to the fact that it was GECC, and GECC alone, which was entitled to all the accounts receivable collected via the Lock Box Agreement. Plaintiff's insufficient claims for fraud, misrepresentation, negligence, conversion and turnover do not gain any sufficiency by Plaintiffs' rebottling those claims in the form of a claim for declaratory judgment.

Second, all of the funds that went through the Lockbox prior to Closing have been disbursed. This is not a case where an escrow fund is being held by an escrowee who needs direction from a court as to whom to pay the escrow funds. The "wrong", if one had been committed, is past. See Morganthau v. Erlbaum, 59 N.Y.2d 143, 451 N.E.2d 150 (1983) (purpose of declaratory relief is to determine parties' rights before "wrong" occurs).

Third, contrary to Plaintiffs' claims that they have "no adequate remedy at law", if Plaintiffs had any viable claim (which they do not), they would be entitled to damages, which would adequately compensate them for any alleged improper diversion of receivables. Although the existence of an adequate remedy at law is not automatically

fatal to the grant of the discretionary remedy of declaratory relief, its existence bears heavily on whether that discretion is properly exercised.  See Morganthau v. Erlbaum, supra;   see also Ramos v. Madison Square Garden Corp., 257 A.D.2d 492, 684 N.Y.S.2d 212 (1st Dept. 1999); The Benjamin Shapiro Realty Company v. The Great American Insurance Companies, 2000 WL 35489676 (N.Y. Sup. July 5, 2000).

Accordingly, Plaintiffs' Sixth Cause of Action for declaratory judgment should be dismissed.

## CONCLUSION

For all of the foregoing reasons, Defendant GECC respectfully requests that this Court grant, in its entirety, GECC's motion to dismiss the Adversary Complaint for failure to state a claim on which relief can be granted.

Dated: Garden City, New York
      January 6, 2011

MORITT HOCK & HAMROFF LLP

By:/s/_____
*Marc L. Hamroff*
Marc L. Hamroff
William P. Laino
Theresa A. Driscoll
400 Garden City Plaza
Garden City, New York  11530
(516) 873-2000
*Attorneys for Defendant General Electric Capital Corporation*

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK     ) ss:

COUNTY OF NASSAU     )

     Joyce DeSousa, being duly sworn, deposes and says:

     I am not a party to the action, am over 18 years of age and reside at Whitestone, New York.

     On the 6th day of January, 2011, I served a true copy of the Memorandum of Law in Support of Defendant General Electric Capital Corporation's Motion to Dismiss the Adversary Complaint in a securely sealed postpaid wrapper addressed to the last known address of the addressee(s) as indicated below by in an official depository under the care and custody of the United States Postal Service within the State of New York as follows:

Abraham Backenroth, Esq.
Backenroth Frankel & Krinsky LLP
Attorneys for Plaintiffs
489 Fifth Ave., 28th Fl.
New York, NY 10017


                      /s/_____
                      JOYCE DESOUSA

Sworn to before me this
6th day of January, 2011


/s/_____
Dagmar E. Rowinsky
Notary Public, State of New York
No. 4789327
Qualified in Nassau County
Commission Expires 10-31-13