Mark Frankel (516720)
Backenroth Frankel & Krinsky LLP
489 Fifth Avenue
28th Floor
New York, NY 10017
(212) 593-1100
(212) 644-0544 (fax)
abackenroth@bfklaw.com
*Attorneys for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re:                                                  Chapter 11

HIGHGATE LTC MANAGEMENT, LLC,                           Case No: 07-11068 (REL)

                        Debtor,

-----------------------------------------------------------x

EF CONSULTING LLC and OASIS HC LLC,                     Adversary Pro. No. 10-90175

                        Plaintiffs,

                        v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

                        Defendant,

-----------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Backenroth Frankel & Krinsky LLP
489 Fifth Avenue
28th Floor
New York, NY 10017
(212) 593-1100
(212) 644-0544 (fax)
*Attorneys for Plaintiffs*

{043289}

# TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………………………… 1

LEGAL STANDARD…………………………………………………………. 7

STATEMENT OF FACTS……………………………………………………. 8

    The Substitute Receiver Order…………………………………………… 9

    Relationship of Substitute Receiver and Oasis………………………….. 11

    The Lockbox Agreement………………………………………………… 11

    The Cash Collateral Order……………………………………………….. 12

    GECC's Diversion of Highgate's Assets………………………………… 13

POINT I…………………………………………………………………....... 15

    UNDER THE TERMS OF THE SUBSTITUTE RECEIVER ORDER
    AND STATUTORY LAW, GECC WAS NOT PERMITTED TO
    DIVERT THE RECEIVERS' INCOME…………………………………. 15

    A.    GECC Was Not Permitted To Take Any
           Funds From the Substitute Receiver
           Pursuant to the Substitute Receiver Order ………………….. 15

    i.    GECC Was Not Entitled To Any Accrued Interest………………… 18

    ii.    GECC Had No Authority To Divert Assets As Payment For "Fees" 19

    iii.    GECC Had No Authority to Divert the Medicaid Retroactive
          Adjustment…………………………………………………….. 19

        a.  The Medical Adjustment Procedure……………………….. 19

        b.  The Receivers' Medicaid Adjustment…………………………. 21

    B.    GECC Violated New York Law And Was Not Permitted to
           Take Any Funds From The Receiver Or Substitute Receiver………… 23

POINT II……………………………………………………………………….. 24

       THIS COURT SHOULD DENY DEFENDANT'S MOTION TO
       DISMISS BECAUSE PLAINTIFFS HAVE STATED A CLAIM FOR
       EACH OF THE ALLEGATIONS IN THE COMPLAINT………………… 24

A.      Plaintiff's Fraud Claims Are Plead With Particularity…………………….. 24

B.      Plaintiff's Breach Of Fiduciary Duty Claims Must be Sustained………...…… 33

C.      GECC Must Pay Punitive Damages For Its Willful Violations of
       The Court Orders And The Automatic Stay……………………………………….. 36

D.      Plaintiffs Have Stated A Claim For Negligence…………………………………… 39

E.      Plaintiffs Have Plead A Cause Of Action For Conversion…………………………42

F.      Plaintiffs May Properly Assert A Claim For Turnover Under 11 U.S.C. § 542……44

G.      Plaintiffs Have Standing To Assert GECC's Numerous
       Violations Of The Automatic Stay Under 11 U.S.C. § 362 …………….….... 46

H.      Plaintiffs Are Entitled To A Declaratory Judgment Declaring
       The Rights Of The Parties To The Lockbox……………………………….. 50

CONCLUSION……………………………………………………………………….. 54

**Cases**

*Advanced Marine Technologies, Inc. v. Burnham Sec. Inc.*,
16 F. Supp.2d 375, 384 (S.D.N.Y. 1998)................................................................. 40

*Air Crash at Belle Harbor*,
2008 U.S. Dist. LEXIS 109247 (S.D.N.Y. Mar. 10, 2008) ........................................ 38

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................... 9

*Ashcroft v. Iqbal*,
129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ...................................................... 8

*Bank Leumi Trust Co. v. Block*
*3102 Corp.*, 180 A.D.2d 588, 589, (1st Dep't 1992)............................................... 47

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)................................. 7

*Bernheim v. Litt*,
79 F.3d 318, 321 (2d Cir. 1996).......................................................................... 8

*Bland v. Norfolk & So. R. Co.*,
406 F.2d 863, 866 (4th Cir. 1969) ...................................................................... 49

*Bonnie & Co. Fashions v. Bankers Trust Co.*,
945 F. Supp. 693 (S.D.N.Y. 1996)...................................................................... 40

*Borkowski v. Borkowski*,
39 N.Y.2d 982, 355 N.E.2d 287, 387 N.Y.S.2d 233 (1976)...................................... 35

*Budget Service Co. v. Better Homes of Va.*,
804 F.2d 289, 292-93 (4th Cir.1986) ................................................................... 44

*Caldwell v. New Jersey Steamboat Co.*,
47 N.Y. 282, 296 (1872) .................................................................................. 37

*Capital Corp. XXVII v. W.J. Bachman Mechanical Sheet Metal Co., Inc.*,
177 Misc.2d 652, 676 N.Y.S.2d 832...................................................................... 14

*Castle Creek Tech. Partners v. Cellpoint Inc.*,
2002 U.S. Dist. LEXIS 23760 (S.D.N.Y. Dec. 6, 2002) .....................................28,41

*Chase Manhattan Bank N.A. v. Perla*,
65 A.D.2d 207, 411 N.Y.S.2d 66, 68 (1978) ......................................................... 35

*Clemmer*,
178 B.R. 160, 167 (Bankr. E.D.Tenn. 1995) .......................................................................... 46

*Cohen v. Kaback*,
153 N.Y.S. 5 (1st Dep't 1915)................................................................................................ 42

*Colonial Sand & Stone Co. v. Tracy Towing Line, Inc.*,
16 A.D.2d 645 (1st Dep't 1962).............................................................................................. 40

*Commodore Int'l v. Gould* (in *Re Commodore Int'l Ltd.*),
262 F.3d 96, 100 (2d Cir. 2001).............................................................................................. 44

*Constellation Bank, N.A. v. Binghamton Plaza, Inc.*,
236 A.D.2d 698, 653 N.Y.S.2d 208 (3d Dep't 1997) .............................................................. 15

*Copeland v. Saloman*,
56 N.Y.2d 222, 451 N.Y.S.2d 682 (1982) .............................................................................. 15

*Cosmas* v. *Hassett*,
886 F.2d 8, 11 (2d Cir. 1989)................................................................................................. 25

*Country-Wide Ins. Co. v. Frolich*,
119 Misc. 2d 1089, 1092 (N.Y. Civ. Ct. 1983)....................................................................... 31

*Danann Realty Corp. v. Harris*,
5 N.Y.2d 317, 320, 157 N.E.2d 597, 184 N.Y.S.2d 599 (1959)................................................ 31

*Daro Indus. v. RAS Enters.*,
44 N.Y.2d 969, 408 N.Y.S.2d 329 (1978) .............................................................................. 15

*DiVittorio* v. *Equidyne Extractive Industries, Inc.*,
822 F.2d 1242 (2d Cir. 1987).................................................................................................. 25

*Durand & Co. v. Howard & Co.*,
216 F. 585, 588-589 (2d Cir. N.Y. 1914) ................................................................................ 30

*East New York Savings Bank v. 520 West 50th Street, Inc.*,
160 Misc.2d 789, 611 N.Y.S.2d 459 ( N.Y. Co., 1994) ......................................................... 14

*EBC I, Inc. v. Goldman Sachs & Co.*,
5 N.Y.3d 11, 19-20 (2005)...................................................................................................... 32

*Fidelity Mortg. Investors v. Camelia Builders, Inc.*,
550 F.2d 47, 51, 57 (2d Cir. 1976).......................................................................................... 36

*Fierro v. Gallucci,*
 No. 06-CV-5189, 2008 U.S. Dist. LEXIS 38513, 2008 WL 2039545, at *13-*14 (E.D.N.Y.
 May 12, 2008) ................................................................................................................ 31

*Fisher v. Offerman & Co.,*
 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. Sept. 30, 1996) ....................................... 27

*Forrest v. Fuchs,*
 126 Misc. 2d 8, 12 (N.Y. Sup. Ct. 1984) ................................................................... 31

*Foust,*
 2000 Bankr. LEXIS 1146, No. 98-50774 SEG, 98-5032 SEG, M198-00185, 2000 WL
 33769159, at *4, 6 (Bankr. S.D. Miss. July 18, 2000) ............................................. 48

*Freestone v. New England Log Homes, Inc.,*
 819 A.2d 550, 553-54 (Sup. Ct. Pa. 2003*) ..............................................................* 39

*Geisler v. Petrocelli,*
 616 F.2d 636, 639 (2d Cir. 1980) ................................................................................. 6

*Geressy v. Digital Equip. Corp.,*
 950 F. Supp. 519, 523 (E.D.N.Y) .......................................................................... 36,37

*Givoldi, Inc. v. United Parcel Serv.,*
 729 N.Y.S.2d 25, 27 (1st Dept. 2001) ...................................................................... 39

*Glinka v. Federal Plastics Mfg. (In re Housecraft Indus. USA, Inc.),*
 310 F.3d 64, 70 (2d Cir. 2002) .................................................................................... 43

*Gostkowski v. Roman Catholic Church of the Sacred Hearts,*
 262 N.Y. 320, 323, 186 N.E. 798, 799 (1933) .......................................................... 37

*Graham v. Richardson,*
 403 U.S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971) ........................................... 52

*Gumowitz ex rel. West 79th St. Assocs. v. First Fed. Sav. & Loan Ass'n,*
 1994 U.S. Dist. LEXIS 9160 (S.D.N.Y. July 7, 1994) ............................................. 30

*Haas v. Tishman Constr. Corp.,*
 1987 U.S. Dist. LEXIS 137 (S.D.N.Y. Jan. 12, 1987) .............................................. 38

*Hale Trucks of Md. v. Volvo Trucks of N. Am.,*
 224 F. Supp. 2d 1010, 1025 (D. Md. 2002) ............................................................... 39

*Harris Trust & Sav. v. John Hancock Mut. Life Ins*. Co.
 302 F.3d 18, 29 (2d Cir.2002) ..................................................................................... 39

*Hartford Accident and Indem. Co. v. Village of Hempstead,*
48 N.Y.2d 218, 226, 422 N.Y.S.2d 47, 53, 397 N.E.2d 737, 743 ........................................... 36

*HF Mgmt. Servs., LLC v. Pistone,*
2006 NY Slip Op 5153 (1st Dep't 2006).................................................................. 33

*Home Ins. Co. v. American Home Prods. Corp.,*
75 N.Y.2d 196, 203, 551 N.Y.S.2d 481, 485, 550 N.E.2d 930, 934 (1990)........................... 36

*Homer Nat'l Bank v. Namie,*
96 Bankr. 652, 655 (W.D. La. 1989) (section 362(h)................................................. 44

*Horowitz v. Kevah Konner, Inc.,*
67 A.D.2d 38, 42 (1st Dep't 1979) ................................................................... 40

*In re Berscheit,*
223 B.R. 579, 581 (Bankr. D. Wyo. 1998) ............................................................ 48

*In re Murphy Pac. Marine Salvage Co.,*
1982 Bankr. LEXIS 3600, 23-24 (Bankr. E.D.N.Y. Aug. 3, 1982)...................................... 42

*Inman v. Merchants Mut. Casualty Co.,*
190 Misc. 720, 722 (N.Y. Co. 1947) ................................................................. 30

*Investors' Ins. Co. of Am. v. Grisko,*
261 F. Supp. 124 (D. Conn. 1966) ................................................................... 52

*Kaplan v. 2108-2116 Walton Ave. Realty Co.,*
74 A.D.2d 786, 425 N.Y.S.2d 817 (1st Dep't 1980) ................................................. 16

Keiley v. Dusenbury,
42 N.Y. Sup. Ct. 238................................................................................. 37

*Kletschka v. Driver,*
411 F.2d 436 (2d Cir. 1969)......................................................................... 52

*Knight v. U.S. Fire Insurance,*
804 F.2d 9, 11 (2d Cir. 1986)........................................................................ 7

*Kroh Bros. Development Co.,*
91 Bankr. 525, 539 n. 3 (W.D. Mo. 1988)............................................................ 44

*Lau v. Kiley,* 410 F. Supp. 221 (S.D.N.Y. 1976) ...................................................... 52

*Lobel v. Maimonides Med. Ctr.,*
39 A.D.3d 275, 276, 835 N.Y.S.2d 28, 29 (N.Y. App. Div. 2007) ................................... 30

*Lopresti v. Terwilliger,*
   126 F.3d 34, 41 (2d Cir. 1997) (internal citations omitted) ...................................... 41

*Manufacturers Hanover Trust Co. v. Yanakas,*
   7 F.3d 310, 316-318 (2d Cir. N.Y. 1993) ............................................................. 30

*Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.),*
   920 F.2d 183, 187 (2d Cir. N.Y. 1990) ............................................................... 36

*Matney v. First Protective Life Ins. Co.,*
   73 F.R.D. 696 (W.D. Va. 1977) ........................................................................ 38

*Matter of Schewe,*
   94 Bankr. 938, 948 (W.D. Mich. 1989) ............................................................... 44

*MedImmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118, 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007) ................................. 53

*Megaris Furs v. Gimbel Bros.,*
   172 A.D.2d 209 (1st Dep't 1991) ...................................................................... 39

*Meisel v. Grunberg,*
   651 F. Supp. 2d 98, 122 (S.D.N.Y. 2009) ........................................................... 30

*Merino v. New York City Transit Auth.,*
   639 N.Y.S.2d 784, 758 (1st Dep't.), aff'd, 89 N.Y.2d 824 (1996) ........................... 38

*Metromedia Fiber Network, Inc.,*
   290 B.R. 487 (Bankr. S.D.N.Y. 2003) .............................................................. 45,48

*Mid-City Parking, Inc.,*
   332 B.R. 798, 816 (Bankr. N.D. Ill. 2005) ......................................................... 46

*Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield (In re Mid-Island Hosp., Inc.),* 276
   F.3d 123, 130 (2d Cir. 2002) .......................................................................... 33

*Mills v. Polar Molecular Corp.,*
   12 F.3d 1170 (2d Cir. 1993) ........................................................................... 26

*Minpeco, USA, Inc. v. Swiss Bank Corp.,*
   237 B.R. 12, 26 (Bankr. S.D.N.Y. 1997) ........................................................... 39

*Mokuba N.Y. LLC v. Pitts (In re Pitts),*
   2009 Bankr. LEXIS 4023, 18-19 (Bankr. E.D.N.Y. Dec. 8, 2009) ........................... 46

*Morgenthau v. Erlbaum*,
    59 N.Y.2d 143, 148 (N.Y. 1983) ............................................................ 50,51

*Moses v. Martin*,
    360 F.Supp.2d 533, 541 (S.D.N.Y. 2004) ............................................. 50, 51

*Mumford v. Crouch*,
    8 A.D. 529, 538 (N.Y. App. Div. 1896) ....................................................... 29

*Murray v. Xerox Corp.*,
    811 F.2d 118, 122-24 (2d Cir. 1987) ........................................................... 28

*NAACP v. New York*,
    *413 U.S. 345, 93 S.* Ct. 2591, 37 L. Ed. 2d 648 (1973) ............................ 43

*Nash Philips/Copus, Inc. v. el Paso Floor, Inc.*,
    78 Bankr. 798, 803 (W.D. Tx. 1987) ........................................................... 46

*Nathan W. Drage, P.C. v. First Concord Sec., Ltd.*,
    707 N.Y.S.2d782, 787 (N.Y. Sup. Ct. 2000) ............................................... 37

*Newbro v. Freed*,
    409 F. Supp. 2d 386 (S.D.N.Y. 2006) .......................................................... 42

*Newburger v. Lubell*,
    257 N.Y. 383 (N.Y. 1931) ............................................................................ 30

*Nissan Motor Acceptance Corp. v. Baker*,
    239 B.R. 484, 488-89 (N.D. Tex. 1999) ....................................................... 46

*NWFX, Inc.*,
    81 Bankr. 500, 503 n. 3 (W.D. Ark. 1987) .................................................. 46

*NWL Properties, Inc. v. 401 East 89th Street Owners, Inc.*,
    1995 U.S. Dist. LEXIS 4722 (S.D.N.Y., April 12, 1995) ......................... 14

NYCRR § 86-2.10 ................................................................................................ 23

NYCRR § 86-2.10 *et seq* .................................................................................... 23

*One-O-One enters Inc. v. Caruso*, 8
    48 F.2d 1283 (D.C.Cir 1988) ....................................................................... 26

*Pan Am. Corp. v. Delta Air Lines, Inc.*,
    175 B.R. 438, 511 (S.D.N.Y. 1994) ............................................................. 33

*Parnes v. Mast Property Investors, Inc.*,
    776 F. Supp. 792, 795 (S.D.N.Y. 1991)............................................................... 31

*Pennsylvania Chiropractic Ass'n v. Independence Blue Cross*,
    2001 WL 1807781, at*6 (Pa. Ct. Com. Pl. July 16, 2001) ...................................... 39

*Perrotta v. Irizarry*,
    430 F. Supp. 1274 (S.D.N.Y. 1977).......................................................................... 46

*Pierpoint v. Hoyt*,
    260 N.Y. 26, 29, 182 N.E. 235 (1932) ...................................................................... 42

*Pittston Warehouse Corp. v. American Motorists Ins. Co.*,
    1991 U.S. Dist. LEXIS 7030 (S.D.N.Y. May 23, 1991)............................................ 42

*Powers v. Manhattan Ry.*,
    120 N.Y. 178, 182, 24 N.E. 295, 296 (1890)............................................................ 37

*Prairie Trunk Railway*,
    112 B.R. 924 (Bankr. N.D. Ill. 1990) ........................................................................ 47

*Queenie, Ltd. v. Nygard Intern.*,
    321 F.3d 282 (2d Cir. 2003)....................................................................................... 38

*Ramos v. Madison Square Garden Corp.*,
    257 A.D.2d 492 (N.Y. App. Div. 1st Dep't 1999) ..................................................... 43

*Randy Homes Corp.*,
    84 Bankr. 799, 802 (M.D. Fla. 1988)........................................................................ 47

*Reinah Development Corp. v. Kaaterskill Hotel Corp., et al.*,
    86 A.D.2d 50, 488 N.Y.S.2d 686 (1982) .................................................................. 36

*Restivo v. Conservative Party of the State of N.Y.*,
    391 F. Supp.813 (S.D.N.Y. 1975)............................................................................. 45

*Richard Equipment Corp. v. Manhattan Industrial Contracting Co.*,
    9 A.D.2d 691 (2d Dep't 1959).................................................................................. 41

*Riginsky v. Richardson-Merrell, Inc.*,
    378 F.2d 832 (2d Cir. 1967)...................................................................................... 37

*Ripple's of Clearview, Inc. v. Le Havre Associates*,
    88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dep't 1982) ................................................ 16

*Scheuer v. Rhodes,*
 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) ...................................... 7

*Schewe,*
 94 Bankr. 938, 948 (W.D. Mich. 1989) ................................................................. 48

*Schwartzberg v. Whalen,*
 96 A.D.2d 974, 466 N.Y.S.2d 846 (3d Dep't 1983) .............................................. 17

*Scone Investments, L.P. v. American Third Market Corp.,*
 1998 WL 205338 *10 (S.D.N.Y. 1998) .................................................................. 44

*Securities and Exchange Commission v. Geyser Minerals Corp.,*
 452 F.2d 876 (10th Cir. 1971) .............................................................................. 29

*Security Pacific Mortgage and Real Estate Services, Inc. v. The Republic of the Philippines,*
 962 F.2d 204 (2d Cir. 1992) ................................................................................. 19

*Sharapata v. Town of Islip,*
 56 N.Y.2d 332, 452 N.Y.S.2d 347, 349, 437 N.E.2d 1104 (1982) ........................ 35

*Shea & Gould v. Red Apple Cos.* (*In re Shea & Gould*),
 198 B.R. 861, 870 (Bankr. S.D.N.Y. 1996) ........................................................... 46

*Sherwood v. Graco, Inc.,*
 427 F. Supp. 155 (D. Colo. 1977) ......................................................................... 37

*Shields v. Citytrust Bancorp.,*
 25 F.3d 1124 (2d Cir. 1994) ................................................................................. 30

*Siskin,*
 231 B.R. 514, 519 (Bankr. E.D.N.Y. 1999) ........................................................... 36

*Skinner,*
 90 Bankr. 470, 474 n. 2 (D. Utah 1988) ............................................................... 36

*Soucy v. Greyhound Corp.,*
 27 A.D. 112, 113 276 N.Y.S.2d 173, 175 (1967) .................................................. 37

*Sterbenz v. Attina,*
 205 F. Supp.2d 65, 70 (S.D.N.Y. 2002) ................................................................ 38

*STN Enterprises,*
 779 F.2d 901, 904 (2d Cir. Vt. 1985) ................................................................... 47

*Taylor v. New York City Transit Auth.*,
   309 F. Supp. 785 (E.D.N.Y.), *aff'd*, 433 F.2d 665 (2d Cir. 1970) ........................... 45

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)....................................... 26

*The Benjamin Shapiro Realty Company v. The Great American Insurance Companies*,
   2000 WL 35489676 (N.Y. Sup. July 5, 2000) ...................................................... 43

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400, 403-04 (2d Cir. 2006) .............................................................. 41

*United Christian Scientists v. Christian Sci. Bd. of Dirs.*,
   829 F.2d 1152, 1158-71, 265 U.S. App. D.C. 20 (D.C. Cir. 1987) ........................... 43

*United States v. Inslaw, Inc.*,
   113 Bankr. 802, 1989 U.S. Dist. LEXIS 14001.................................................... 44

*Vigilant Ins. Co. of America v. Housing Auth. City of El Paso, Texas*,
   87N.Y.2d 36, 44 (1995) ............................................................................. 41

*Vogel v. Sands Bros. & Co.*,
   126 F. Supp. 2d 730 (S.D.N.Y. 2001)............................................................... 26

*Wagner*,
   74 Bankr. 898, 903 n. 12 (E.D. Pa. 1987)........................................................ 44

*Walker v. Sheldon*,
   10 N.Y.2d 401, 404 (N.Y. 1961) .................................................................... 35

*Westchester Teamsters Local 456 Annuity Fund v. Fleet Nat'l Bank*,
   2006 U.S. Dist. LEXIS 54213 (S.D.N.Y. Aug. 18, 2006) ....................................... 35

*White v. Wood (In re Debevec)*,
   2002 Bankr. LEXIS 1577, 8-9 (Bankr. W.D. Va. Dec. 4, 2002).............................. 47

*Williams v. WMX Techs., Inc.*,
   112 F.3d 175, 178 (5th Cir. 1997) ................................................................ 25

*WIT Holding Corp. v. Klein*,
   282 A.D.2d 527, 52................................................................................... 33

*Zaber*,
   223 B.R. 102, 105 (Bankr. N.D. Tex. 1998)...................................................... 38

## PRELIMINARY STATEMENT

Plaintiffs EF Consulting, LLC (the "Substitute Receiver") and Oasis HC LLC ("Oasis") respectfully submit this memorandum of law in opposition to defendant General Electric Capital Corporation's ("GECC") motion to dismiss and in support of plaintiffs' motion for summary judgment. GECC's motion to dismiss attempts to turn the Bankruptcy and Receivership law on its head and argues that GECC was permitted to convert millions of dollars from the Debtors while the Debtors' assets were exclusively under the control of the court appointed Receiver and thereafter the Substitute Receiver. GECC does not deny that it took millions of dollars of the Debtors' and Receivers' funds; (i) as undefined fees and interest; (ii) including $610,218 received from Medicaid. GECC converted these millions of dollars while the Receiver and then the Substitute Receiver, were faced with significant budget shortfalls. As a result of GECC's unauthorized taking of funds the Receiver and Substitute Receiver were unable to pay a commensurate amount of Receivership expenses which were required to be paid first before GECC could take anything. As detailed below, as a matter of law, the post petition trade debt must be paid before GECC could even make a claim to any of the funds that it took. Therefore, the Court should grant plaintiffs partial summary judgment and Order GECC to return the funds to plaintiffs.

GECC's unauthorized taking was a simple and effective scheme. At the time of the bankruptcy filing in April 2007, the Debtors owed GECC money under a credit line (the "LSA") in the amount of $3,492,795 (the "Pre-Petition LSA Debt"). Prior to and throughout this Bankruptcy, all of the Debtors' income would be remitted to a lockbox. GECC transferred the income received in the lockbox ("Lockbox Income") to GECC's own account. Only upon

request of the Court appointed Receivers did GECC then remit <u>part,</u> but not all of the Lockbox Income to the Receivers leaving Receivership expenses unpaid. The difference GECC improperly took in violations of court orders and state law.

Under Statutory law and Court Orders all of the Lockbox Income had to be remitted to the Receivers, first to be applied to the ongoing expenses of the Receivership. GECC's violation of statutory law, Court Orders and outright conversion of the Lockbox Income left the Receivers unable to an equal amount of trade creditors for post-petition debt.

GECC did this in three ways. First, GECC used the Lockbox Income to pay itself fees. The Substitute Receiver Order did not permit GECC to receive any fees. GECC's fees during the bankruptcy (which were taken from the Lockbox Income) were $804,358.

Second, GECC used the Lockbox Income to pay itself interest in the amount of $760,313. This is not permitted by statutory law or case law. The Substitute Receiver Order explicitly required the Substitute Receiver to first pay all of its post petition trade creditors and expenses before GECC was permitted any interest payments. The trade creditors were not paid in full and the Receiver had a shortfall at all times. The substitute Receivers' accounts payable and resulting shortfall at the time of the Closing was over $13 million.

Third, GECC seized $610,218 from the Lockbox Income which Medicaid paid to the Substitute Receiver as a retroactive adjustment for accounts receivable fees owed by New York State. This adjustment was ordinary income that was due to the Substitute Receiver. The Substitute Receiver Order does not permit GECC to take any of the Substitute Receiver's income and then, only interest provided all of the expenses of the Receivership were paid – which they clearly were not.

GECC attempts to lay a smokescreen before the Court by confusingly setting forth an amalgam of bankruptcy orders, state court foreclosure orders and, incredibly plaintiff's purchase agreement with debtors (to which GECC is not a signatory). None of these Orders ever permitted GECC to take the funds (as fees, interest, principal or otherwise) that it took from the Receivers in priority to the payment of Receivership expenses, if at all.

As this Court is well-aware, the operative documents, including this Court's final sale order and the State court's substitute receiver order, clearly did not allow GECC to take any fees. GECC was allowed to collect only accrued interest if a surplus existed. There was no surplus and therefore GECC could not receive interest. Indeed, under well established bankruptcy law, because GECC had insufficient collateral to cover its claims, GECC was not entitled to interest and attorneys fees at all.

GECC misleadingly attempts to paint itself as a victim. Nothing could be further from the truth. GECC's conversion of over $2.2 million of the Lockbox Income left the Substitute Receiver unable to pay all of the trade creditors for post petition expenses. The funds which GECC should be required to return to plaintiffs can be used to pay trade creditors for post petition debt incurred by both Receivers.

As a direct result of GECC's actions, both of the plaintiffs have been harmed – the Receiver was denied funds she was entitled to, and the purchaser was now required to pay an additional $2.2 million in unpaid receivership expenses that should have been paid by the Receiver if all the funds that should have been advanced to her by GECC was advanced as opposed to having been withheld.

The intent and content of the Orders and the purchase agreement provide for the following course of events:

(i)     as of November 3, 2008, the Substitute Receiver was entitled to all of the

        Debtors' income including outstanding accounts receivable;

(ii)    as of November 3, 2008, the Substitute Receiver was responsible for its post-

        petition expenses as well as the outstanding expenses of the first Receiver;

(iii)   as of the closing date which occurred on August 30, 2010 (the "Closing"), Oasis,

        the purchaser, took title to all of Debtors' assets, which included all of the

        Receivers' income and accounts receivable; and

(iv)    as of the Closing, Oasis  assumed the responsibility to pay all of the the

        Receivers' outstanding post petition trade creditors and expenses.

Oasis had to pay millions of dollars for the Receivers' expenses and trade creditors, because GECC's conversion left the Substitute Receiver with an additional $2.2 million dollar shortfall with regard to the payment of post petition trade debt.[1]  When Oasis closed on its purchase of the nursing homes, Oasis was entitled to all of the Receivers' income and accounts receivable, including the converted funds taken by GECC.  The funds improperly taken by GECC would have been used by the Substitute Receiver to pay down the post petition trade creditors and Oasis would have assumed less outstanding post petition trade debt and expenses. Instead, GECC misappropriated the money, in violation of all the court orders.

GECC's actions were contrary to bankruptcy law, Court Orders in this case and New York statutory laws that govern receivers.  The Substitute Receiver is an agent of the Court. The

---

[1] GECC makes the confusing argument that both plaintiffs are not necessary in this action since they were both not damaged.  GECC misses the point.  Plaintiffs seek simply the return of the same bundle of the Receivers' accounts receivable that belonged to the Receivers.  This money should have been available to the Substitute Receiver to pay off post petition trade creditors and expenses.  Since it was not, the Substitute Receiver was left with a significant shortfall which it did not pay, thereby obligating Oasis at closing.  Both plaintiffs seek the return of the funds so that post petition trade creditors and expenses may be paid with these funds.

Substitute Receiver is imbued with those powers outlined by the Court in the Substitute Receiver Order pursuant to its statutory authority. Neither the Substitute Receiver Order nor the law allowed GECC to divert the Receivers' funds collected in the lockbox and retain a portion for itself as interest, "fees," principal payback or otherwise, while the Receivers' operational expenses remained unpaid.

Under the Substitute Receiver Order, the Substitute Receiver was tasked with collecting all accounts payable and using those funds to pay the operating expenses of the skilled nursing facilities owned by Debtors and operated by the Receivers. This is a court-appointed function, not a service for GECC. If there was any money remaining (which there never was), the Substitute Receiver, like any other court-appointed receiver, was permitted to pay interest only under the Revolving Credit Note (the "LSA"). This Substitute Receiver Order mirrored New York law and at most GECC was entitled to accrued interest only *after* all expenses were paid. The expenses were never paid.

Worse, because this was bankruptcy, the Lockbox Income was off limits to GECC, just like all of any Debtors' income. Only if authorized by Court order could funds be retained. The fact that the money came into a lockbox which was previously used by the Debtors did not give GECC permission to misuse that right by withholding funds for its own benefit in violation of specific orders which prioritized the use of those funds and which forbade the use of those funds under any circumstances unless and until the Receivership obligations were paid first – which they were not!

To avoid its inability to collect the accrued interest, principal and "fees" from the Substitute Receiver through the normal course of business (or through the operation of state

receivership law and federal bankruptcy law), GECC mislead the Substitute Receiver and misused the lockbox arrangement previously existing between Debtors and GECC.

Although the lockbox arrangement itself survived the Substitute Receiver Order, the mere existence of the lockbox did not entitle GECC to divert the funds collected by the Substitute Receiver (through the lockbox) which had to be first turned over to the Receiver to pay Receivership expenses under court order. The lockbox was merely a method to collect the income and ensure that the Court, GECC and other creditors were all kept apprised of what was collected by the Receiver and Substitute Receiver. All money from the lockbox is required to be turned over to the Substitute Receiver as specifically required under court order.

In any event, under the Substitute Receiver Order (and New York law), the scheme concocted by GECC was unlawful. GECC was not entitled to collect any payments or pay down the pre-petition LSA debt—all money collected by the Substitute Receiver was to be applied only to the Receivers' operating costs. Only if there was a surplus in operations, which concededly there was not, could GECC be entitled to any pay down whatsoever.

Since the petition was filed, GECC inappropriately converted at least three categories of funds: (i) over $760,313.90 in interest; (ii) over $804,358 in unexplained "fees" and "expenses; and (iii) $610,218 Medicaid adjustment – or approximately $2.2 million dollars that should have gone to the payment of Receivership expenses.

Therefore, the plaintiffs are entitled to partial summary judgment on each of its causes of action in the Complaint, including those sounding in fraud, negligent misrepresentation, breach of fiduciary duties, negligence, conversion, declaratory judgment, and turnover pursuant to 11 U.S.C. § 542.

## **LEGAL STANDARD**

Pursuant to Federal Rules of Civil Procedure § 12(b)(6), a defendant may move to dismiss for "failure to state a claim upon which relief may be granted." In reviewing a Rule 12(b)(6)motion, the task of the court "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974). A court must accept the plaintiff's factual allegations as true, drawing all reasonable inferences in plaintiff's favor. *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir 1996); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (citation omitted); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage . . . .").

Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Knight v. U.S. Fire Insurance,* 804 F.2d 9, 11 (2d Cir. 1986) (citation omitted), *cert denied.,* 480 U.S. 932 (1987). Rule 56 is made applicable to adversary proceedings in bankruptcy by Fed. R. Bank. P. 7056. Under the standards of this Court, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(a). While the party resisting summary

judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. As the Supreme Court has held, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

As set forth below, under the applicable legal standards the Court should deny defendant's motion to dismiss and grant plaintiffs' summary judgment on their complaint.

### STATEMENT OF FACTS

Highgate LTC Management, LLC ("Debtors") was the operator of three skilled nursing facilities in the Albany region and the City of Cortland with a total of over 500 beds (the "facilities"). Highgate Manor Group, LLC also owned the real property upon which the facilities are located.

On or about May 26, 2005, Highgate and GECC entered into three agreements: (a) a Loan and Security Agreement pursuant to which GECC provided Highgate with a revolving line of credit of up to $4 million for the operation of the facilities (the "LSA" or "Line of Credit"); (b) a Lockbox Account Agreement; and (c) a Loan Agreement for up to $23,500,000 secured by mortgages (collective, the "Loan Documents").

On or about April 2006, Debtors defaulted by failing to make payments under the Loan Documents. On or about October 11, 2006, GECC commenced an action against Highgate to foreclose on its mortgages and for the appointment of a receiver.

On or about November 29, 2006, the Court appointed The Long Hill Alliance Company ("Long Hill" or the "Receivers") as a receiver of the properties and the facilities.

On or about April 16, 2007, Highgate filed for Chapter 11 relief. The bankruptcy court appointed a trustee who obtained an order from the bankruptcy court to arrange the sale of most

of Highgate's assets (the "Final Sale Order").  Under the Final Sale Order, Oasis HC, LLC purchased all of Highgate's assets.  EF Consulting, LLC (the "Substitute Receiver") replaced Long Hill as the receiver until the purchase was finalized.  The Final Sale Order provided, *inter alia*, that purchasers took all assets free and clear of all liens and encumbrances and that there be no successor liability.

## The Substitute Receiver Order

On or about November 3, 2008, the Court issued an order appointing EF Consulting, LLC as the substitute receiver on the properties and facilities.  Pursuant to the Substitute Receiver Order, the Substitute Receiver was subject to the laws governing receivers under the Real Property and Proceedings Law and the Public Health Law.  *See* Exhibit 10, p. 15.

Like all receivers, the Substitute Receiver was given the power to collect all income and account receivables of Highgate and to pay all trade creditors, accounts payable and expenses of the properties and facilities necessary for their continued operation.  *See* Exhibit 10, pp. 8, 9, 11. The Substitute Receiver was given sole control over all bank accounts containing assets of Highgate.  As stated in the Order:

> The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder, including, in Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes…

Exhibit 10, p. 15.

All incoming payments were ordered to go directly towards expenses of the properties and facilities:

> The Substitute Receiver shall collect incoming payments from all sources ***and apply them to the costs incurred in the performance of its functions and obligations hereunder***.

Exhibit 10, p. 16 (emphasis added).


Under the Substitute Receiver Order, only after ***all*** expenses were paid could the remaining funds be applied to accrued interest under the Line of Credit.

> That the Substitute Receiver be, and hereby is, authorized and directed: (a) to keep the Mortgaged Premises insured against loss or damage by fire and in repair; (b) to pay the taxes, assessments, water charges, sewer rents, electric bills, and other charges on the Mortgaged Premises, in a manner consistent with the provisions of this Order; (c) to comply with all requirements of any municipal department or authority having jurisdiction over the Mortgaged Premises; (d) to procure, if necessary, such insurance and liability insurance against claims for losses or injuries to persons and property, which may be asserted by persons on, near or about the Mortgaged Premises, as may be necessary; and (e) to pay to Plaintiff monthly, ***out of funds remaining in the custody of the Substitute Receiver***, all interest accrued on the Revolving Credit Note, provided that any unpaid interest shall continue to accrue on the Real Estate Loan, Senior Promissory Note and Revolving Credit Documents secured by its Consolidated and Leasehold Mortgages.

Exhibit 10, p. 25 (emphasis added).

Critically, there is no provision at all allowing for the payment of any fees, expenses or principal to GECC aside from interest under the Line of Credit (if there were surplus funds – which there wasn't) and GECC is given no control over any of Highgate's assets. In fact, the Substitute Receiver Order is clear:

> ***The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder***, including, in Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes…

Exhibit 10, p. 15 (emphasis added).

Further, the Substitute Receiver Order gives the Substitute Receiver the authority to utilize **_all_** of the Debtors' accounts receivable to meet its obligations.

> That the Substitute Receiver **_shall be entitled to utilize all accounts receivable_** cash existing at the Facility as of the date of the commencement of its appointment as receiver to meet Substitute Receiver's obligations hereunder except that funds held in escrow by Long Hill for professional fees shall not be deemed to be cash existing at the Facility but shall be turned over by Long Hill to be held in escrow by counsel to the Trustee.

Exhibit 10, p. 9 (emphasis added).

## Relationship of Substitute Receiver and Oasis

The intent and provision of the Orders was for the purchaser Oasis to ultimately receive all of the assets and income of the Receiver and Substitute Receiver. Likewise, Oasis accepted certain liabilities. Accordingly, the Substitute Receiver and Oasis, the purchaser of the nursing homes, have a unity of interest and equal standing to assert any claims. Oasis was a direct intended beneficiary of all of the orders and agreements.

## The Lockbox Agreement

Under the terms of the Substitute Receiver Order, the Court ordered that

> The Substitute Receiver shall forthwith deposit all monies received by it at the time it receives same in a special account in its own name as Substitute Receiver in RBS Citizens Bank, N.A.,…[n]othing herein is intended to amend, modify or abrogate the lock box arrangement for the collection and deposit of accounts receivable by the Substitute Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC.

Exhibit 10, p. 21-22.

The "lock box arrangement" was created prior to the Receivership and Bankruptcy filing, and is embodied by a Lockbox Account Agreement (the "Lockbox Agreement") between GECC, Highgate and Manufacturers and Traders Trust Company (the "bank"). Exhibit 3. The Lockbox Agreement, like most such agreements, is simply a *mechanism* for GECC to ensure that all accounts receivable are properly collected. The Lockbox Agreement provides that all accounts receivable collected by the lockbox to a "Concentration Account" designated by GECC. Under the Lockbox Agreement, Highgate has the explicit authority to modify this arrangement.

> Company may modify these directions by written notice to Bank and Lender, provided that such a modification shall not become effective until ten (10) business days after receipt by Bank and Lender of such notice by facsimile or overnight delivery service as the addresses or facsimile numbers shown in Section 12 below.

Exhibit 3, p. 3.

The Lockbox Agreement does not in any way permit GECC to utilize any of Debtors' income to pay principal, interest or fees. Moreover, as stated above, the Substitute Receiver Order does *not* permit GECC to take funds that are needed to be paid to trade creditors for the Receiver's expenses.

**The Cash Collateral Order**

The Cash Collateral Order ("CCO") cited extensively by GECC is dated May 14, 2007. Like all cash collateral orders, it gives super priority to liens incurred post petition. What it does not do, is allow GECC to pay itself.

There were numerous stipulations and order modifying the COO (the "Modification Orders"). GECC does not cite to any of them because the budgets attached to each of the Modification Orders does not provide for the payments of interest, fees or principal to GECC in the amounts that GECC took.

**GECC's Diversion of Highgate's Assets**

*Prior* to Highgate's default under the Loan Documents and the bankruptcy filing, when money was deposited into the lockbox, GECC would apply the money collected from the lockbox into the Concentration Account to pay down the outstanding Line of Credit. In this way, the Line of Credit would have new funds available for disbursement to Highgate. Once the Bankruptcy was filed, the Pre-Petition LSA Debt could not be paid down.

When the Substitute Receiver was appointed, GECC took the lockbox funds. As discussed below, this arrangement is against the Substitute Receiver Order, New York law and a violation of the automatic stay in bankruptcy. GECC unlawfully manipulated the lockbox and took alleged expenses and interest on a regular basis leaving an equal amount of Receivership obligations unpaid. Since the petition was filed, GECC inappropriately converted at least three categories of funds: (i) a $610,218 Medicaid reimbursement; (ii) over $804,358.28 in unexplained "fees" and "expenses;" and (iii) over $760,313.79 in interest – or approximately $2.2 million dollars

As noted, Medicaid made a $610,218.18 rate-adjustment payment to the facilities. When the check cleared the lockbox, GECC decided to retain the entire amount and refused to return it to the Substitute Receiver to pay outstanding Receivership expenses. The Substitute Receiver immediately made a motion in state court for the return of this money. The State Court found that the Bankruptcy Court was the proper forum for such actions. Accordingly, plaintiffs filed the instant adversary proceeding.

The Substitute Receiver Order (and New York law) does not allow GECC to retain control over the income of the Receivers to pay down the Line of Credit. Further, under bankruptcy law, post-petition income of the debtors was absolutely off-limits to anyone, let alone

GECC. Under the order, all income of the facilities belonged solely to the Substitute Receiver, and by extension plaintiff Oasis.  As a result of GECC's actions, plaintiff Oasis was forced to pay for millions of dollars in extra liabilities at closing. GECC diverted over $2.2 million from the Receivers.

**UNDER THE TERMS OF THE SUBSTITUTE RECEIVER
ORDER AND STATUTORY LAW GECC WAS NOT PERMITTED TO
DIVERT THE RECEIVERS' INCOME**

A.   **GECC Was Not Permitted To Take Any
Funds From the Substitute Receiver
Pursuant to the Substitute Receiver Order**

Under the Substitute Receiver Order, GECC had no authority to: (a) divert the Substitute

Receiver's assets to its own bank account; (b) apply those funds to pay down the Line of Credit;

(c) collect any funds as accrued interest or expenses under the LSA line of credit; (d) lower the

LSA Pre-Petition Debt;  and certainly not before all Receivership expenses were paid – which

they were not.

Under New York law it is well-settled that a receiver is an agent of the Court with only

the powers given to it by the order appointing the receiver.  *Copeland v. Saloman,* 56 N.Y.2d

222, 451 N.Y.S.2d 682 (1982) ("A receiver…acts as the hand of the court"); *Constellation Bank,*

*N.A. v. Binghamton Plaza, Inc.,* 236 A.D.2d 698, 653 N.Y.S.2d 208 (3d Dep't 1997) ("A

receiver acts as the hand of the court with only those powers provided in the appointment order

and may perform only those acts expressly authorized therein"); *Security Pacific Mortgage and*

*Real Estate Services, Inc. v. The Republic of the Philippines,* 962 F.2d 204 (2d Cir. 1992), *citing*

*Daro Indus. v. RAS Enters.,* 44 N.Y.2d 969, 408 N.Y.S.2d 329 (1978) ("[a]s a court-created

entity, a receiver has only those powers provided for in the appointment order and may perform

only those acts expressly authorized by the appointing court").  Although a receiver oftentimes

benefits the mortgagee, the receiver does not work for the mortgagee.  *Ripple's of Clearview,*

*Inc. v. Le Havre Associates,* 88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dep't 1982) ("[c]ase law

clearly provides that a receiver is an officer of the court and cannot be considered the agent of

the owner or mortgagee") (citations omitted); *Kaplan v. 2108-2116 Walton Ave. Realty Co.,* 74 A.D.2d 786, 425 N.Y.S.2d 817 (1st Dep't 1980) ([a] Receiver is an officer of the court and not an agent of the mortgagee or the owner...[h]is duty is to preserve and operate the property, within the confines of the order of appointment") (citations omitted). Therefore, the Substitute Receiver is bound by the terms of the Substitute Receiver Order, and GECC was not entitled to collect or divert funds in a manner inconsistent with that order.

Under the plain terms of the Substitute Receiver Order, the Substitute Receiver had the sole authority to collect the Debtors' accounts receivable (the Lockbox Income) and maintain its bank accounts. There is no authority whatsoever under the Substitute Receiver Order for GECC to maintain or collect any funds. In fact, the only funds GECC was entitled to was interest under the LSA <u>after</u> the Substitute Receiver paid all of its operating expenses. It is indisputable that this *never* occurred because the Receivers' outstanding accounts payable for post-petition expenses was over $13 million.

Notably, GECC was to be paid from funds "***in the custody of the Substitute Receiver***." (emphasis added). As the Court ordered:

> That the Substitute Receiver is not the owner of the Facility but, in contemplation of the purchase of the Facility, and notwithstanding any provision in the Final Sale Order to the contrary, he, together with the Purchaser and Operating Designee (a) shall pay in the ordinary course all of the obligations and Expenses, as defined, including all payables, liabilities or obligations of any kind incurred by the Substitute Receiver from the inception of its receivership, and (b) shall pay in the ordinary course, all of the obligations and Expenses incurred by Long Hill in its performance of Long Hill's obligations under the Receivership Order.

Exhibit 10, p. 11,

> The Substitute Receiver shall collect incoming payments from all sources and apply them to the costs incurred in the performance of its functions and obligations hereunder. In the event that the

Department of Health determines that deficiencies exist at the Facility, and in accordance with applicable law imposes a civil penalty, such penalty may be assessed against the Substitute Receiver, the Purchaser or the Operating Designee if the Department of Health, in its discretion, determines either that the deficiencies arose subsequent to the appointment of the Substitute Receiver or that the deficiencies arose prior to such appointment, but were onto corrected within a reasonable period of time.  Such penalty, if any, shall be paid by the assessed party.  In the event any such penalty has not been paid prior to the Closing, as such term is defined in the Final Sale Order, it shall be paid by Purchaser and/or the Operating Designee at or before the Closing.

Exhibit 10, p. 16.  (emphasis added)

That Long Hill, Highgate Manor, Highgate Management, their affiliates and all of their partners, agents, attorneys, representatives, employees and assigns, (a) shall hold in trust and immediately pay over to the Substitute Receiver any and all rents, issues, profits, medical reimbursements, or other income with respect to the Mortgaged Premises received by any of them on or after the appointment of the Substitute Receiver, including those proceeds, rents, issues, profits and other income that have accrued prior thereto and remain unpaid as of such appointment; and (b) shall hold in trust and immediately pay over to the Substitute Receiver any and all security deposits received from residents, patients, tenants, subtenants, licensees or other persons for the lease, use or occupancy of the Mortgaged Premises.

Exhibit 10, p. 23.

That the Substitute Receiver be, and hereby is, authorized and directed: (a) to keep the Mortgaged Premises insured against loss or damage by fire and in repair; (b) to pay the taxes, assessments, water charges, sewer rents, electric bills, and other charges on the Mortgaged Premises, in a manner consistent with the provisions of this Order; (c) to comply with all requirements of any municipal department or authority having jurisdiction over the Mortgaged Premises; (d) to procure, if necessary, such insurance and liability insurance against claims for losses or injuries to persons and property, which may be asserted by persons on, near or about the Mortgaged Premises, as may be necessary; and (e) to pay to Plaintiff monthly, out of funds remaining in the custody of the Substitute Receiver, all interest accrued on the Revolving Credit Note, provided that any unpaid interest shall continue to accrue on the Real Estate Loan, Senior Promissory Note and Revolving

> Credit Documents secured by its Consolidated and Leasehold Mortgages.

Exhibit 10, p. 25. (emphasis added)

Clearly the court did not condone the situation presented here, where GECC retained money it had in its own custody before it ever reached the hands of the Substitute Receiver. Under the plain terms of the Substitute Receiver Order, the Substitute Receiver had the sole authority to collect Debtors' accounts receivable and maintain its bank accounts. There is no authority whatsoever under the Substitute Receiver Order for GECC to maintain or collect any funds – yet alone pay itself before Receivership expenses.. In fact, any payment for interest to GECC was only after the Substitute Receiver paid all its expenses. This never occurred.

Plaintiffs are not, and never were, a party to the Loan Agreement and thus this agreement has no bearing on the rights or responsibilities of the parties in this action. The Lockbox Agreement, too, like most such agreements, is simply a *mechanism* for GECC to ensure that all accounts receivable are properly collected. The Lockbox Agreement does not in any way permit GECC to utilize any of the Debtors' and the Receivers' income to pay principal, interest or fees. The Final Sale Order provided, *inter alia*, that purchasers took all assets free and clear of all liens and encumbrances and that there be no successor liability. Once again, no part of the Final Sale Order allows for the unrestrained payments of interest, fees, or principal.

### i. GECC Was Not Entitled To Any Interest

Under the plain terms of the Substitute Receiver Order all funds collected by the Substitute Receiver were to be applied to pay the legitimate operating expenses of the facilities. Then, *and only then*, was the Substitute Receiver authorized to pay GECC for accrued interest "out of funds *remaining* in the custody of the Substitute Receiver."

Clearly, GECC was entitled only to "remaining" funds from the Substitute Receiver, *e.g.* funds remaining after the Substitute Receiver discharged its duty maintaining the facilities and paying their operating expenses. As discussed above, the Substitute Receiver owed over $13 million for its accounts payable and operating expenses. Therefore, there were no "funds remaining" for the payment of accrued interest to GECC. GECC's collection of over $305,348 during the Substitute Receivers' tenure in accrued interest, therefore, violated the express terms of the Substitute Receiver Order. Therefore, the Court should grant plaintiffs judgment in the amount of $$305,348.

ii.      **GECC Had No Authority To Divert Assets As Payment For "Fees"**

The Substitute Receiver Order contains absolutely no authority for GECC to keep money as "fees." GECC collected over $645,014 from the Substitute Receiver's assets simply as unexplained "fees," with no authority. Therefore, the Court should grant plaintiff's partial summary judgment in the amount of $645,014.

iii.      **GECC Had No Authority to Divert the Medicaid Retroactive Adjustment**

In addition to the "fees" and interest seized by GECC, GECC also took a $610,218.18 Medicaid Retroactive Adjustment from the Lockbox Income.

a.      **The Medicaid Adjustment Procedure**

In order to understand why GECC's seizure of the Medicaid Retroactive Adjustment was illegal it is important to understand the Medicaid System and how it operated in nursing home context. Nursing homes must be certified by the Department of Health of the State of New York ("DOH"). It is the policy of Federal and State reimbursement programs alike to ensure that each resident of a Skilled Nursing Facility ("SNF") receives the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being of that

patient, in accordance with a comprehensive assessment and plan of care. The primary purchaser

of nursing home services is the State of New York. Through the Medicaid program, New York

State pays for the treatment and room and board of nursing home residents. Each County's

Department of Social Services ("DSS") is the federally designated state agency responsible for

the payment of nursing home services to providers such as Debtors. DSS pays the nursing home

for the patient services it provides to its Medicaid residents via what is known as the "Medicaid

Rate," which is determined by the DOH. The initial Medicaid Rate is essentially an estimated

rate. Each nursing home is given its own separate and distinct nursing home rate which is based

upon a very complicated formula utilizing numerous factors, including the average cost of the

performing nursing home in its last base year trended forward and the severity of the maladies

and the intensity of the nursing care required to be given to the patients at the nursing home.

This rate is then multiplied by the number of "Medicaid patient days" to determine a nursing

home's ultimate reimbursement. A "Medicaid patient day" is a unit of measure denoting lodging

provided and services rendered to one patient for one complete day.

Medicaid reimburses nursing homes based on an estimated compensation system that is

extremely complex. Medicaid then conducts reviews to determine the accuracy of its payouts,

and will frequently retroactively adjust the amount of compensation it has paid out for past

services. This retroactive adjustment can result in either a net gain or loss for a nursing home-

that is, a nursing home will sometimes have to reimburse Medicaid for overpayments for past

services, or, they may receive additional compensation for past services rendered as the result of

the periodic reviews.

Medicaid, through DOH, reimburses a skilled nursing facility such as Debtors for each

patient under its care entitled to Medicaid. DOH bases its reimbursement rate on the submission

of bi-annual Patient Review Instrument ("PRI"). The submission of PRIs is governed by 10 NYCRR § 86-2.10 *et seq*. Under those regulations a facility is required to submit a full assessment of every patient under its case. This assessment outlines the level of care provided to each patient and the value of such case. Three months after every full assessment the facility is required to submit an assessment regarding any new patients or discharges. DOH's Medicaid reimbursement to a facility is based on its last processed PRI submission. Often, because of delays in DOH's processing of PRI submissions, a facility receives an outdated reimbursement rate for its patient. Under 10 NYCRR § 86-2.10, when DOH finally processes the updated PRIs a facility is entitled to a retroactive reimbursement rate based on what it should have received for each patient if its PRI submission was processed by DOH timely. This arises solely from the fact that because of DOH's delay in processing a facility's PRI, DOH was reimbursing a facility based on an outdated and inaccurate rate. This is what happened to the facilities, DOH delayed processing the submissions for so long that when they were finally processed, and the facilities' rate was property adjusted.

### b. The Receivers' Medicaid Adjustment

In or about April 2010, during the Substitute Receiver's tenure, Medicaid paid $610,218.18 as a net retroactive reimbursement. GECC unlawfully diverted the $610,218.28 from the Lockbox Income and refused to turn it over to the Substitute Receiver. As a direct result, the Substitute Receiver was unable to pay an additional $610,218.18. of its expenses.

The Medicaid adjustment was clearly intended to be the Substitute Receiver's funds. On July 9, 2008, this Court entered a Stipulation and Agreed Order Resolving the Claims By and Against the New York Department of Health the ("DOH Order"). The DOH Order was a carve out and part and parcel of the anticipated "363 Sale" of all of the Debtors' assets. The DOH

Order acknowledged that the Medicaid retroactive adjustment owed by New York State to the Debtors was $2,668,316. Pursuant to the terms of the carve out, DOH was permitted to offset $2,668,316 against the New York State Assessment Tax owed by the Debtors.

In or about April 2010, DOH offset the Medicaid retroactive adjustment owed by New York against the agreed to part of the New York State Assessment Tax owed by the Debtors. However, as a result of the additional time, payments by the Receivers and recalculation of the amounts due from New York State for the Medicaid retroactive adjustment, an additional $610,218.18 was paid by New York State for the Medicaid retroactive adjustment. These funds were converted by GECC.

Moreover, it is clear from the Substitute Receiver Order that the money received as a PRI adjustment, like all Medicaid reimbursements, was available to the receiver to pay expenses. In fact, the Substitute Receiver Order specifically carves out only <u>one</u> form of money that was *not* available to the receiver—money collected from any appeal to Medicare or Medicaid. *See* Page 13 of the Substitute Receiver Order, Exhibit 10. As discussed above, the PRI adjustment was not an appeal but was simply an ordinary course adjustment done by Medicaid. Therefore, the money received as a PRI adjustment belonged to the receiver to use to pay down the facilities' expenses.

GECC cannot avoid the fact that under the Substitute Receiver Order the PRI adjustment belonged to the receiver. Instead, like much of this motion, GECC attempts to use a completely unrelated document to somehow justify its illegal actions. GECC argues that under the purchase agreement, Oasis did not purchase any rate adjustments. This argument is a *non sequiter* on its face. First, even under GECC's parsed quote of the Purchase Agreement, the Medicaid Retroactive Adjustment would not be paid to GECC. Second, the parsed quotes by GECC

clearly refers to the part of the Medicaid Retroactive Adjustment for $2.6 million which was a permitted offset by DOH as a carve out. Third, GECC is not a party to the purchase agreement and, therefore, what Oasis ultimately purchased at closing has nothing to do with GECC diversion of money before closing. GECC cannot, and does not, argue that the money should not have gone to the Substitute Receiver (as opposed to Oasis). If GECC would have left the money alone, like it was required to do, the Substitute Receiver would have had more money to pay done expenses. Therefore, at closing Oasis should have been left with a much smaller assumption of accounts payable. Further, it should be noted that GECC cannot cite to a single document which states that the PRI adjustment belonged to GECC because, like all post-petition income the money belonged to the Substitute Receiver to pay down expenses.

In addition to the over $610,218 that was diverted by GECC from a Medicaid reimbursement payment, the Substitute Receiver was harmed because the Substitute Receiver was required to cover a 6% New York State tax assessment on the money GECC diverted. As discussed above, GECC had no authority to divert money from the lockbox to pay its expenses or fees. To make matters worse, the substitute Receiver paid taxes on money GECC took!

**B.      GECC Violated New York Law**
**        And Was Not Permitted To Take Any**
**        <u>Funds From the Receiver or Substitute Receiver</u>**

The Receiver and Substitute Receiver were both agents of the Court bound by New York's statutory law. GECC's actions violated New York law. Under the terms of the Receiver and Substitute Receiver Order, the Receivers are bound by the laws governing receivers found in New York's Real Property Actions and Proceedings Law (RPAPL). Even without the Court's specific order applying the RPAPL, as a receiver in a mortgage foreclosure action, the Substitute Receiver would be bound by the RPAPL. Further, to the extent this action concerns New York

Public Health Law because the Debtors were skilled nursing facilities, the same RPAPL rules apply. *Schwartzberg v. Whalen,* 96 A.D.2d 974, 466 N.Y.S.2d 846 (3d Dep't 1983)

Under NY RRPAPL 1325, a receiver can only pay accrued interest to the mortgagee: (a) pursuant to an explicit court order; and (b) **after** all the expenses are paid. *East New York Savings Bank v. 520 West 50th Street, Inc.,* 160 Misc.2d 789, 611 N.Y.S.2d 459 ( N.Y. Co., 1994).

Section 1325 acts as a limit on the court's authority to direct the disbursement of the receiver's funds: **only after** the payment of the facilities' expenses can the court order the payment of accrued interest, and even then, no payments other then accrued interest can be made from the receiver to the mortgagee.

In addition, under well established Bankruptcy law as enunciated by the Supreme Court of the United States in <u>Timbers</u>, GECC was also not entitled to interest and attorneys fees, in any event since, as it turned out, the value of the GECC collateral was less than the outstanding debt. *United Sav. v. Timbers of Inwood Forest*, 484 U.S. 365 (1988).

Therefore, GECC's diversion of the Receivers' funds directly violates New York law and the *Timbers* case. By statute, GECC was not allowed to take during the Receivers tenure (i) over $760,313.90 in interest; (ii) over $804,358 in unexplained "fees" and "expenses; and (iii) $610,218 Medicaid adjustment or approximately $2.2 million dollars.


**POINT II.**

**THE COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS BECAUSE PLAINTIFFS HAVE STATED A CLAIM FOR <u>EACH OF THE ALLEGATIONS IN THE COMPLAINT</u>**

**A.      <u>Plaintiffs' Fraud Claims Are Plead With Particularity</u>**

As described above, GECC schemed and defrauded plaintiffs by unlawfully taking the Receivers' funds. After taking the Receivers' Lockbox Income, GECC withheld the funds from the Receivers under the guise that they were permitted to do so. As set forth above, as a matter of law, GECC was not permitted to take these funds. GECC then represented that (i) it was permitted to take the Lockbox Income; (ii) unless a request for funds through a so called "Borrowing Base Certificate" was submitted to GECC, GECC would not release the Lockbox Income; and (iii) GECC also represented that the Lockbox Income being returned to the Receivers were "advances." GECC committed this scheme 301 times (according to GECC's motion). The aggregate amount taken by GECC from the Lockbox Income was over $75 million. According to GECC's motion, GECC returned to the Receivers only $72 million.

The elements of a claim for fraud under New York law are (1) that the defendant made a material false representation, (2) with the intent to defraud the plaintiff, (3) upon which the plaintiff reasonably relied, and (4) that the plaintiff suffered damage as a result of that reliance. *Unicredito Italiano SPA v JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 497 (SDNY 2003). Federal Rules of Civil Procedure, <u>Rule 9(b)</u> requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." <u>Rule 9(b)</u>'s stringent requirements are tempered, however, by the general pleading rule set forth in <u>Fed. R. Civ. P. 8(a)</u> that a complaint consists of "short and plain statement(s)" of claims for relief. *See DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242 (2d Cir. 1987). Rule 9(b) does not 'reflect a subscription to fact pleading' ... and requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 178 (5th Cir. 1997).

The Complaint easily meets its burden for pleading fraud with particularity. In order to plead fraud with particularity, "a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989).

The first 16 pages of the complaint set forth, in specific detail, the numerous statements that were false or misleading and gives particulars as to the respect in which plaintiffs contend the statements were fraudulent. These acts include GECC misrepresenting to plaintiffs its procedure for operation of the lockbox in order to induce them to continue to deposit money in the lockbox and retain Debtors' previous bank accounts. GECC's misrepresentations included telling plaintiffs that: (i) the Line of Credit was still in force and effect; (ii) it would continue to provide plaintiffs with the money that was collected in the lockbox; and (iii) that it would not retain any of the funds deposited in the lockbox. *See* Complaint ¶ 65. Incredibly, in its motion, GECC admits each of these representations.

In addition, the Complaint sets forth how GECC acted fraudulently when it continued to maintain the farce that the Line of Credit was still in force and effect in order to lull plaintiffs into a false sense of security that GECC was working together with them to maintain the debtors' assets for Oasis' ultimate purchase pursuant to the Court's Order and the ultimate discharge of the Debtors' debt in bankruptcy. GECC further fraudulently failed to disclose to plaintiffs that it was no longer authorized to retain any of the money deposited in the lockbox. *See* Complaint ¶ 66.

The Complaint then sets forth plaintiffs' reliance. As set forth, in reliance of GECC's misrepresentations, the Substitute Receiver continued to deposit all accounts receivable in the

lockbox and continued to allow GECC to maintain control of the collection accounts. Plaintiffs had no knowledge as to the falsity of GECC's misrepresentations and omissions. Only GECC knew it would unlawfully abuse its authority over the lockbox and collection account to misappropriate the funds. Plaintiffs' reliance was justifiable under the circumstances because: (i) GECC was bound by state and federal law not to convert or misuse the money deposited in the lockbox; and (ii) GECC had maintained the lockbox previously, with the earlier Receiver, without any known incident.

GECC's tortured arguments cannot be sustained in light of the demonstrated specificity of the fraud claims. GECC improperly cites stale case law such as *Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) and *Shields v. Citytrust Bancorp.*, 25 F.3d 1124 (2d Cir. 1994) in its desperate attempt to thwart plaintiffs' well pleaded fraud claims. Each of these cases are no longer valid law and have been overruled by the Private Securities Litigation Reform Act ("PSLRA") which contains a heightened pleading requirement for securities fraud and are inapplicable to the matter at hand which is not a securities law action. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). Nonetheless, as noted, even if these standards did apply, plaintiffs have set forth their fraud claims with sufficient detail.

GECC's citations of *Rubin Squared, Inc. v Cambrex Corp.,* 2007 WL 2428485 (S.D.N.Y. 2007) and *One-O-One enters Inc. v. Caruso,* 848 F.2d 1283 (D.C.Cir 1988) are misplaced. Plaintiffs are not suggesting a reliance on an oral modification to any agreements.

GECC makes the incredible claim that GECC did not have the requisite intent to defraud because GECC's fraud was for financial gain. GECC's claim that financial gain is insufficient to establish intent simply does not make sense. According to GECC, Bernie Madoff did not

defraud anyone because he had "economic motive" to steal a billion dollars. GECC did not steal minimal fees; GECC took $75 million through their scheme and returned only $72 million. Madoff also returned funds to certain investors in order to continue his scheme. GECC cites *Fisher v. Offerman & Co.,* 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. Sept. 30, 1996) and *Vogel v. Sands Bros. & Co.,* 126 F. Supp. 2d 730 (S.D.N.Y. 2001) which they claim supports their position. In actuality, these cases (i) discuss the sufficiency of the predicate acts needed for RICO claims; (ii) deal with securities fraud; and (iii) deal with fraud claims against professional service providers, such as accountants and lawyers. Each of these categories has a pleading requirement beyond that of ordinary fraud. Our case is not a securities fraud case, does not involve predicate acts for RICO claims, and GECC is not a professional service firm.

Since the petition was filed, GECC has illegally taken the following funds: (i) an approximately $610,218 Medicaid reimbursement; (ii) $804,358 in unexplained "fees" and "expenses;" and (iii) $760,313.79 in interest or approximately $2.2 million dollars. GECC's conversion and retention of each of these categories of funds, totaling approximately $2.2 million dollars, is a direct violation of the Court Orders, state law, and a violation of the automatic stay. GECC, like anyone else in bankruptcy proceedings can take debtor property only if they are authorized to do so. GECC does not deny taking these funds – nor were they authorized to do so since receivership obligations remained unpaid. Rather, GECC attempts to obfuscate its misconduct by noting that plaintiffs accepted their own money when it was returned in part, executed the borrowing certificates as per GECC's instructions, as if this somehow excuses GECC's fraudulent intent and its violations of the Court Orders and Automatic Stay. Essentially, GECC seeks to use its own misconduct in which it duped the Receiver as cover for its misconduct. A party is estopped from using its own misconduct to its advantage. *See Castle*

*Creek Tech. Partners v. Cellpoint Inc.*, 2002 U.S. Dist. LEXIS 23760 (S.D.N.Y. Dec. 6, 2002) (A party in breach of an agreement is estopped from using that breach to its own advantage.)

For the very same reasons, plaintiffs are entitled to summary judgment on their fraud claims. As discussed, there are no questions of fact. GECC does not deny fraudulently inducing plaintiffs into allowing it to take the Lockbox Income, pay down of Pre-Petition LSA Debt, interest and outrageous fees by pretending the agreements were in full force and effect. Rather, GECC claims that its actions were permitted under the various agreements and belligerently continues to insist that is the case. However, the clear language of the SRO prohibited GECC from taking anything unless there was money left over, and even then to pay <u>only</u> interest. There is no dispute as to what took place and thus no questions of fact. *See Murray v. Xerox Corp.*, 811 F.2d 118, 122-24 (2d Cir. 1987) (summary judgment granted on a claim of fraudulent intent not to perform); *Securities and Exchange Commission v. Geyser Minerals Corp.*, 452 F.2d 876 (10th Cir. 1971) (summary judgment on fraud claims and granting permanent injunction against defendants affirmed.) Accordingly, the court should enter partial summary judgment for plaintiffs on their fraud claims.

GECC further misquotes the relevant Orders in attempt to whitewash its misconduct. As a threshold matter, the Substitute Receiver Order governs over any other Order. Sale Order Exhibit 9 ¶30. Also, GECC was not a party to the purchase agreement so it is difficult to fathom how such an agreement will in any way protect GECC from any claims. Nonetheless, the Purchase Agreement explicitly provides that the "Purchaser shall be in compliance with the Order Appointing Substitute Receiver. (Purchase Agreement Section 1.C, Page 4. Exhibit 8) Thus, as per the terms of the SRO, GECC was prohibited from taking any money until all trade creditors were paid, which never occurred during the term of either receiver.

GECC's assertion that the terms of the LSA somehow excused its misconduct and released it from future, undefined acts is simply ridiculous. The LSA was entered into in 2005, prior to the bankruptcy. Plaintiffs were not a party to the LSA. GECC's farcical claim that the LSA excused its conduct is therefore yet another smokescreen and an attempt to excuse GECC's inexcusable conduct.

Likewise, GECC attempts to obfuscate its misconduct by claiming that $72,195,736.40 was disbursed by them during the Substitute Receiver Period. What GECC conveniently omits is that GECC illegally converted the remaining Lockbox Income which it illegally withheld!

GECC's assertion that the receiver waived any claims by signing a release is untenable for several reasons. First, the Substitute Receiver never authorized or signed a release. The form requesting the return of the Lockbox Income was signed by an accountant. Second, a receiver does <u>not</u> have the ability to waive claims *See Mumford v. Crouch*, 8 A.D. 529, 538 (N.Y. App. Div. 1896) ("A receiver is clothed with no powers to waive the equitable rights of the judgment creditors for the protection of whom he was appointed"...."plaintiff is a trustee for the creditors of his assignors, and he cannot, by pursuing a futile remedy, produce a forfeiture of the vested rights of his cestuis que trust... nor can he voluntarily relinquish their rights in that respect. His power and duty in the execution of the trust are in harmony, and he cannot effectually proceed in contravention of either.") *See also*, *Durand & Co. v. Howard & Co.*, 216 F. 585, 588-589 (2d Cir. N.Y. 1914) ("When a court exercising jurisdiction in equity appoints a receiver of all the property of a corporation, the court assumes the administration of the estate; the possession of the receiver is the possession of the court; and the court itself holds and administers the estate, through the receiver as its officer, for the benefit of those whom the court shall ultimately

adjudge to be entitled to it.")  Accordingly, the receiver has no power to waive claims and thus any "release" executed by a receiver is a nullity.

Moreover, even if the receiver had the ability to waive claims, any alleged "releases" were secured by fraud and are thus invalid.  It is well established that where a release of a cause of action is procured by fraud, it is invalid and may be revoked.  *See Inman v. Merchants Mut. Casualty Co.*, 190 Misc. 720, 722 (N.Y. Co. 1947); *Lobel v. Maimonides Med. Ctr.*, 39 A.D.3d 275, 276, 835 N.Y.S.2d 28, 29 (N.Y. App. Div. 2007); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 122 (S.D.N.Y. 2009); ("Defendant's arguments regarding the release plaintiff executed in connection with the Buy-Out Agreement is similarly unavailing because a release procured by fraud may be voided "even when it results from prolonged negotiations by represented parties.") *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316-318 (2d Cir. N.Y. 1993) (holding that a fraud claim may be dismissed on the basis of a release only if the release explicitly disclaims reliance on the specific misrepresentations that form the basis of the fraud.)  *See also Parnes v. Mast Property Investors, Inc.*, 776 F. Supp. 792, 795 (S.D.N.Y. 1991); *Gumowitz ex rel. West 79th St. Assocs. v. First Fed. Sav. & Loan Ass'n*, 1994 U.S. Dist. LEXIS 9160 (S.D.N.Y. July 7, 1994)  a generalized boilerplate exclusion will not defeat a fraud claim.  *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 317 (2d Cir. N.Y. 1993)  (under New York law, the affirmative defense of fraudulent inducement is not precluded by contract language providing that the contract's terms are "absolute and unconditional"); *See*, e.g., *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320, 157 N.E.2d 597, 184 N.Y.S.2d 599 (1959); *Fierro v. Gallucci*, No. 06-CV-5189, 2008 U.S. Dist. LEXIS 38513, 2008 WL 2039545, at *13-*14 (E.D.N.Y. May 12, 2008). (Holding that under New York law merger clauses generally do

not bar claims for fraudulent inducement unless the clause specifically addresses the very conduct complained of in the fraud allegation).

As set forth in painstaking detail below and in the complaint, GECC perpetrated a fraud on the receiver.  These acts include GECC misrepresenting to plaintiffs its procedure for operation of the lockbox in order to induce them to continue to deposit money in the lockbox and retain Highgate's previous bank accounts.  GECC's misrepresentations included telling plaintiffs that: (i) the Line of Credit was still in force and effect; and (ii) it would continue to provide plaintiffs with the money that was collected in the lockbox; and (iii) that it would not retain any of the funds deposited in the lockbox.  *See* Complaint ¶ 65.  Any "waivers" are therefore ineffective.

Additionally, the receiver was completely unaware as to the extent of the fraud and that GECC had no right to the money it was taking.   <u>There can be no waiver where the party allegedly waiving his right was unaware of a dispute.</u>  *Country-Wide Ins. Co. v. Frolich*, 119 Misc. 2d 1089, 1092 (N.Y. Civ. Ct. 1983); *Newburger v. Lubell*, 257 N.Y. 383 (N.Y. 1931).  *See also Forrest v Fuchs,* 126 Misc. 2d, 12 (N.Y. Sup. Ct. 1984) holding that one cannot waive a right which did not exist at the time of the alleged waiver or where the facts are not disclosed at that time or are changed thereafter.   Accordingly, any alleged releases are invalid as they were only procured as a result of the aforementioned fraud.

Finally, there was no consideration for the alleged release because GECC was merely returning in part, the Lockbox Income that it improperly withheld as a matter of law.

**B.**     <u>Plaintiffs Breach Of Fiduciary Duty Claims Must Be Sustained</u>

Plaintiffs have easily plead a cause of action for breach of fiduciary duties as the Complaint clearly alleges that GECC assumed responsibility and created a relationship beyond a mere contractual one. GECC's cite *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19-20 (2005) in a failed effort to show that parties were not in a fiduciary relationship. Rather than bolster GECC's claims, it undermines them. *EBC I* clearly states that parties in a contractual relationship will be held to be fiduciaries. The Court of Appeals held Goldman Sachs to be a fiduciary, in spite of their contractual relationship. As the court notes: "a cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, apart from the terms of the contract, the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone. Here, the complaint alleges an advisory relationship that was independent of the underwriting agreement." *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19-20 (2005).

Likewise, the complaint in this instance pleads a cause of action for breach of fiduciary duties as it clearly alleges that GECC assumed responsibility and created a relationship beyond that of an ordinary fiduciary. As the complaint states: "GECC assumed the responsibility of operating and maintaining the lockbox and collection account. Included in that responsibility was the responsibility to ensure the funds collected in the lockbox were only used for legitimate purposes pursuant to the Substitute Receiver Order and New York law. **Notably, pursuant to the Substitute Receiver Order and the terms of the Lockbox Agreement, GECC did not have to participate in the operation of the lockbox—it chose to**. Complaint ¶ 79. The Complaint further states that " GECC breached its fiduciary duty to plaintiffs by continuing to operate the Line of Credit as if Highgate was still a compliant borrower and thereby using

income from the facilities to pay down the Line of Credit prior to plaintiffs' closing on its purchase."  Complaint ¶ 82.  Thus, plaintiffs have clearly pleaded the existence of a confidential relationship beyond the narrow terms of the contract.

Likewise, the other cases cited by GECC are inapposite.  *HF Mgmt. Servs., LLC v. Pistone,* 2006 NY Slip Op 5153 (1st Dep't 2006) deals with a situation where the parties did not assume obligations beyond that of the four corners of the contract, in contrast to this case, as noted above.  In *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 52 the Court explicitly held that "A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge" as was the situation here, which went beyond a mere contractual relationship.  Likewise, *Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 130 (2d Cir. 2002), quoting *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994)  notes that a debtor-creditor relationship can be a fiduciary relationship through the addition of "a relationship of confidence, trust, or superior knowledge or control" as is the case here.  The rest of GECC's cases are cumulative and are inapplicable as the complaint clearly alleges a relationship beyond that of a mere Debtors' creditor, or that put forth by the contract.

GECC's role went beyond that of the contract and extended to that of a fiduciary.  It has been held that when a fiduciary, in furtherance of his individual interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make full disclosure of all material; absent such full disclosure, the transaction is voidable.  *Blue Chip Emerald v Allied Partners Inc.,* 299 A.D.2d 278, 750 N.Y.S.2d 291 (1st Dept. 2002) (co-venturers were fiduciaries of the owners in matters relating to the venture until the moment the buy-out transaction closed, and therefore owed the owners a fiduciary duty).  *See*

*also Dube-Forman v D'Agostino,* 61 A.D.3d 1255, 877 N.Y.S.2d 740 (3d Dept., 2009) (a contractual clause cannot defeat a claim of fraud if the defendant owes the plaintiff a fiduciary duty and breaches that duty by failing to disclose information).

GECC knowingly advised the Substitute Receiver, and used their position to mislead him in his capacity of an officer of the court.  Plaintiffs  are seeking to hold GECC liable for its breach of the fiduciary duties created when GECC voluntarily assumed control over the lockbox after a receiver was brought in, along with duties under the court order and as an advisor to the receiver, an officer of the court, thus creating duties independent and  outside of any contract. Plaintiffs are not borrowers and do not seek to hold GECC liable under a simple "borrower lender relationship" as GECC misleadingly asserts.  Plaintiffs do not even plead a cause of action for breach of contract because plaintiffs are not a party to any of the loan agreements.  In fact, the only agreement to which the GECC and the plaintiffs were parties to was the Substitute Receiver Order, which specifically prohibits additional borrowing.  Thus, GECC's claim that this was merely a borrower-lender relationship is completely misguided and intended to obfuscate its breach of its fiduciary duties.  Accordingly, plaintiffs have plead a cause of action for breach of fiduciary duties.

For the very same reasons, plaintiffs are entitled to summary judgment on their breach of fiduciary claims.  As discussed, there are no questions of fact.  GECC does not deny voluntarily assuming control of the lockbox after a receiver was brought in.  GECC clearly had duties under the court order and as an advisor to the receiver, an officer of the court. They knowingly advised the Substitute Receiver, and used their position to mislead him in his capacity of an officer of the court.  GECC does not deny its actions, but claims that its actions were permitted under the various agreements and in fact belligerently continues to insist that is the case.  Its only denial is

whether its actions created fiduciary duties. There is no dispute as to what took place and thus no questions of fact. *See Westchester Teamsters Local 456 Annuity Fund v. Fleet Nat'l Bank*, 2006 U.S. Dist. LEXIS 54213 (S.D.N.Y. Aug. 18, 2006) (granting summary judgment on breach of fiduciary duties claim)

Accordingly, the court should enter summary judgment for plaintiffs on their breach of fiduciary duties claims.

## C.  GECC Must Pay Punitive Damages For Its Willful Violations Of The Court Orders And The Automatic Stay

In tort actions, punitive damages may be awarded where the wrong complained of is morally culpable or actuated by evil or reprehensible motives. *Walker v. Sheldon,* 10 N.Y.2d 401, 404 (N.Y. 1961). Punitive damages also have been awarded where a tort has been committed "in reckless or wanton disregard of the safety or rights of another." *Sharapata v. Town of Islip,* 56 N.Y.2d 332, 452 N.Y.S.2d 347, 349, 437 N.E.2d 1104 (1982); *Soucy v. Greyhound Corp.,* 27 A.D. 112, 113 276 N.Y.S.2d 173, 175 (1967). A plaintiff need not show that the tort was "aimed at the public generally" in order to recover punitive damages. *Borkowski v. Borkowski,* 39 N.Y.2d 982, 355 N.E.2d 287, 387 N.Y.S.2d 233 (1976); *Reinah Development Corp. v. Kaaterskill Hotel Corp., et al.,* 86 A.D.2d 50, 488 N.Y.S.2d 686 (1982). The controlling consideration is the degree of defendant's moral culpability. *Chase Manhattan Bank N.A. v. Perla,* 65 A.D.2d 207, 411 N.Y.S.2d 66, 68 (1978).

GECC does not deny the willfulness of their actions in illegally violating the court orders and the automatic stay provisions. Rather, they continue to pretend there was nothing wrong with their violations and theft of over $2.2 million and claim their actions were motivated by a noble desire to see the company survive. GECC claims that punitive damages are not available

for a corporation as a result of their violations of the automatic stay. As a threshold matter, GECC did not just willfully violate the mandatory stay, they also willfully and contumaciously violated numerous other Court Orders, including the Substitute Receiver Order. Thus, even if punitive damages were unavailable under the provisions of the automatic stay, they are clearly available here where GECC violated a host of court orders, in addition to the automatic stay. *See Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 203, 551 N.Y.S.2d 481, 485, 550 N.E.2d 930, 934 (1990) (punitive damages "are intended as punishment for gross misbehavior for the good of the public . . . . [they are not awarded] because the plaintiff has suffered any monetary damage for which he is entitled to reimbursement"); *Hartford Accident and Indem. Co. v. Village of Hempstead*, 48 N.Y.2d 218, 226, 422 N.Y.S.2d 47, 53, 397 N.E.2d 737, 743 ("the purpose of punitive damages . . . is to punish and to deter others from acting similarly"). *Geressy v. Digital Equip. Corp.,* 950 F. Supp. 519, 523 (E.D.N.Y)

Nonetheless, even had GECC merely violated the automatic stay, damages would still be available. The very case cited by GECC, *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183, 187 (2d Cir. N.Y. 1990) specifically allows for contempt proceedings in cases of willful violations of the automatic stay, as is the case here. *Maritime*, in fact, cites to numerous cases that provide for this. *See, e.g., Fidelity Mortg. Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 51, 57 (2d Cir. 1976) (allowing imposition of costs, including reasonable attorney's fees under civil contempt powers for acts which bankruptcy judge found were done with "knowledge" of automatic stay and "deliberate[]" disregard of bankruptcy rules regarding requirements for relief), cert. denied, 429 U.S. 1093, 97 S. Ct. 1107, 51 L. Ed. 2d 540 (1977); *Drywall Tapers*, Local 1974 v. Local 530, 889 F.2d 389, 394-95 (2d Cir. 1989) (knowledge of violation and terms of injunction required to hold party in civil contempt), cert.

denied, 494 U.S. 1030, 110 S. Ct. 1478, 108 L. Ed. 2d 615 (1990); *see also In re First RepublicBank Corp.,* 113 B.R. 277, 279 (Bankr.N.D.Tex.1989) (recognizing power of bankruptcy court under § 105 of the code and Bankruptcy Rule 9020 to impose contempt sanctions for violations of automatic stay); *In re Brilliant Glass, Inc.,* 99 B.R. 16, 18 (Bankr.C.D.Cal.1988) (finding contempt an appropriate remedy for violation of the automatic stay where § 362(h) by its words only benefits individual debtors)."

For the very same reasons, plaintiffs are entitled to summary judgment on their punitive damages claims. "The purpose of punitive damages . . . is to punish and to deter others from acting similarly." *Geressy v. Digital Equip. Corp.*, 950 F. Supp. 519, 523 (E.D.N.Y. 1997) New York State law allows for an award of punitive damages for non-intentional torts where defendant's behavior exhibits "utter recklessness," *Caldwell v. New Jersey Steamboat Co.*, 47 N.Y. 282, 296 (1872), or where defendant's conduct has been "wanton or malicious, or gross and outrageous," *Powers v. Manhattan Ry.*, 120 N.Y. 178, 182, 24 N.E. 295, 296 (1890), and reflects defendant's "conscious indifference to the effect of his acts."*Gostkowski v. Roman Catholic Church of the Sacred Hearts*, 262 N.Y. 320, 323, 186 N.E. 798, 799 (1933). *Riginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir. 1967). As discussed, there are no questions of fact. GECC does not deny the willfulness of their actions in illegally violating the court orders and the automatic stay provisions. Rather, they continue to pretend there was nothing wrong with their violations- going so far as to claim their actions were motivated by a noble desire to see the company survive-as if GECC is motivated by anything but their bottom line. GECC willfully violated numerous court orders and should be punished so as to dissuade others from such conduct. *See Haas v. Tishman Constr. Corp.*, 1987 U.S. Dist. LEXIS 137 (S.D.N.Y. Jan. 12, 1987); *In re Air Crash at Belle Harbor*, 2008 U.S. Dist. LEXIS 109247 (S.D.N.Y. Mar. 10,

2008) (summary judgment granted on issue of punitive damages); *Matney v. First Protective Life Ins. Co.,* 73 F.R.D. 696 (W.D. Va. 1977); *Sherwood v. Graco, Inc.,* 427 F. Supp. 155 (D. Colo. 1977) (Same). Accordingly, the court should enter summary judgment for plaintiffs and award punitive damages.

**D.**     <u>Plaintiffs Have Stated A Claim For Negligence</u>

Plaintiffs have easily met the standard for pleading a claim of negligence. The only open issue is the amount of punitive damages GECC correctly cites the standard for a claim of negligence (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) that such breach was a cause of the resulting injury. *See Merino v. New York City Transit Auth*., 639 N.Y.S.2d 784, 758 (1st Dep't.), aff'd, 89 N.Y.2d 824 (1996); *Nathan W. Drage, P.C. v. First Concord Sec., Ltd*., 707 N.Y.S.2d 782, 787 (N.Y. Sup. Ct. 2000). However, GECC incorrectly claims that plaintiffs have not plead negligence because they do not plead a cognizable duty. The complaint clearly states that "GECC assumed the responsibility of operating and maintaining the lockbox and collection account." Included in that responsibility was the responsibility to ensure the funds collected in the lockbox were only used for legitimate purposes pursuant to the Substitute Receiver Order and New York law. GECC owed plaintiffs a duty to perform its duties responsibly, in good faith and with due regard to the rights of the plaintiffs, consistent with the standard of care exercised by like individuals or entities in similar circumstances and in the banking industry. Complaint ¶ 86-87.

GECC then cites a slew of cases that are supposed to stand for the proposition that negligence claims are repetitive or unavailable when breach of contract is plead. Plaintiffs have not plead a cause of action for breach of contract and so the suggestion that negligence claims

are duplicative of its nonexistent breach of contract claim borders on the ridiculous. At this time, plaintiffs have not pleaded a breach of contract claim[2]. GECC is liable because it voluntarily chose to operate the lockbox for the receivers thus creating a duty to plaintiffs, the receivers, and the court and because of its extra judicious and negligent misuse for its own illegal purposes

GECC citation to *Megaris Furs v. Gimbel Bros.*, 172 A.D.2d 209 (1st Dep't 1991) is, therefore, inapposite. It is also grossly misleading as plaintiffs have plead a cause of action for negligence-not the nonexistent tort of negligent performance of [a] contract that *Megaris* addresses. In fact, the court in Megaris specifically allows for negligent claims when a legal duty has been violated independent of contract claims, as is the case here. Id at 211. *Bank Leumi Trust Co. v. Block 3102 Corp.*, 180 A.D.2d 588, 589, (1st Dep't 1992) cited by GECC, likewise specifically notes the availability of tort claims when an independent duty has been violated. *Bank Leumi* is inapposite because GECC is negligent as outlined above, and plaintiffs are not merely seeking to hold plaintiffs liable for a "negligent administration of a loan" that plaintiffs were not a party to. Likewise, *Bonnie & Co. Fashions v. Bankers Trust Co.,* 945 F. Supp. 693 (S.D.N.Y. 1996); *Advanced Marine Technologies, Inc. v. Burnham Sec. Inc*., 16 F. Supp.2d 375, 384 (S.D.N.Y. 1998); *Scone Investments, L.P. v. American Third Market Corp*., 1998 WL

---

[2] For the same reason, Defendant's citations to *Sterbenz v. Attina*, 205 F. Supp.2d 65, 70 (S.D.N.Y. 2002); *In re Minpeco, USA, Inc. v. Swiss Bank Corp*., 237 B.R. 12, 26 (Bankr. S.D.N.Y. 1997*); Pennsylvania Chiropractic Ass'n v. Independence Blue Cross,* 2001 WL 1807781, at*6 (Pa. Ct. Com. Pl. July 16, 2001) *Freestone v. New England Log Homes, Inc.,* 819 A.2d 550, 553-54 (Sup. Ct. Pa. 2003*) Givoldi, Inc. v. United Parcel Serv*., 729N.Y.S.2d 25, 27 (1st Dept. 2001) *Harris Trust & Sav. v. John Hancock Mut. Life Ins*. Co. 302 F.3d 18, 29 (2d Cir.2002), *Hale Trucks of Md. v. Volvo Trucks of N. Am*., 224 F. Supp. 2d 1010, 1025 (D. Md. 2002) are all inapposite. Plaintiffs are seeking to hold GECC liable for the negligence that occurred after it voluntarily assumed control over the lockbox after a receiver was brought in, along with duties under the court order and as an advisor to the receiver, an officer of the court-thus creating duties independent and outside of any contract. As noted, plaintiff does not plead a cause of action for breach of contract thus making the terms of the contract irrelevant.

205338 *10 (S.D.N.Y. 1998) are all fully consistent with plaintiffs' negligence claim because a duty was owed to plaintiffs, the receivers, and the court, as outlined above. Accordingly, plaintiffs have plead a cause of action for negligence.

For the very same reasons, plaintiffs are entitled to summary judgment on their negligence claims. As discussed, there are no questions of fact. GECC does not deny any of the facts underlying plaintiffs' negligence claims or that plaintiffs were as harmed a result of its actions. Rather, GECC claims that it owed no "duty." However, as discussed, GECC voluntarily assumed the responsibility of operating and maintaining the lockbox and collection account. Included in that responsibility was the responsibility to ensure the funds collected in the lockbox were only used for legitimate purposes pursuant to the Substitute Receiver Order and New York law. GECC owed plaintiffs a duty to perform its duties responsibly, in good faith and with due regard to the rights of the plaintiffs, consistent with the standard of care exercised by like individuals or entities in similar circumstances and in the banking industry. There are no questions of fact. Courts do not hesitate to grant summary judgment on the issue of negligence. *Colonial Sand & Stone Co. v. Tracy Towing Line, Inc*., 16 A.D.2d 645 (1st Dep't 1962); *Richard Equipment Corp. v. Manhattan Industrial Contracting Co*., 9 A.D.2d 691 (2d Dep't 1959); *Horowitz v. Kevah Konner, Inc*., 67 A.D.2d 38, 42 (1st Dep't 1979); *Bland v. Norfolk & So. R. Co*., 406 F.2d 863, 866 (4th Cir. 1969) (summary judgment available in variety of legal and equitable proceedings; summary judgment granted in negligence action in which defendant demonstrated plaintiff contributory negligent as matter of law). Accordingly, the court should enter summary judgment for plaintiffs on their negligence claims.

**E.**     **Plaintiffs Have Plead A Cause Of Action For Conversion**

GECC correctly notes that conversion is the unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *Lopresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir. 1997) (internal citations omitted); *see Vigilant Ins. Co. of America v. Housing Auth. City of El Paso, Texas,* 87 N.Y.2d 36, 44 (1995)." *Moses v. Martin*, 360 F.Supp.2d 533, 541 (S.D.N.Y. 2004).  In New York, conversion is "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006).

GECC does not deny, nor can it, the conversion of the following funds since the petition was filed: (i) an approximately $610,000 Medicaid reimbursement; (ii) over $843,467 in unexplained "fees" and "expenses;" and (iii) over $845,709.90 in interest.

They admit to taking (i) a specific identifiable thing (the funds) and (ii) that such taking was to the exclusion of plaintiffs' rights.  Instead, of denying their misconduct, they make the farcical claim that they should not be liable for their taking of funds because when they took the funds it had not been determined that plaintiffs had a superior right of possession.  A party is estopped from using its own misconduct to its advantage.  *See Castle Creek Tech. Partners v. Cellpoint Inc., 2002 U.S. Dist. LEXIS 23760 (S.D.N.Y. Dec. 6, 2002).*

It is also clear that plaintiffs had a superior right to those funds because plaintiffs were responsible to pay the shortfall for post-filing obligations and in fact paid out millions to do so.  As discussed under the numerous court orders GECC was prohibited from taking anything but interest, and even then, were only permitted to do so when there was a surplus.  At no point was there ever a surplus.  Accordingly, the funds that GECC took were supposed to be part of the

bankruptcy estate and used to pay the bankruptcy debts.  Accordingly, plaintiffs have a superior right to possession, and so GECC is liable for its admitted conversion of the funds.

Moreover, [i]t is elementary" that conversion "is concerned with possession, not with title." *Pierpoint v. Hoyt*, 260 N.Y. 26, 29, 182 N.E. 235 (1932).  Although the tort of conversion contemplates much more than a "mere detention" of property by the non-owner possessor, 10 N.Y.Jur. § 34, p. 531; *Cohen v. Kaback*, 153 N.Y.S. 5 (1st Dep't 1915); conversion may result if there is a wrongful taking, an unreasonably long detention or an improper disposal of the property.  *In re Murphy Pac. Marine Salvage Co*., 1982 Bankr. LEXIS 3600, 23-24 (Bankr. E.D.N.Y. Aug. 3, 1982).

Plaintiffs have established that: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."  *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004).  As demonstrated, the money is a specifically identifiable fund which was segregated in a lockbox, plaintiffs had a right to possession to those funds, and GECC by virtue of its illegal actions exercised unauthorized dominion over the money to the exclusion of plaintiffs' rights.

Plaintiffs have, therefore, plead a cause of action for conversion.

For the very same reasons, plaintiffs are entitled to summary judgment on their conversion claims.  As discussed, there are no questions of fact.  GECC does not deny any of the facts underlying plaintiffs' conversion claims. GECC admits to taking the pre-filing money and outrageous fees by pretending (and continuing to pretend) that the agreements were in full force and effect.  Rather, GECC claims (i) that its actions were permitted under the various agreements

despite the clear language of the SRO which prohibited GECC from taking anything unless there

was money left over and even then to pay only interest and in the alternative (ii) that plaintiffs

did not have a right to possession of the funds that GECC converted, plaintiffs were responsible

to pay the shortfall for post-filing obligations and in fact paid out millions to do so.  GECC's

actions indisputably caused a far greater shortfall.  Moreover, it is GECC's actions in illegally

converting the funds that prevented the Court from awarding the money to plaintiffs.  There are

no questions of fact.  *See Pittston Warehouse Corp. v. American Motorists Ins. Co.*, 1991 U.S.

Dist. LEXIS 7030 (S.D.N.Y. May 23, 1991) (summary judgment granted on conversion claims);

*Newbro v. Freed,* 409 F. Supp. 2d 386 (S.D.N.Y. 2006) (same).  Accordingly, the court should

enter summary judgment for plaintiffs on their breach of fiduciary duties claims.

## F.      Plaintiffs May Properly Assert A Claim For Turnover Under 11 U.S.C. § 542

There is no question that the Substitute Receiver acted in a capacity equal to the Trustee

and/or Debtor.  GECC once again does not bother denying that they took property subject to

turnover pursuant to Section 542(a) of the Bankruptcy Code which provides that: "an entity,

other than a custodian, in possession, custody, or control, during the case, of property that the

trustee may use, sell, or lease under section 363 of this title . . .shall deliver to the trustee, and

account for such property or the value of such property, unless such property is of

inconsequential value or benefit to the estate. 11 U.S.C. §542(a) (emphasis added).  Rather, they

claim that plaintiffs have no standing to bring suit.  As noted in the very cases GECC cites, *In re*

*STN Enterprises*, 779 F.2d 901, 904 (2d Cir. Vt. 1985); *Glinka v. Federal Plastics Mfg. (In re*

*Housecraft Indus. USA, Inc.)*, 310 F.3d 64, 70 (2d Cir. 2002); *Commodore Int'l v. Gould* (in *Re*

*Commodore Int'l Ltd.*), 262 F.3d 96, 100 (2d Cir. 2001), standing may be found for others to

bring suit when either (i) the debtors in possession unreasonably fails to bring suit on its claims

or (ii) where the trustee or debtors in possession consents.  Given GECC's admitted conversion of debtor funds, there can be no dispute that the trustee's failure to bring suit is unreasonable.  Accordingly, plaintiffs have standing to bring suit.  In fact, since the Substitute Receiver was in possession of the facilities, it is, in essence, like the Trustee or a debtor-in-possession, and, therefore, should have standing to bring this claim.

It has been held that the word "individual" in the statute, includes a corporate debtor.  *See Budget Service Co. v. Better Homes of Va.,* 804 F.2d 289, 292-93 (4th Cir.1986); *United States v. Inslaw, Inc.,* 113 Bankr. 802, 1989 U.S. Dist. LEXIS 14001 (D.D.C. November 22, 1989); *Matter of Schewe,* 94 Bankr. 938, 948 (W.D. Mich. 1989); *In re Kroh Bros. Development Co.,* 91 Bankr. 525, 539 n. 3 (W.D. Mo. 1988); *In re Skinner,* 90 Bankr. 470, 474 n. 2 (D. Utah 1988); *In re Randy Homes Corp.,* 84 Bankr. 799, 802 (M.D. Fla. 1988); *In re NWFX, Inc.,* 81 Bankr. 500, 503 n. 3 (W.D. Ark. 1987); *Nash Philips/Copus, Inc. v. el Paso Floor, Inc.,* 78 Bankr. 798, 803 (W.D. Tx. 1987); *see also Homer Nat'l Bank v. Namie,* 96 Bankr. 652, 655 (W.D. La. 1989) (section 362(h) "'must be read in conjunction with the rest of <u>section 362</u> and its sanctions are not limited to the relief of an individual in the literal sense'") (quoting *Budget Service,* 804 F.2d at 292); *In re Wagner,* 74 Bankr. 898, 903 n. 12 (E.D. Pa. 1987) (endorsing approach of interpreting section 362(h) "in accordance with its intended purpose rather than in a literal fashion").

For the very same reasons, plaintiffs are entitled to summary judgment on their turnover claims.  As provided in § 542(b) of the Bankruptcy Code, turnover proceedings apply to "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order".  11 U.S.C. §542(b).  GECC does not deny that they took property subject to turnover pursuant to Section 542(a) of the Bankruptcy Code which provides that: "an entity,

other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . .shall deliver to the trustee, and account for such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. §542(a) (emphasis added). Rather, they claim that plaintiffs have no standing to bring suit. As discussed above, plaintiffs do have standing. There are therefore no questions of fact. *See Shea & Gould v. Red Apple Cos.* (*In re Shea & Gould*), 198 B.R. 861, 870 (Bankr. S.D.N.Y. 1996); (granting summary judgment in a turnover proceeding); *Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.)*, 290 B.R. 487, 488 (Bankr. S.D.N.Y. 2003) (same). Accordingly, the court should enter summary judgment for plaintiffs on its turnover claims

**G.      Plaintiffs Have Standing To Assert GECC's Numerous
          Violations Of The Automatic Stay  Under 11 U.S.C. § 362**

GECC has plainly violated the provision of the automatic stay under 11 U.S.C. § 362 by illegally taking the following funds since the petition was filed: (i) over $760,313.90 in interest; (iii) over $804,358 in unexplained "fees" and "expenses; and (iii) $610,218 Medicaid adjustment. No reading of any court order allows for this. In fact, the SRO (Exhibit 10, page 25) explicitly only allows "pay plaintiff monthly, **out of funds remaining in the custody of the substitute receiver**, all interest accrued" (emphasis added). The SRO only allows GECC to be paid interest if there are funds remaining-and even then, only the payment of interest is provided for. At no point does the court allow for the payment of principal. At no point does the court allow for any payments except with funds leftover. There were no funds left over, and in fact, there was a massive shortfall. GECC therefore has no right to take the funds. Likewise, the Cash Collateral Order only allowed for payment of interest or fees if all other obligations were

paid off (which they were not)  and certainly never allowed for payment of pre-petition principal thus making GECC's conversion of the Medicaid Retroactive Adjustment illegal.

Moreover, plaintiffs have standing to sue under the automatic stay provisions.  In *Queenie, Ltd. v. Nygard Intern.*, 321 F.3d 282 (2d Cir. 2003), the Court of Appeals for the Second Circuit concluded that, "The automatic stay can apply to non-debtors…when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." Id. at 287.  The Second Circuit in *Queenie* listed several examples of such immediate adverse economic consequences including: (1) a claim against a non-debtor for an obligation for which the debtor was a guarantor, (2) a claim against a debtor's insurer, and (3) actions where there is an identity between the debtor and third-party defendant that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.  *See also Mokuba N.Y. LLC v. Pitts (In re Pitts)*, 2009 Bankr. LEXIS 4023, 18-19 (Bankr. E.D.N.Y. Dec. 8, 2009) The third factor listed by the *Queenie* court applies here as GECC's illegal conversion of the Medicaid Retroactive Adjustment and taking of the other lockbox funds was effectively a judgment against plaintiff Oasis because Oasis was to be the ultimate recipient of all of Debtors' assets.

The cases cited by GECC, including *In re Mid-City Parking, Inc*., 332 B.R. 798, 816 (Bankr. N.D. Ill. 2005); *In re Clemmer,* 178 B.R. 160, 167 (Bankr. E.D.Tenn. 1995) do not dispute that when the special circumstances exist, as they do here, a non-party may invoke the automatic stay provisions.  In fact, GECC's citation of *In re Siskin*, 231 B.R. 514, 519 (Bankr. E.D.N.Y. 1999) explicitly acknowledges this.

GECC's reliance on *In re Prairie Trunk Railway*, 112 B.R. 924 (Bankr. N.D. Ill. 1990) is misplaced because *Prarie Trunk* is not binding in the Second Circuit and has been overruled by

the Second Circuit's holding in *Queenie* in any event. Additionally, the reasoning of *Prarie Trunk* has been soundly repudiated. *See White v. Wood (In re Debevec)*, 2002 Bankr. LEXIS 1577, 8-9 (Bankr. W.D. Va. Dec. 4, 2002). Accordingly, under *Queenie*, plaintiffs have standing and may properly assert the automatic stay provisions.

For the very same reasons, plaintiffs are entitled to summary judgment as a result of GECC's violations of the provisions of the automatic stay under *11 U.S.C. § 362* by illegally taking the Medicaid Retroactive Adjustment to pay off pre-filing principal on the debt. Again, GECC does not deny taking the money, but rather, claims that it was allowed to take it. However, no reading of any court order allows for this. In fact, the SRO (Exhibit 10, page 25) explicitly only allows "pay plaintiff monthly, **out of funds remaining in the custody of the substitute receiver**, all interest accrued" (Emphasis added). The SRO only allows GECC to be paid interest if there are funds remaining, and even then, only the payment of interest is provided for. At no point does the court allow for any payments except with funds leftover. There were no funds left over, and in fact, there was a massive shortfall. GECC therefore has no right to take the funds. Likewise, the Cash Collateral Order allowed for payment of interest or fees <u>only</u> if all other obligations were paid off (which they were not) thus making GECC's conversion of the Medicaid Retroactive Adjustment illegal.

There are, therefore, no questions of fact. Section 362(a) provides in subsection (3) in relevant part that the filing of a petition operates as a stay of "any act … to exercise control over property of the estate …." *See Nissan Motor Acceptance Corp. v. Baker,* 239 B.R. 484, 488-89 (N.D. Tex. 1999) (rejecting creditor argument that it had "the right to seek adequate protection by retaining the Vehicle to protect its interest" and finding "there is nothing in § 363(e) that

grants a creditor like Appellant the authority to engage in self-help to retain estate property as adequate protection …."); *In re Metromedia Fiber Network, Inc.,* 290 B.R. 487 (Bankr. S.D.N.Y. 2003) (holding that creditor must turn over estate property and that creditor could not retain possession until debtor first provided adequate protection); *In re Zaber,* 223 B.R. 102, 105 (Bankr. N.D. Tex. 1998) ("Like § 363, § 542(a) titled 'Turnover of property to the estate' requires no preliminary action on the part of the debtor. The statute contains no provision requiring adequate protection as a prerequisite to turnover.") (footnote omitted); *In re Berscheit,* 223 B.R. 579, 581 (Bankr. D. Wyo. 1998) (adopting reasoning in *Knaus* and rejecting creditor argument that turnover not required until adequate protection requirements of § 363 are met); *In re Foust,* 2000 Bankr. LEXIS 1146, No. 98-50774 SEG, 98-5032 SEG, M198-00185, 2000 WL 33769159, at *4, 6 (Bankr. S.D. Miss. July 18, 2000) (rejecting creditors' argument that they were justified in retaining seized collateral until their motion for relief from stay and adequate protection was heard and holding that "post petition retention of estate property without court authority following a prepetition seizure constitutes an exercise of control over property of the estate and is a violation of the automatic stay.").

There is no question that GECC retained, and in fact took, property that was the possession of the bankruptcy estate and which, pursuant to court orders, was to be used to pay ongoing receivership expenses first which were payable in the Chapter 11 period..  As noted above, such conduct was prohibited under every court order and is a prima facia violation of the automatic stay. The receivership creditors were administration creditors as well who were entitled to the protection of the automatic stay and the payments provided for under court order.

Additionally, while the Cash Collateral Order ¶ 6 specifically notes that "the receiver shall make interest payments to GECC…it specifically states "<u>provided that</u>  prior to the

payment of any professional fees and expenses, Debtors' Counsel, Committee Counsel, and the office of the United States Trustee shall be given 10 days notice with an opportunity to object thereto; and further provided that such payments to GECC shall be subject final application submitted by GECC to the court." Those provisions are inserted to protect the wanton raiding of the account without giving the parties a chance to challenge such taking. Thus aside from the fact that the taking of such funds was unauthorized under the court orders, at no point did GECC give the notice necessary to take such funds – even if they were allowed to do it – which they were not. At no point did GECC provide notice to Debtors Counsel, Committee Counsel or the office of the United States Trustee. Even according to GECC claim that the Cash Collateral Order allowed them to "reignite" the line of credit-*GECC never sought the required waiver*.

Plaintiffs had no knowledge of GECC's continuous and flagrant breaches of the automatic stay by paying itself interest and fees. The Substitute Receiver had no inkling that GECC was flagrantly violating the automatic stay. There are no questions of fact-GECC does not deny its actions but rather claims it was permitted to violate the automatic stay without court permission. As demonstrated, that is simply false.

Accordingly, the court should enter summary judgment for plaintiffs as a result of GECC's violations of the automatic stay.

**H.      Plaintiffs Are Entitled To A Declaratory Judgment Declaring
         The Rights Of The Parties To The Lockbox**

GECC has plainly violated the provision of the automatic stay under *11 U.S.C. § 362* by illegally taking the Medicaid Retroactive Adjustment to pay off pre-filing principal on the debt. No reading of any court order allows for this. In fact, the SRO (Exhibit 10, page 25) explicitly only allows to "pay plaintiff monthly, **out of funds remaining in the custody of the substitute**

**receiver**, all interest accrued" (emphasis added.) The SRO only allows GECC to be paid interest if there are funds remaining-and even then, only the payment of interest are provided for. At no point does the court allow for the payment of principal. At no point does the court allow for any payments except with leftover funds. There were no funds left over, and in fact, there was a massive shortfall. GECC therefore has no right to take the funds. Likewise, the Cash Collateral Order only allowed for payment of interest or fees if all other obligations were paid off (which they were not) thus making GECC's theft of the Medicaid Retroactive Adjustment illegal. The funds in the lockbox belonged to plaintiffs because plaintiffs were responsible to pay the shortfall for post-filing obligations, and as a result of GECC's misconduct in taking the funds from the lockbox, Plaintiffs were forced to pay a shortfall totaling millions of dollars.

Nor is declaratory relief limited to righting past wrongs as GECC erroneously suggests. GECC intentionally misquotes *Morgenthau v. Erlbaum*, 59 N.Y.2d 143, 148 (N.Y. 1983) which explicitly notes the broadness of the availability of a declaratory judgment action stating:

> With reference to declaratory relief, it should first be noted that it is not an extraordinary remedy. Instead, a declaratory judgment "is a remedy sui generis and escapes both the substantive objections and procedural limitations of special writs and extraordinary remedies" Unlike prohibition, its use is not limited to reviewing public acts of a judicial nature. Rather, it has broad application, being invoked to declare rights derived from both private and public law….

> The mere existence of other adequate remedies, however, does not require dismissal: "We have never gone so far as to hold that, when there exists a genuine controversy requiring a judicial determination, the Supreme Court is bound, solely for the reason that another remedy is available, to refuse to exercise the power conferred" *Morgenthau v. Erlbaum,* 59 N.Y.2d 143, 148 (N.Y. 1983) *Id.*

Likewise, the other cases cited by GECC are inapposite. *Ramos v. Madison Square Garden Corp.*, 257 A.D.2d 492 (N.Y. App. Div. 1st Dep't 1999) dismissed the claim not because of the availability of other remedies but because "the particular equitable relief here sought, in the nature of a prior restraint, is strongly disfavored." *The Benjamin Shapiro Realty Company v.*

*The Great American Insurance Companies*, 2000 WL 35489676 (N.Y. Sup. July 5, 2000), as GECC admits, allows for declaratory relief even in circumstances where other relief is available.

Accordingly, plaintiffs have plead a cause of action for a declaratory judgment.

For the very same reasons, plaintiffs are entitled to summary judgment on its declaratory judgment claim.  Under the Declaratory Judgment Act, 28 U.S.C. § 2201, a federal court can issue a judgment declaring the rights and legal relations between interested parties if the facts of a case "'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007) (internal citations omitted).  A party can seek declaratory judgment through summary judgment. See *United Christian Scientists v. Christian Sci. Bd. of Dirs.,* 829 F.2d 1152, 1158-71, 265 U.S. App. D.C. 20 (D.C. Cir. 1987) (affirming district court's issuance of a declaratory judgment pursuant to a motion for summary judgment).

As discussed, declaratory judgment is a broadly available remedy and it is well within the courts discretion to allow for it.  As a result of GECC's violations of the court orders and the provisions of the automatic stay under 11 U.S.C. § 362 by illegally taking the Medicaid Retroactive Adjustment to pay off pre-filing principal on the debt (which GECC does not deny) the Court should enter an order declaring that the money from the lockbox retained and used by GECC must be returned to plaintiffs for the use they were intended – the payment of Receivership obligations.   *See Investors' Ins. Co. of Am. v. Grisko,* 261 F. Supp. 124 (D. Conn. 1966) (summary judgment for defendant against insurer declaring injury to be covered by policy).  *NAACP v. New York, 413 U.S. 345, 93 S.* Ct. 2591, 37 L. Ed. 2d 648 (1973) (state's declaratory judgment action for determination of applicability of Voting Rights Act of 1965 to

three of its counties; summary judgment for state affirmed); *Graham v. Richardson*, 403 U.S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971) (action challenging constitutionality of state welfare requirements; summary judgment for plaintiff affirmed).  *Kletschka v. Driver*, 411 F.2d 436 (2d Cir. 1969); *Perrotta v. Irizarry*, 430 F. Supp. 1274 (S.D.N.Y. 1977) (declaration of constitutional rights); *Lau v. Kiley,* 410 F. Supp. 221 (S.D.N.Y. 1976) (immigration status; plaintiff's motion granted when presented on cross motions); *Restivo v. Conservative Party of the State of N.Y.*, 391 F. Supp.813 (S.D.N.Y. 1975) (action by party members seeking a declaration that certain of party's rules are unconstitutional; defendants' motion granted); *Taylor v. New York City Transit Auth.*, 309 F. Supp. 785 (E.D.N.Y.), *aff'd*, 433 F.2d 665 (2d Cir. 1970) (employee's dismissal; cross-motions; employee's motion denied; defendant's motion granted).

Accordingly, the Court should enter an order declaring that the money from the lockbox retained and used by GECC must be returned to plaintiffs.

## **CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request that the Court issue an order

denying GECC's motion to dismiss and granting plaintiff's motion for partial summary judgment

in its entirety.

Dated: New York, New York
     February 7, 2011

Backenroth Frankel & Krinsky LLP
*Attorney for Plaintiffs*

By: /s/ Abraham Backenroth
Abraham Backenroth (AB-1989)
 489 Fifth Avenue, 28th Floor
New York, New York 10017
(212) 593-1100
(212) 644-0544 (fax)
mfrankel@bfklaw.com