Mark Frankel (516720)
Backenroth Frankel & Krinsky LLP
489 Fifth Avenue
28th Floor
New York, NY 10017
(212) 593-1100
(212) 644-0544 (fax)
abackenroth@bfklaw.com
mfranklel@bfklaw.com
*Attorneys for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHGATE LTC MANAGEMENT, LLC, | Case No: 07-11068 (REL) |
| Debtor, | |

-----------------------------------------------------------x

| | |
|---|---|
| GE CONSULTING LLC and OASIS HC LLC, | Adversary Case no. |
| Plaintiffs, | |
| v. | |
| GENERAL ELECTRIC CAPITAL CORPORATION, | |
| Defendant, | |

-----------------------------------------------------------x

## **DECLARATION OF NACHUM SHERMAN**

**NACHUM SHERMAN** declares under the penalty of perjury:

1. I am the Comptroller of EF Consulting, LLC (the "Substitute Receiver"), the Substitute Receiver in this action. I submit this Declaration in opposition to defendants General Electric Capital Corporation's ("GECC") motion to dismiss the complaint and in support of plaintiffs', the Substitute Receiver and Oasis HC LLC ("Oasis"), motion for partial summary

{043246}

judgment awarding plaintiffs $2,960,450 plus prejudgment interest. I have personal knowledge of the facts set forth below. A copy of the Complaint is attached as Exhibit 1.

2. Plaintiffs are moving for summary judgment for four distinct amounts of the Substitute Receiver's and ultimately Oasis's funds converted by GECC during the Bankruptcy. First, GECC converted $785,561, by using the Receivers' income to pay down the Debtors' Pre-Petition line of credit debt. This conversion violated the automatic stay and court orders. Second, GECC converted $760,313 of the Receivers' income to pay itself interest during the course of the bankruptcy. This conversion violated New York law governing income received during a receivership and court orders. Third, GECC converted $804,358 of the Receivers' income to pay itself fees during the course of the bankruptcy. This conversion violated New York law governing income received during a receivership and court orders. Fourth, GECC converted $610,218 of the Receivers' income which represented a Medicaid adjustment of the Receivers' ordinary income. This conversion violated the automatic stay, New York law governing income received during a receivership and court orders. In sum, GECC converted at least $2,960,450. Therefore, the Court should grant plaintiffs partial summary judgment in the amount of $2,960,450 plus prejudgment interest.

**Summary Background**

3. In April 2007, Highgate LTC Management, LLC and Highgate Manor Group, LLC (collectively "Debtors") were placed in Chapter 11 Bankruptcy protection. Prior to and during the Bankruptcy, Debtors' assets were placed under the control of court appointed receivers. Pursuant to a "363 Sale," Oasis entered in an agreement to purchase all of Debtors' assets. A copy of the Purchase Agreement is attached as Exhibit 8 and the Sale Order is attached

{043246} 2

as Exhibit 9.

Pending the closing of the sale, the Substitute Receiver was appointed Receiver of all of the Debtors' assets. The agreements and Orders, and the intent thereof, provided for the (i) Substitute Receiver to receive all of Debtors' assets (including accounts receivables) and for the Substitute Receiver to be responsible for all post-petition debt incurred by the Substitute Receiver; and (ii) the purchaser of Debtors' assets, Oasis, to receive all of Debtors' assets (including the assets to which the Substitute Receiver was entitled) at the Closing and be responsible for all post-petition debt incurred by the Substitute Receiver. Oasis was the intended beneficiary to all of the court orders and agreements, including the orders concerning the Substitute Receiver's entitlement to all of the Debtors' accounts receivable and income.

4. On August 30, 2010, Oasis closed and purchased all of the Debtors' assets. As described herein, at that time, as a result of GECC's theft, Oasis received at least $2,960,450 less than it should have. Moreover, Oasis became responsible for well over $10 million in post-petition accounts payable. But for GECC's theft, the Substitute Receiver would have paid down its post-petition trade creditors and expenses by $2,960,450. GECC's conversion directly harmed the Substitute Receiver (as it is responsible for all its expenses) and Oasis (as it should have received at the Closing from the Substitute Receiver all of the available cash and income, which was diminished by $2,960,450 and/or should have been responsible for $2,960,450 <u>less</u> of the Receivers' post petition debt to trade creditors).

**Background**

5. The Substitute Receiver was appointed, pursuant to an order dated November 3, 2008 (the "Substitute Receiver Order" or "SRO"), to act as substitute receiver of Debtors. A

{043246} 3

copy of the Substitute Receiver Order is attached as Exhibit 10. As provided for in the Substitute Receiver Order, the Substitute Receiver has the powers accorded to a receiver appointed in an action to foreclose a mortgage on real property and in equity, and the powers, duties, rights and obligations of a receiver appointed under Section 2810(2) of the New York State Public Health Law.

6. Debtors were the operators of three nursing homes in the Albany region and one in the City of Cortland with a total of over 500 beds. Highgate Manor owned the real property upon which the skilled nursing facilities are located.

7. On May 26, 2005, Debtors and GECC entered into the following agreements: (a) a Loan and Security Agreement pursuant to which GECC provided Highgate with a revolving line of credit (the "LSA" or "Line of Credit") of up to $4,000,000.00 for the operation of the Facilities; (b) a Lockbox Account Agreement, to facilitate the operation of the Line of Credit (the "lockbox agreement"); and (c) a Loan Agreement, pursuant to which GECC provided Highgate up to $23,500,00.00 for refinancing of the Properties, which loan is secured by the Mortgages (collectively the "Loan Documents"). A copy of the lockbox agreement is attached to this declaration as Exhibit 3 and a copy of the LSA is attached as Exhibit 2.

8. GECC claimed that in April 2006, Debtors defaulted on it its obligations to GECC by failing to make payments when due under the Loan Documents. On or about October 11, 2006, GECC commenced an action in State Court against Debtors, seeking, among other things, to foreclose on the Mortgages and, in the interim, to have a receiver appointed to operate and manage Debtors' skilled nursing facilities.

9. By an order dated November 29, 2006, the Court appointed The Long Hill

Alliance Company ("Long Hill") as the receiver of Debtors. A copy of the Order is attached as Exhibit 4. Thereafter, on April 16, 2007, Debtors filed petitions for relief under Chapter 11 of the United States Bankruptcy Code. Mark I. Fishman, Esq., who was appointed bankruptcy trustee, obtained the approval of the Bankruptcy Court pursuant to an order, dated August 28, 2008 (the "Final Sale Order"), to sell substantially all of Debtors' assets. The Final Sale Order, a copy of which is attached as Exhibit 9, provides that Oasis will be the purchaser of the assets of Debtors, and that Substitute Receiver replace Long Hill as receiver. Subsequently, GECC moved this Court for an order appointing Substitute Receiver as substitute receiver. The motion was granted, the Receiver Order was entered, and Substitute Receiver began acting as substitute receiver, and took over operation of the Debtors, on November 3, 2008.

10. During the tenures of the Receivers, the Receivers consistently lost money in the operations of the Debtors' skilled nursing facilities.

11. The Receivers never paid all of their trade creditors and expenses. The accounts payable increased on an ongoing basis. There never was any surplus funds after the Receivers paid (part) of their expenses.

12. At the time of the bankruptcy filing, the "Pre-Petition LSA Debt" owed by Debtors to GECC was $3,492,795. During the Receivers' tenure and during bankruptcy, GECC took from the Receivers' income $785,561 to lower the Pre-Petition LSA Debt to $2,707,234. At the time of the closing on August 30, 2010, the pre-petition LSA Debt was $2,707,234.

13. Also, during the tenure of the Receivers, GECC took over $760,313.79 in interest. GECC was not permitted to take any interest under the Substitute Receiver Order because there never was a surplus of funds. The Receivers always operated on a loss. In fact, as of the August

{043246} 5

30, 2010 closing, the Receivers' outstanding Accounts Payable far exceeded $10 million.

14. Furthermore, during the Receiver's tenure, GECC also wrongfully converted $804,358.28 in alleged and unspecified "fees." The Substitute Receiver Order did not permit any such fees.

15. Finally, GECC converted a $610,218 Medicaid Retroactive Adjustment which was the Substitute Receiver's ordinary income. This payment was not based on any appeal, but was paid by Medicaid as part of the ordinary "PRI" adjustment procedure based on a nursing home's submission to Medicaid every three and six months as required by statute.

16. The Medicaid adjustment was intended to be the Substitute Receiver's funds. On July 9, 2008, this Court entered a Stipulation and Agreed Order Resolving the Claims By and Against the New York Department of Health the ("DOH Order"). The DOH Order acknowledged that the Medicaid retroactive adjustment owed by New York State to the Debtors was $2,668,316 at that time. Pursuant to the terms of the Order, DOH was permitted to offset $2,668,316 against the New York State Assessment Tax owed by the Debtors. A copy of the DOH Order is attached as Exhibit 5.

17. In or about April 2010, DOH offset the Medicaid retroactive adjustment owed by New York against the agreed to part of the New York State Assessment Tax owed by the Debtors. However, as a result of the additional time, payments by the Receivers and recalculation of the amounts due from New York State for the Medicaid retroactive adjustment, an additional $610,218.18 was paid by New York State to the Lockbox for the Medicaid retroactive adjustment. These funds were stolen by GECC. The Orders do not permit GECC to take those funds. They were the property of the Receiver.

**The Substitute Receiver Order**

18. Like all receivers, the Substitute Receiver was given the power to collect all income and account receivables of Debtors and to pay all trade creditors, accounts payable and expenses of the properties and facilities necessary for their continued operation. See Exhibit A.

19. The Substitute Receiver was given sole control over all bank accounts containing assets of Debtors. As stated in the Order:

> The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder, including, in Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes…

P. 15.

20. All incoming payments were ordered to go directly towards expenses of the properties and facilities:

> The Substitute Receiver shall collect incoming payments from all sources *and apply them to the costs incurred in the performance of its functions and obligations hereunder*.

P. 16 (emphasis added).

21. Under the Substitute Receiver Order, only after ***all*** expenses were paid could the remaining funds be applied to accrued interest under the Line of Credit:

> That the Substitute Receiver be, and hereby is, authorized and directed: (a) to keep the Mortgaged Premises insured against loss or damage by fire and in repair; (b) to pay the taxes, assessments, water charges, sewer rents, electric bills, and other charges on the Mortgaged Premises, in a manner consistent with the provisions of this Order; (c) to comply with all requirements of any municipal

{043246}  7

department or authority having jurisdiction over the Mortgaged Premises; (d) to procure, if necessary, such insurance and liability insurance against claims for losses or injuries to persons and property, which may be asserted by persons on, near or about the Mortgaged Premises, as may be necessary; and (e) to pay to Plaintiff monthly, ***out of funds remaining in the custody of the Substitute Receiver***, all interest accrued on the Revolving Credit Note, provided that any unpaid interest shall continue to accrue on the Real Estate Loan, Senior Promissory Note and Revolving Credit Documents secured by its Consolidated and Leasehold Mortgages.

P. 25 (emphasis added).

22. Critically, there is no provision allowing for the payment of any fees, expenses or principal to GECC aside from interest under the LSA and GECC is given no control over any of Debtors' assets or the Receiver's income. In fact, the Substitute Receiver Order is clear:

> *The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder*, including, in Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes…

P. 15 (emphasis added).

23. Further, the Substitute Receiver Order gives the Substitute Receiver the authority to utilize ***all*** of the facilities accounts receivable to meet its obligations.

> That the Substitute Receiver *shall be entitled to utilize all accounts receivable* cash existing at the Facility as of the date of the commencement of its appointment as receiver to meet Substitute Receiver's obligations hereunder except that funds held in escrow by Long Hill for professional fees shall not be deemed to be cash existing at the Facility but shall be turned over by Long Hill to be held in escrow by counsel to the Trustee.

P. 9 (emphasis added).

**The Lockbox Agreement**

      24.    Under the terms of the Substitute Receiver Order, the Court ordered that:

> The Substitute Receiver shall forthwith deposit all monies received by it at the time it receives same in a special account in its own name as Substitute Receiver in RBS Citizens Bank, N.A.,…[n]othing herein is intended to amend, modify or abrogate the lock box arrangement for the collection and deposit of accounts receivable by the Substitute Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC.

P. 21-22.

      25.    The "lock box arrangement" is embodied by a Lockbox Account Agreement (the "Lockbox Agreement") between GECC, Debtors and Manufacturers and Traders Trust Company (Exhibit 3 to this declaration). The Lockbox Agreement, like most such agreements, is simply a *mechanism* for GECC to ensure that all accounts receivable are properly collected. The Lockbox Agreement provides that all accounts receivable collected by the lockbox to a "Concentration Account" designated by GECC. Under the Lockbox Agreement, the Substitute Receiver has the explicit authority to modify this arrangement.

> Company may modify these directions by written notice to Bank and Lender, provided that such a modification shall not become effective until ten (10) business days after receipt by Bank and Lender of such notice by facsimile or overnight delivery service as the addresses or facsimile numbers shown in Section 12 below.

P. 3.

      26.    The Lockbox Agreement does not in any way permit GECC to utilize any of the Receiver's income to pay principal, interest or fees. Moreover, as stated above, the Substitute

Receiver Order does *not* permit GE to take funds that are needed to be paid to Debtors' trade creditors for the Receiver's expenses.

**The Cash Collateral Order**

27. The Cash Collateral Order ("CCO") cited extensively by GECC is dated May 14, 2007. This was prior to the Substitute Receiver Order. Like all cash collateral orders, it gives super priority to liens incurred post petition. What it does not do, is allow GECC to pay itself. A copy of the Cash Collateral Order is attached as Exhibit 6.

28. There were numerous stipulations and order modifying the COO (the "Modification Orders"). GECC does not cite to any of them because the budgets attached to each of the Modification Orders do not provide for the payments of interest, fees or principal to GECC in any amounts close to what they took from the Lockbox Income. Even the ones that provide for interest, such interest may only be taken from surplus funds pursuant to the Substitute Receiver Order. Also, the Modification Orders terminated any borrowing that may have existed. Copies of a few of the Modification Orders are attached as Exhibit 7.

**The Alleged Releases**

29. *Prior* to Debtors' default under the Loan Documents, when money was deposited into the lockbox, GECC would apply the money collected from the lockbox into the Concentration Account to pay down the outstanding Line of Credit. In this way, the Line of Credit would have new funds available for disbursement to Debtors.

30. GECC accomplished its theft and fraud by misleading the Receiver and Debtors' employees to believe and act as if the LSA was still in effect concerning the Pre-Petition LSA Debt.

31. GECC transferred all of the Receivers' income received through the Lockbox into accounts controlled by GECC. GECC would then hold the Receivers' funds until the Debtors' employees would demand the funds. At times, GECC withheld the funds even after a request. GECC was not permitted to do so.

32. GECC implicitly and explicitly held itself out that it was permitted to control the Receivers' Lockbox Income, which it was not.

33. Moreover, GECC was never permitted to take any of the Receivers' funds. GECC misled the Receiver and Debtors' employees with their ongoing scheme to (i) control the Receivers' Lockbox Income; (ii) pay itself Pre-Petition LSA Debt, interest and fees; and (iii) purportedly "lend back" to the Receivers the Receivers' own Lockbox Income.

34. GECC claims that plaintiffs waived and released GECC from its wrongdoing. This notion is ridiculous. First, the documents completed by Debtors' employees were demands for the return of the Receiver Lockbox Income. Second, these forms were part and parcel of GECC's scheme which defrauded the Receivers and ultimately the purchaser. Third, the person who allegedly signed the so called waiver was at best a office employee, such as a bookkeeper or accountant employed by Debtors and was never authorized by the plaintiffs to waive any claims.

35. The plaintiffs never intended to and, in fact, never waived any claims.

WHEREFORE, plaintiffs, respectfully requests that the Court deny defendant GECC's motion to dismiss and grant plaintiffs' motion for partial summary judgment.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 6th day of February, 2011.

_____
Nachum Sherman