EXHIBIT "8"

## PURCHASE AGREEMENT

AGREEMENT made as of the 12th day of August, 2008, by and between Mark Fishman, Esq. as Chapter 11 Trustee ("Trustee") of HIGHGATE MANOR GROUP, LLC, a limited liability company organized under the laws of the State of New York, with offices at 1805 Providence Avenue, Niskayuna, NY 12309 ("Manor"), and HIGHGATE LTC MANAGEMENT, LLC, a limited liability company organized under the laws of the State of New York, with offices at 1805 Providence Avenue, Niskayuna, NY 12309 ("LTC") (Manor and LTC, collectively, the "Debtors" or the "Sellers") and Oasis HC, LLC, an New York limited liability company, with offices at 1775 Broadway, Suite 608, New York, NY 10019 ("Purchaser").

## W I T N E S S E T H:

WHEREAS, MANOR is owner of the fee interest in the following properties (which are more specifically described in Exhibits A 1-4 annexed hereto):

NORTHWOODS REHABILITATION AND EXTENDED CARE FACILITY AT ROSEWOOD GARDENS, located at 284 Troy Road, East Greenbush, New York; NORTHWOODS REHABILITATION AND EXTENDED CARE FACILITY AT TROY, located at 100 New Turnpike Road, Troy, New York; NORTHWOODS REHABILITATION AT HILLTOP, located at 1805 Providence Avenue, Niskayuna, New York; and NORTHWOODS REHABILITATION AND EXTENDED CARE FACILITY AT CORTLAND, located at 28 Kellog Road, Cortland, New York; and

WHEREAS, upon each of the foregoing described properties are real estate, buildings and improvements comprising a facility which provides residential health care and related services pursuant to Article 28 of the Public Health Law of the State of New York ("Article 28")

(each of the foregoing described properties are referred to as a "Facility" and, collectively as the "Facilities"); and

WHEREAS, until the appointment of a Receiver (by Order Appointing Receiver, dated November 29, 2006 (the "Order Appointing Receiver"), by the Supreme Court of the State of New York, County of Rensselaer, in the matter of *General Electric Capital Corporation v. Highgate Manor Group, LLC, et al.*, Index No. 219393/06 (the "State Court Action")), LTC was the operator of the Facilities pursuant to the requisite regulatory approvals and operating certificates issued by the New York State Department of Health ("DOH") and/or the Public Health Council. Long Hill Alliance Company (the "Receiver") was appointed the Receiver pursuant to the Order Appointing Receiver and continues to operate the Facilities; and

WHEREAS, on April 16, 2007 (the "Petition Date"), Manor and LTC filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in bankruptcy proceedings entitled *In re: Highgate LTC Management, LLC* and *In re: Highgate Manor Group, LLC*, pending in the United States Bankruptcy Court for the Northern District of New York, Albany Division (the "Bankruptcy Court"), Case Nos. 07-11068 and 07-11069, jointly administered under 07-11068) (the "Bankruptcy Case"); and

WHEREAS, by order dated May 21, 2007, the Bankruptcy Court approved the appointment of Mark I. Fishman as the Chapter 11 Trustee of Debtors' estates with the authority and function of a Chapter 11 Trustee, *inter alia*, to sell the Facilities; and

WHEREAS, in accordance with the terms of this Agreement, the Purchaser desires to purchase all of the Sellers' right, title and interest in and to the real estate, business and operations of the Facilities, and all of the other assets used in connection with the operation of

2

the Facilities as such assets exist at the time of Closing (collectively, with the Facilities, the "Purchased Assets"); and

WHERAS, the parties acknowledge that the Purchaser or the person or entity or entities designated by the Purchaser to take over the operations of the Facilities on a temporary basis until Closing (the "Receivership Designee") must receive the Requisite Approvals; and

WHEREAS, the parties acknowledge that the Purchaser or the person or entity or entities designated by the Purchaser to operate the Facilities (the "Operating Designee(s)") must seek the approval of the DOH; and

WHERAS, the parties acknowledge that the Operating Designee(s) may be a different person or entity or entities than the Purchaser or the Receivership Designee.

WHEREAS, Purchaser acknowledges that Purchaser or the Operating Designee(s) must submit one or more Certificates of Need applications (the "CON Application(s)") to the DOH and/or the Public Health Council, which DOH and/ or Public Health Council approval of the CON Application(s) is a condition precedent to Closing; and

WHEREAS, Purchaser or the Receivership Designee seeks to take over the operations of the Facilities on a temporary basis until Closing and substitute Purchaser or the Receivership Designee in place of Long Hill Alliance Company as the Receiver pursuant to an order in the State Court Action in the form annexed hereto as Exhibit "1" (the "Order Appointing Substitute Receiver"), which document is incorporated herein.

WHEREAS, Purchaser acknowledges that the Trustee's authority to transfer and sell the Purchased Assets is subject to the approval of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code (the "Final Sale Order"); and

WHEREAS, Purchaser acknowledges that the Trustee's authority to assume and assign the Assumed Contracts, as defined herein, is subject to obtaining an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the assumption and assignment of the Assumed Contracts to Purchaser (the "365 Order").

NOW, THEREFORE, it is mutually agreed as follows:

1.   <u>PURCHASE AND SALE OF ASSETS</u>

   A.   <u>Purchased Assets</u>

   Subject to the terms and conditions of this Agreement, at the Closing (as defined in Section 3), the Trustee shall sell to Purchaser all of the Debtors' right, title and interest in, to and under the Purchased Assets, on an "as-is, where-is, with-all-faults" basis, free and clear of all liens, including, without limitation, the following assets:

   (i)   The real estate and Fee Interests in the Facilities as described above, and further described in Exhibits A1, A2, A3, and A4;

   (ii)   The furniture, fixtures, equipment, tools, spare parts, supplies (including all of the Seller's inventory), artwork, and all other tangible property owned by Seller, used by Seller in the conduct of its business, and located at the Seller's business facilities, and any vehicles, if any, owned by Seller, and any capital assets owned by Seller;

   (iii)   All contracts and agreements designated by Purchaser and listed on Schedule B, subject to any applicable restrictions on assignment of provider agreements, which shall be assumed by the Trustee and assigned to Purchaser (the "Assumed Contracts"). Schedule B shall be provided to Seller and GE by the Purchaser, not less than one hundred twenty (120) days after the entry of the Order Appointing Substitute Receiver;

   (iv)   All ordinary course accounts receivable;

   (v)   The names NORTHWOODS REHABILITATION AND EXTENDED CARE FACILITY AT ROSEWOOD GARDENS, (located at 284 Troy Road, East Greenbush, New York), NORTHWOODS REHABILITATION AND EXTENDED CARE FACILITY AT TROY (located at 100 New Turnpike Road, Troy, New York), NORTHWOODS REHABILITATION AND EXTENDED CARE FACILITY AT HILLTOP (located at 1805 Providence Avenue, Niskayuna, New York),

4

and NORTHWOODS REHABILITATION AND EXTENDED CARE FACILTY AT CORTLAND (located at 28 Kellog Road, Cortland, New York), and the Facilities' current telephone numbers, websites, domain names and web and internet addresses;

(vi) The books and records of the Facilities, title to which will vest in the Purchaser or Operating Designee(s) upon such person's obtaining the CON Approval(s) (defined hereinafter), but access to which will be granted to the Receivership Designee and Operating Designee(s) prior to Closing on a temporary basis;

(vii) Patient Records, upon satisfaction by Purchaser and Seller, at Purchaser's sole expense, of all applicable requirements relating to the confidentiality and transferability of such Patient Records and their maintenance and storage, which satisfaction shall be an affirmative requirement of this Agreement. "Patient Records" means any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of, any individual, or that are otherwise subject to regulation under applicable Law, title to which will vest in the Purchaser or Operating Designee(s) upon such person's obtaining the CON Approval(s) but access to which will be granted to the Receivership Designee and Operating Designee(s) prior to Closing on a temporary basis;

(viii) All plans and surveys, including without limitation, those related to utilities, easements and roads, "as built" plans, plants, specifications, engineers' drawings and architectural renderings and similar items owned by the Seller and in the Seller's possession or reasonable control relating to the Facilities;

(ix) All insurance proceeds and insurance proceeds receivable (including applicable deductibles, co-payments, or self-insured requirements) arising from any claim made under Seller's insurance policies with respect to the Purchased Assets but excluding insurance proceeds and proceeds receivable in respect of tort liabilities such as medical malpractice claims and other Excluded Liabilities;   *MIF   PTJ*

(x) All transferable licenses and permits relating to the Facilities and Seller's business;

(xi) All rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees, transferred employees, and agents of Seller or with third parties to the extent relating to the Seller's business or the Purchased Assets;

(xii) All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent

relating to services provided to Seller after the Closing or to the extent affecting any Purchased Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(xiii) Any right to receive or expectancy of the Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate) received or arising after the date hereof that is specifically designated by the terms of such gift, grant, bequest or legacy to be applied or used solely in respect of the Seller's business or Facilities;

(xiv) All assets under employee benefit plans assumed by Purchaser hereunder; and

(xv) All of Sellers' right, title and interest in and to other assets of the Debtors located at the Facilities.

(xvi) All of Seller's cash and cash equivalents or similar type investments, uncollected checks, bank accounts, certificates of deposit, Treasury bills and other marketable securities as of the Closing Date; except for (a) cash and cash equivalents arising from excluded Claims as set forth in Section 1B below and (b) cash placed in escrow with the Receiver at any time, wherever located as of Closing, with respect to professional and/or trustee fees; and

(xvii) The funds in any pension, retirement or health fund to the extent of any overfunding;

(xviii) Any security, vendor, utility or other deposits not specifically identified on Schedule 2.2(b).

The Purchased Assets do not include the Excluded Assets.

B.    Excluded Assets

Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean each of the following assets:

(i)    Any security, vendor, utility or other deposits and any security deposits with any Governmental Entity, each as listed on Schedule 2.2(b);

(ii)    Any contracts, leases or agreements other than the Assumed Contracts, including without limitation the contract with First Niagara Risk Management;

(iii)     All rights, demands, claims, actions and causes of action and the proceeds thereof (collectively, the "Claims") that the Trustee or the Debtors or any of their affiliates may have against any other Person(s) pursuant to and under the Bankruptcy Code, non-bankruptcy law or otherwise;

(iv)      Any refunds of tax attributable to the Facilities or the Purchased Assets during the Pre-Closing Tax Period;

(v)       All Claims, including proceeds thereof, which the Debtors may have against any other Person with respect to any Excluded Assets or the Facilities, including Claims for contribution or indemnity arising prior to the Closing;

(vi)      All Claims, proceeds, or rights to receive refunds or other payments under insurance policies which Claims refer, relate to or arose prior to the Closing (excluding payments due from residents at the facilities);

(vii)     All rights to refunds, settlements, retainages, holdbacks, and/or retroactive adjustments, to the extent applicable to periods ending on or before the Closing, arising in connection with Sellers' Medicare and Medicaid provider numbers and related participation or any other third party healthcare payor program, including but not limited to a certain account receivable or retroactive adjustment, however denominated, in favor of Sellers in the approximate amount of $2.6 million as set forth in paragraph 2 of the DOH Stipulation (as defined in Section 10.2 hereof), arising from services provided by Sellers prior to and after the Petition Date;

(viii)    Related party and insider debts and/or accounts receivable;

(ix)      All (i) books and records that the Trustee, the Receiver or the Sellers are required to maintain by Law; provided, however, that subject to a confidentiality agreement in form and substance acceptable to Purchaser and Sellers, Purchaser shall have the right to make copies of any portions of such retained files, books and records that relate to the Facilities as conducted before the Closing (except as prohibited by Law) or that relate to any of the Purchased Assets; (ii) documents which the Trustee, the Receiver or Sellers are not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than Patient Records subject to the patient records confidentiality agreement); (iii) documents relating to proposals to acquire the Facilities or any other assets, properties or interests of Sellers by Persons other than Purchaser; and (iv) documents related to or that are required in order to realize the benefits of any Excluded Assets;

(x)     All of Seller's deposits or prepaid charges and expenses paid in connection with or related to any Excluded Assets;

(xi)    The tanks located at the Facilities which are owned by Northeast Gas Technologies, Ltd.; and

(xii)   All personal property of Residents and patients in the Facilities.

C.      <u>Assumption of Liabilities During Temporary Receivership</u>

To the extent Purchaser, as Receiver or the Receivership Designee during the period prior to Closing, seeks to use any accounts receivable and establish and/or continue the revolving credit facility of General Electric Capital Corporation ("GE"), then:  (A) Purchaser shall use accounts receivable collected for services rendered or provided both prior to and after the issuance to Purchaser of the Requisite Approvals to pay, without credit to the Purchase Price, all accrued operating expenses, including trade accounts payable, professional fees and expenses (including trustee fees) of Trustee, and Committee and U.S. Trustee fees which are incurred between Final Sale Order and Closing (in accordance with Annex 1C hereto), accrued vacation, sick and personal time and similar items,  cash receipt assessment and similar taxes, employee wages or salary, and required contributions under employee benefit plans or programs, including accrued but unbilled expenses arising from the operation of the Facilities after the Order Appointing Receiver through the Closing Date; and (B) Purchaser shall be in compliance with the Order Appointing Substitute Receiver and pay expenses of the estate consistent with the approved budgets and cash collateral orders entered by the Bankruptcy Court.  At the Closing, Purchaser shall pay or otherwise resolve, at its sole expense, all section 365 cure obligations with respect to the Assumed Contracts and all retroactive premium adjustments with respect to workers' compensation and other insurance policies to the extent attributable to time periods subsequent to the Petition Date. It is expressly understood that Purchaser is not assuming any obligations related to the First Niagara Risk Management Agreement.

"Requisite Approvals" shall mean the approvals required to operate the Facilities on a temporary, provisional or conditional basis pursuant to Article 28 or the Public Health Law of the State of New York.

All of the liabilities assumed by Purchaser pursuant to this section 1.C. shall be referred to collectively as the "Assumed Liabilities" and shall survive the Closing or any earlier termination of this Agreement, as the case may be.

2. PURCHASE PRICE

2.1    In exchange for the Purchased Assets, Purchaser agrees to pay to Trustee the sum of Twenty ~~Two~~ *Three* Million, ~~Seven~~ *Three* Hundred ~~and Fifty~~ Thousand Dollars (~~$22,750,000.00~~ *23,300,000*) (the "Purchase Price"), subject to any adjustments or credits set forth in this Agreement, payable as follows:

(a)    Two Million, Two Hundred and Seventy Five Thousand Dollars ($2,275,000.00) already paid by the Purchaser to the Trustee as a deposit (the "Deposit") as a part of the Purchaser's Qualified Bid; which Deposit shall be refundable only if Purchaser is not granted the Requisite Approvals or as defined in Section 12.6; and

(c)    Twenty *One* Million, ~~Four Hundred and Seventy~~ *Twenty* Five Thousand Dollars (*($21,025,000.00)*) (~~$22,475,000.00~~), subject to adjustments set forth in this Agreement, by bank, cashier's or certified check(s) or wire transfer to the order of Trustee or by wire transfer to an account designated by Trustee to Purchaser prior to Closing.

(d)    The Deposit will be held in escrow by the Trustee's counsel in accordance with the Final Sale Order and this Agreement. In the event Purchaser fails to Close or this Agreement is otherwise terminated by the Trustee in accordance with Section 12 hereof, any interest earned on the Deposit shall be paid to Trustee otherwise any interest shall be applied at

9

the Closing as a credit to the Purchase Price. The Deposit shall constitute and be a part of GE's collateral.

2.2    The Purchase Price shall be allocated among the Purchased Assets at Closing by agreement of the parties. Upon the entry of the Order Appointing Substitute Receiver and the Final Sale Order, the Deposit shall become non-refundable (subject to section 12.6 hereof) and may be retained by the Trustee as liquidated damages and not as a penalty in the event of a breach of this Agreement by the Purchaser or in the event that Purchaser fails to close or fails to obtain the CON Approval(s) (hereinafter defined) .

3.    CLOSING

Subject to the satisfaction (or waiver, as applicable) of all conditions included in this Agreement, the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities as contemplated hereunder (the "Closing") shall take place ~~no later than~~ no later than thirty (30) days after Purchaser or the Operating Designee(s) obtain non-contingent written approval of the CON Application(s) (the "CON Approval(s)") to be filed by Purchaser, or the Operating Designee(s), for the establishment and licensure of ~~Buyer~~ Purchaser, or the Operating Designee(s) as the operator of the Facilities. The Closing will be held at the offices of Moritt Hock Hamroff & Horowitz LLP, 400 Garden City Plaza, Garden City, New York, at 10:00 a.m. on such date or such other date and time as the parties shall mutually agree within the time constraints set forth above.

3.1    Seller's Closing Documents. At the Closing, Seller shall deliver or cause to be delivered to Purchaser:

(a)    Quit Claim Deeds transferring title to the Facilities;

(b)    A duly executed Bill of Sale for the Purchased Assets;

(c)     A duly executed Assumption and Assignment Agreement, in form and substance reasonably satisfactory to Seller, which provides for the assignment by the Seller and the Assumption by the Purchaser of all of the Assumed Liabilities and Assumed Contracts;

(d)     The Final Sale Order;

(e)     The 365 Order;

(f)     All other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all liens (except permitted exceptions), including certificates of title for vehicles, if any; and

(g) A settlement agreement with the DOH substantially in the form annexed hereto as Exhibit "2".

(h)     List of all employees, to the extent not prohibited by applicable law.

3.2     <u>Purchaser's Closing Documents</u>.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller:

(a)     The Purchase Price;

(b)     Purchaser's Certificate of compliance with Section 7 hereof;

(c)     A duly executed Assumption and Assignment Agreement, in form and substance reasonably satisfactory to Seller, which provides for the assignment by the Seller and the Assumption by the Purchaser of all of the Assumed Liabilities and Assumed Contracts;

(d)     A bank, cashier's or certified check or wire transfer for the aggregate cure amounts with respect to the Assumed Contracts;

(e)     Checks, payable to, and in form satisfactory to, the applicable recipients, for all conveyance or transfer taxes, deed stamps, title and survey fees, recording fees and similar

charges in connection with the Closing except to the extent exempted pursuant to Section 1146 of the Bankruptcy Code;

     (f)    Satisfactory evidence of the CON Approval(s);

     (g)    A confidentiality and indemnification agreement, in form and substance satisfactory to Seller, regarding Purchaser's use of Patient Records;

     (h)    A sworn certification by Purchaser, *Operating Designee and Receivership Designee* that ~~Purchaser has~~ *each have* complied with and/or satisfied all of its obligations under Article 1.C. hereof and under the Order Appointing Substitute Receiver.

## 4.   ADJUSTMENTS

     4.1    To the extent Purchaser closes the transaction after *it or Operating Designee or Receivership Designee operates* ~~operating~~ the Facilities as a Receiver under the Order Appointing Substitute Receiver, there shall be no adjustments at Closing.  The period of time between the entry of the Order Appointing Substitute Receiver and the closing (or the earlier termination of this Agreement) shall be referred to as the "Temporary Receivership Period").  If Closing occurs without Purchaser *or its designees* having operated the facilities as temporary receiver, then at or before the Closing, the Purchase Price shall be adjusted by the parties to account for the following (as of midnight of the night immediately preceding the date of the Closing) such that the costs, expenses and payments for such items will be adjusted in the customary manner between Seller and Purchaser:

     (a)    Real estate, school and similar taxes attributable to the Facilities;

     (b)    Water and sewer taxes or charges attributable to the Facilities;

     (c)    Telephone, gas, water, electric and any other utility charges;

     (d)    Payroll taxes;

     (e)    Health insurance premium payments;

(f)     Prepayments for patient charges for periods after the Closing; and

(g)     Such other items customarily requiring adjustment in connection with similar transactions.

All such adjustments shall be agreed to by the parties at or prior to the Closing or at such other time as the parties may agree.  In the event an error is made in the calculation of any of the foregoing adjustments, the parties hereto shall promptly, upon the discovery of such error (provided that such error is discovered and notice thereof given within 30 days following the Closing), further adjust the Purchase Price to correct such error and make appropriate payment within 10 days of the date such adjustment is agreed upon.

4.2     If any retroactive adjustment in payments is made subsequent to the Closing (resulting from audit or otherwise) with respect to third party payments due to Sellers for services rendered by or on behalf of the Debtors prior to the Closing, and such adjustments are made by increasing the third party payments for the Facilities subsequent to the Closing, then, in the case of an increase and/or lump sum refund, the funds received by Purchaser attributable to periods prior to the Closing shall belong to Sellers and the attributable amount shall be held by Purchaser as trustee for and on behalf of Sellers and shall be paid by Purchaser to Sellers together with an accounting thereof within 10 days of receipt.  There shall be no recourse by Purchaser against Sellers or the Trustee in the event of a retroactive adjustment subsequent to Closing which results in a decrease in third party payments or otherwise imposes liability or recoupment obligations upon Purchaser.

5.     ACCOUNTS RECEIVABLE

5.1     (a)     At Closing, all of the accounts receivable (*i.e.*, amounts earned or due, whether or not actually billed) and any other amounts due to Seller as a result of owning and

operating the Facilities prior to the Closing, other than the Excluded Assets, shall be the Property of the Purchaser. All moneys received by the Sellers after the Closing from private patients, as well as Medicare, Medicaid and other reimbursements, or from any other source with respect to care rendered, or as a result of owning and operating the Facilities prior to the Closing, shall be held in trust by the Sellers for the benefit of Purchaser and shall be paid over by Sellers to Purchaser within 10 days of receipt, together with all statements relating thereto.

(b)     Any bills received after the Closing by Purchaser which are required to be paid by Debtors' estates under this Agreement shall be delivered to the Trustee within 5 business days of Purchaser's receipt.

(c)     All accounts receivable collected during the Temporary Receivership Period shall be held by the ~~Purchaser or~~ _Substitute_ Receiver, _(as defined in the Order Appointing Substitute Receiver)_ and applied to the payment of all expenses at the facilities including those incurred during the pendency of the prior receivership of Long Hill Alliance Company consistent with cash collateral orders in the Bankruptcy Case, approved budgets and the terms of the Order Appointing Substitute Receiver. Purchaser shall comply with all aspects of the existing Revolving Credit Facility with GE including the establishment of lock box accounts and executing such other documents a GE may reasonably require.

_RTB_
_MMF_

5.2     (a)     The Trustee and the Receiver shall have the right to protest, contest, appeal and seek to adjust the Facilities' third party reimbursement rates and/or challenge Medicare or Medicaid rate audit proceedings for periods prior to the Closing and to maintain any such actions which are pending. The Receiver or Trustee shall notify Purchaser of any such actions. To the extent any appeals or proceedings, relating to Medicaid, are successful and result in higher third party reimbursement to the Facilities for any period prior to the Closing and such moneys are paid to the Purchaser, Purchaser shall forward the same to the Trustee pursuant to

section 5.1 hereof. To the extent that any such proceedings result in an increase in the Facilities' rate(s) for a period subsequent to the date of the Closing, additional payments resulting from such increase shall be the sole property of Purchaser. Nothing herein shall obligate the Purchaser as Receiver or the Trustee to prosecute or continue any proceeding(s) described above.

(b)      Purchaser shall promptly notify the Trustee or the Long Hill Alliance Company of any protest, contest or appeal filed by Purchaser and which relates to any period (wholly or partially) prior to the Temporary Receivership Period or the Closing as applicable and the Trustee and the Long Hill Alliance Company shall have the right to participate in such protest, contest or appeal as a party thereto. Purchaser shall cooperate with the Trustee and the Long Hill Alliance Company, upon reasonable request, in connection with Purchaser participation in such protest, contest or appeal.

5.3      The provisions of Sections 5.1 - 5.3 shall survive the Closing.

6.      REPRESENTATIONS OF SELLERS

Sellers hereby represent and warrant to Purchaser as follows:

6.1      Authority. Pursuant and subject to the terms of the Final Sale Order and the 365 Order and subject to entry of such orders, the Trustee has all requisite power and authority to execute and deliver this Agreement, the Deeds and Assignment Agreements and to consummate the transactions herein. This Agreement, the Deeds and all the documents to be delivered by Sellers and the Trustee are valid and binding agreements enforceable in accordance with their respective terms, subject to receipt of the Requisite Approvals and entry of the Final Sale Order and the 365 Order.

6.2      Environmental Matters. The operation of the Seller's business and the Purchased Assets is in compliance in all material respects with environmental laws, including obtaining,

maintaining, timely applying for renewal of and complying with all permits required to environmental laws; and there are no facts, circumstances or conditions existing at any of the facilities or Purchased Assets reasonably likely to result in remedial action or the imposition of any material liability pursuant to environmental laws or regulations. Seller shall deliver copies of existing environmental reports, if any, to Purchaser.

7.   REPRESENTATIONS OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

7.1   Authority.

(a)   Purchaser has all requisite power and authority to execute and deliver this Agreement and the Assignment Agreements and to consummate the transactions to be effected on its part hereby.

(b)   This Agreement and the Assignment Agreements and all of the documents to be delivered by Purchaser have been duly authorized, executed and delivered by Purchaser and approved by all requisite corporate action of Purchaser. This Agreement and the Assignment Agreements are valid and binding agreements of Purchaser enforceable in accordance with their terms.

(c)   Subject to the receipt of the Requisite Approvals, Purchaser's execution, delivery and performance of this Agreement and the Assignment Agreements do not and will not conflict with or constitute a breach of or default under the provisions of any material indenture, agreement or other instrument to which Purchaser is a party or by which Purchaser's respective properties may be bound, or the provisions of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award of any court, government or governmental agency or

instrumentality, having applicability to Purchaser or Purchaser's property, or by which Purchaser or Purchaser's properties may be bound.

7.2     Status of Purchaser.

7.2.1   (a)     Purchaser (or any of its shareholders, members, partners, officers, directors, or owners) has never been convicted of: (i) any offense related to the delivery of an item or service under the Medicare or Medicaid programs; (ii) a criminal offense relating to neglect or abuse of patients or residents in connection with the delivery of a long term care or health care item or service; (iii) fraud, theft, embezzlement or other financial misconduct in connection with the delivery of a long term care or health care item or service; or (iv) obstructing an investigation of any crime.

(b)     Purchaser (or any of its shareholders, members, partners, officers, directors, or owners) has never been required to pay any civil monetary penalty under 42 U.S.C. §1128A regarding false, fraudulent or impermissible claims caused by Purchaser which may result in payments under, or payments to induce a reduction or limitation of long term care or health care services to beneficiaries of, any state or federal health care program.

(c)     Purchaser (or any of its shareholders, members, partners, officers, directors, or owners) has never been excluded from participation in the Medicare or Medicaid programs or state long term care or health care programs.

(d)     Purchaser (or any of its shareholders, members, partners, officers, directors, or owners) has no knowledge that he is the subject of any ongoing investigation or proceeding that could lead to any of the events set forth in items (a) through (c).

7.2.2   Purchaser knows of no reason that DOH or any other governmental authority would reject or delay Purchaser's *Operating Designee's or Receivership Designee's* application(s) for the Requisite Approvals or the CON

17

Approval(s) nor has any such application by Purchaser *[Operating Designee or Receivership Designee]* (or any of its shareholders, members, partners, officers, directors or owners) ever been denied, or approval revoked. Purchaser *[Operating Designee and Receivership Designee]* (or any of its shareholders, members, partners, officers, directors or owners) has never been excluded from participation in any federal or state health care program.

7.2.3   Purchaser or the Operating Designee(s) if applicable is a duly organized, validly existing and in good standing under the laws of the State of its formation with full corporate power and authority to perform its obligations under this Agreement, the Assignment Agreements and the Assumption Agreement. At the Closing, Purchaser will have the requisite power and authority to operate the Facilities as licensed skilled nursing facilities in the State of New York on at least a temporary, provisional or conditional basis.

7.2.4   <u>Insurance</u>. As of the inception of the Receivership and as of the Closing, Purchaser shall have appropriate insurance coverage in place for the business consistent with what would be maintained under ordinary industry business practices.

7.3   <u>Capitalization of Purchaser</u>. If Purchaser assigns this Agreement pursuant to Section 17 hereof, as of the date of such assignment and as of Closing, and after giving effect to the subject transaction, such assignee(s) shall be capitalized with working capital, or shall have available to it (or them), not less than $1,000,000 as evidenced by financial statements certified by the Purchaser in form and substance acceptable to the Trustee and GE.

7.4   The aforesaid representations shall be true as of the date of the Closing as though made on such date.

8.   <u>COVENANTS OF SELLER</u>

Seller hereby covenants and agrees with Purchaser as follows:

8.1     Conveyance.  At the Closing, pursuant and subject to entry of and the terms of the Final Sale Order, Sellers shall convey the Purchased Assets to Purchaser free and clear of all mortgages, liens, claims, liabilities, charges and encumbrances whatsoever (the "Liens").

8.2     Conduct of Business Pending Closing.  Subject to the provisions of paragraph 8.2(f) below, from and after the date of this Agreement and until the date of entry of the Final Sale Order as hereinafter defined, unless this Agreement shall have been terminated, except as otherwise consented to or directed by Purchaser in writing (which shall not be unreasonably withheld):

(a)     The business of the Facilities will be operated by the Receiver in the usual, regular and ordinary manner consistent with practice since entry of the Order Approving Receiver;

(b)     Sellers shall not sell, dispose of or make any other disposition or abandonment of the Purchased Assets, except in the ordinary course of business;

(c)     All properties used or useful in the operation of the Facilities shall be maintained by the Receiver and kept in good condition, repair and working order, ordinary wear and tear excepted;

(d)     Insurance shall be maintained by the Receiver with respect to the Purchased Assets in accordance with ordinary practice;

(e)     Books of record and accounts may be kept by the Receiver in accordance with past practice; and

(f)     Purchaser acknowledges that the Trustee has no role in the operation of the Facilities and no control over, or responsibility for, the actions of the Receiver.

8.3     Cooperation with Purchaser. Sellers shall assist and cooperate with Purchaser upon Purchaser's reasonable request in regard to Purchaser's CON Application(s) and all other applications for the Requisite Approvals.

9.     COVENANTS OF PURCHASER

Purchaser hereby covenants and agrees with Trustee as follows:

9.1     Certificate of Need. Purchaser or the Operating Designee(s), at their sole cost and expense, will promptly prepare and submit to the DOH not later than forty-five (45) days after the Final Sale Order one or more CON Applications. Purchaser shall keep Seller and its counsel fully informed of the status of the CON Application(s) and provide Seller with copies, within ten (10) days of sending or receipt, of all communications to and from governmental authorities with respect to the CON Application(s). Notwithstanding the foregoing, any application which is required in connection with Purchaser's *or its designee's* appointment as Substitute Receiver shall be submitted to the DOH within ~~five (5)~~ *ten (10)* days after the Final Sale Order. Purchaser or the Operating Designee(s) shall promptly (and no later than seven (7) business days after the receipt thereof) fully comply with requests for additional information from such agencies, and shall take all other steps required to obtain consent for the transactions contemplated hereby, including receipt of the Requisite Approvals. Purchaser or the Operating Designee(s) shall provide Seller with copies, within three days of submission or receipt as applicable, of all such applications, submissions, documents, and other communications with the applicable governmental agencies.

9.2     Intentionally omitted.

9.3     Upon entry of a Final Sale Order, the Parties shall immediately seek entry of an order of the Order Appointing Substitute Receiver substituting Purchaser or Receivership Designee as the Receiver. The Order Appointing Substitute Receiver shall provide that the

Purchaser *or* Receivership Designee shall immediately assume the obligation to operate the Facilities and to meet all funding obligations necessary to continue the operation of the Facilities through the Closing Date unless this Agreement is otherwise terminated in accordance Section 12 hereof. In connection with its appointment as Substitute Receiver, Purchaser *or* Receivership Designee shall post such bonds as may be required by the United States Trustee, the Bankruptcy Court or the State Court in the State Court Action. As used herein, a "Final Sale Order" shall mean an order of the Bankruptcy Court reasonably acceptable in form and substance to Purchaser, which order shall not have been stayed, vacated or otherwise rendered ineffective, authorizing, among other things, the sale of the Purchased Assets to Purchaser free and clear of all liens, claims, encumbrances and liabilities (other than the Assumed Liabilities) and contemplating that the Purchaser or its Receivership Designee shall act as receiver, terminating the existing Receiver as provided by entry of the Order Appointing Substitute Receiver in the State Court Action in the form annexed hereto as Exhibit "1".

9.4    <u>Indemnity Regarding the Facilities</u>. Except as otherwise expressly provided by this Agreement, Purchaser hereby indemnifies and holds Trustee and Sellers harmless from and against any and all claims or losses of any kind or character, to the extent that such claims or losses result from or arise out of or have been incurred with respect to the ownership or the operation of the Facilities by the Purchaser on or after the date of the entry of the Final Sale Order; provided that Seller or Trustee notify Purchaser of any such claim within 10 days of their notification thereof. The provisions of this Section 9.4 shall survive the closing. In the Event this Agreement is terminated prior to the Closing Date but after the entry of the Final Sale Order, the indemnity herein contained shall only relate to the period during which the Purchaser or

21

Receivership Designee was operating the Facilities pursuant to the Final Sale Order or Order Appointing Substitute Receiver.

9.5  Employees.  Purchaser, *or Operating Designee* shall offer employment to substantially all of Sellers' employees (or those otherwise engaged by the Receiver at the Facilities), effective as of the Closing.  With respect to any Facility which is subject to a collective bargaining agreement, such employees shall receive compensation similar to their respective compensation levels at the time of the Final Sale Order unless otherwise agreed to in writing by the by the subject collective bargaining unit. In addition, Purchaser, *or Operating Designee* shall comply with all of the requirements of the Workers Adjustment Retraining Notification Act, 29 U.S.C. § 2101, *et seq.*, if applicable, and all state and local counterparts to it (collectively, the "WARN Act") and shall retain a sufficient number of employees, computed separately for each Facility, to prevent Sellers from being in violation of the WARN Act.

9.6  Access to Records.  Purchaser *or Operating Designee* will preserve for no less than four years from the Closing Date and will provide Trustee, the Creditors Committee, and their respective professionals and other professionals of Debtors' estates with prompt and reasonable access to books and records conveyed to Purchaser, *or Operating Designee,* will permit inspection and copying of such books and records as necessary for administration of Debtors' estates and will make its employees reasonably available to facilitate such access.  Purchaser *or Operating Designee* shall not be required to incur substantial expenses in connection with the matters described in this paragraph.

10.  CONDITIONS PRECEDENT TO THE OBLIGATIONS OF PURCHASER

The obligations of Purchaser to close hereunder are subject to the fulfillment at or prior to the Closing of all of the following conditions precedent:

10.1    Regulatory Approvals. Purchaser or the Operating Designee(s) shall have obtained written noncontingent approval of the CON Application(s) to operate the Facilities.

10.2    Delivery of the Final Sale Order and DOH Stipulation. Purchaser shall have received the Final Sale Order and the 365 Order, which have not been stayed by any court. In addition, there shall have entered in the Bankruptcy case a stipulation and order substantially in the form annexed hereto as Exhibit 2 (the "DOH Stipulation"), which provides, inter alia that the Purchaser shall not have any liability for any cash receipts assessments or Medicaid recoupment claims relating to the period prior to the date of the Order Appointing Receiver.

10.3    No Legal Prohibition. No injunction, temporary restraining order, judgment or other order of any court or governmental agency or instrumentality shall have been issued or have been entered which would be violated by the consummation of the transactions contemplated herein; and, unless waived, no suit, action or other proceeding brought by the United States or the State of New York, or any agency or instrumentality of the United States or the State of New York, shall be pending in which it is sought to restrain or prohibit the effectuation of this Agreement or the consummation of the transactions contemplated herein.

11.    CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER

The obligations of Seller hereunder are subject to the fulfillment at or prior to the Closing of all of the following conditions precedent, unless such fulfillment is waived by Trustee:

11.1    The Final Sale Order and the 365 Order shall be final orders.

11.2    Purchaser's representations and warranties set forth in Article 7 hereof shall be true and correct in all material respects as of the date of the Closing, as though made on and as of such date.

11.3    No injunction, temporary restraining order, judgment or other order of any court or governmental agency or instrumentality shall have been issued or have been entered which would be violated by the consummation of the transactions contemplated herein; and, unless waived, no suit, action or other proceeding brought by the United States or the State of New York, or any agency or instrumentality of the United States or the State of New York, shall be pending in which it is sought to restrain or prohibit the effectuation of this Agreement or the consummation of the transactions contemplated herein.

11.4    Purchaser shall be in good standing under the laws of the State of its formation.

11.5    Purchaser or the Operating Designee(s) shall have obtained written noncontingent approval of the CON Application(s) to operate the Facilities.

12.    TERMINATION OF AGREEMENT

12.1    Failure to Timely File Application.  If neither Purchaser nor the Receivership Designee files the application for the Requisite Approvals within ten (10) days from the date of the Final Sale Order, then Trustee may terminate this Agreement, and the Deposit, together with any interest accrued thereon, shall be paid to Trustee.

12.2    Failure to Obtain Requisite Approvals.  If neither Purchaser nor the Receivership Designee obtains the Requisite Approvals within 20 days of the date of entry of the Final Sale Order hereof and is consequently unable to be substituted for Long Hill Alliance Company as Receiver , then Trustee may terminate this Agreement and the Deposit, together with any interest accrued thereon, shall be paid to Purchaser.

12.3    Failure to Secure Department of Health Approval.  Subject to the provisions of Section 12.8 hereof, if neither Purchaser nor the Operating Designee(s) obtain the CON Approval(s) within 12 months of the date hereof (the "Approval Deadline"), then Trustee may

24

terminate this Agreement and the Deposit shall be released from escrow, together with any

interest accrued thereon, and shall be paid to Trustee with the lien of GE attaching to such

proceeds and not commingled by the Trustee with any other assets. The Purchaser shall be

entitled to up to ~~six (6)~~ twelve (12) thirty (30) day extensions (each an "Extension") of the Approval

Deadline by submitting written notice (each an "Extension Notice") to the Trustee. Each

Extension Notice shall be given not later than (5) five business days before the then effective

Approval Deadline and shall be accompanied by a bank check or wire transfer in the amount of

$150,000 (each such amount a "Purchase Price Installment") for the subject Extension. Each

Purchase Price Installment shall be deemed to increase the amount of the Deposit hereunder.

12.4    Purchaser's Failure to Close. If, after thirty (30) days following receipt of the

CON Approval, Purchaser has failed to close the transaction contemplated hereunder for any

reason, excluding default of Seller, then the Trustee, in addition to any other remedies available

to him, may terminate this Agreement, and the Deposit shall be released from escrow, together

with any interest accrued thereon, and shall be paid to the Trustee as liquidated damages and not

as a penalty with the lien of GE attaching to such proceeds and not commingled by the Trustee

with any other assets.

12.5    Other Breach by Purchaser. If Purchaser is at any time in material breach of any

representation, warranty or covenant hereunder, which breach is not cured within thirty (30)

days, then Sellers shall have the right to terminate this Agreement, and the Deposit shall be

released from escrow and paid to Trustee as liquidated damages and not as a penalty with the

lien of GE attaching to such proceeds and not commingled by the Trustee with any other assets.

12.6    Seller's Default or Failure to Close. If Seller defaults under the terms of this

Agreement and has failed to cure any such default within thirty (30) days of written notice

thereof, Purchaser may at its option, terminate this Agreement and receive a refund of the Deposit or Purchaser shall at its own expense be entitled to bring an action for specific performance.

12.7 <u>Intentionally omitted</u>

12.8 <u>Inadequate CON Approval</u>. If the Public Health Council issues one or more CON Approvals to the Purchaser or Operating Designee(s), which CON Approvals provide approval for fewer than 500 patient beds in the aggregate at the Facilities, Purchaser shall have the right to terminate this Agreement (a "Minimum Bed Termination") by sending written notice (a "Minimum Bed Termination Notice") as hereinafter described. The Minimum Bed Termination Notice shall be sent with five (5) business days of receipt by the Purchaser of CON Approvals which affords the Purchaser fewer than five hundred (500) approved beds in the aggregate for all of the Facilities. Upon timely sending of an authorized Minimum Bed Termination Notice, the Deposit shall be disbursed as follows:

(a) $500,000 (plus the sum of the Purchase Price Installments, if any) shall be returned to the Purchaser within five (5) business days of receipt by Trustee of the Minimum Bed Termination Notice;

(b) $750,000 shall be paid to the Trustee; and

(c) The balance of the Deposit net of accrued interest (the "Balance") shall be allocated as follows:

(i) A portion of the Balance equal to Purchaser's Capital Expenditures, as defined hereinafter, but not to exceed $750,000, which were approved by both GE and the Trustee in advance shall be paid to the Purchaser; and

26

(ii)     The remaining portion of the Balance shall be paid to the Trustee;

(iii)    For the purposes of this Section, "Capital Expenditures" shall mean expenditures actually paid by Purchaser or Receivership Designee for Seller's benefit during the Temporary Receivership Period for real estate fixtures, equipment and permanent structural improvements made by the Receiver, but shall not include soft costs (*e.g.*, professional fees, supplies, payables, inventory or any expenses associated with the operation of the Facilities).

(iv)    In furtherance of this Section 12.8, prior to any Capital Expenditures, but in any event not less often than monthly, Purchaser shall submit to both GE and the Trustee, for their respective review and approval, a projected budget for Capital Expenditures during the next 30 day period. The determination of whether such budgeted items fall within the definition of Capital Expenditures above and the approval of such budgeted items shall be reserved to the reasonable discretion of GE and the Trustee. Capital Expenditures which are not both approved in such manner and expended as approved shall be ineligible for allocation to the Purchaser under Section 12.8 (c)(i).

(d)     Interest on the Deposit shall be allocated in proportion to the disbursements in (a)-(c) above.

13.     RESIDENT/PATIENT ACCOUNT

13.1     <u>Deliveries at Closing</u>. Upon entry of the Order Appointing Substitute Receiver and Purchaser or Receivership Designee's Appointment as Substitute Receiver, subject to any

27

confidentiality requirements, the Receiver shall deliver to Purchaser or Receivership Designee (i) a schedule of all Resident/Patient funds held by the Receiver, with all such funds designated on a patient by patient basis; (ii) a check drawn on the Residents'/Patients' Allowance Account for the full amount of such account which shall be deposited by Purchaser in a new Residents'/Patients' Allowance Account to be maintained by Purchaser in accordance with legal requirements; (iii) a schedule of all bank accounts maintained by the Facilities on behalf of their Residents/Patients; (iv) all bankbooks and other assets belonging to Residents/Patients of the Facilities maintained in the custody of the Facilities together with a schedule thereof listing such assets and the names of the Residents/Patients for whom they are being so held; and (v) a schedule of any remaining Resident/Patient security deposits and prepayments designated on a patient by patient basis ("Resident Security Deposits"), together with a check in the amount of such security deposits and unexpended prepayments (collectively, "Patient Accounts").

13.2 <u>Notices</u>. Purchaser or Receivership Designee and the Receiver will jointly and promptly give all notices required by law in connection with the aforesaid transfer of the Residents'/Patients' assets.

14. <u>SURVIVAL</u>

Except as specifically set forth herein to the contrary, none of the representations, warranties, covenants and agreements contained herein shall survive the closing or any termination of this Agreement.

15. <u>MERGER, AMENDMENT AND WAIVER</u>

This Agreement contains the entire agreement of the parties hereto with respect to the transactions contemplated hereby. There are no other representations, warranties, agreements, undertakings, or conditions, whether made by the parties hereto or by their agents, or by persons

or entities purporting to be their agents, except as may be contained herein. The terms of this Agreement may be amended, modified or eliminated, and the observance or performance of any term, covenant, condition or provision herein may be omitted or waived (either generally or in a particular instance and either prospectively or retroactively) only by the written consent or consents of Sellers and Purchaser. A party hereto may, only by an instrument in writing, waive compliance for its benefit by the other party hereto with any term or provision of this Agreement on the other part of such other party to be performed or complied with. Such waiver by any party hereto of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

16.   BINDING EFFECT

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives and successors.

17.   ASSIGNMENT

Subject to Assignee's agreement to be bound by all terms of this Agreement, and without releasing or discharging the Purchaser from any of the covenants, warranties, obligations or agreements set forth herein or in the Order Appointing Substitute Receiver (including without limit the obligations under Section 9.3 hereof) and provided that an assignment shall not delay the granting of the Requisite Approvals or the CON, this Purchase Agreement may be assigned to any entity or entities owned at least in part by any members of the Purchaser.

18.   NOTICES

Any notices to be given to the parties hereto shall be in writing, and, except as otherwise provided herein or as otherwise directed in writing by one of the parties hereto, shall be delivered

personally, against receipt, or by registered or certified mail, return receipt requested, to the

parties at the addresses indicated below:

| | |
|---|---|
| If to Seller: | Mark I. Fishman, Esq.<br>Neubert, Pepe & Monteith, P.C.<br>195 Church Street<br>New Haven, CT 06510<br>MFishman@npmlaw.com |
| with copies to: | Marc L. Hamroff, Esq.<br>Moritt Hock Hamroff & Horowitz LLP<br>Attorneys for General Electric Capital Corporation<br>400 Garden City Plaza<br>Garden City, NY 11530 |
| | Ted A. Berkowitz, Esq.<br>Farrell Fritz, P.C.<br>Attorneys for Creditors Committee<br>1320 Rexcorp Plaza<br>Uniondale, NY 11556 |
| If to Purchaser: | Mr. Benjamin Landa<br>1337 East 7th Street<br>Brooklyn, NY 11230 |
| with a copy to: | Marvin L. Tenzer, Esq.<br>Tenzer and Lunin LLP<br>1775 Broadway<br>Suite 608<br>New York, NY 10019 |

## 19. NON-RECOURSE

Except as may be provided herein, no past, present or future director, officer, employee,

incorporator, member, partner, or stockholder of Purchaser shall have any liability for any

obligations or liabilities of Purchaser under this Agreement or related documents or for any claim

based on, in respect of, or by reason of, the transactions contemplated hereby or thereby. The

Trustee and his advisers, including his professionals and their members, principals, partners and

employees, shall have no personal liability to Purchaser or any other person under or with respect

to this Agreement or related documents, under or with respect to any agreement or understanding related to this Agreement or the Order Appointing Substitute Receiver, or for any claim based on, in respect of, or by reason of, either the transactions contemplated hereby or thereby or audits, appeals, recoupment, retroactive rate adjustments or other matters relating to reimbursement and/or third-party payments. The Purchaser acknowledges that the Trustee has been acting solely in a representative capacity and that the Purchaser is not relying on any statement or representation, either express or implied, made by the Trustee or the Receiver. The provisions of this section shall survive the Closing and shall survive any termination of this Agreement.

20.    CONSUMER PRIVACY POLICIES

Purchaser or the Operating Designee(s) and Receivership Designee agree and undertake immediately to adopt and thereafter to abide by the Sellers' and/or Receiver's existing policies for the protection of personally identifiable information about residents of the Facilities.

21.    COUNTERPARTS

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page hereto by telecopier or by electronic mail in PDF format shall be as effective as delivery of a manually executed counterpart hereof.

22.    BROKERS

The parties hereto represent to each other that they have not employed or entered into any agreement, arrangement or undertaking with any broker or finder in connection with this Agreement or the transactions contemplated thereby except Marcus & Millichap whose fees shall

be payable by the Seller. Each party agrees to indemnify and save harmless the other party from and against any and all claims, losses, damages or expenses of any kind or character including reasonable attorney's fees for the breach of the foregoing representations and warranties set forth in this section founded upon the act of the party giving such indemnification. The provisions of this section shall survive the closing.

23. <u>NEW YORK LAW TO GOVERN</u>

Subject to the requirements of the Bankruptcy Code, HIPAA and other applicable federal law, this Agreement shall be construed in accordance with and shall be governed by and enforced under the laws of the State of New York, applicable to agreements fully executed and performed therein, without regard to its conflict of laws principles. The parties further agree that the Bankruptcy Court shall be the exclusive forum for any litigation arising under or in connection with this Agreement or the transaction contemplated hereunder unless the Bankruptcy Court refuses or declines to hear such matter.

24. <u>CONFIDENTIAL INFORMATION</u>

Identifiable information and any information concerning the businesses and affairs of the Purchaser or the Sellers that is not generally available to the public as of the date of this Agreement (regardless of when the information was made available to Sellers or Purchaser including, but not limited to, any information provided before the execution of this Agreement) shall be deemed Confidential Information. Confidential Information shall not include any information that: (a) is or subsequently becomes publicly available without the receiving Party's breach of any obligation owed to the disclosing Party; (b) became known to the receiving Party from the source other than the disclosing Party in a manner that did not involve the breach of an

obligation of confidentiality owed to the disclosing Party; or (c) is independently developed by the receiving Party.

25. <u>CONSUMER CREDIT TRANSACTIONS</u>

To the extent, if any, that the Purchased Assets or Assumed Contracts include consumer credit transactions subject to the Truth in Lending Act or consumer credit contracts, then, notwithstanding the Final Sale Order and the 365 Order, Purchaser shall remain subject to all claims and defenses related thereto to the same extent as Purchaser would be subject to such claims and defenses had such interest been purchased at a sale which is not made under Section 363 of the Bankruptcy Code. The Trustee is not personally aware of any consumer credit transactions subject to the Truth in Lending Act or consumer credit contracts within the Purchased Assets or Assumed Contracts. The Trustee makes no warranty or representation regarding such matters other than as to his own state of knowledge.

26. The form of replacement guaranty that Benjamin Landa has undertaken to deliver (in form reasonably satisfactory to the Trustee and GECC) shall be delivered within ten (10) days of the date hereof.

*PB*
*MF*

33

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the

date and year first above written.

SELLERS:

HIGHGATE MANOR GROUP, LLC
HIGHGATE LTC MANAGEMENT, LLC

By: _____ Trustee
    Mark I. Fishman, as Trustee

PURCHASER:

OASIS HC, LLC

By: _____
    Benjamin Landa, Member

34

**Exhibit A-1**

## EXHIBIT A

All that certain tract or parcel of land, together with the improvements situated thereon, located in the City of Cortland, County of Cortland, and State of New York; said parcel being more particularly bounded and described as follows:

BEGINNING at the point of intersection of the division line between the lands now or formerly of the City of Cortland as described in Book 344 of Deeds at Page 1182 and Book 344 of Deeds at Page 1187 on the east, said parcel of land being commonly known as Buckbee Mears Road (80 feet wide), and other lands of the City of Cortland as described in Book 409 of Deeds at Page 96 on the south; said parcel being formerly lands of Erie-Lackawanna Railway Company, Inc. with the lands now or formerly of Highgate Manor Group LLC as described in Instrument Number 2009 1293 on the west; said point also being located 263.32' southerly, measured along the westerly line of said Buckbee Mears Road, so-called, from its intersection with the southwesterly line of Kellogg Road (60 feet wide);

Thence along the division line between the said lands of Highgate Manor Group LLC on the northeast and the last described lands of the City of Cortland on the southwest the following three (3) courses and distances:

1) North 68 deg. 49 min. 00 sec. West, 21.49 feet to a point; thence
2) North 64 deg. 26 min. 00 sec. West, 184.30 feet to a point; and
3) North 63 deg. 27 min. 00 sec. West, 1625.60 feet to its intersection with the division line between the said lands of Highgate Manor Group LLC on the southeast, and the lands now or formerly of the Attica Development Co., Inc. as described in Book 515 of Deeds at Page 269 on the northwest;

Thence North 49 deg. 47 min. 00 sec. East, along the division line between the said lands of Attica Development Co., Inc. and lands now or formerly of Shelmar Company, Inc. et al. as described in Instrument Number 2002 2006 in part by each on the northwest and the said lands of Highgate Manor Group LLC on the southeast, 640.35 feet to its intersection with the southwesterly line of Kellogg Road;

Thence South 40 deg. 13 min. 00 sec. East, along the southwesterly line of Kellogg Road, 531.87 feet to its intersection with the first herein above described division line between the said lands of Highgate Manor Group LLC on the west and the said lands of the City of Cortland commonly known as Buckbee Mears Road on the east;

Thence South 00 deg. 20 min. 00 sec. West, along the last described division line, 263.32 feet to the point or place of beginning containing 9.738 acres of land more or less.

Commonly known as: 28 Kellogg Road,
Cortland, New York

**Exhibit A-2**

**EXHIBIT A**

1805 Providence Avenue, Town of Niskayuna, County of Schenectady, New York

ALL that Tract or Parcel of Land, situate in the Town of Niskayuna, County of Schenectady and State of New York, lying northerly of Providence Avenue, easterly of Hillside Avenue and being more particularly bounded and described as follows:

BEGINNING at a point on the easterly side of Hillside venue, said point being situate at the intersection of the common line dividing lands now or formerly of Wells on the north, lands now or formerly of Jewish Community Center of Schenectady, Inc. on the south with the easterly margin of Hillside Avenue and runs thence from said point of beginning along said common line North 75 degrees 12 minutes East, 199.24 feet to a point; thence along the lands now or formerly of 231 Hillside Associates, Inc. the following three (3) courses: (1) North 74 degrees 52 minutes East, 582.15 feet to a point; (2) North 65 degrees 10 minutes 30 seconds East, 47.81 feet to a point; (3) North 56 degrees 53 minutes East, 73.65 feet to a point; thence through lands now or formerly of Jewish Community Center of Schenectady, Inc., South 8 degrees 08 minutes 40 seconds West, 411.48 feet to a point, said point being situate n the Northerly margin of Enthis Road; thence along the Northwesterly margin of Newport Avenue along a curve to the left of radius 576.06 feet, 243.95 feet to a point (the chord for the above described curve being South 35 degrees 57 minutes West, 242.14 feet); thence along the Northerly line of lands now or formerly of Donald & Mary Schaffer and lands now or formerly of Robert & Helen Shaw, North 69 degrees 11 minutes West, 370.00 feet to a point, said point being situate at the intersection of Lots 9 and 10 as shown on a map entitled "Map of Van Vranken Avenue Gardens", dated February 1922 and made by Ernest Branch with the Southerly line of lands now or formerly of Jewish Community Center of Schenectady, Inc.; thence along said division lines of Lots 9 and 10, South 20 degrees 49 minutes West, 100.00 feet to a point, said point being situate on the Northerly margin of Providence Avenue; thence along said Northerly margin, North 69 degrees 11 minutes West, 275.55 feet to a point, said point being situate at the intersection of the Northerly margin of Providence Avenue with the Easterly margin of Hillside Avenue, also being the Southwest corner of Lot 3 as shown on the above described map; thence along the Easterly margin of Hillside Avenue the following three courses: (1) North 7 degrees 03 minutes 40 seconds West, 116.97 feet to a point; (2) North 68 degrees 36 minutes West, 3.43 feet to a point; (3) North 8 degrees 27 minutes West, 96.07 feet to the point or place of beginning.

TOGETHER with a sewer easement appurtenant thereto, created by grant of Andrew Shabldiah et. Al., copartners doing business as Hilltop Manor, to Charles Brearick et al, dated may 2, 1974, recorded with the Schenectady County Clerk's Office in Book 979, Page 678.

1

**Exhibit A-3**

EXHIBIT A

All that certain tract, piece or parcel of land situate in the City of Troy, Town of Schaghticoke, County of Rensselaer, State of New York, lying southeasterly of New Turnpike Road, and being more particularly bounded and described as follows:

BEGINNING at a point on the Southeasterly road boundary of New Turnpike Road at its point of intersection with the division line between lands now or formerly of Highgate Manor Group, LLC as described in Reel 178 of Deeds at Frame 2838 on the North and lands now or formerly of Setya Health System, Inc. as described in Book 1771 of Deeds at Page 71 on the South, said point being situate 75.80 feet Southwesterly as measured along said Southeasterly road boundary from its point of intersection with the division line between the City of Troy on the Southwest and the Town of Schaghticoke on the Northeast and runs thence from said point of beginning along said Southeasterly road boundary North 41 deg. 31 min. 44 sec. East 64.47 feet to its point of intersection with the division line between lands of said Highgate Manor Group, LLC on the South and lands now or formerly of Scott D. Macallister and Cathleen Burnell as described in Reel 45 of Deeds at Page 2346 on the North; thence along said division line South 89 deg. 93 min. 51 sec. East 113.51 feet to its point of intersection with the common division line between lands of said Highgate Manor Group, LLC on the Southwest and lands of said Macallister and Burnell, and lands now or formerly of Patricia K. Mazzuco as described in Book 1696 of Deeds at Page 69. on the Northeast; thence along said common division line South 56 deg. 25 min. 30 sec. East 75.55 feet to its point of intersection with the division line between lands of said Highgate Manor Group, LLC on the South and lands of said Mazzuco on the North; thence along said division line the following four (4) courses: 1) North 69 deg. 47 min. 48 sec. East 73.56 feet to a point; 2) South 89 deg. 63 min. 51 sec. East 69.82 feet to a point; 3) North 79 deg. 16 min. 57 sec. East 15.77 feet to a point; and 4) North 89 deg. 47 min. 48 sec. East 72.60 feet to its point of intersection with the common division line between lands of said Highgate Manor Group, LLC on the South and lands now or formerly of Joyce Macallister as described in Book 1673 of Deeds at Page 37 and lands now or formerly of Billi G. Loomis as described in Book 794 of Deeds at Page 142 on the North; thence along said common division line North 88 deg. 16 min. 01 sec. East 466.27 feet to its point of intersection with the division line between lands of said Highgate Manor Group, LLC on the West and lands now or formerly of Charles J. Elliot as described in Book 1461 of Deeds at Page 331 on the East; thence along said division line South 69 deg. 14 min. 18 sec. West 453.39 feet to its point of intersection with the division line between lands of said Highgate Manor Group, LLC on the North and lands now or formerly of Niagara Mohawk Power Corporation as described in Book 1128 of Deeds at Page 198 and Book 1131 of Deeds at Page 445 on the South; thence along said division line the following two (2) courses: 1) North 69 deg. 18 min. 00 sec. West 129.92 feet to a point, said point being situate on the above mentioned division line between the City of Troy and the Town of Schaghticoke; and 2) North 69 deg. 18 min. 00 sec. West 324.31 feet to its point of intersection with the division line between lands of said Highgate Manor Group, LLC on the East and lands of said Niagara Mohawk Power Corporation on the West; thence along said division line North 20 deg. 42 min. 00 sec. East 25.00 feet to its point of intersection with the division line between lands of said Highgate Manor Group, LLC on the North and lands of said Niagara Mohawk Power Corporation on the South; thence along said division line North 69 deg. 18 min. 00 sec. West 149.12 feet to its point of intersection with the division line between lands of said Highgate

Manor Group, LLC on the East and lands of said Seton Health System, Inc. on the West, thence along said division line North 20 deg. 46 min., 00 sec. East 96.90 feet to its point of intersection with the division line between lands of said Highgate Manor Group, LLC on the Northeast and lands of said Seton Health System, Inc. on the Southwest, said point also being on the above mentioned division line between the City of Troy and the Town of Schaghticoke, thence along said division line and marking the division line between the said City of Troy and the said Town of Schaghticoke, North 56 deg. 24 min. 30 sec. West 149.38 feet to its point of intersection with the above first mentioned division line; thence along said above first mentioned division line North 38 deg. 37 min. 45 sec. West 140.85 feet to the point and place of beginning, containing 5.167± acres of land.

Commonly known as:    100 New Turnpike Road and vacant lot east of New Turnpike Road, Troy, New York

**Exhibit A-4**

284 Troy Road, Town of East Greenbush, Rensselaer County, New York

ALL that certain plot, piece, or parcel of land, with the buildings and improvements thereon erected, situated, lying, and being in the Town of East Greenbush, County of Rensselaer, and State of New York, more particularly bounded and described as follows:

BEGINNING at a concrete monument on the easterly line of New York State Highway Route #4 and 40 as it is intersected by the division line between lands of the People of the State of New York, formerly Lois Bonacker, on the north and the lands now or formerly of Richard R. Hertzel and runs from said point of beginning along said division line South 64° 17'49" East a distance of 1047.15 feet to a concrete monument; thence South 45° 33' 30" West along the division line between lands of Edward and Ruth E. Ostrander on the east and lands now or formerly of Richard R. Hertzel on the west, said division line marked by a fence, a distance of 414.52 feet to an iron pipe marker located in the division line between lands now or formerly of Martha Grooms Thompson on the south and lands now or formerly of Richard R. Hertzel on the north; thence North 89° 27'56" West along said division line a distance of 785.46 feet to a iron marker in the southeasterly corner of lands now or formerly of Robert R. Richardson; thence North 26°10' East along the westerly line of lands of Richard R. Hertzel a distance of 672.44 feet to an iron marker in the ground in the northeasterly corner of lands now or formerly of one Moore; thence North 63° 50' West along the northerly line of lands now or formerly of one Moore a distance of 200.0 feet to the easterly line of NYS Highway Route #4 and 40; thence North 26° 10' East along said easterly line a distance of 51.12 feet to the point and place of beginning.

1

Schedule 2.2(b)

[None]

## TREATMENT OF PROFESSIONAL FEES DURING INTERIM RECEIVERSHIP

The Receiver/Purchaser, subject to Court approval, will pay Trustee fees and expenses and fees and expenses of professionals retained by the Trustee and by the Creditors' Committee ("Committee") from the monthly positive cash flow generated by the operation of the Highgate facilities up to the amounts of (a) $15,000.00 a month in the aggregate for the Trustee and his professionals, (b) $15,000.00 a month in the aggregate for the Committee's professionals, (c) $5,000.00 a month for United States Trustee fees and, assuming the foregoing have been paid or escrowed, $10,000.00 a month for Receiver fees. GECC will cooperate in the inclusion of the aforesaid fees in cash collateral budgets. The Trustee and the subject professionals would retain the right to seek the payment of fees and expenses from other sources consistent with either orders of the Court or agreements with GECC, subject to Bankruptcy Court Approval.

"Positive Cash Flow", as used in this document, refers to the net cash flow generated from the operation of the Highgate facilities and shall be measured by the "check book" amounts of cash at the beginning and the end of the month without giving effect to any additional capital provided by the Receiver or capital expenditures made by the Receiver. Checks issued by the Receiver/Purchaser but not yet paid shall be treated as expenditures. Checks received but not yet deposited or paid shall be treated as receipts. All expenditures will be made in the ordinary course of business and will neither be prepaid nor delayed. It would be presumed that expenditures normally paid monthly would be paid on the same date each month. The computation of positive cash flow will be performed separately for each month and will not be cumulative. No effect will be given to negative cash flow in any given month.

# EXHIBIT 1 to Purchase Agreement

At an Ex-Parte Part of the Supreme Court of
the State of New York held in and for the
County of Rensselaer at the Courthouse
thereof, Congress and Second Street, Troy,
New York, on _____, 2008.

PRESENT:

Honorable _____,
                    Justice.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RENSSELAER
-------------------------------------------------------------------X
GENERAL ELECTRIC CAPITAL CORPORATION,

                              Plaintiff,

                    -against-

HIGHGATE MANOR GROUP, LLC, HIGHGATE
LTC MANAGEMENT, LLC, GUILDERLAND LTC
MANAGEMENT, LLC, DIANNA R. KOEHLER-
NACHAMKIN, EUGENE M. NACHAMKIN,
SCOTT H. BIALICK, HOWARD S. KRANT,
AMC NEW YORK, INC., d/b/a ROYAL CARE
PHARMACY, NEW YORK STATE DEPART-
MENT OF TAXATION AND FINANCE
and JOHN DOE NOS. 1-10 being fictitious and unknown to
plaintiff, the persons or parties intended being the
tenants, occupants, persons or corporations, if any,
having or claiming an interest in or lien upon the premises
described in the complaint,

                              Defendants.
-------------------------------------------------------------------X

**Index No.: 219393-06**

**ORDER APPOINTING
SUBSTITUTE RECEIVER**

UPON the Order Appointing Receiver dated November 29, 2006 (the "Receivership

Order") entered by this Court, all the pleadings, proceedings and documents described in the

Receivership Order, the proceedings heretofore occurring in this action, the Order of the U.S.

Bankruptcy Court dated May 18, 2007 (Case Nos. 07-11068 jointly administered, together, the

"Bankruptcy Case"), excusing compliance with §543 of the Bankruptcy Code to enable the

Receiver, The Long Hill Alliance Company ("Long Hill"), to continue to fully and faithfully

perform all its duties under the Receivership Order; and it appearing to the satisfaction of the Court

THAT this action was brought by Plaintiff to foreclose a certain Consolidated and Modified Mortgage Assignment of Rents, Security Agreement and Financing Statement dated May 26, 2005 (the "Consolidated Mortgage") executed, acknowledged and delivered by Defendant Highgate Manor Group, LLC ("Highgate Manor"), a New York limited liability company, as mortgagor, to Plaintiff, as mortgagee, and a certain Leasehold Mortgage, Assignment of Rents, Security Agreement and Fixture Financing Statement dated May 26, 2005 (the "Leasehold Mortgage") executed, acknowledged and delivered by Defendant Highgate LTC Management LLC ("Highgate Management"), a New York Limited Liability Company, as mortgagor, to Plaintiff, as mortgagee, to secure the payment, inter alia, of a certain Loan Agreement ("Real Estate Loan Agreement") of even date and Consolidated and Modified Senior Promissory Note (the "Senior Promissory Note") in the sum of $23,000,000.00 and a Revolving Credit Agreement and Revolving Credit Note of even date in the maximum amount of $4,000,000.00 (collectively the "Revolving Credit Documents"), and the performance of all other covenants, agreements and obligations of, inter alia, Highgate Manor and Highgate Management to Plaintiff; and it further appearing

THAT the Consolidated Mortgage constitutes a lien encumbering Highgate Manor's fee interest in certain premises referred to and described in the Amended Verified Complaint and Amended Notice of Pendency, known as 284 Troy Road, East Greenbush, County of Rensselaer, State New York; 100 New Turnpike Road, Troy and Schagitoke, County of Rensselaer, State of New York; 1805 Providence Avenue, Niskayunna, County of Schenectady, State of New York, and 28 Kellog Road, Cortland, County of Cortland, State of New York, all as more particularly

2

described in Exhibit B annexed to the Laino Affirmation[1] (collectively, the "Mortgaged Premises"); and it further appearing

THAT the Leasehold Mortgage constitutes a lien encumbering Highgate Management's leasehold interest in the Mortgaged Premises; and it further appearing

THAT in and by the Consolidated Mortgage and the Leasehold Mortgage the mortgagors covenanted that, inter alia, if a default should be made in the payment of the principal sum and/or interest thereon at the time therein specified for the payment thereof, or in the performance of any other covenant contained therein or in the Revolving Credit Documents as defined in the Amended Verified Complaint, Plaintiff would be entitled, upon the event of default, to apply, as a matter of right, for the appointment of a Receiver to operate the Mortgaged Premises and to collect the rents, issues, income, fees and profits of the Mortgaged Premises, which application, by the terms of the Consolidated Mortgage and the Leasehold Mortgage and by operation of Real Property Law §254(10), may be made without notice and without regard to the adequacy of any security for the indebtedness secured by said Consolidated Mortgage and Leasehold Mortgage; and it further appearing

THAT the Consolidated Mortgage and Leasehold Mortgage are in default due, inter alia, to Highgate Manor's failure to make the payments due under the Real Estate Loan and the Senior Promissory Note; Highgate Manor's and Highgate Management's failure to pay certain taxes or cash receipts assessments in an amount in excess of $4,100,000.00 and Highgate Manor's and Highgate Management's failure to comply with other affirmative and negative covenants set forth in the Consolidated Mortgage, the Leasehold Mortgage and the Revolving Credit Documents; and that as a result of said defaults, Plaintiff has duly accelerated the payment of all amounts

---

[1] References to the Laino Affirmation shall be to the Affidavit of William P. Laino, Esq., dated November 20, 2006, in support of the motion for the entry of the Receivership Order.

3

due or secured by the Consolidated Mortgage and the Leasehold Mortgage, and that the same are now due; and it further appearing

THAT all or a portion of the Mortgaged Premises is operated as four skilled nursing facilities (collectively, the "Facility") licensed by the New York State Department of Health and that Highgate Manor is entitled to receive lease payments from Highgate Management for lease of the Mortgaged Premises and that Highgate Management receives income for the use of the Mortgaged Premises by residents or patients for skilled nursing and other services, and that such income might be applied to necessary disbursements in connection with the use, operation and maintenance of the Mortgaged Premises, and to the payment of real estate taxes, water and sewer rents, meter charges and insurance as and when they become due; and that the appointment of a receiver of the operation of the Facility and of such rents, issues and profits of the Mortgaged Premises is necessary and desirable for the protection of the Plaintiff and the preservation of the Mortgaged Premises; and it is further appearing

THAT on April 26, 2005, pursuant to the assignments of rents and security agreements contained in the Consolidated Mortgage and Leasehold Mortgage, GECC duly filed a Financing Statement (UCC-1) with the Secretary of State of the State of New York evidencing a security interest given by Highgate Manor to Plaintiff in the collateral described therein, which includes all rents, income, accounts, accounts receivable, general intangibles, equipment, inventory, fixtures and proceeds of the foregoing (the "Collateral") relating to the Mortgaged Premises, as security for payment of all amounts due under the Consolidated Mortgage and Leasehold Mortgage and that such UCC-1 was also filed on May 31, 2005 in the Office of the Clerk of Rensselear County and on June 1, 2005 in the Office of the Clerk of Cortland County and on June 7, 2005 in the Office of the Clerk of Schenectady County; and it further appearing

THAT Plaintiff is the lawful holder of the Real Estate Loan Agreement, Senior Promissory Note, Consolidated Mortgage, Leasehold Mortgage, Revolving Credit Documents and Financing Statement; and it further appearing

THAT Plaintiff has a duly perfected security interest in the Collateral for payment of all sums due it under the Consolidated Mortgage, subject, however, to rights reserved or preserved by Orders of the United States Bankruptcy Court; and it further appearing

THAT the borrowers under the Real Estate Loan, Senior Promissory Note and Revolving Credit Documents secured by the Consolidated Mortgage and Leasehold Mortgage have heretofore admitted the validity of said instruments and their default thereunder; and it further appearing

THAT the Receivership Order appointed Long Hill as Receiver; and it further appearing

THAT on April 16, 2007 Highgate Manor and Highgate Management filed petitions for relief under Chapter 11 of the United States Bankruptcy Code; and it further appearing

THAT Mark I. Fishman (the "Trustee") duly appointed by the Bankruptcy Court in the Bankruptcy Case to act as trustee pursuant to §1104 of the Bankruptcy Code over Highgate Manor and Highgate Management, has obtained the approval of the Bankruptcy Court for the sale of substantially all of the assets of Highgate Manor and Highgate Management, including the Collateral, pursuant to Order dated _____, 2008 (the "Final Sale Order") and it further appearing

THAT, pursuant to the Final Sale Order, Oasis HC, LLC will be the purchaser of, inter alia, the Collateral and such purchaser seeks to replace or designate a replacement (subject to the approval of the New York State Department of Health ("Department of Health"), GE, and the Trustee) for Long Hill as receiver pending a closing under the Final Sale Order (Purchaser or its designee hereinafter referred to as the "Substitute Receiver"), and it further appearing

5

THAT the Department of Health has been apprised of this application and has approved the form of Order Appointing a Substitute Receiver to take the place of Long Hill as the receiver to be appointed hereunder;

THAT Plaintiff and the DOH wish to provide the mechanism for Long Hill to return as receiver under the terms of the Receivership Order should closing not occur pursuant to the Final Sale Order.

NOW, on motion of Moritt Hock Hamroff & Horowitz LLP, attorneys for Plaintiff, it is

**ORDERED** that within ten (10) business days from the entry of this Order, Long Hill is discharged as Receiver and is relieved of all further obligations with respect to the Facilities; and it is further

**ORDERED** that the surety in all bonds posted by the Receiver are discharged and the Receiver's bond is cancelled; and it is further

**ORDERED** that the fees paid to the Receiver and its professionals are approved; and it is further

**ORDERED** that Long Hill may, at no expense to the Substitute Receiver, establish a certain Self-Insured Retention ("SIR") Fund used to pay the deductible portion of claims and defense costs under a "tail insurance policy" the funding and payment of which are to be as agreed with Plaintiff. Such SIR Fund is not property of either the receivership or of the Bankruptcy Estate. Long Hill shall account to Plaintiff to the extent agreed between them. Long Hill shall use reasonable efforts to add the Trustee as an additional insured under any such "tail insurance policy"; and it is further

**ORDERED**, that, _____, having an office located at

_____, and referred to herein as the Substitute Receiver, be and hereby is appointed receiver of the Mortgaged Premises, for the benefit of Plaintiff and consistent with

6

bankruptcy court orders, with the usual powers and directions, including the authority to act as interim operator of the Facility and including the power to collect all rents, issues, fees, revenues, profits, and all other monies and proceeds now due and unpaid or to become due during the pendency of this action, and issuing from the Mortgaged Premises, including, but not limited to, all rents and other payments now due and unpaid or to become due from or on behalf of all residents, patients, medical insurance providers, including without limitation, Medicare and Medicaid, tenants, subtenants, occupants and licensees at the Mortgaged Premises, or any part thereof; and it is further

**ORDERED,** that prior to entering upon its duties as receiver, the Substitute Receiver shall execute to the People of the State of New York, and file in the Office of the Clerk of Rensselaer County, with certified copies in the Offices of the Clerks of Schenectady County and Cortland County, an undertaking with sufficient surety, in the penal sum of $10,000.00 conditioned upon the faithful performance of its duties as the receiver and a fiduciary bond payable to the United States in the amount of $500,000.00; and it is further

**ORDERED,** that prior to entering upon its duties, the Substitute Receiver shall execute and file an oath that the Substitute Receiver will faithfully and fairly discharge the trust committed to it; and it is further

**ORDERED,** that the Substitute Receiver shall accept the Mortgaged Premises in its then present "as is" condition; and it is further

**ORDERED,** subject to further order of this Court, the duration of the appointment of the Substitute Receiver as receiver of the Mortgaged Premises shall continue until the earlier of a: (i) sale of the Mortgaged Premises, subject to Bankruptcy Court approval, pursuant to a Judgment of Foreclosure and Sale issued by this Court and delivery of a Referee's Deed to such purchaser, or (ii) closing on the sale of the Mortgaged Premises as authorized by the Bankruptcy

Court.  Any prospective purchaser at such foreclosure or bankruptcy sale or the appointment of a

further substitute receiver shall be subject to the approval of the Department of Health pursuant

to law and its rules and regulations applicable thereto.  Anything in this Order to the contrary

notwithstanding, the Department of Health may apply to this Court for an immediate order

terminating the authority of the Substitute Receiver or for an Order of Involuntary Receivership

pursuant to the Public Health Law, if the Department of Health determines, in its sole discretion,

(i) that deficiencies have occurred at the Mortgaged Premises which warrant the removal of the

Substitute Receiver; (ii) the Substitute Receiver has been convicted of a crime; (iii) if otherwise

mandated by law; (iv) upon the mutual written consent of Plaintiff, the Department of Health and

the Substitute Receiver; or (v) if the Department of Health determines, with respect to matters

other than deficiencies as set forth in clause (i) above, in its sole discretion, that the Substitute

Receiver is not in substantial compliance with the terms and provisions of this Order, provided,

however, that in such event the Department of Health will have provided the Substitute Receiver,

Plaintiff and the Trustee with written notification of the nature and extent of its non-compliance,

and the Substitute Receiver has failed, in the Department of Health's opinion, to make sufficient

progress toward attaining compliance.  The Substitute Receiver waives any right to a hearing

under any section of the Public Health Law relative to revocation of an operating certificate, and

agrees to surrender the operating certificate issued to it upon expiration or termination of its

receivership; and it is further

　　　　ORDERED, that the Substitute Receiver, Purchaser and Operating Designee (as defined

in the Purchase Agreement referenced in the Final Sale Order)  (a) shall have the responsibility

and obligation to pay and discharge all obligations incurred by Long Hill at or for the Facility,

including trade accounts payable, accrued vacation, sick and personal time and similar items,

cash receipts assessment and similar taxes, employee wages or salary and taxes thereon, and

required contributions under employee benefit plans or programs, and including accrued but unbilled expenses and/or obligations incurred after the filing of the Bankruptcy Case as well as, subject to the conditions and to the extent provided in Exhibit A hereto, all fees and expenses of the Trustee, the U.S. Trustee, Creditors Committee and their professionals which accrue subsequent to the Final Sale Order, (all of the foregoing, commencing with "trade accounts," being referred to, collectively, as the "Expenses"), (b) shall fund all operations at the Facility during the term of the Substitute Receiver's receivership, including prior debts and obligations coming due and/or remaining unpaid and debts and obligations incurred or undertaken during said term and all other Expenses of the receivership and (c) shall have liability and responsibility to pay any shortfall out of its own funds if the income generated at the Facility is insufficient to meet the expenses of the Facility. At or prior to the closing pursuant, to the Final Sale Order, the Substitute Receiver, Purchaser and Operating Designee shall have paid in full all of the debts, obligations, and/or Expenses which are the subject of this paragraph and provide sworn certifications that such debts, obligations, and/or Expenses have been paid in full.

ORDERED, that the Substitute Receiver shall be entitled to utilize all accounts receivable and cash existing at the Facility as of the date of the commencement of its appointment as receiver to meet Substitute Receiver's obligations hereunder except that funds held in escrow by Long Hill for professional fees shall not be deemed to be cash existing at the Facility but shall be turned over by Long Hill to be held in escrow by counsel to the Trustee; and it is further

ORDERED, that prior to closing any foreclosure sale or sale in the Bankruptcy Court, the Purchaser or its operating designee shall submit an application for approval of establishment to the Public Health Council within forty-five (45) days following the entry of the Final Sale Order or acceptance of its bid by the Referree to Sell (as the case may be) and no sale shall be

closed, unless and until the Department of Health has approved the Purchaser or its operating designee and issued to it a certificate authorizing Purchaser or its operating designee to operate; and it is further

**ORDERED**, that provided the Facility or prior operator has a Title XIX provider agreement and the Substitute Receiver continues to meet the requirements for participation as a provider in the Medicaid program, the Substitute Receiver shall be reimbursed as an operator for patient services provided by it or in the name of the Facility through the Medicaid program pursuant to 10 N.Y.C.R.R. Subpart 86-2. The Substitute Receiver's expenses of operation shall be paid out of the rents, profits, income, Medicaid reimbursements and other sums received by the Substitute Receiver and any shortfall to meet the expenses shall be borne by the Substitute Receiver, Purchaser and Operating Designee. The Department of Health shall not be responsible for any expenses incurred by the Substitute Receiver and related to the operation of the Facility which are not reimbursed pursuant to Subpart 86-2 or by any other payor; and it is further

**ORDERED**, that the Substitute Receiver shall not act as an agent of the Department of Health nor represent or hold itself out as an agent for the Department of Health in any matter, nor shall it hold itself out as a political subdivision of the State of New York. Notwithstanding the provisions of any other agreement to the contrary, the Substitute Receiver shall not add a new member, director, officer or stockholder, transfer or otherwise dispose of any shares of stock or voting rights, or modify the management or legal structure of the Substitute Receiver during the term of the receivership without the prior written approval of the Department of Health. The Substitute Receiver shall act in good faith and shall not delegate its duties and responsibilities to any other individual or entity, except that it may hire its own administrators and staff as specifically set forth in this Order as the same may be amended from time to time. The Substitute Receiver shall operate the Facility in substantial compliance with all applicable laws,

rules and regulations, including, but not limited to, the requirements for participation in the

Medicare/Medicaid programs. If, upon commencement of the receivership, the Facility is not

found to be in such substantial compliance, the Substitute Receiver shall be obligated to take

reasonable actions so as to bring the Facility into such substantial compliance within a

reasonable period of time. In its operation of the Facility as receiver, the Substitute Receiver

shall not engage in any practice that may result, directly or indirectly, in any financial gain to

itself in its capacity as receiver, except as expressly set forth herein. The Substitute Receiver

shall not be paid any fees for services as receiver except as set forth in Exhibit A hereto, and it is

further

      **ORDERED**, that the Substitute Receiver is not the owner of the Facility but, in

contemplation of the purchase of the Facility, and notwithstanding any provision in the Final

Sale Order to the contrary, he, together with the Purchaser and Operating Designee (a) shall pay

in the ordinary course all of the obligations and Expenses, as defined, including all payables,

liabilities or obligations of any kind incurred by the Substitute Receiver from the inception of its

receivership, and (b) shall pay in the ordinary course, all of the obligations and Expenses

incurred by Long Hill in its performance of Long Hill's obligations under the Receivership

Order; and it is further

      **ORDERED**, that all Expenses reflected in the books and records of Long Hill shall,

absent manifest error, be presumed to be correct and accurate and shall not be challenged by the

Substitute Receiver, Purchaser or Operating Designee without the written consent of the Trustee

and Plaintiff; and it is further

      ORDERED, that the Substitute Receiver, Purchaser and Operating Designee shall, in

addition to all other obligations provided for herein, consistent with applicable law governing

receiverships, pay such past and future operating expenses as necessary to maintain operation of

the Facility in accordance with the laws and applicable rules and regulations of the Department of Health governing the operation of the Facility, including, but not limited to, expending sufficient funds to remedy any operational deficiencies; and it is further

**ORDERED**, that in the event of the expiration or termination of the receivership for any reason other than sale of the Mortgaged Premises to the Substitute Receiver pursuant to a Judgment of Foreclosure and Sale, or sale in the Bankruptcy Court, the Substitute Receiver shall execute and deliver such assignments, reassignments, conveyances, releases and other documents as may be reasonably required to transfer the assets, liabilities and operation of the Facility, deliver all books and records, operating and policy manuals, licenses and all other documents which it prepared or maintained and which are necessary to the operation of the Facility, and divest itself of all incidents of ownership thereof to such person(s) or entities as the Trustee shall designate or, in the event of a sale pursuant to the Final Sale Order or a foreclosure sale, to the purchaser at such sale, subject to the approval of the Department of Health; and it is further

**ORDERED**, that the Substitute Receiver, within ninety (90) days after the end of each calendar quarter, shall provide the Department of Health, Plaintiff and the Trustee with an accounting, in accordance with the Long Hills's previous practices or on such other basis as the Department of Health may require, of its operation of the Facility during the term of its receivership and shall, in accordance with Long Hill's previous practices, provide monthly to the Trustee the required information for the Trustee's monthly operating reports. Nothing herein contained shall be construed so as to limit Substitute Receiver's obligation to maintain financial accounts and comply with reporting requirements to the Department of Health as hereinafter provided or as required by the Bankruptcy Court. The provisions of this section shall survive the expiration or termination of the receivership; and it is further

**ORDERED**, that the Department of Health will not have an adequate remedy at law in the event of a breach or threatened breach by the Substitute Receiver of any of its obligations under this Order, and the Department of Health shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Order, or to compel compliance with and enforce the provisions hereof. Nothing herein shall be construed as prohibiting the Plaintiff or Trustee from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages, or as specifically granting any rights to any parties not named in this Order; and it is further

**ORDERED**, that the Substitute Receiver shall not incur any obligation or make borrowings secured by the Facility or any part of the Facility or the Facility's assets, or undertake any transaction, other than in the ordinary course of business, subject to this Order, which would place an encumbrance upon the assets of the Facility during the term of the receivership except as may be permitted by the Final Sale Order or cash collateral orders in the Bankruptcy Court; and it is further

**ORDERED**, that the Substitute Receiver may apply and file in its name such administrative and/or judicial rate appeals as Highgate Management or Long Hill may have applied for or filed under the Medicaid, Medicare, or any other third party reimbursement or insurance program. The Substitute Receiver shall prepare, file and prosecute such appeals before the appropriate administrative or judicial bodies including such actions or proceedings relating to periods prior to the date hereof. It is expressly understood that the Substitute Receiver may file such rate appeals as it may deem appropriate arising from its operations. Monies generated by all appeals shall be turned over by the Substitute Receiver to the Trustee, subject to the lien of GE; and it is further

**ORDERED**, that during the term of the receivership, the Substitute Receiver shall keep and maintain accurate records of the time its personnel devotes to the management and operation of the Facility, indicating in reasonable detail the nature and extent of the matters on which they worked, so that the time may properly be allocated to appropriate cost centers; and it is further

**ORDERED**, that if the Substitute Receiver shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or shall file any petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future Federal, State or other statute or law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Substitute Receiver or of the Facility, and such appointment shall not have been vacated or stayed, on appeal or otherwise, or if within twenty (20) days after the expiration of any such stay, such appointment shall not have been vacated, the Trustee, Plaintiff or the Department of Health may apply to this Court for the immediate appointment of Long Hill Alliance Company as receiver or the appointment of another substitute receiver. Nothing herein shall prohibit the Department of Health from commencing proceedings for the appointment of an involuntary receiver pursuant to the Public Health Law; and it is further

**ORDERED**, that subject to HIPAA and all other applicable federal and state patient privacy or confidentiality requirements, all of which are incorporated herein by reference, the Plaintiff, Creditors Committee in the Bankruptcy Case and Trustee shall be entitled to access to all of the books and records relating to the operation of the Facility before or during the receivership, at the Facility, during normal business hours upon 24 hours notice to the Substitute Receiver upon the condition that this does not interfere with the operation of said Facility and that Plaintiff's, Committee's and Trustee's access shall not violate any patient's right of privacy or confidentiality; and it is further

14

**ORDERED**, that except as otherwise limited in this Order, the powers, rights, duties and obligations of the Substitute Receiver shall include those accorded a receiver appointed in an action to foreclose a mortgage on real property and in equity, and the Substitute Receiver shall also have the powers, duties, rights and obligations as if appointed under Section 2810(2) of the Public Health Law, unless otherwise limited herein, including, but not limited to, the following:

1.    The Substitute Receiver shall use reasonable care, diligence and prudence in the use and maintenance of the Mortgaged Premises.

2.    The Substitute Receiver shall maintain an appropriate system of financial accounts with respect to the operation of the Facility, shall meet all reporting requirements of the Department of Health, and shall itemize receipts and expenditures in a current and business-like manner in accordance with New York State rules and regulations as well as the New York State RHCF Accounting and Reporting Manual. The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder, including, in Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes.

3.    Except as limited by subparagraphs 7 and 8 below, the Substitute Receiver, at its own expense, may enter into contracts and incur expenses for the maintenance and operation of the Mortgaged Premises and the Substitute Receiver is authorized, at its own expense, to retain such person or persons to perform all services necessary in connection with the repair and maintenance of the Mortgaged Premises and to pay all charges necessary for the repair and maintenance of the Mortgaged Premises incurred in the ordinary course.

4.    The Substitute Receiver shall collect incoming payments from all sources and apply them to the costs incurred in the performance of its functions and obligations hereunder. In the event that the Department of Health determines that deficiencies exist at the Facility, and in accordance with applicable law imposes a civil penalty, such penalty may be assessed against the Substitute Receiver, the Purchaser or the Operating Designee if the Department of Health, in its discretion, determines either that the deficiencies arose subsequent to the appointment of the Substitute Receiver or that the deficiencies arose prior to such appointment, but were not corrected within a reasonable period of time. Such penalty, if any, shall be paid by the assessed party. In the event any such penalty has not been paid prior to the Closing, as such term is defined in the Final Sale Order, it shall be paid by Purchaser and/or the Operating Designee at or before the Closing.

5.    The Substitute Receiver may hire at its own expense and may fire such personnel, including professional consultants, as from time to time it may deem necessary or advisable, except as prohibited by law or regulation or as limited by subparagraphs 7 and 8 below. All employees at the Facility shall become and remain employees of the Substitute Receiver for so long as the receivership is in effect to the same extent such employees were employees of Long Hill, provided that the Substitute Receiver shall have the right, at its reasonable discretion to hire and terminate any employee so long as work force levels are adequate to provide the level of care consistent or superior to current levels and as required in accordance with the rules and regulations of the Commissioner of the Department of Health. Additionally, with regards to a Facility whose employees are represented by a collective bargaining agent, the Substitute Receiver shall comply with the terms of the collective bargaining agreement. The Substitute Receiver may not hire in any capacity, retain as a consultant or in any other way utilize the services of any partner, director, officer, shareholder or member of Highgate Manor or Highgate

Management.  Such consultants shall be required to keep and maintain accurate records of the time they devote to the management and operation of the Facility, indicating in reasonable detail the nature and extent of the matters on which they worked so that their time may properly be allocated to appropriate cost centers, and in the event such expenses are reimbursable under the Medicaid program, as to which no party, including the Department of Health, makes any representation and/or takes any position.

6.     The Substitute Receiver shall immediately procure and shall maintain, at its own expense, insurance in adequate amounts and coverage of such types and amounts as are usual and customary for similar facilities or as may be required by law or by the United States Trustee, including comprehensive general liability insurance, comprehensive automobile liability, malpractice and/or professional liability insurance, worker's compensation and employer's liability insurance, boiler and machinery insurance, business interruption insurance, and any other insurance deemed necessary for the operation of the Mortgaged Premises, including the Facility, at the current coverage levels or at higher levels. In the alternative, the Substitute Receiver may continue Long Hill's existing policies, subject to the provisions of this paragraph. Said insurance coverage shall name the Trustee, the Substitute Receiver, Long Hill, Defendants, and such other persons as the Substitute Receiver may reasonably request, as additional insureds and shall provide that the United States Trustee be provided ten (10) days' prior notice of any change to or cancellation of the policy.  Such insurance shall be with a carrier authorized to do business within the State of New York and shall be subject to the approval of the U.S. Bankruptcy Court and the United States Trustee.  No party, including the Department of Health, at this time takes any position with respect to the reimbursability of such expenses under the Medicaid program.

7.    Prior to making any capital or leasehold improvement in excess of Fifteen Thousand Dollars ($15,000.00), the Receiver shall advise the Trustee, Plaintiff and the Department of Health of its plans and shall obtain the written consent of the Trustee and Plaintiff, provided, however, that the consent of the Trustee and the Plaintiff will not be required if such improvement is mandated by the New York State Department of Health in order to effect compliance with applicable statutes and regulations. In the absence of such consent (if such consent is required pursuant to the terms of this Section 7), Substitute Receiver may apply to the Court for permission to incur such expense.

8.    Except as provided in subparagraph 7 above, the Substitute Receiver is authorized, (i) from time to time without further order of the Court or the Bankruptcy Court, to negotiate and enter into any new contract, lease or agreement or renewal thereof only if such contract, lease or agreement or renewal thereof is terminable on 30 days or less notice and the consideration for which does not exceed Twenty Five Thousand Dollars ($25,000.00); (ii) without further order of the Court or the Bankruptcy Court, to make payments and perform existing contracts, leases and agreements in the normal course of the operations of the Mortgaged Premises as a skilled nursing facility for patients and residents, subject to the rules and regulations of the New York State Department of Health and pursuant to the terms and conditions of such existing contracts, leases and agreements, and (iii) subject to further order of the Court, to execute the surrender, or release of, or the modification or amendment which materially alters the terms of, any contract, lease or agreement now or hereafter in existence with respect to the Mortgaged Premises. The Substitute Receiver shall not enter into any labor contract regarding employees, at the Facility without the approval of the Trustee, Committee and the United States Bankruptcy Court.

9.     The Substitute Receiver has and shall have no employment, consulting agreements or other business agreements of any kind whatsoever with Highgate Manor, Highgate Management or any affiliates or any principal, shareholder, member, officer or director thereof and no agreement of such kind will be entered into during the term of this Order; and it is further

10.     The Substitute Receiver shall timely prepare and present to the Trustee for filing all required state and federal tax returns for the Facility.

**ORDERED**, that the Substitute Receiver, subject to HIPAA and all other applicable federal and state patient privacy or confidentiality requirements, which are incorporated herein by reference, shall have full access to, and shall make, all books and records, accounts, agreements and documents of whatsoever nature, or copies thereof, relating to the Facility available to the Department of Health and the applicable federal authorities upon demand during the term of the receivership and for a period of four years thereafter.  There will be no charge to the Department of Health for any copies made.  Nothing herein shall be deemed to transfer ownership of the books and records of the Facility to the Substitute Receiver; and it is further

**ORDERED**, that no provision contained herein shall be deemed to relieve Highgate Manor or Highgate Management or any person from any civil or criminal liability incurred or imposed by law by reason of their acts or omissions prior to the appointment of the Substitute Receiver; and it is further

**ORDERED**, that a provisional operating certificate shall be deemed to have been issued to the Substitute Receiver as of the date hereof.  Such operating certificate shall be issued and delivered to the Substitute Receiver by the Department of Health as soon as practicable and shall remain in effect during the period the Substitute Receiver serves as Substitute Receiver of the Mortgaged Premises hereunder.  Upon termination of the receivership, the Substitute Receiver

shall surrender its operating certificate to the Department of Health. The Department of Health shall promulgate a Medicaid reimbursement rate for the Substitute Receiver in accordance with Subpart 86-2. The Department of Health, provided all conditions of participation in Title XVIII and Title XIX are met, shall recommend to the United States Department of Health and Human Services that a Title XVIII Provider Agreement be issued to the Substitute Receiver and to issue a Title XIX Provider Agreement to the Substitute Receiver. Except as otherwise specifically provided herein, nothing contained herein shall be construed in any way to alter or abridge the right and authorities of the Department of Health or the Public Health Council as provided for in the Public Health Law. Nothing herein contained shall be deemed to change the Medicaid reimbursement policies, rules and regulations of the New York State Department of Health; and it is further

ORDERED, that the Shortfall Agreement, as per its terms, shall be terminated as of the date hereof and the Substitute Receiver shall have no rights thereunder. The termination of the Shortfall Agreement shall not operate as a release to the parties to the Shortfall Agreement with respect to any obligations incurred thereunder prior to the date hereof, including any obligations of the Receiver relating to operational deficiencies, if any; and it is further

ORDERED, that any notices to the Department of Health by the Substitute Receiver shall be sent to:

> Thomas Conway, General Counsel
> New York State Department of Health
> Nelson A. Rockefeller Empire State Plaza
> Erastus Corning Tower, 24th Floor, RM 2482
> Albany, New York 12237
> Attn: Michael Stone, Assistant Counsel;

and it is further

ORDERED, except as may be limited by the Final Sale Order or the purchase agreement approved and described therein, that the Substitute Receiver be, and hereby is, authorized and

directed to demand, collect and receive from the residents, patients, tenants, subtenants, occupants and licensees in possession of or using the Mortgaged Premises, and any other persons liable therefore, all the rents, license fees, medical reimbursements, and other charges thereof now due and unpaid, or hereafter to become due, and that the Substitute Receiver be and hereby is authorized to institute and carry on all legal proceedings necessary for the protection of the Mortgaged Premises or any portion thereof, including such proceedings as may be necessary to recover possession of the whole, or any part thereof, and/or apply to the Court to compel the residents, patients, medical insurance providers, including Medicare and Medicaid, tenants, subtenants, occupants and licensees to attorn to the Substitute Receiver, and to institute and prosecute suits for the collection of such rents, fees, income, medical reimbursements, profits and other charges now due and hereafter to become due, and for summary or other proceedings for the removal of any residents, patients, tenant, subtenants, occupants, licensees or other persons therefrom as provided by law; and it is further

ORDERED, that the Substitute Receiver shall forthwith deposit all monies received by it at the time it receives same in a special account in its own name as Substitute Receiver in RBS Citizens Bank, N.A., or such other bank as GECC shall require, (the "Depository") and that no withdrawals shall be made therefrom except in the ordinary course of the operation, repair and maintenance of the Mortgaged Premise or as directed herein or by further Order of the Court or the Bankruptcy Court, and that the Substitute Receiver shall furnish the Trustee and Plaintiff's attorneys, Moritt Hock Hamroff & Horowitz LLP, 400 Garden City Plaza, Garden City, New York, 11530 (Attn: William P. Laino Esq.), with monthly statements of the receipts and expenditures of the receivership, together with a photocopy of the monthly statements received from the above-described Depository. Nothing herein is intended to amend, modify or abrogate the lock box arrangement for the collection and deposit of accounts receivable by the Substitute

Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC; and it is further

**ORDERED,** that the residents, patients, tenants, subtenants, occupants or licensees of the Mortgaged Premises and such other persons as may be in possession of or use the Mortgaged Premises, or any portion thereof, and any medical insurance providers, including Medicare and Medicaid, be and, are hereby directed to attorn to the Substitute Receiver and, until the further order of this Court, to pay over to the Substitute Receiver all rents, license fees, profits and other income of the Mortgaged Premises or any medical reimbursement for services rendered to residents or patients at the Mortgaged Premises now due and unpaid or that may hereafter become due; and it is further

**ORDERED,** that Highgate Manor, Highgate Management, their affiliates and all of their partners, agents, representatives, employees, servants, attorneys or anyone else acting on their behalf, be enjoined and restrained from collecting the rents, profits, income, license fees, medical reimbursements and other charges resulting from use of or services provided at the Mortgaged Premises or the rendition of services therefore and from interfering in any manner with the Mortgaged Premises or its possession, use or operation by the Substitute Receiver or the supply of any and all utilities or other services to the Mortgaged Premises, and from transferring, removing or changing entries in the books and records of or pertaining to the Mortgaged Premises, or from transferring, removing or in any way disturbing any of the residents, patients, tenants, occupants, licensees or employees at the Mortgaged Premises; and that all such residents, patients, tenants, subtenants, occupants or licensees of the Mortgaged Premises and other persons liable for same, including medical insurance providers for services rendered to such residents or patients, be, and hereby are, enjoined and restrained from paying any such income or other charges for the Mortgaged Premises to Highgate Manor, Highgate Management,

their affiliates, or their partners, agents, representatives, employees, servants, attorneys or anyone else acting on their behalf or to any other person other than the Substitute Receiver herein or his/her duly designated agent, provided, however, that Substitute Receiver may in its reasonable discretion elect to continue the employ of Facility billing, bookkeeping and clerical personnel, as employees of the Substitute Receiver, to the same extent that such employees were employees of Long Hill, and to the extent such election is made the restrictions set forth in this paragraph shall not be applicable to and with respect to such persons; and it is further

ORDERED, that the Trustee shall have no duties, responsibilities or liability with respect to the Substitute Receiver's operation of the Facility; and it is further

ORDERED, that the Trustee, Long Hill Alliance Company, Highgate Manor, Highgate Management, their affiliates and all of their partners, agents, attorneys, representatives, servants, employees and assigns, are directed to, and shall, cooperate fully with the Substitute Receiver in immediately providing the Substitute Receiver with all keys, books and records, financial instruments and bank accounts, files, orders, leases, subleases, licenses, maintenance agreements, contracts, invoices, correspondence, notices, registration statements, employee records and other books, records, papers and agreements relating to the ownership, maintenance, operation or leasing of the Mortgaged Premises or any part or parts thereof and all other documents, materials, and things necessary for the Substitute Receiver to discharge his/her obligations hereunder which any of them may have in their possession; and it is further

ORDERED, that Long Hill, Highgate Manor, Highgate Management, their affiliates and all of their partners, agents, attorneys, representatives, employees and assigns, (a) shall hold in trust and immediately pay over to the Substitute Receiver any and all rents, issues, profits, medical reimbursements, or other income with respect to the Mortgaged Premises received by any of them on or after the appointment of the Substitute Receiver, including those proceeds,

rents, issues, profits and other income that have accrued prior thereto and remain unpaid as of

such appointment; and (b) shall hold in trust and immediately pay over to the Substitute Receiver

any and all security deposits received from residents, patients, tenants, subtenants, licensees or

other persons for the lease, use or occupancy of the Mortgaged Premises; and it is further

**ORDERED**, that Highgate Manor, Highgate Management, their affiliates and all of their

partners, agents, representatives, assigns, servants, employees, and attorneys, be and hereby are

enjoined and restrained from disposing of any rents, issues, income, medical reimbursement, or

profits of the Mortgaged Premises or any part thereof, previously received by any of them except

in payment of all liabilities relating to the operation of the Mortgage Premises as have accrued

prior to the appointment of the Substitute Receiver and outstanding sums secured by the

Consolidated Mortgage and the Leasehold Mortgage, and they are further restrained from

interfering in any manner with the Mortgaged Premises or the possession of same by the

Substitute Receiver; and it is further

**ORDERED**, that pursuant to the provisions of the General Obligations Law § 7-105, Highgate

Manor, Highgate Management, Long Hill and any entity or person holding any deposits or advanced

rent as security under any lease, use or occupancy or license agreement affecting space in the

Mortgaged Premises affected by this action shall (i) turn same over to the Substitute Receiver within

five (5) days after said Receiver shall have qualified, to be held by the Substitute Receiver in a separate

savings account in the above referenced Depository in the name of the Substitute Receiver as "Special

Deposit Account", pursuant to the terms and provisions of the agreements entered into by the persons

who made such deposits or advance payments of rent and (ii) notify each of such persons by certified

mail that the respective security deposits or advance payments of rent of each of the tenants so received

are being held by the Substitute Receiver pursuant to the provisions of each such person's respective

agreement; and thereupon the said Substitute Receiver shall hold such security subject to such

disposition thereof as shall be provided in an order of this Court to be made and entered in this action; and it is further

**ORDERED**, that the Substitute Receiver be, and hereby is, authorized and directed: (a) to keep the Mortgaged Premises insured against loss or damage by fire and in repair; (b) to pay the taxes, assessments, water charges, sewer rents, electric bills, and other charges on the Mortgaged Premises, in a manner consistent with the provisions of this Order; (c) to comply with all requirements of any municipal department or authority having jurisdiction over the Mortgaged Premises; (d) to procure, if necessary, such insurance and liability insurance against claims for losses or injuries to persons and property, which may be asserted by persons on, near or about the Mortgaged Premises, as may be necessary; and (e) to pay to Plaintiff monthly, out of funds remaining in the custody of the Substitute Receiver, all interest accrued on the Revolving Credit Note, provided that any unpaid interest shall continue to accrue on the Real Estate Loan, Senior Promissory Note and Revolving Credit Documents secured by its Consolidated and Leasehold Mortgages; and it is further

**ORDERED**, that all persons, other than patients or residents receiving skilled nursing services, now or hereafter in possession of the Mortgaged Premises, or any part thereof, and not holding such possession under valid and existing leases, subleases, licenses or tenancies, do forthwith surrender such possession to the Substitute Receiver; and it is further

**ORDERED**, that the Substitute Receiver, or any party to this action, may, at any time, upon proper and sufficient notice to all parties who have appeared in this action, apply to this Court for further or other instructions or authority, whenever such instructions or additional authority shall be deemed necessary or desirable in order to enable the Substitute Receiver to properly fulfill its duties or to protect Plaintiff's interest in the property secured by the Consolidated and Leasehold Mortgages; and it is further

**ORDERED**, that the Substitute Receiver shall comply fully with the requirements of CPLR §6401-6404 and that the Substitute Receiver shall execute and file in the Office of the Clerk of Rensselaer County, a copy of this Order, its original oath of office, and its undertaking, with certified copies thereof filed in the Offices of the Clerks of Schenectady and Cortland Counties, and shall serve a copy of its oath of office and its undertaking, on the Plaintiff's attorneys, Moritt Hock Hamroff & Horowitz LLP, 400 Garden City Plaza, Garden City, New York 11530 (Attn: William P. Laino, Esq.), on the United States Trustee and on all of the parties named in this action or the attorneys who have appeared for such parties, and, thereafter, the Substitute Receiver shall serve any other papers filed by it with the Court in connection with its appointment on all parties to this action who have appeared herein and are not in default and the Department of Health; and it is further

**ORDERED**, that any costs and expenses incurred by Plaintiff pursuant to this Order, including those incurred under the Shortfall Agreement under the Receivership Order, shall be added to the Consolidated Mortgage and Leasehold Mortgage (collectively the "Mortgages"), shall be a lien on the Mortgaged Premises and shall be recoverable from the borrowers, guarantors and other persons and properties liable as provided in said Mortgages and the loan documents secured thereby or executed in connection therewith; and it is further

**ORDERED**, that the Substitute Receiver, Purchaser and Operating Designee shall be deemed to have indemnified the Trustee and the bankruptcy estates of Highgate Management and Highgate Manor and shall hold them harmless for any and all liabilities or Expenses, as defined hereinabove, caused, incurred or created by the Substitute Receiver and for any and all liability arising from the Substitute Receiver's access to, or use of, Patient Records or Patient Information, each as defined in the Purchase Agreement which was approved by the Final Sale Order; and it is further

26

**ORDERED**, that Long Hill Alliance Company will assist in the orderly transition to the Substitute Receiver in connection with the operation of the Facility. The Receivership Order shall remain unaffected with respect to obligations, rights and remedies arising or occurring prior to the date hereof; and it is further

**ORDERED**, that the obligations and duties of the Substitute Receiver hereunder shall survive the termination of the receivership, whether by reason of a closing pursuant to the Final Sale Order or otherwise.

ENTER,

_____
J.S.C.

Approved as to Form and Substance:

New York State Department of Health

By:_____

Name:_____

Title:_____


Long Hill Alliance Company, Outgoing
 Receiver

By:_____

Name:_____

Title: _____


Trustee of the Chapter 11 estates of
Highgate Manor Group, LLC and
Highgate LTC Management, LLC

By:_____

Name:_____


Substitute Receiver

By:_____

Name:_____

Title:_____     Title:_____

## TREATMENT OF PROFESSIONAL FEES DURING INTERIM RECEIVERSHIP

The Substitute Receiver and Purchaser, subject to Court approval, will pay Trustee fees and expenses and fees and expenses of professionals retained by the Trustee and by the Creditors' Committee ("Committee") from the monthly positive cash flow generated by the operation of the Highgate facilities up to the amounts of (a) $15,000.00 a month in the aggregate for the Trustee and his professionals, (b) $15,000.00 a month in the aggregate for the Committee's professionals, (c) $5,000.00 a month for United States Trustee fees and, assuming the foregoing have been paid or escrowed, $10,000.00 a month for Substitute Receiver fees. GECC will cooperate in the inclusion of the aforesaid fees in cash collateral budgets. The Trustee and the subject professionals would retain the right to seek the payment of fees and expenses from other sources consistent with either orders of the Court or agreements with GECC, subject to Bankruptcy Court Approval. Nothing contained in this Order shall require the United States Trustee to exclusively seek payment of United States Trustee fees due pursuant to 28 U.S.C. § 1930(a)(6), or professionals or the Trustee to exclusively seek payment of their fees and/or expenses due pursuant to 11 U.S.C. §§ 326, 330 and/or 331, from the Substitute Receiver's monthly positive cash flow, and the United States Trustee, the trustee, and professionals, as the case may be, may seek payment of such fees from any other debtor or estate asset.

"Positive Cash Flow", as used in this document, refers to the net cash flow generated from the operation of the Highgate facilities and shall be measured by the "check book" amounts of cash at the beginning and the end of the month without giving effect to any additional capital provided by the Substitute Receiver, Purchaser or Operating Designee or capital expenditures made by the Substitute Receiver, Purchaser or Operating Designee. Checks issued by the Substitute Receiver, Purchaser or Operating Designee but not yet paid shall be treated as

expenditures. Checks received but not yet deposited or paid shall be treated as receipts. All expenditures will be made in the ordinary course of business and will neither be prepaid nor delayed. It would be presumed that expenditures normally paid monthly would be paid on the same date each month. The computation of positive cash flow will be performed separately for each month and will not be cumulative. No effect will be given to negative cash flow in any given month.

M:\BANKRUPT.CY\Highgate\subreceiverorder FINAL.doc

# EXHIBIT 2 to Purchase Agreement

So ordered this ____ day of July, 2008

_____

Hon. Robert E. Littlefield, JRECEIVED & FILED
U.S.B.J.

**RECEIVED & FILED**

**JUL 9 - 2008**

OFFICE OF THE BANKRUPTCY CLERK
ALBANY, NY

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

In re:

**HIGHGATE LTC MANAGEMENT LLC,**

Debtors.

-------------------------------------------------------X

Chapter 11

Case No. 07-11068-REL
(Jointly Administered)

### STIPULATION AND AGREED ORDER RESOLVING CLAIMS
### BY AND AGAINST THE NEW YORK DEPARTMENT OF HEALTH

This Stipulation and Agreed Order (the "Stipulation"), dated as of May, 2008 is entered

into by and among: (a) Mark I. Fishman, not individually but solely as chapter 11 trustee (the

"Trustee") for Highgate LTC Management, LLC ("LTC") and Highgate Manor, LLC ("Manor";

together with LTC, the "Debtors"); (b) General Electric Capital Corporation ("GECC"); (c) the

Committee of Unsecured Creditors (the "Committee"); and (d) the New York State Department

of Health ("DOH"; together with the Trustee, GECC and the Committee, the "Parties").

### R E C I T A L S

WHEREAS, on April 16, 2007 (the "Petition Date") LTC and Manor filed voluntary

petitions for relief under chapter 11 of the Title 11 the United States Code, 11 U.S.C. §101 et

seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of

New York ( the "Court") (Case No. 07-11068-REL) (the "Chapter 11 Cases");

1

WHEREAS, the Court entered an Order on April 18, 2007 providing for the joint administration of the Chapter 11 Cases;

WHEREAS, Manor is a real estate holding company for four parcels[2] that each have a long term care facility constructed on them and LTC previously provided the operational services for the Facilities;

WHEREAS, the Debtors are licensed by the DOH;

WHEREAS, prior to the Petition Date, the Debtors entered into various loan, mortgage, security, forbearance and other related documents with GECC, each of which are more particularly described on *Schedule 1* annexed hereto (collectively, the "Loan Documents");

WHEREAS, prior to the Petition Date, the Debtors were in default under the terms of the Loan Documents;

WHEREAS, by reason of the Debtors' default under the Loan Documents, on or about November 8, 2006, GECC commenced an action (the "Foreclosure Action") in the New York State Supreme Court, Rensselaer County (the "State Court") titled *General Electric Capital Corporation v. Highgate Manor, LLC et al.*, Index No. 219393-06, seeking to foreclose its mortgage on each of the Facilities;

WHEREAS, by order of the State Court entered on November 29, 2006 (the "Receivership Order") in the Foreclosure Action, Long Hill Alliance Company (the "Receiver") was appointed as receiver for the Facilities;

---

[2] Northwoods Rehabilitation and Extended Care Facility-Rosewood Gardens (Rensselaer County), Northwoods Rehabilitation and Extended Care Facility, Troy (Rensselaer County), Northwoods Rehabilitation and Extended Care Facility-Hilltop (Schenectady County), Northwoods Rehabilitation and Extended Care Facility- Cortland (Cortland County) (each a "Facility" and collectively, the "Facilities")

WHEREAS, in accordance with the Receivership Order, and the Shortfall Agreement with GECC, the Receiver took possession of the Facilities and undertook the management thereof with the consent and approval of the DOH;

WHEREAS, after the Petition Date, and pursuant to a stipulation among the Trustee, the Committee and GECC and "so ordered" by the Court on September 10, 2007, the automatic stay imposed by Section 362(a) of the Bankruptcy Code was modified to permit GECC to continue the Foreclosure Action up to entry of a judgment by foreclosure, and thereafter GECC moved for summary judgment in the Foreclosure Action ( the "GECC Summary Judgment Motion");

WHEREAS, after the Petition Date, by Order dated May 17, 2007, the Court directed the appointment of a chapter 11 trustee (the "Trustee Order") and, pursuant to the Court's Order Excusing Compliance with Sections 543 (a) and (b) of the Bankruptcy Code dated May 18, 2007 (the "Order Excusing Compliance"), the Receiver has continued to operate the Facilities;

WHEREAS, by order of the State Court dated December 20 2007, the GECC Summary Judgment Motion was granted;

WHEREAS, the DOH has asserted the following claims against the Debtors:

(a)     A claim in the approximate amount of $8,400,000.00 for unpaid prepetition cash receipts assessments, interest and penalties (the "DOH Cash Receipts Assessment Claim"); and

(b)     A claim in an unliquidated amount, based on audits performed or to be performed, for retroactive Medicaid adjustments, together with a right of recoupment (this claim, together with the DOH Cash Receipts Assessments Claim, the "DOH Claims");

WHEREAS, DOH was not prepared to grant a license or Certificate of Need to a buyer of the Facilities absent the buyer's agreement to assume the liability evidenced by the DOH Claims;

3

WHEREAS, the Trustee, GECC and the Committee have agreed that it is in the best interests of the Debtors' estates and their creditors that the Facilities be sold in accordance with § 363 of the Bankruptcy Code (a "363 Sale"); and

WHEREAS, in order to facilitate the sale of the Facilities (such sale, whether pursuant to the judgment of foreclosure and sale entered in the Foreclosure Action, a 363 Sale or a sale under a chapter 11 plan to a Qualified Buyer is referred to in this Stipulation as the "Sale"), and provided that the Debtors' estate or the Receiver has paid all post-petition cash receipts assessments relating to periods prior to the closing date of the Sale, the DOH has agreed that: (a) the DOH Claims relating to periods prior to the closing date of Sale shall be fixed and liquidated in accordance with the terms of this Stipulation, and (b) a Qualified Buyer of the Facilities shall neither be subject to, nor required to assume in order to obtain any license or Certificate of Need from NYS, any debts, obligations or liabilities of any of the Debtors to the DOH relating to the Facilities, including, but not limited to, any debts, obligations or liabilities of the Facilities arising under, in connection with or related to the NYS Medicaid Program, and (c) it will not assert against the Qualified Buyer or the purchased assets any claim of recoupment or setoff, or similar claim or liability, regarding obligations of any of the Debtors to the DOH relating to the Facilities.

NOW THEREFORE, in order to resolve the DOH Claims, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree and stipulate as follows:

1.  Each of the foregoing recitals is hereby incorporated as part of this Stipulation. Capitalized terms defined in the recitals of this Stipulation are incorporated herein by this reference and are used herein as so defined. Qualified Buyer as used herein shall mean the Sale

4

to a person or entity that is not an: (a) affiliate of the Debtor (an affiliate shall not include a court appointed receiver), (b) insider of the Debtors, or (c) insider of the principals of the Debtors.

2. Effective as of the closing date of the Sale and provided that DOH has been paid in full with respect to all post-petition cash receipts assessments relating to periods prior to the closing date of the Sale, the DOH Claims shall be allowed in the total aggregate amount of eight million, three hundred seventy-seven thousand, two hundred twenty-three and 54/100 dollars ($8,377,223.54) (the "Allowed DOH Claim"), which amount shall not be subject to any further reduction or offset (except as set forth in subparagraph (a) herein), and distributions to the DOH on account of the Allowed DOH Claim shall be made in the following manner and form:

(a) DOH shall recoup against the Allowed DOH Claim, the sum of two million, six hundred sixty - eight thousand, three hundred sixteen and 00/100 dollars ($2,668,316.00), which amount represents a retroactive adjustment owing by NYS to the Debtors for the period beginning March 1, 1999 to and including December 31, 2008, which the DOH shall be permitted to apply to the Allowed DOH Claim indebtedness as of the closing date of the Sale.

(b) Two million, one hundred sixty-seven thousand, forty-three and 53/100 dollars ($2,167,043.53) of the Allowed DOH Claim, which amount constitutes interest and penalties, shall be a general unsecured claim in the Chapter 11 Cases; and

(c) Three million, five hundred forty-one thousand, eight hundred sixty-four and 20/100 dollars ($3,541,864.20) of the Allowed DOH Claim ("the DOH Receivable") shall be paid solely from a fixed-rate annuity ("the Annuity") funded by the Sale Carve Out (as defined below), so that DOH receives on account of the DOH Receivable, 420 equal monthly payments in the amount of $8,433.01, exclusive of any fees or commissions. The payment of the DOH Receivable from the Sale Carve Out is expressly conditioned upon the Closing of the Sale as

5

provided in a purchase and sale agreement approved by the Bankruptcy Court to a Qualified Buyer. For purposes of this Stipulation, "Sale Carve Out" means the carve out from GECC's lien in the proceeds of the Sale in an amount necessary to fund in full the Annuity. The Annuity shall be procured by GECC and be in form reasonably acceptable to the DOH and GECC.

3. Neither the DOH nor any other agency or office of NYS responsible for the administration and supervision of the NYS Medicaid Program (such other agency or office, an "Other Office of Medicaid Management") shall, as a condition to a closing of the Sale, require a Qualified Buyer to: (a) execute a Form 4-B Medicaid Affidavit, (b) assume any debts, obligations or liabilities of any of the Debtors under the NYS Medicaid Program, including, without limitation, cash receipts assessments, and (c) be subject to any recoupment or offset, or similar claim or liability, by NYS with respect to any debts, obligations and liabilities of any of the Debtors under the NYS Medicaid Program.

4. All rights of the DOH and any Other Office of Medicaid Management to approve a Qualified Buyer of the Facilities for license by NYS, including State and Public Health Council approval, are not impaired or affected by this Stipulation.

5. If a Sale does not occur, the terms of this Stipulation shall be of no force and effect and no Party shall be bound by any of the terms of this Stipulation, including (a) the waiver and release of claims by DOH against the Debtors for recoupment or offset that DOH may have or hereafter have and (b) the obligations of GECC to fund the Sale Carve Out.

6. If, in connection with the Sale, the buyer requests that it be approved by DOH as a temporary receiver to operate the Facilities pending closing of the Sale, and such request is approved by DOH but the Sale fails to close, then the Receiver shall, upon written notice by GECC, be authorized to resume its obligations under the Receivership Order and the Shortfall Agreement.

6

7.     Provided that the DOH has been paid in full with respect to any and all post-petition cash receipts assessments, and provided further, that all appeals filed by the Debtor(s) or filed on the Debtor(s)' behalf, arising out of, in connection with or related to the NYS Medicaid Program are withdrawn or deemed to be withdrawn relating to periods prior to the closing date of the Sale, allowance of the Allowed DOH Claim as set forth under the terms of this Stipulation shall be in full and final satisfaction of any and all claims (whether or not asserted) of DOH against the Debtors arising out of, in connection with or related to the NYS Medicaid Program with respect to the Facilities. The DOH hereby represents and warrants that except for the DOH Claims and any unpaid post petition cash receipts assessment relating to periods prior to the closing date of the Sale, it shall assert no claims against the Debtors or their estates arising out of, in connection with or related to the NYS Medicaid Program with respect to the Facilities, known or unknown, whether asserted or unasserted, and that as of the date of this Stipulation, it is not a party to any agreement to assign, sell, convey or otherwise transfer, in whole or in part, any portion of its right, title or interest in and to the DOH Claims and any claim arising from post petition cash receipts assessments. This representation and warranty by the DOH shall be deemed repeated as of the closing date of the Sale and shall have the same force and effect as though this Stipulation were dated as of the closing date of the Sale.

8.     All notices shall be sent to:

Thomas Conway, General Counsel
New York State Department of Health
Nelson A. Rockefeller Empire State Plaza
Erastus Corning Tower, 24th Floor, RM 2482
Albany, New York 12237
Attn: Michael Stone, Assistant Counsel;

All distributions on the DOH Allowed Claim shall be made to:

Richard Pellegrini, Director
Bureau of Financial Management & Information Support
New York State Department of Health
Nelson A. Rockefeller Empire State Plaza
Erastus Corning Tower, Rm. 984
Albany, New York 12237

9.     Neither this Stipulation, nor any statement made or action taken in connection with the negotiation of this Stipulation, shall be offered or reserved in evidence or in any way referred to in any legal action or administrative proceeding among or between the Parties hereto, other than as may be necessary (a) to obtain approval of and to enforce this Stipulation or (b) to seek damages or injunctive relief in connection herewith.

10.    This Stipulation shall be governed by the laws of the State of New York without giving effect to the conflict of laws provisions thereof. The Parties consent to the Court's retention of jurisdiction with respect to matters arising from or related to the Allowed DOH Claim, including, but not limited to, any and all issues or disputes arising from or other actions to interpret, administer or enforce the terms or provisions of this Stipulation.

11.    Each of the Parties hereto shall execute and deliver any and all additional papers, documents and other assurances, and shall perform any and all acts and things reasonably necessary or appropriate in conjunction with the performance of its obligations hereunder.

12.    The Parties hereto represent and warrant to each other that the signatories to this Stipulation are authorized to execute this Stipulation, that each has full power and authority to enter into this Stipulation and that this Stipulation is duly executed and delivered and constitutes a valid, binding agreement in accordance with its terms.

13.    This Stipulation may be executed by facsimile or electronically and in counterparts, all of which taken together shall constitute one and the same instrument.

14.    This Stipulation constitutes the full agreement of the Parties hereto with respect to its subject matter and supersedes all prior agreements, conversations, negotiations and understandings with respect thereto. This Stipulation shall not be altered, amended, modified, or otherwise changed in any respect whatsoever except by a writing duly executed by authorized representative of each of the Parties.

15.    Notwithstanding anything else herein, this Stipulation shall be binding on the Parties hereto upon its execution, but is expressly subject to and contingent upon Court approval.

Dated: June 26, 2008

<br>

**MORITT HOCK HAMROFF & HOROWITZ LLP**
Attorneys for General Electric Capital
Corporation

By: _____
Marc L. Hamroff, Esq.
400 Garden City Plaza
Garden City, NY 11530
516-873-2000

**NEUBERT, PEPE & MONTEITH, P.C.**
Attorneys for the Chapter 11 Trustee

By: _____
Mark I. Fishman, Esq.
195 Church Street
New Haven, CT 06510
Phone: (203) 821-2000

**FARRELL FRITZ, P.C.**
Attorneys for the Unsecured Creditors' Committee

By: _____
Louis A. Scarcella, Esq.
1320 RexCorp Plaza
Uniondale, New York 11556-1320
Tel: 516-227-0647

9

**OFFICE OF THE NEW YORK
STATE ATTORNEY GENERAL**
Attorneys for the New York State
Department of Health

By:  *Nancy Hershey Lord*
      Nancy Hershey Lord, Assistant Attorney General
      The Capitol
      Albany, NY 10224-0341
      (518) 473-6992

**NEW YORK STATE
DEPARTMENT OF HEALTH**

By:
      Richard F. Daines, M.D.
      Commissioner of Health
      Nelson A. Rockefeller Empire State Plaza
      Erastus Corning Tower
      Albany, NY 12237
      (518) 474-2011

**GENERAL ELECTRIC CAPITAL
CORPORATION**

By:

      2 Bethesda Metro Center, Suite 600
      Bethesda, Maryland 20814

**OFFICE OF THE NEW YORK
STATE ATTORNEY GENERAL**
Attorneys for the New York State
Department of Health

By: _____

Nancy Hershey Lord, Assistant Attorney General
The Capitol
Albany, NY 10224-0341
(518) 473-6992

**NEW YORK STATE
DEPARTMENT OF HEALTH**

By: _____

Richard F. Daines, M.D.
Commissioner of Health
Nelson A. Rockefeller Empire State Plaza
Erastus Corning Tower
Albany, NY 12237
(518) 474-2011

**GENERAL ELECTRIC CAPITAL
CORPORATION**

By: _____

2 Bethesda Metro Center, Suite 600
Bethesda, Maryland 20814

**SCHEDULE NO. 1 TO STIPULATION AND AGREED ORDER RESOLVING CLAIMS BY AND AGAINST THE NEW YORK DEPARTMENT OF HEALTH**

**LOAN DOCUMENTS BETWEEN GENERAL ELECTRIC CAPITAL CORPORATION, AS LENDER, AND HIGHGATE MANOR GROUP, LLC, HIGHGATE LTC MANAGEMENT, LLC AND OTHERS, AS BORROWERS**

1. Mortgage dated March 13, 2000 between Highgate Manor Group, LLC, as Mortgagor, and M&T Real Estate, Inc., as Mortgagee, in the principal amount of $21,500,000.00.

2. Assignment of Mortgage No. 1 dated May 20, 2005 between M&T Real Estate, as Assignor, and General Electric Capital Corporation, as Assignee.

3. Real Estate Loan Agreement dated May 26, 2005 by and among Highgate Manor, LLC, Highgate LTC Management, LLC and Guilderland LTC Management, LLC, as Borrowers, and General Electric Capital Corporation, as Lender, in the principal amount of $23,500,000.00.

4. Consolidated and Modified Senior Promissory Note dated May 26, 2005 by and among Highgate Manor, LLC, Highgate LTC Management, LLC and Guilderland LTC Management, LLC, as Borrowers, and General Electric Capital Corporation, as Lender, in the principal amount of $23,500,000.00.

5. Mortgage dated May 26, 2005 between Highgate Manor Group, LLC, as Mortgagor, and General Electric Capital Corporation, as Mortgagee, in the principal amount of $6,972,815.25.

6. Consolidated and Modified Mortgage, Assignment of Rents, Security Agreement and Fixture Financing Statement dated May 26, 2005 between Highgate Manor Group, LLC, as

Mortgagor, and General Electric Capital Corporation, as Mortgagee, securing the principal amount of $23,500,000.00.

7. Leasehold Mortgage, Assignment of Rents, Security Agreement and Fixture Financing Statement dated May 26, 2005 between Highgate LTC Management, LLC, as Mortgagor, and General Electric Capital Corporation, as Mortgagee, securing the principal amount of $23,500,000.00.

8. Loan and Security Agreement date May 26, 2005 by and among Highgate Manor Group, LLC, Highgate LTC Management, LLC and Guilderland LTC Management, LLC, as Borrowers, and General Electric Capital Corporation, as Lender, providing a revolving loan up to $4,000,000.00 in principal amount.

9. Revolving Credit Note dated May 26, 2005 by and among Highgate Manor Group, LLC, Highgate LTC Management, LLC and Guilderland LTC Management LLC in the principal amount of $4,000,000.00.

10. Security Agreement dated May 26, 2005 by and among Highgate Manor Group, LLC Highgate LTC Management, LLC, Guilderland LTC Management, LLC, as Debtors, and General Electric Capital Corporation, as Secured Party securing a loan in the principal amount of $23,500,000.00.

11. UCC-1 Financing Statements filed in favor of General Electric Capital Corporation as Secured Party including those filed on April 26, 2005, April 27, 2005, May 27, 2005, May 31, 2005, June 1, 2005 and June 7, 2005 against Highgate Manor Group, LLC, and on April 26, 2005, April 27, 2005 , May 27, 2005, May 31, 2005, June 1, 2005 and June 7, 2005 against Highgate LTC Management, LLC, and on April 26, 2005 and May 27, 2005 against Guilderland LTC Management, LLC, as Debtors.

12.     Forbearance Agreement dated April 12, 2006 by and among Highgate Manor Group, LLC, Highgate LTC Management, LLC, Guilderland LTC Management, LLC, as Borrowers, and Dianna R. Koehler-Nachamkin, Eugene M. Nachamkin, Scott H. Bialick and Howard S. Krant, as Guarantors, and Patricia Bruder and Longview Horizon, LLC, as Principals, and General Electric Capital Corporation, as Lender.

13.     First Amendment to Forbearance Agreement dated May 31, 2006 by and among Highgate Manor Group, LLC, Highgate LTC Management, LLC, Guilderland LTC Management, LLC, as Borrowers, and Dianna R. Koehler-Nachamkin, Eugene M. Nachamkin, Scott H. Bialick and Howard S. Krantt, as Guarantors, and Patricia Bruder and Longview Horizon, LLC, as Principals, and General Electric Capital Corporation, as Lender.

14.     Second Amendment to Forbearance Agreement dated June 23, 2006 by and among Highgate Manor Group, LLC, Highgate LTC Management, LLC, Guilderland LTC Management, LLC, as Borrowers, and Dianna R. Koehler-Nachamkin, Eugene M. Nachamkin, Scott H. Bialick and Howard S. Krantt, as Guarantors, and Patricia Bruder and Longview Horizon, LLC, as Principals, and General Electric Capital Corporation, as Lender.

15.     Agreement of Principals dated May 26, 2005 by and among Dianna R. Koehler-Nachamkin, Eugene M. Nachamkin, Scott H. Bialick, Howard S. Krantt, Patricia Bruder and Longview Horizon, LLC, as Principals, and General Electric Capital Corporation, as Agent.