Mark Frankel (516720)
Backenroth Frankel & Krinsky LLP
489 Fifth Avenue
28th Floor
New York, NY 10017
(212) 593-1100
(212) 644-0544 (fax)
abackenroth@bfklaw.com
mfranklel@bfklaw.com
*Attorneys for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHGATE LTC MANAGEMENT, LLC, | Case No: 07-11068 (REL) |
| Debtor, | |

-----------------------------------------------------------x

| | |
|---|---|
| GE CONSULTING LLC and OASIS HC LLC, | Adversary Case no. |
| Plaintiffs, | |
| v. | **STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 7056-1 AND FRCP RULE 56.1** |
| GENERAL ELECTRIC CAPITAL CORPORATION, | |
| Defendant. | |

-----------------------------------------------------------x

Plaintiffs, EF Consulting, LLC (the "Substitute Receiver") and Oasis HC LLC ("Oasis"), respectfully submits this statement Pursuant to Rule 56.1of the FRCP and Local Bankruptcy Rule 70561-1 in support of plaintiffs motion for summary judgment.

1. EF was appointed as the Substitute Receiver over the assets of the debtors by the New York State Supreme Court in a state foreclosure action, entitled *General Electric Capital*

{043178}

*Corp. v. Highgate Manor Group, LLC et al,* Rennselaer County, Index No. 2193393-06 (the "foreclosure action"). (Sherman Dec., Exhibit 10.)

2. Oasis purchased, pursuant to the order of this Court, the assets of the debtors in this action. (Complaint ¶ 3, Sherman Dec., Exhibit 8 and 9.)

3. In April 2006, Debtors defaulted on their obligations to GECC by failing to make payments when due under the Loan Documents. On or about October 11, 2006, GECC commenced the foreclosure action against Debtors, seeking to foreclose the mortgage and to have an interim receiver appointed to operate and manage Debtors' skilled nursing facilities. (Complaint ¶ 9)

4. In April 16, 2007, Debtors filed these joint petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. By Order dated August 28, 2008, the Court-appointed bankruptcy trustee received the approval of this Court to sell most of Debtors' assets (the "Final Sale Order"). (Sherman Dec., Exhibit 9).

5. The Final Sale Order provides that Oasis will be the purchaser of the assets of Highgate, and that EF replace Long Hill as receiver. (Complaint ¶ 11, Sherman Dec., Exhibit 9.)

6. On or about August 30, 2010, Oasis closed on its purchase of Debtors' assets. (Complaint ¶ 12. Sherman Dec. ¶ 4.)

7. At the closing, the Receivers owed over $10 million to trade creditors and for expenses. (Sherman Dec. ¶ 4.)

8. The State Court Order gave the Substitute Receiver the power to collect all income and account receivables of Debtors and to pay all trade creditors, accounts payable and expenses of the properties and facilities necessary for their continued operation. (Complaint ¶

15, Sherman Dec., Exhibit 10.)

9. The Substitute Receiver was given sole control over all bank accounts containing assets of Debtors. As stated in the Order:

> The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder, including, in Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes…

(Complaint ¶ 16, Sherman Dec., Exhibit 10, P. 15.)

10. All incoming payments were ordered to go directly towards expenses of the properties and facilities:

> The Substitute Receiver shall collect incoming payments from all sources *and apply them to the costs incurred in the performance of its functions and obligations hereunder*.

(Complaint ¶ 17, Sherman Dec. Exhibit 10, P. 16) (emphasis added).

11. Under the Substitute Receiver Order, only after **all** expenses were paid could the remaining funds be applied to accrued interest under the Line of Credit. The Substitute Receiver Order provided:

> That the Substitute Receiver be, and hereby is, authorized and directed: (a) to keep the Mortgaged Premises insured against loss or damage by fire and in repair; (b) to pay the taxes, assessments, water charges, sewer rents, electric bills, and other charges on the Mortgaged Premises, in a manner consistent with the provisions of this Order; (c) to comply with all requirements of any municipal department or authority having jurisdiction over the Mortgaged Premises; (d) to procure, if necessary, such insurance and liability insurance against claims for losses or injuries to persons and property, which may be asserted by persons on, near or about the Mortgaged Premises, as may be necessary; and (e) to pay to

> Plaintiff monthly, ***out of funds remaining in the custody of the Substitute Receiver***, all interest accrued on the Revolving Credit Note, provided that any unpaid interest shall continue to accrue on the Real Estate Loan, Senior Promissory Note and Revolving Credit Documents secured by its Consolidated and Leasehold Mortgages.

(Complaint ¶ 18-19, Sherman Dec., Exhibit 10, P. 25) (emphasis added).

12. This provision of the Order clearly indicates that GECC was only entitled to interest from "funds remaining" after the Substitute Receiver first discharged its duty to pay all of Debtors' operating costs and expenses. (Complaint ¶ 20, Sherman Dec., Exhibit 10, P. 25.)

13. The Receivers never had any "funds remaining" as they never paid all of their operating costs and expenses and had outstanding expenses to trade creditors. (Sherman Dec. ¶¶ 4, 10-11)

14. The Receivers never had any surplus funds. (Sherman Dec. ¶ 11.)

15. The Order does not allow the payment of ***any*** money to GECC aside from accrued interest under the Line of Credit. There is no provision allowing for the payment of any fees, expenses or principal to GECC. (Complaint ¶ 22, Sherman Dec., Exhibit 10, P. 25.)

16. GECC was not permitted to use the lockbox funds and any of Debtors' funds to pay down the line of credit. (Complaint ¶ 23, Sherman Dec., Exhibit 10.)

17. At the time of GECC's transfers, Debtors still had millions of dollars in outstanding operating expenses. (Complaint ¶ 24, Sherman Dec. 4.)

18. Further, under the Order, GECC was not permitted to exert control over any of Debtors' assets. The Substitute Receiver Order provides:

> *The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder*, including, in

> Substitute Receiver's reasonable discretion, by continuing the use of existing personnel at the Facility who performed such responsibilities and functions prior to the receivership, and continuing the use of existing billing and bookkeeping processes…

(Complaint ¶ 25, Sherman Dec. Exhibit 10, P. 15) (emphasis added).

19. The Substitute Receiver Order gives the Substitute Receiver the authority to utilize *all* of the facilities' accounts receivable to meet its obligations.

> That the Substitute Receiver *shall be entitled to utilize all accounts receivable* cash existing at the Facility as of the date of the commencement of its appointment as receiver to meet Substitute Receiver's obligations hereunder except that funds held in escrow by Long Hill for professional fees shall not be deemed to be cash existing at the Facility but shall be turned over by Long Hill to be held in escrow by counsel to the Trustee.

(Complaint ¶ 26, Sherman Dec. 4, Exhibit 10, P. 9) (emphasis added).

20. GECC, by taking funds from the lockbox account, violated the Substitute Receiver Order and 11 U.S.C. 362.

21. Under the terms of the Substitute Receiver Order, the Court ordered that:

> The Substitute Receiver shall forthwith deposit all monies received by it at the time it receives same in a special account in its own name as Substitute Receiver in RBS Citizens Bank, N.A.,…[n]othing herein is intended to amend, modify or abrogate the lock box arrangement for the collection and deposit of accounts receivable by the Substitute Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC.

(Complaint ¶ 28, Sherman Dec., Exhibit 10, P. 21-22.)

22. The "Lock Box Arrangement" referred to by the court is embodied by a Lockbox Account Agreement (the "Lockbox Agreement") between GECC, Debtors and Manufacturers and Traders Trust Company. (Complaint ¶ 29, Sherman Dec., Exhibit 3.)

23. The Lockbox Agreement, like most such agreements, is simply a *mechanism* for GECC to ensure that all accounts receivable are properly collected.

24. The Lockbox Agreement provides that all accounts receivable collected by the lockbox are placed in a "Concentration Account" designated by GCCE. (Complaint ¶ 31, Sherman Dec. 4, Exhibit 3.)

25. Under the Lockbox Agreement, Debtors have the explicit authority to modify this arrangement.

> Company may modify these directions by written notice to Bank and Lender, provided that such a modification shall not become effective until ten (10) business days after receipt by Bank and Lender of such notice by facsimile or overnight delivery service as the addresses or facsimile numbers shown in Section 12 below.

(Complaint ¶ 32, Sherman Dec., Exhibit 3, P.3.)

26. The Lockbox Agreement does not in any way permit GECC to utilize any of Debtors' income to pay principal, interest or fees. (Complaint ¶ 33, Sherman Dec., Exhibit 3)

27. GECC required that the Substitute Receiver formally request funds from GECC as if the Substitute Receiver was somehow a borrower and the line of credit agreement was in full force and effect. (Complaint ¶ 37, Sherman Dec. ¶31.)

28. GECC's taking of funds from the lockbox and then providing other funds to the Substitute Receiver breached the Substitute Receiver Order, New York law and Federal Bankruptcy law.

29. Since the Petition Date, GECC has taken Debtors' income and paid down the Line of Credit in the amount of $785,561. (Complaint ¶ 43, Sherman Dec. ¶ 12.)

30. As of the Bankruptcy Petition date, Debtors owed $3,492,795 to GECC under the

Line of Credit. (Complaint ¶ 43, Sherman Dec. ¶12.)

31. At the time of the closing on August 30, 2010, the pre-petition Line of Credit debt owed to GECC was $2,707,234.

32. GECC never moved the Bankruptcy Court and the Bankruptcy never entered an Order to lift the automatic stay in order to permit the repayment of the pre-petition Line of Credit debt in whole or in part to GECC.

33. Since the commencement of the Bankruptcy, GECC has taken Debtors' income and paid itself purported fees in the amount of $804,358. (Complaint ¶ 47, Sherman Dec. ¶ 2.)

34. The Substitute Receiver did not pay all expenses and owed over $10 million in payables. (Sherman Dec. Exhibit 10.)

35. On or about April 7, 2010, Medicaid made a $610,218 rate-adjustment payment to the facilities (the Medicaid Adjustment"). (Sherman Dec. ¶ 15.)

36. This Medicaid Adjustment was received because of Medicaid's regular practice of retroactively adjusting its per-patient reimbursement rate based on the patient's actual condition and treatment. On or about April 7, 2010, GECC took $610,218 from the Lockbox. (Complaint ¶ 54, Sherman Dec. ¶¶15-17.)

Dated: New York, New York
      February 7, 2011

Backenroth Frankel & Krinsky LLP
*Attorney for Plaintiffs*

By: /s/ Mark Frankel
Mark Frankel (516720)
489 Fifth Avenue, 28th Floor
New York, New York 10017
(212) 593-1100
(212) 644-0544 (fax)
mfrankel@bfklaw.com