Hearing Date: February 11, 2011 at 11:00 a.m.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____x

In re:

HIGHGATE LTC MANAGEMENT, LLC, *et al.*,

                               Debtors.
_____x

Chapter 11
Case No. 07-11068 (REL)
(Jointly Administered)


EF CONSULTING LLC AND
OASIS HC LLC,

                     Plaintiffs,

                     v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

                     Defendant.

_____x

Adversary Pro. No. 10-90175

### DEFENDANT GENERAL ELECTRIC CAPITAL CORPORATION'S MEMORANDUM IN REPLY TO PLAINTIFFS' <u>OPPOSITION TO MOTION TO DISMISS</u>

Defendant General Electric Capital Corporation ("<u>GECC</u>") respectfully submits this Memorandum in Reply to Plaintiffs' Opposition to GECC's Motion to Dismiss Adversary Complaint Pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Motion to Dismiss</u>").[1]  Rather than simply oppose GECC's Motion to Dismiss, Plaintiffs have also filed what purports to be their motion for "partial"

---

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms by the Motion to Dismiss.  For purposes of this Reply, GECC's references to the Motion to Dismiss shall include the Declaration of Richard Arrowsmith dated January 4, 2011 (the "<u>Arrowsmith Dec.</u>") and the twelve documentary exhibits filed in support of the Motion to Dismiss.

summary judgment as to all of their alleged causes of action.[2]  Plaintiffs' Summary

Judgment Motion should be treated solely as Plaintiffs' opposition to GECC's Motion to

Dismiss and Plaintiffs' request for summary relief should be denied at this time for,

among other reasons, Plaintiffs' failure to properly notice the motion for hearing.

Pursuant to Rule 9013-1(e) of the Local Bankruptcy Rules for the

Northern District of New York, a summary judgment motion must be served "at least 15

days before the return date of the hearing."  Plaintiffs' Notice of Partial Summary

Judgment was served on GECC's counsel on Monday, February 7, 2010.  No return date

was set forth in this Notice and, thus, no response can or should be due.  Further,

Plaintiffs' Summary Judgment Motion is for "partial" summary judgment on "each" of

their purported causes of action.  Plaintiffs apparently wish to somehow split each of their

causes of action into parts, some of which Plaintiffs wish to have summarily adjudicated

now, leaving other parts for another day.  Nowhere in their papers do Plaintiffs inform

GECC, let alone this Court, what part of each cause of action they believe is ripe for

adjudication.  Accordingly, unless and until Plaintiffs properly notice their motion and

clearly explain what "partial" summary judgment they seek, GECC will simply treat

Plaintiffs' papers as opposition to GECC's Motion to Dismiss.

## PRELIMINARY STATEMENT

Remarkably absent from Plaintiffs' sixty page brief are any new facts or

documents to support their claims or amplify their Adversary Complaint.  After devoting

111 separate paragraphs in their Complaint to conclusory allegations that GECC

---

[2] It remains unclear how Plaintiff EF has been damaged even assuming the allegations in the Complaint as true.  The Purchase Agreement requires Plaintiff Oasis to pay all post-petition trade claims and expenses as of the Closing Date.  Plaintiff EF had no obligations under the Purchase Agreement to pay postpetition claims and expenses existing as of the Closing Date.

defrauded Plaintiffs and misrepresented the operation of the Lock Box and the LSA, not

once in Plaintiffs' papers do they set forth who at GECC falsely said what to which

Plaintiffs and when.  Instead, Plaintiffs resort to extensive hyperbole and repetitive

conclusory assertions and ignore the operative Court orders in a vain attempt to resuscitate

a moribund Adversary Complaint.  As more fully set forth in GECC's Motion to Dismiss

(and again below), at all relevant times (including the nineteen months preceding Plaintiff

EF's tenure as Substitute Receiver), GECC acted in accordance with the terms of the

LSA, Lockbox Agreement, Final Sale Order and Cash Collateral Order and applicable

Receivership Order.  Simply put, Plaintiffs' Complaint should be dismissed with

sanctions.

**PLAINTIFFS' INTERPRETATION OF THE OPERATIVE
 DOCUMENTS IS FALSE AND INCORRECT**

The heart of Plaintiffs' opposition to GECC's Motion to Dismiss is their erroneous

notion that the SRO mandated that all expenses of the substitute receivership had to be

paid before any payment could be made to GECC under the Revolver.  Moreover,

Plaintiffs claim that even after all receivership expenses had been paid, only interest on

the Revolver could be paid and that the SRO contained no provisions, under any

circumstances, for the payment of fees or principal to GECC.  (See Plaintiffs'

Memorandum of Law in Opposition to Defendant's Motion to Dismiss and In Support of

Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at pp. 2-3, 5-6, 10, 12, 15, 16, 18-

19, 22-24, 29, 42-43, 48, 50 and Plaintiffs' Statement Pursuant to Local Bankruptcy Rule

7056-1 and F.R.C.P. 56 ("Pl. Rule 56 Statement") at ¶¶ 3-7). Plaintiffs are simply and

demonstrably wrong.[3]

The clearest and most concise statement that the Revolving Credit Agreement,

which permitted GECC to sweep all accounts receivable collections to pay accrued

interest and fees, increase availability and re-loan funds for the operation of the Substitute

Receivership, is contained in the Purchase Agreement approving Plaintiff Oasis's

purchase of certain assets of the Debtors. The Purchase Agreement, which provides for

the appointment of Plaintiff or its designee as Substitute Receiver, expressly states that

> "All accounts receivable collected during the Temporary
> Receivership Period shall be held by the Substitute
> Receiver as defined in the Order Appointing Substitute
> Receiver and applied to the payment of all expenses of the
> facilities…Purchaser shall comply with all aspects of the
> existing Revolving Credit Facility with GE including the
> establishment of lock box accounts and execute such other
> documents as GE may reasonably require."

(See Arrowsmith Dec. Exhibit 8, ¶5.1(c) (emphasis added)).

The Purchase Agreement was, of course, approved by this Court's Final Sale

Order (See Arrowsmith Dec. Exhibit 9). This Court's Final Sale Order itself made it clear

that the Substitute Receiver was deemed to have replaced the Debors "as signatory and

responsible person on the Lock Box currently maintained by Citizen's Bank…" (See

Arrowsmith Dec. Exhibit 9, ¶12).

In their Adversary Complaint and opposition to GECC's Motion to Dismiss,

Plaintiffs ignore this language and rely solely on snippets from the SRO as if the SRO

somehow modified or abrogated this Court's orders which are the foundation upon which

---

[3] Plaintiffs' opposition is so palpably incorrect in so many ways that it is difficult to know where to begin to
refute their absurd assertions. For example, throughout their papers, they claim that they purchased "all" of
the Debtors' assets. As the Purchase Agreement clearly shows, they did not. The Purchase Agreement
contains an extensive list of Excluded Assets. See Arrowsmith Dec. Exhibit 8, ¶ 1(B).

the SRO is based.  The SRO, however, read as a whole, makes it clear that this is simply

not so.  The SRO itself refers to and incorporates by referene the prior orders of this

Court.  See Arrowsmith Dec., Exhibit 10, ¶¶5, 6, 13, 18 and 21.  Indeed, the SRO plainly

states that

> "Nothing herein is intended to annul, modify or abrogate
> the lock box arrangement for the collection and deposit of
> accounts receivable by the Substitute Receiver…pursuant
> to the Revolving Credit Agreement between the Facilities
> and GECC."  (Id. p. 21).

In their opposition papers, beyond their oft-repeated mantra that the lockbox

arrangement was nothing more than a bookkeeping service provided by GECC, Plaintiffs

do not address these clear mandates.  Instead, Plaintiffs cite to three paragraphs in the

SRO which, they claim, required GECC to give the Substitute Receiver access to 100%

of all accounts receivable deposited into the lockbox without regard to GECC's right

under the revolving loan agreement, which provides for payment to GECC, to which the

LBA expressly refers.  (See Arrowsmith Dec. Exhibit 3, 2d Whereas and ¶2).

The first paragraph of the SRO on which Plaintiffs rely states that "the Substitute

Receiver shall have full control over and take full responsibility for all acounts and

bookkeeping with the Facility."  Pl. Mem. At 9.  According to Plaintiffs, in derogation of

all othe provisions of this Court's prior orders and other provisions of the SRO, this

clause means that Plaintiffs were to have "sole" control over all Debtor accounts,

including the Lockbox Account and, presumably, GECC's Concentration Account to

which funds remitted to the Lockbox Account were transferred by Citizens Bank

pursuant to the LBA.   The second paragraph to which Plaintiffs cite states that "[t]he

Substitute Receiver shall collect incoming payments from all sources and apply them to

the costs incurred in the performance of its functions and obligations hereunder." Pl.
Mem. P. 9. This, Plaintiffs claim, means that they were entitled to apply 100% of all
monies collected and apply them to all receivership costs without regard to costs or
obligations under the Revolver. It should be obvious that on their face, these two
paragraphs do not mean what Plaintiffs claim.

   The first paragraph cited simply means that the Substitute Receiver, as opposed to
the Facilities' owners – the Debtors or their Trustee – will get the "full" benefit of
receivables collected during the Substitute Receivership Period. There is nothing in this
paragraph that terminates the procedure under the LBA whereby any accounts receivable
collections that were sent by account debtors to the Lock Box would be swept to GECC's
Concentration Account. The Plaintiffs' distorted interpretation of what "full control"
means can not be reconciled with the SRO's express requirement that the LBA remain in
full force and effect. What "full control" means is that when Plaintiff EF submitted to
GECC Borrowing Base Certificates, as it did 301 times during the Substitite Receivership
Period, it - and not the Debtors or the Trustee - was entitled to take full control of the
funds re-lent by GECC.

   Similarly, the second paragraph cited by Plaintiffs does not mean what they say.
That paragraph does not require that the Lockbox Account procedure be terminated or
abandoned in favor of a collection procedure whereby the Substitute Receiver would now
advise all of the Facilities' account debtors to stop sending their payments to the Lock
Box and send them instead to a new address from which the Substitute Receiver, rather
than Citizens Bank, could collect the funds and use 100% of them to pay all receivership
expenses other than those due GECC.

Under Section 4(c) of the Lockbox Agreement, the Debtors irrevocably made,

constituted and appointed Citizen's Bank as their "true and lawful attorney and agent-in-

fact to endorse [the Debtors'] name on all checks payable to [the Debtors] "and deposit

and transfer them to GECC.  Further, as noted above, under ¶12 of the Final Sale Order,

the Court directed that

> "Upon entry of the Order Appointing Substitute Receiver,
> <u>the Substitute Receiver shall be deemed to have replaced
> The Long Hill Alliance Company and/or the Debtors as
> signatory and responsible person on the Lock Box</u> currently
> maintained by Citizen's operating account, without need for
> further Order of this Court."  (<u>See</u> Arrowsmith Dec. Exhibit
> 9, p. 13 (emphasis added))

This Court's Cash Collateral Order[4] further provides that the "Receiver is

authorized to borrow money <u>in accordance with the terms of … the Loan</u>

<u>Documents</u>…which shall be used for payment of interest, fees and expenses in

accordance with the Order <u>and the Loan Documents</u>."  (<u>See</u> Arrowsmith Dec. Exhibit 6, ¶

2) (emphasis added).  Thus, as provided in the second paragraph cited by Plaintiffs, the

Substitute Receiver, through its agent, Citizens Bank, did indeed "collect incoming

payments from all sources."  Further, since the obligations of the Lock Box Agreement

and the Revolving Credit Agreement are obligations of the Substitute Receivership, all

collections were in fact applied to the Substitute Receiver's "functions and obligations

hereunder."  In addition to authorizing borrowings under the LSA, the Cash Collateral

---

[4] Pursuant to that certain Stipulation and Order Modifying and Extending the Terms of the Final Order
Authorizing the Debtors to: (A) Borrow Money and (B) Use Cash Collateral on a Consensual Basis and
Certain Related Deadlines approved by this Court on November 19, 2008, Plaintiff EF, as Substitute
Receiver, replaced Long Hill as Receiver under the terms of the Cash Collateral Order ("The defined term
Receiver as utilized in the Final Order shall as of the date hereof shall apply to the term Substitute Receiver
. . .").  Notably, each and every cash collateral extension stipulation filed and approved after the November
19, 2008 extension stipulation was signed by Plaintiff EF as Substitute Receiver through one or more of its
counsel.

7

Order authorized [Plaintiff EF]'s use of GECC's cash collateral in accordance with the

budget.  In connection with the approved use of cash collateral, Plaintiff EF was

authorized to "make interest payments to GECC . . . pursuant to Section 506 of the

Bankruptcy Code as and when (and in the amounts) due under the Loan Documents."

Cash Collateral Order, ¶ 6(a) (emphasis added).[5]

The third paragraph of the SRO on which Plaintiffs rely states that

> The Substutute Receiver be, and hereby is, authorized and
> directed: (a) to keep the Mortgaged Premises insured
> against loss or damage by fire and in repair; (b) to pay the
> taxes, assessments, water charges, sewer rents, electric
> bills, and other charges on the Mortgaged Premises, in a
> manner consistent with the provisions of this Order; (c) to
> comply with all requirements of any municipal department
> or authority having jurisdiction over the Mortgaged
> Premises; (d) to procure, if necessary, such insurance and
> liability insurance against claims for losses or injuries to
> persons and property, which may be asserted by persons
> on, near or about the Mortgaged Premises, as may be
> necessary; and (e) to pay Plaintiff monthly, out of funds
> remaining in the custody of the Substitute Receiver, all
> interest accrued on the Revolving Credit Note . . . (See
> Arrowsmith Dec. Exhibit 10, p. 25).

Plaintiffs claim that this paragraph of the SRO requires that "all" expenses of the

Substitute Receivership be paid in full before any payment can be made on the Revolver.

In their Memorandum of Law, Plaintiffs repeat this mantra that "all" expenses need be

paid first at least eight times.  See Pl. Mem. at pp. 2-3, 5, 9, 14, 16, 18, and 19.  Again,

Plaintiffs have distorted the SRO.

---

[5] Plaintiffs argue that GECC was not entitled to interest based on the holding of the Supreme Court case of
Timbers.  See United Sav. Ass'n of Texas v. Timbers, 484 U.S. 365 (1988) (holding that unsecured and
undersecured creditors are not entitled to postpetition interest on their claims under Section 506 of the
Bankruptcy Code).  Because the Cash Collateral Order expressly authorized the payment of interest to
GECC pursuant to Section 506, Plaintiffs' argument is of no moment.  Moreover, the Court is reminded that
the interest GECC was authorized to receive was on the $4 million revolver loan while no interest, for the
entire case, was being paid on in excess of $20,000,000 of mortgage debt interest.

First, standing alone, this paragraph does not say what Plaintiffs say it does.  On its face, this paragraph does not require the payment of "all" expenses before payment to GECC.  Rather than being a prohibition against payment to GECC, this paragraph is a directive to the Substitute Receiver to ensure, at a minimum, a certain limited category of expenses – taxes, and municipal ordinances that could create a lien on the Mortgaged Premises and fire and property insurance that could result in the loss of the Mortgaged Premises – were always paid.  Contrary to Plaintiffs' claim, this paragraph does not require full payment of "all" expenses before payment to GECC.

Indeed, the payment of this limited category of expenses where non-payment would directly affect GECC's remaining collateral, was of such importance to GECC that when the Substitute Receiver failed to pay them, GECC reserved funds to ensure that they were paid. (See Arrowsmith Dec. ¶ 30).  There is no showing in Plaintiffs' opposition papers that by applying the accounts receivable as provided under the LBA and LSA and then releasing them to Plaintiff EF there was a shortage of funds to pay these necessary expenses.  As GECC held a superpriority lien on accounts receivable and on the Mortgaged Premises, this paragraph, rather than being a detriment to GECC, was actually for its benefit.  See SRO p. 6 ("the Substitute Receiver, be and hereby is appointed receiver of the Mortgaged Premises, for the benefit of Plaintiff [GECC].") (emphasis added).

Second, this paragraph should not be read as a stand alone paragraph.  The SRO and the Orders of this Court which are the genesis of the SRO are replete with unmistakable provisions that the LBA and LSA were to continue during the Substitute

Receivership Period as they had for the previous 19 months of these bankruptcy cases without objection from any party in interest.[6]

One of the most egregious misrepresentations made by Plaintiffs in their opposing papers involves GECC's application of the $610,218.28 retroactive Medicaid adjustment collected in April, 2010.  In its Motion to Dismiss, GECC points out that under the Purchase Agreement, the purchaser, Plaintiff Oasis, did not purchase any positive pre-closing retroactive Medicaid adjustments.  (See Arrowsmith Dec. ¶¶34-35).  In their opposition, Plaintiffs claim that the Medicaid adjustment excluded from purchase under the Purchase Agreement only refers to a $2.6 Million adjustment that was the subject of a Stipulation which permitted the DOH to offset that adjustment against tax assessments due from the Debtors (Pl. Mem. p. 23).  This is pure fabrication.  As Section 1B(vii) of the Purchase Agreement clearly states, "Excluded Assets" encompasses "All…retroactive adjustments…owing in connection with Sellers' Medicare and Medicaid provider members…including but not limited to a certain account receivable or retroactive adjustment, however denominated, in favor of Seller in the approximate amount of $2.6 Million…"  For Plaintiffs to claim otherwise is more than disingenuous.[7]

## PLAINTIFFS' INTERPRETATION OF THE APPLICABLE LAW IS ALSO DEMONSTRABLY INCORRECT

A.     RPAPL § 1325

---

[6] GECC can represent to the Court that during the 19 month period prior to the Substitute Receivership Period, the original Receiver, Long Hill, submitted 534 Borrowing Base Certificates pursuant to which an aggregate of $79,739,959.93 in advances were made to Long Hill pursuant to the LSA during its tenure as Receiver of the Facilities.

[7] Plaintiffs also claim that as an Excluded Asset, any Medicaid adjustment would be the Trustee's property and would not be paid to GECC in any event (Pl. Mem. p. 23).  This assertion is false because it was a receivable on which GECC held a superpriority lien under the Cash Collateral Order.  Moreover, even if this receivable belonged to the Trustee and not GECC, that fact does not make it an asset of Plaintiff EF or Oasis entitling them to sue for its recovery or for damages for its loss.

Plaintiffs' claim that GECC was prohibited from being paid interest under New York state law is contradicted by the language of the SRO.  Section 1325 of the NY RPAPL provides that "upon the application of the plaintiff [mortgagee] . . . the court may direct the receiver of the rents appointed in such action apply, during the pendency of the action, the rents received by him towards the payment of accrued interest on the mortgage, provided due provision shall have been made for the payment of taxes, administration expenses, fees and charges and such reserve as <u>the court may direct</u>."  NY <u>RPAPL</u> §1325 (emphasis added).  Here, the SRO – the Order appointing Plaintiff EF as receiver pursuant to, among other things, <u>RPAPL</u> § 1325 - expressly provides for the payment of fees and accrued interest to GECC "pursuant to the Revolving Credit Agreement."  Thus, Plaintiffs' arguments with regard to state law are incorrect.[8]

B.    <u>Plaintiffs' Lack Standing to Raise Certain of Their Claims.</u>

Plaintiffs make illogical arguments in an attempt to refute GECC's position that Plaintiffs lack the requisite standing to assert claims for turnover and stay violations. Notably absent from Plaintiffs' papers is a discussion of the plain language of Section 542 which includes the unambiguous words "shall deliver to the trustee."  11 U.S.C. §542(a). The reason is simple: Plaintiffs are not the Trustee and any recoveries on a turnover claim will go directly to Plaintiffs and not the Debtors' creditors (which was the intent of Congress in enacting Section 542).   Rather, Plaintiffs argue that GECC is "an entity . . . in possession, custody, or control, during the case of property that the trustee may use, sell, or lease under section 363 of this title . . ."  11 U.S.C. §542(a).  What Plaintiffs fail

---

[8] If it is now Plaintiffs' contention that the orders of this Court and the SRO violate <u>RPAPL</u> § 1325, Plaintiffs' complaint comes too late.  Suffice it to say that at no time during the 22 months of the Substitute Receivership did any party in interest – the Debtors, the Trustee, any creditors, let alone the Plaintiffs – make any application to revoke or modify any of those orders.

to acknowledge (perhaps because of a lack of understanding) is that GECC's collections from the Lockbox Account were <u>GECC's cash collateral</u> which, at all relevant times, was not "property that the [Substitute Receiver] may use, sell, or lease under section 363 of this title" other than as provided for by the Cash Collateral Order.  11 U.S.C. § 363.  The Cash Collateral Order authorized the Debtors' (and Plaintiff EF's) use of GECC's cash collateral <u>subject to</u> the terms thereof as well as the LSA and LBA.

Plaintiffs' arguments to support standing to assert automatic stay violations are incorrect as a matter of law.  The principal case relied upon by Plaintiffs to support standing (and the body of well-developed case law related thereto) was decided in the context of an <u>extension</u> of the automatic stay provisions to non-debtor third parties (<u>e.g.</u> to enjoin litigation against officers and directors of a debtor).  <u>See</u>, <u>e.g.</u>, <u>Queenie, Ltd. V. Nygard Intern.</u>, 321 F.3d 282 (2d Cir. 2003) (in extending the protections of the automatic stay to the individual debtor's wholly-owned corporation, the court noted that the "automatic stay can apply to non-debtors, but normally does so <u>only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate</u>.  Examples are a claim to establish an obligation of which the debtor is a guarantor . . . a claim against the debtor's insurer . . and actions where there is such an identity between the debtor and third-party defendant that the debtor may be said to be the real party defendant.") (internal citations omitted) (emphasis added).  In the present case, there is no identity of interest between the Debtors' estate and Plaintiffs.  Any act or omission by GECC with respect to the accounts receivable affected Plaintiffs alone and any recovery by Plaintiffs (of which there should be none) will inure to their benefit

12

alone.  The decisional law cited to by Plaintiffs simply does not confer standing on

Plaintiffs to assert stay violations (of which there were none).

C.      <u>Plaintiffs Do Not State A Cause of Action for Fraud.</u>

When confronted with a motion to dismiss for failure to state a claim for fraud

one would expect that the Plaintiffs would respond by bolstering their allegations through

the submission of specific facts to support the claim.  Plaintiffs have failed in that regard.

It remains unclear to GECC (as it should to this Court) exactly what fraud occurred here

and who said what to whom and when.  The Declaration of Nachum Sherman filed in

support of Plaintiffs' opposition to the Motion to Dismiss (the "<u>Sherman Dec.</u>") is nothing

more than a recitation of  Plaintiffs' arguments set forth in their 60 page brief.  Mr.

Sherman, Comptroller of Plaintiff EF, does not state a single fact to support Plaintiffs'

fraud claim.

Nonetheless, Plaintiffs claim that they have not satisfied the pleading

requirements of Federal Rule 9(b). [9]  Surprisingly, Plaintiffs cite to a Second Circuit

decision in <u>Cosmas v. Hassett</u>.  886 F.2d 8 (1989).  The holding in <u>Cosmas</u> was later

adopted by the Second Circuit in the cases relied upon and properly cited to by GECC in

the Motion to Dismiss.  <u>See</u> <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir.

1993); <u>Shields v. Citytrust Bancorp.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994).  Rather than

helping Plaintiffs, each of these cases support the proposition that to properly plead fraud

under Federal Rule 9(b), the pleading must "give particulars as to the respect in which

---

[9] As set forth in the Motion to Dismiss, Rule 9(b) of the Federal Rules requires that when alleging fraud, the pleading "must state with particularity the circumstances constituting fraud . . ." F.R.C.P. 9(b).  "As applied to allegations of fraud, this standard requires the pleader to state the time, place, and content of the misrepresentation, the fact misrepresented, and what was obtained or given up as a consequence of the fraud."  2 MOORE'S FEDERAL PRACTICE, § 9.03[1] (Matthew Bender 3d ed.).

plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Cosmas, 886 F.2d at 11; see also Mills, 12 F.3d at 1175 ("Rule 9(b) . . . requires that fraud be pled with particularity. Specifically, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (citing Cosmas v. Hassett); Shields, 25 F.3d at 1128.[10] Nowhere in the Adversary Complaint do Plaintiffs state any particulars as to GECC's alleged misstatements such as when and where the statements were made and the identitie(s) of those responsible for the statements. Simply alleging that "GECC stated" is woefully insufficient especially to an alleged speaker such as GECC.

Plaintiffs' fraud claim fails not only because there never were any misreprsentations of fact made by GECC, but also because Plaintiffs knew to the penny how the LBA and LSA worked. Here, Plaintiff EF, individually or through its agents, requested 301 advances under the LSA aggregating in excess of $72 million during the Substitute Receivership Period. The Purchase Agreement provides that Plaintiffs "shall comply with all aspects of the existing Revolving Credit Facility with GE including the establishment of lock box accounts and executing such other documents a[s] GE may reasonably require." Purchase Agreement, § 5.1(c). In the face of this clear language, it strains credulity beyond the breaking point that Plaintiffs continue to take the position

---

[10] Plaintiffs are quick to blame others for their own shortfalls. Illustrative of this point is Plaintiffs' brazen accusation that GECC cited to "stale law." Had Plaintiffs reviewed (or understood) the very case they rely upon (Cosmas v. Hassett), they would have discovered that GECC accurately cited to good Second Circuit law interpreting the general pleading requirements of Federal Rule 9(b) (which, as to the element of scienter, were later heightened for securities fraud claims under the Private Securities Litigation Reform Act of 1995).

that they were never bound by the terms of the LSA.  Nonetheless, this language along

with the SRO's requirement that all monies collected by Plaintiff EF shall be deposited

into the Lockbox Account, to which Plaintiff EF is deemed a signatory by virtue of the

Final Sale Order, and be subject to the terms of the LSA, confirm beyond doubt that

Plaintiffs' reliance under any circumstance would have been unjustified.  See Village of

Canon v. Bankers Trust Company, 920 F. Supp. 520, 530 (S.D.N.Y. 1996) (dismissing

plaintiffs claims for fraud where the alleged misrepresentations were "flatly contradicted

by the terms of the Loan Agreement."); Bank Leumi Trust Company of New York v. D-

Evori International, Inc., 558 N.Y.S.2d 909, 915 (1st Dept. 1990) (noting that "reliance is

an essential element of [a fraud] claim . . . and given the unambiguous terms of the loan

agreement, which leaves to the bank's sole discretion the decision whether to advance

funds, any such reliance would not be justified."). [11]

Mr. Sherman states that "GECC transferred all of the Receivers' income received

through the Lockbox into accounts controlled by GECC.  GECC would then hold the

Receivers' funds until the Debtors' employees would demand the funds."  Sherman Dec.,

¶31.[12]  Mr. Sherman, as Comptroller of the Substitute Receiver, purports to claim that he

had nothing to do with the requests for advances under the LSA and Plaintiff EF attempts

to disassociate itself from the 301 Borrowing Base Certificates by arguing that the

---

[11] Plaintiffs deliberately ignore these two cases (each of which was cited in the Motion to Dismiss) in
arguing why their reliance on the alleged representations was reasonable.

[12] Symptomatic of the distortions contained throughout Plaintiff's Complaint, in his Declaration, Mr.
Sherman attempts to transform Plaintiffs' 301 Borrowing Base Certificate submissions into some form of
protest and demand for allegedly wrongfully withheld funds rather than what they really were -- requests
for revolving credit pursuant to the terms of the LSA.  Mr. Sherman is hard pressed to explain why, despite
a sense of outrage and indignation, Plaintiffs took the time to fill out 301 detailed Borrowing Base
Certificates rather than send a lawyer's letter.  Moreover, Mr. Sherman is hard pressed to explain why
when making such "protest" against GECC's "outrageous" conduct, Plaintiffs asked for the "return" of only
85% of Eligible Accounts allegedly wrongfully withheld.

individuals who signed the Certificates were employees of the Debtors when, in point of

fact, the Debtors had nothing to do with the operation of the Facilities.  This is yet

another disingenuous claim by Plaintiffs.  Plaintiff EF, as Substitute Receiver, was tasked

with the operations of the Facilities.  Indeed, the SRO provides that "[a]ll employees of

the Facility shall become and remain employees of the Substitute Receiver for so long as

the receivership is in effect."  SRO p. 16 at ¶5

D.      Plaintiffs Do Not Plead A Special Relationship To Support Claims for Breach of
        Fiduciary Duty, Negligent Misrepresentation and Negligence.

Plaintiffs plead no facts to support that they "repose[d] confidence in [GECC] and

reasonably relie[d] on … [GECC's] superior expertise or knowledge."  WIT Holding

Corp. v. Klein, 724 N.Y.S.2d 66, 68 (2d Dept. 2001) (noting that "an arms-length

business relationship does not give rise to a fiduciary obligation").  Because Plaintiffs

have failed to allege a special relationship, their claims for breach of fiduciary duty and

negligent misrepresentation must fail.[13]  See WIT Holding Corp. v. Klein (2d Dept.

2001) ("A claim alleging negligent misrepresentation must also be based on some special

relationship which implies a close degree of trust between plaintiff and defendant.").

Plaintiffs argue that GECC "voluntarily assumed control upon [sic] the lockbox

after the receiver was brought in" and in so doing somehow elevated an arms-length

business relationship into that of a fiduciary relationship.  See Pl. Mem. at p. 35

(emphasis added).  As stated, GECC merely continued the operation of the Lockbox

Agreement in accordance with the LSA during the Substitute Receivership Period

consistent with GECC's conduct and lending activities prior to Plaintiff EF's appointment.

---

[13] Apart from a failure to plead the special relationship needed to support a claim for negligent
misrepresentation, Plaintiffs do not identify any other duty or any other act or omission by GECC in breach
of such duty necessary to support an ordinary negligence claim.

Plaintiffs further argue that the "[Adversary] Complaint clearly alleges that GECC assumed responsibility and created a relationship beyond a mere contractual one." Notwithstanding Plaintiffs' self-serving, conclusory assertions, after a thorough review of the Complaint, GECC is unable to identify any allegations sufficient to support the existence of a special relationship.

Plaintiffs argue that "[the case of] EBC I clearly states that parties in a contractual relationship will be held to be fiduciaries." Pl. Mem. P. 33. To the contrary, the Court of Appeals in EBC I, Inc. v. Goldman Sachs stated that

> A fiduciary relationship 'exists between two persons where one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. Such a relationship is necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions. Generally, where parties have entered into a contract, courts look to the agreement 'to discover . . . the nexus of [the parties] relationship and the particular contractual expression establishing the parties' interdependency. 'If the parties . . . do not create their own relationship of higher trust, courts should no ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them.'

5 N.Y.3d 11, 19 (2005) (emphasis added). Here, not only do Plaintiffs fail to plead any facts to support the notion that GECC and Plaintiff EF created a relationship grounded in a higher level of trust, GECC and Plaintiff EF had no relationship (of trust or otherwise) other than a commercial arms-length business relationship governed at all relevant times by the LSA, Lockbox Agreement, Cash Collateral Order and SRO.

Because Defendant GECC was nothing more than a lender to Plaintiff EF (and, in fact, had no relationship with Plaintiff Oasis), GECC had no duty whatsoever to ensure

that Plaintiffs' unexpressed and erroneous expectations were discussed, let alone fulfilled.

GECC did not assume any responsibility above and beyond the express terms of the LSA

and Lockbox Agreement.  In fact, GECC merely continued its post-petition lending

activity pursuant to the LSA and Lockbox Agreement consistent with the nineteen month

period preceding the Substitute Receivership Period.  (See footnote 6 supra)

E.      Plaintiffs Do Not State A Cause of Action for Conversion.

        Without any analysis, Plaintiffs once again make unsupportable assertions of fact

and conclude that the Substitute Receiver had a superior right to the monies claimed to be

the subject of Plantiffs' conversion claim.  Plaintiff EF not only did not have "legal title"

to the monies at issue, but it also did not have a "superior right of possession."  See

Lopresti v. Terwilliger, 126 F3d 34, 41 (2d Cir. 1997).  What Plaintiffs do not analyze or

plead in any respect is how a claim for conversion can lie where a plaintiff does not have

title to the property in question and voluntarily relinquishes possession of such property

to defendant.  See, e.g.,  Regions Bank v. Wieder & Mastroianno, P.C., 526 F.Supp.2d

411 (S.D.N.Y. 2007) ("When a defendant's possession of property was initially lawful,

there is no conversion unless the defendant refuses the owner's demand to return the

property or wrongfully transfers or disposes of it before a demand is made.") (emphasis

added).  Here, GECC rightfully took possession of the monies in the Lockbox Account

pursuant to an agreement which Plaintiff EF was deemed to be a signatory.  The use and

distribution of such funds to Plaintiff EF was never wrongful and was, at all relevant

times, in accordance with the SRO, the LSA and the Cash Collateral Order.  No claim of

"conversion" can stand in the face of such authority.

F.      Plaintiffs Are Not Entitled to Punitive Damages.

Plaintiffs continue to argue in conclusory fashion that GECC's conduct supports a claim for punitive damages. Plaintiffs do not plead any additional facts to support such a claim. Plaintiffs fail to show how they could be entitled to punitive damages under Section 362. See 11 U.S.C. § 362(k) ("an <u>individual</u> injured by any willful violation of a stay provided by this section . . ., in appropriate circumstances, may recover punitive damages.") (emphasis added).[14] Plaintiffs also fail to plead any additional facts to support a contention that GECC's "conduct . . . threatens the public at large." <u>See Rocanova v. Equitable Life Assurance Soc'y of the U.S.</u>, 83 NY2d 603, 613 (1994). Accordingly, Plaintiffs are not entitled to punitive damages.

G.    <u>Plaintiffs Fail to State a Claim for Declaratory Relief.</u>

Plaintiffs' claim for declaratory relief likewise fails and should be dismissed where it is undeniable that the Substitute Receivership Period and Plaintiff EF's borrowings are now historical events and that that money damages would suffice if Plaintiffs were somehow successful on the claims asserted in the Adversary Complaint. Plaintiffs are not entitled to declaratory relief as there are adequate remedies available. <u>See</u> <u>Morgenthau v. Erlbaum</u>, 59 N.Y.2d 143, 148-150 (1983) ("Declaratory relief, generally seeks a determination of rights of parties <u>before</u> a wrong occurs" and "[a] court may decline to hear the matter if there are adequate remedies available" ) (emphasis added). Accordingly, GECC submits that Plaintiffs' claim for declaratory relief should be dismissed in its entirety.

---

[14] Plaintiffs cite to a litany of cases for the proposition that the remedies for stay violations set forth in Section 362(k) of the Bankruptcy Code may be extended beyond the statutory language of "individuals" to "corporate debtors." Not only are none of the cases relied upon by Plaintiffs binding on this Court, even if they were, Plaintiffs have not overcome a threshold issue of how they have standing to assert stay violations in the first instance.

## **CONCLUSION**

For the foregoing reasons, Defendant GECC respectfully request that this Court overrule Plaintiffs' opposition to the Motion to Dismiss, deny Plaintiffs' "partial" summary judgment motion and grant GECC's Motion to Dismiss in its entirety.

Dated: Garden City, New York
       February 10, 2011

MORITT HOCK & HAMROFF LLP

By: /s/ Marc L. Hamroff
      Marc L. Hamroff
      William P. Laino
      Theresa A. Driscoll
400 Garden City Plaza
Garden City, New York  11530
(516) 873-2000

*Attorneys for Defendant General Electric
Capital Corporation*

197752v5